**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF INDIANA**

| | | |
|---|---|---|
| TAHINA CORCORAN, | ) | |
|     as Next Friend on behalf of | ) | |
|     Joseph E. Corcoran, | ) | |
| | ) | |
| *Petitioner,* | ) | Case No. 24-970 |
| | ) | |
| v. | ) | CAPITAL HABEAS |
| | ) | |
| RON NEAL, WARDEN | ) | **EXECUTION SCHEDULED** |
| | ) | **DECEMBER 18, 2024** |
| *Respondent.* | ) | **BEFORE THE HOUR OF SUNRISE** |

**PETITION FOR WRIT OF HABEAS CORPUS BY A PERSON IN STATE CUSTODY**
**UNDER 28 U.S.C. § 2254 RAISING RIPE CLAIM OF INCOMPETENCY TO BE**
**EXECUTED UNDER *FORD V. WAINRIGHT*, *PANETTI V. QUARTERMAN*, AND**
***MADISON V. ALABAMA***

Laurence E. Komp, MO Bar No. 40446
Faith J. Tan, IL Bar No. 6342729
Michelle M. Law, MO Bar 45487
Federal Public Defender
Western District of Missouri
1000 Walnut Street, Suite 600
Kansas City, MO 64106
816-675-0923
laurence_komp@fd.org
faith_tan@fd.org
michelle_law@fd.org

*Attorneys for Joseph E. Corcoran*

1

The State of Indiana plans to execute Joseph E. Corcoran on December 18, 2024, before the hour of sunrise. Mr. Corcoran is currently incarcerated, as he has been for over two decades, at Indiana State Prison in the custody of Respondent, Warden Ron Neal. Mr. Corcoran suffers from severe and longstanding paranoid schizophrenia, which manifests as auditory hallucinations and delusions that prison guards are torturing him with an ultrasound machine and that he suffers from a sleep disorder causing him to unknowingly speak and behave in an inappropriate way.

Petitioner raised and attempted to present an incompetency to be executed claim in the Indiana Supreme Court once it became ripe. Without argument or any evidentiary process, the Indiana Supreme Court denied Petitioner's attempt, with three justices concurring over two dissenting justices—a razor-thin margin.

The majority unreasonably failed to comply with past Indiana practices and order a contemporaneous evaluation. To avoid that past practice, the majority, contrary to federal law, unreasonably relied on a 20+ year old competency determination. This ignores what every other court knows – competency is a fluid state, and certainly over a span of 20 years.

The other leg of the two-legged stool was premised upon a recent affidavit of Mr. Corcoran. This affidavit was filed after Counsel filed their reply in the Indiana Supreme Court. The majority cited or referenced this affidavit approximately 20 times. The majority found the affidavit credible on its face without affording a meaningful process and opportunity to be heard. While seemingly admitting that Mr. Corcoran is seriously mentally ill, the majority unreasonably relied upon the statements of an individual suffering from paranoid schizophrenia as the only evidentiary basis to find him competent. It is unreasonable to allow the insane to determine their own competency.

If the court had provided a meaningful opportunity to respond, Petitioner could have presented the testimony of Board-Certified forensic psychiatrist Dr. Angeline Stanislaus. Dr.

Stanislaus could have reiterated Mr. Corcoran's long history of masking and rejoined the reliance

solely on his affidavits:

> In the affidavit he filed in 2006 to the court, he denies all mental health symptoms and eloquently describes them as "stories" he made up. His writings are organized and well written. His ability to write and speak eloquently has served him well to cover up his mental health symptoms and psychosis. Dr. Parker noted in his testimony that in brief interviews he could easily cover up the symptoms and present as logical. However, when we look at the full picture longitudinally, we see the signs and symptoms of schizophrenia, which has influenced his illogical decision making.

> With regards to his November 2024 affidavit, he makes it sound like his decision to forgo any further litigation is logical. He states that in execution his heart will stop, and all brain activity will cease. This again ties into his delusion of the ultrasonic machine inserting and broadcasting his thoughts from his brain.

Attachment N pp. 11 (259a).

Mr. Corcoran recently confirmed the delusions in his book entitled: *Electronic*

*Harassment: A Whistle-blower Report*. Attachment H. Wherein, he confirmed the continued

torture:

- "The device can easily be used to make someone seriously paranoid…A person susceptible to ultrasonic surveillance would be the easiest to make paranoid. Since an individual can tell what the individual is thinking it would be easy to cause them to believe false things." *Id.* p. 15 (Apx. 183a);

- "Therefore, using electricity to activate bodily processes is not limited to muscle movements and sleep cycles. Let's say, therefore, that there is an unfortunate man who some bad actor wants to wake up, make stand on his feet, run to a wall, and then pound on it angrily with a closed fist. After this the bad actor wants the poor man to feel dizzy, confused and then vomit." *Id.* p. 16 (184a);

- "[I]t is apparent to me that correctional staff and other individuals and/or agencies use ultrasonic surveillance devices on susceptible people for sport. However, the fact that institutions keep their possession of such equipment confidential would make it extremely difficult for those abused to expose the abuse." *Id.* p. 18 (186a);

- "In essence, they would treat the poor soul like a video game avatar rather than a real person whose life is going to be adversely affected by the nonsense they are afflicting the victim with." *Id.* p. 19 (187a);

He also noted that mental health professionals participate in victimizing him by labeling what he considers electronic torture as mental illness:

> And when you research and find inaccurate information that confirms the victimizers' deception, and you then put stock in it, it frankly makes you look like a mental case. Their goal is accomplished. They have a completely plausible cover for their wrongdoing. … The ignorance on the part of mental health professionals about this technology is taken advantage of by victimizers. If a credentialled medical person says a man is mentally ill, but he says that he is the victim of electronic harassment, who would people be more likely to believe? So because of this the victimizer's cover is now seemingly backed up by medical science….Because of this they will likely be oblivious to the fact that mental illness can be mimicked electronically.

*Id.* at 19-20 (187a-188a).

As confirmed by at least three previous mental health experts, Mr. Corcoran lacks the ability to think rationally—his worldview and his entire existence are completely controlled by his mental illness and the psychosis the illness inflicts. Because of his paranoid schizophrenia, Mr. Corcoran cannot discern between true reality and the "reality" his symptoms have created. Having no concept of reality or the ability to understand reality, Mr. Corcoran does not possess a rational understanding of the reason for his execution. Rather, Mr. Corcoran equates his execution as the avenue to relieve his pain and suffering (which, although he believes it is real, is caused by his delusions) and not as punishment at all. His fixed belief in the ultrasound machine and the torment it causes so pervades his perception that he cannot rationally understand the true reason for his execution. Indeed, he has volunteered to be executed, and is eager to be executed, because he believes his execution will give him relief from the perceived pain his delusions and hallucinations inflict upon him. Dr. Stanislaus, like the dissenting judges in the Indiana Supreme Court, opines a current evaluation is needed. Attachment N p. 12 (260a).

Mr. Corcoran is not competent to be executed and carrying out his execution would violate the Eighth and Fourteenth Amendments to the United States Constitution. U.S. Const. amends.

4

XIII, XIV; *Madison v. Alabama*, 586 U.S. 265 (2019); *Panetti v. Quarterman*, 551 U.S. 930, 959-60 (2007); *Ford v. Wainwright*, 477 U.S. 399, 417 (1985). Mrs. Tahina Corcoran, Joseph Corcoran's wife, files this petition for writ of habeas corpus as next friend petitioner, contending that he is incompetent to be executed and challenging the Indiana Supreme Court's sharply divided 3-2 denial of his request to file a petition for successive post-conviction relief pursuant to Indiana Post-Conviction Rule 1. Because of said incompetence, Mr. Corcoran is incapable of litigating this action on his own behalf.

The evidence presented below meets the required substantial threshold showing that Mr. Corcoran does not have a rational understanding of the reasons for his execution, and the Constitution entitles him to "a 'fair hearing' in accord with fundamental fairness." *Panetti*, 551 U.S. at 949 (citing *Ford*, 477 U.S. at 424, 426).

Mr. Corcoran presented this claim to the Indiana Supreme Court. On December 5, 2024, the Indiana Supreme Court, by a 3-2 vote, denied his request. *Corcoran v. State*, Case No. 24S-SD-222 (Ind. Dec. 5, 2024). Attachment G (166a). On December 10, 2024, the Indiana Supreme Court explained the denial and issued its opinions. *Corcoran v. State*, Case No. 24S-SD-222 (Ind. Dec. 10, 2024). Attachment L. As will be more fully explained below, this Court's review is *de novo*.

## PROCEDURAL HISTORY

On May 22, 1999, a jury found Mr. Corcoran guilty of four counts of murder, and on May 25, 1999, recommended a sentence of death on each count. Prior to trial, Mr. Corcoran rejected a plea offer for life without parole—a plea offer the prosecutor left open for acceptance until the very day the trial began. Mr. Corcoran's reason for rejecting the plea reveals the extent to which his mental illness controls him; Mr. Corcoran agreed to accept the plea offer to save his life only

if he could have his vocal cords severed, and which he insisted had to be done before he came to court to accept the plea. T. 2773. On direct appeal, the Indiana Supreme Court reversed his death sentences and remanded to the Allen Superior Court for resentencing. *Corcoran v. State*, 739 N.E.2d 649 (Ind. 2000). The trial court reimposed the death sentences, and the Indiana Supreme Court affirmed. *Corcoran v. State*, 774 N.E.2d 495 (Ind. 2002).

In post-conviction proceedings, Mr. Corcoran initially refused to sign the post-conviction petition counsel prepared and waived post-conviction review because he wanted to be executed to gain relief from the pain caused by his delusions. After three experts testified at a 2003 competency hearing that Mr. Corcoran was not thinking rationally or logically (and was incapable of doing so because of his paranoid schizophrenia) and was out of touch with reality, the post-conviction court nevertheless found him competent to waive his appeals. This was the same trial court that had improperly castigated Mr. Corcoran at sentencing by leveling an unfounded accusation that: "It's shameful that you would come into this court, Mr. Corcoran, and try to characterize your illness as a mental illness to the disrespect of all people in this country that are in fact mentally ill." T. 2909.

The Attorney General presented no expert opinion challenging those opinions and conceded the severe mental illness. The Indiana Supreme Court noted:

> The State also concedes that Corcoran suffers from a mental illness. At the competency hearing, the State Public Defender presented the testimony of three mental health experts, each of whom concluded that Corcoran suffers from paranoid schizophrenia. One of the symptoms of Corcoran's condition, according to the three experts, are recurrent delusions that Department of Correction prison guards are torturing him through the use of an ultrasound machine, causing him substantial pain and uncontrollable twitching.

*Corcoran v. State*, 820 N.E.2d 655, 660 (Ind. 2005); *id.* at 665 (Rucker, J., dissenting) ("Corcoran is under the paranoid delusion that prison guards are torturing him with sound waves. As a result,

**Corcoran wants the State to execute him in order to end the pain**. I am not willing to accommodate him.") (emphasis added).

Mr. Corcoran later changed his mind[1] and requested to file a petition for post-conviction relief, but the court dismissed the petition as untimely. Over a dissent, the Indiana Supreme Court affirmed. *Corcoran v. State*, 845 N.E.2d 1019 (Ind. 2006).

Mr. Corcoran filed a federal habeas corpus petition in the U.S. District Court for the Northern District of Indiana. That court granted relief on Mr. Corcoran's Sixth Amendment claim. *Corcoran v. Buss*, 483 F. Supp. 2d 709 (N.D. Ind.). The Seventh Circuit Court of Appeals reversed the district court's judgment on the Sixth Amendment claim but failed to address the other habeas claims. *Corcoran v. Buss*, 551 F.3d 703 (7th Cir. 2008). Of note on the competency question, Judge Williams of the Seventh Circuit noted the extent of the mental illness and the State's concession: "No one contests that Corcoran suffers from a mental illness." *Corcoran v. Buss*, 551 F.3d 703, 714 (7th Cir. 2008) (Williams, J., dissenting).

The Supreme Court then granted certiorari and vacated the Seventh Circuit's judgment, finding that the Seventh Circuit erred when it did not address any other claim except for the Sixth Amendment claim. The Court remanded to the Seventh Circuit. *Corcoran v. Levenhagen*, 558 U.S. 1 (2009) (per curiam).

---

[1] *See St. Pierre v. Cowan*, 217 F.3d 939, 948-49 (7th Cir. 2000) ("Given the circumstances of this case and the history of St. Pierre's behavior, the acceptance of St. Pierre's May 2 letter as the 'final' word does not meet the standards for waiver that the Supreme Court established in *Gilmore* and in *Baal*. ... We are not unsympathetic to the predicament in which both the Circuit Court of Cook County and the Illinois Supreme Court found themselves, in the face of St. Pierre's ceaseless changes of heart. This does not, however, relieve any court of the duty to ensure that a definitive waiver has occurred before it deprives the petitioner of remedies that are available under state law.").

On remand, the Seventh Circuit considered the other claims in Mr. Corcoran's habeas petition. The court found that the trial court had considered non-statutory aggravating circumstances in sentencing Mr. Corcoran to death, granted relief, and remanded to the trial court for resentencing. *Corcoran v. Levenhagen*, 593 F.3d 547 (7th Cir. 2010). The State petitioned the Supreme Court for certiorari, which the Court granted. The Court vacated the Seventh Circuit's grant of relief and remanded for further proceedings. *Wilson v. Corcoran*, 562 U.S. 1 (2010) (per curiam).

On remand, the Seventh Circuit reinstated its opinion issued in *Corcoran v. Buss*, 551 F.3d 703 (7th Cir. 2008), and remanded to the district court to consider Mr. Corcoran's remaining habeas claims. *Corcoran v. Wilson*, 651 F.3d 611 (7th Cir. 2011). The district court subsequently denied Mr. Corcoran's habeas petition in full. *Corcoran v. Buss*, No. 3:05-cv-389-JD (N.D. Ind. Mar. 27, 2013). The Seventh Circuit affirmed. *Corcoran v. Neal*, 783 F.3d 676 (7th Cir. 2015).

Almost a decade later, on June 26, 2024, the State filed a motion to set Mr. Corcoran's execution date. The Indiana Supreme Court set December 18, 2024, as that date, stating "the Court finds there is no stay of execution now in effect and the only issue properly before us is our administrative task to set an execution date under Indiana Code section 35-5-2-9(h) and Indiana Criminal Rule 6.1(G)(1)." *Corcoran v. State*, No. 24S-SD-222 (Order dated 9/11/24). The Court noted that while they believed setting an execution date was an "administrative task" based on the State's "Motion to Set Execution Date" and they could not consider claims not based on "previously undiscovered evidence," Mr. Corcoran could "raise constitutional claims through a successive petition for post-conviction relief under Post-Conviction Rule 1(12), or raise challenges to an execution protocol through a civil lawsuit." *Id*.

On November 15, 2024, Mr. Corcoran presented his competency to be executed claim with supporting exhibits to the Indiana Supreme Court. Attachment A.[2] On that same day, he also moved for a stay of execution. Attachment B. On November 19, 2024, the Indiana Supreme Court set a briefing schedule. Attachment C.

On November 26, 2024, the State filed its response with supporting exhibits. Attachment D. On December 3, 2024, Mr. Corcoran filed his reply in support. Attachment E. That same day, Mr. Corcoran filed a pro se affidavit. Attachment F.

On December 5, 2024, the Indiana Supreme Court, by a close vote of 3-2, denied the request. *Corcoran v. State*, Case No. 24S-SD-222 (Ind. Dec. 5, 2024). Attachment G. On December 10, 2024, the Indiana Supreme Court explained the denial and issued its opinions. *Corcoran v. State*, Case No. 24S-SD-222 (Ind. Dec. 10, 2024). Attachment L. The majority premised its denial on two things: Mr. Corcoran's recently filed handwritten affidavit and previous statements proclaiming that he does not want to appeal his death sentence and that he wants to escape prison, and that the previous competency determination refuted Petitioner's *Ford* claim.

Even though pointing to the fact that Mr. Corcoran continues to suffer from auditory hallucinations, psychosis, and delusions, as he has for twenty years, the majority determined that there has been no change in his condition and he is thus still competent, again, based on the previous determinations. Relying on the stale, 20+ year old competency determination – made under a different competency standard—the majority determined it should abide and defer to the seriously mentally ill Mr. Corcoran's affidavit and refuse any further adjudicative review.

---

[2] Mr. Corcoran also presented a state and federal challenge regarding the execution of the seriously mentally ill. That claim is not a subject of this habeas petition.

The majority then determined that the evidence presented did not meet the "substantial threshold showing that Corcoran's mental illness prevents him from rationally understanding why the State seeks to impose the death penalty." *Id.* Again referencing his recently filed affidavit, the majority cited several of Mr. Corcoran's statements in which he claimed he understands the execution, in addition to his previous testimony in which he declared he should be executed because he is guilty of murder. *Id.* If given the opportunity, Petitioner could have presented the testimony on a mental health professional to properly contextual those statements and how they are actually consistent with Mr. Corcoran's irrational beliefs. Attachment N pp. 11-12 (259a-260a).

Although the majority acknowledged Petitioner's argument that Mr. Corcoran possesses a factual understanding of the proceedings and can state that the execution is punishment for his crime, the majority nevertheless concluded, "that isn't the case here" because Mr. Corcoran does not have "a delusional belief that the State has some reason for punishing him other than the reasons the State claims." Attachment L (Molter, J., concurring p. 25) (234a). The dissent vigorously disputed this point. Also acknowledging "no doubt" that "some of Corcoran's other beliefs are irrational," the majority nevertheless credited Mr. Corcoran's own affidavit and decades-old competency determinations over the rest of the evidence in holding that Mr. Corcoran's condition has not changed and his competency remains static. *Id.* at 26 (235a).Thus, the mentally ill can be deferred to.

Analogizing to *Timberlake*, in which Dr. George F. Parker's testimony supported that Mr. Timberlake had a rational understanding of his case (although there, Mr. Timberlake was prohibited from cross-examining Dr. Parker), the majority found that "[D]espite his mental illness, Corcoran has demonstrated he understands why he is being executed, and the State Public Defender has not provided any evidence suggesting that Corcoran's understanding is irrational."

*Id.* In short, the majority relied on a competency determination form another case to deny Mr. Corcoran process here. As noted by the dissent, the majority departed from Indiana past practices that ordered the evaluation. Attachment L (Goff, J., dissenting p. 6) (244a).

While the majority recognized that the standard for waiving post-conviction appeals is separate from the *Panetti* incompetency to be executed standard, and that an incompetency to be executed claim becomes ripe only when an execution is challenged, the majority continued without citation support to state the standards "overlap where it is relevant. Our determination that Corcoran could waive his post-conviction remedies included an analysis of whether his mental illness interfered with his ability to understand why the State was executing him." Attachment L (Molter, J., concurring p. 27) (236a). So, they are different – but they illogically still control.

However, the dissent, authored by Justice Goff and joined by Chief Justice Rush, noted:

> The evidence submitted by Corcoran's attorneys reveals a documented history of severe mental illness, an inability to cooperate with counsel, and a desire to be executed to escape prison—all of which raise substantial questions about his current mental capacity. As a result, we should stay Corcoran's execution to allow his attorneys to seek successive post-conviction relief to litigate his current competency. But at a minimum, we should stay Corcoran's execution and order a psychiatric examination.

Attachment L (Goff, J., dissenting p. 1) (239a). The dissenting justices expressed concern that, "[E]ven if it seems that Corcoran may understand why the State is seeking execution, the point is that we simply do not know," *id.* at 5 (243a), observing that "In his mind, Corcoran views execution not as punishment but as the only path to escaping torment from which he suffers," *id.* at 4 (242a). After reviewing the evidence of Mr. Corcoran's mental illness, they opined that "[t]o ignore these findings now and proceed without a current competency evaluation amounts to enabling his delusions—a state-sanctioned escape from suffering rather than a measured act of justice." *Id.* at 3 (241a) (citing *Panetti*, 551 U.S. at 960). They stated, "A competency evaluation is needed not

because Corcoran fails to acknowledge the facts of his case, but because evidence shows that his mental illness distorts his ability to have the requisite rational understanding." *Id.* at 6 (244a). Finally, the dissenters cautioned, "The death penalty . . . is not a mechanism for granting reprieve from suffering or a means to expedite escape from incarceration. It is the gravest act the State can undertake, reserved for those who bear the full weight of their moral culpability." *Id.* To proceed with Mr. Corcoran's execution, per his wish, would "undermine[] society's interest 'in not allowing the death penalty . . . to be used as a means of state-assisted suicide.'" *Id.* (quoting *Smith v. State*, 686 N.E.2d 1264, 1275 (Ind. 1997)).

## **FACTUAL BACKGROUND**

Mental Illness Prior to Trial

Mr. Corcoran has consistently been diagnosed with severe mental illness, and the symptoms and manifestations long predate his 1999 trial. As early as 1992, Mr. Corcoran had already been diagnosed with major depression and schizoid personality disorder. *See, e.g.*, R. 2607;[3] SR 38[4] (Def's Pre-Sent. Memo, Ex. A p. 4).

Moreover, even before he was formally diagnosed with paranoid schizophrenia, he was wracked with delusions and hallucinations so powerful that people around him took notice. Mr. Russell Branning, Mr. Corcoran's neighbor, remembered that in the early 1990s:

> Joe would be sitting either at our house or elsewhere and I would see him concentrating on something and begin nodding his head or talking like he was answering a question although no one was speaking to him. This occurred many times. I cannot recall a specific number. I believed that when that happened, Joe was having conversations with people who were not present. I also believed that Joe was mentally ill because of his actions in my presence.

PC Comp. Tr. at 79, Defense Ex. V ¶ 4 (Affidavit of Russell Branning) (emphasis added).

---

[3] "R" references the direct appeal record.
[4] SR references the supplemental record on direct appeal.

Ms. Jaynee Buss, another neighbor and Mr. Corcoran's classmate, also witnessed Mr. Corcoran's hallucinations, including that people were talking about him even when no one was. Ms. Buss recalled:

> Joe's perception of events seemed impaired. When we would be riding on the bus or elsewhere, Joe would insist that people were talking about him. However, because I was present and seeing and hearing what was going on, I knew that this was not true.

PC Comp. Tr. at 78-79, Defense Ex. U ¶ 7 (Affidavit of Jaynee Buss).

Despite clear warnings that Mr. Corcoran was suffering from mental illness, Mr. Corcoran did not receive mental health services or treatment until he was already in prison for the current offense. T. 2683-84 (Mr. Corcoran's prior trial lawyers from his 1992 trial never told his family about the extent of his mental illness, but if they had, the family would have pursued treatment).

<u>Evidence of mental illness during Mr. Corcoran's trial</u>

During trial, Mr. Corcoran determinedly attempted to minimize and conceal his delusions and hallucinations. Dr. Philip Coons, M.D., testified that this was expected: "the person with paranoid schizophrenia generally minimizes their symptoms and doesn't bring attention to them . . . unless you know what doors to open, what question to ask, you may well miss it because they keep it to themselves. And that was true of Mr. Corcoran. Had I not known about some kind of sleep problem, I don't think I would have uncovered this delusional system." T. 2706. Another expert, Dr. Eric Engum, a neuropsychologist, also testified during the penalty phase that Mr. Corcoran was "trying to mask it. He's trying to hide it. He's very secretive, again consistent with paranoia and suspiciousness." *Id*. at 2318.

Dr. Coons testified that at the time of the 1997 murders, Mr. Corcoran was suffering from paranoid schizophrenia. *Id*. at 2729. Dr. Coons and another mental health experts believed Mr. Corcoran's was not competent to stand trial because his mental illness rendered him incapable of

assisting counsel in his own defense. Dr. Coons explained that Corcoran's "refusal to accept either a plea bargain or a bench trial without the death penalty was a product of his mental illness." SR 78 (Def.'s Pre-Sent. Memo, Ex. C p. 11. Dr. Larry Davis agreed. SR 99-100 (Def.'s Pre-Sent. Memo, Ex. D p. 6-7) ("I believe his underlying psychosis and associated illogic rendered him incompetent, specifically to work effectively with his own defense attorney in his defense."). Trial counsel have recently signed affidavits asserting that had they fully understood the extent of Corcoran's mental illness, and had they realized how his mental illness prevented them from "consulting with Corcoran in a rational or logical manner," they would have requested a competency hearing. Attachment I (Affidavit of Mark Thoma); Attachment J (Affidavit of John Nimmo). But they did not have this understanding, and the trial proceeded, even though Mr. Corcoran was so mentally ill that he could not assist in his own defense to save his life.

At sentencing, Mr. Corcoran revealed his delusion involving a nonexistent sleep disorder, which he continues to believe he suffers from to this day. The trial court asked Mr. Corcoran about his trial counsel. Mr. Corcoran was unhappy with their performance and felt they had not assisted him properly:

> THE COURT: Is there anything you feel your attorneys have failed to do in representing you?
> THE DEFENDANT: Um, I feel that they've failed to get me treatment for my sleeping disorder. Other than that, no.
> THE COURT: You feel they have failed to treat you for what, sir?
> THE DEFENDANT: My sleeping disorder.
> THE COURT: All right. And what is it that you expected your attorneys to do for your sleeping disorder, Mr. Corcoran?
> THE DEFENDANT: Simply give me a court order so that I could go to a sleeping disorder clinic.

*Id*. at 2587-88.

Mr. Corcoran has no grasp on reality and has been living in a fully delusional world for decades. At the time of the crime and prior to the trial, Mr. Corcoran's every decision, and indeed

his every thought, was through the lens of his delusional world and influenced by his hallucinations. He should never have been allowed to stand trial—he was incompetent because he could not rationally and realistically assist counsel in defense of his life. His attorneys, however, realized this too late to save him. Mr. Corcoran was convicted and sentenced to death despite his incompetence and mental illness, which continued over the next two decades.

<u>2003 competency hearing</u>

At the 2003 post-conviction competency hearing, three mental health experts examined Mr. Corcoran and unanimously opined he was incompetent to waive his appeals: Dr. George Parker (a board-certified forensic psychiatrist), Dr. Robert Kaplan (a clinical psychologist), and Dr. Edmund Haskins (a neuropsychologist). PC Comp. T. 13, 59, 66. All three experts diagnosed Mr. Corcoran with paranoid schizophrenia, *id*. at 11, 48, 66, and all three testified that Mr. Corcoran was not engaging in rational decision-making, but rather, had decided to not pursue state post-conviction review on the basis of his delusion that the prison was torturing him with an ultrasound machine. *Id*. at 14, 53, 66-67.

Dr. Parker testified that Mr. Corcoran experienced delusions and auditory hallucinations and had negative symptoms of schizophrenia, leading him to a paranoid schizophrenia diagnosis. *Id*. at 47-48. He explained that Mr. Corcoran believes that the prison's ultrasound machine tortures him with sounds and causes physical symptoms. *Id*. at 50. Mr. Corcoran believes that the machine both projects sounds that he hears and records his thoughts and projects those throughout the prison. *Id*. at 51. He believes he can hear people talking about him through the walls of his prison cell. *Id*. Dr. Parker also explained that Mr. Corcoran holds the delusional belief that he "speaks in his sleep and says embarrassing or provocative things that make people act in strange ways or

perhaps hostile ways toward him. When that delusion is more intensive, he begins to believe that he . . . while awake . . . is essentially asleep and speaking involuntarily." *Id*. at 29.

Dr. Parker determined that these delusions and hallucinations prevented Mr. Corcoran from making rational decisions about whether to proceed with his appeals. *Id*. at 53. Dr. Parker noted that while Mr. Corcoran did recognize that he faced difficulties, Mr. Corcoran believed they were due "to some physical disorder" and that he "truly believe[d]" that there was an ultrasound machine in the prison. *Id*. at 58. Dr. Parker testified, "[y]ou don't break though that illogic. That is the nature of the delusion. You can't convince the person otherwise." *Id*. at 58.

Dr. Kaplan characterized Mr. Corcoran's paranoid schizophrenia as a "severe mental illness" after reviewing Mr. Corcoran's records and conducting a clinical interview and psychological testing. *Id*. at 9, 11, 16-17 ("[Dr. Kaplan] He is suffering from a very severe mental disease and defect. [Defense Counsel] What mental disease is that? [Dr. Kaplan] Paranoid schizophrenia."). Dr. Kaplan explained:

> [H]e has, -- he has a psychosis which is paranoid schizophrenia that is leading him to believe that, you know, one of the reasons that he wants to die is because he doesn't want to continue to suffer with this speech disorder that he really doesn't have. And another reason he wants to die is because he doesn't want to continue to be a victim of the guards' ultrasound machine. And that is a highly bizarre belief that it is not likely to be in existence either.

*Id*. at 14. Accordingly, Mr. Corcoran did not have the capacity to make a rational decision.

Dr. Kaplan affirmed that Mr. Corcoran's "paranoid schizophrenia is creating a reality in his mind that doesn't exist, and on the basis of the reality that doesn't exist, he is making decisions about whether he wishes to proceed with his defense against the death penalty or not." *Id*. at 17. When Dr. Kaplan administered the MacArthur Competency Assessment to Mr. Corcoran, it indicated that Mr. Corcoran had a "barely adequate understanding of . . . and ability to determine what facts were relevant versus what facts were irrelevant to present to his own Counsel." *Id*. at

20. This was evidenced by Mr. Corcoran's total inability to think of a single piece of information that would be needed to make a decision on whether to hypothetically plead guilty; yet, he would advise such a person to plead guilty. *Id*. at 20. Notably, this is "exactly the opposite of what he did in the previous instance." *Id*. at 20. In making a critical decision literally about his life, Mr. Corcoran could not conceive of even one relevant thing he needed to know or consider when making that decision. *Id*. at 20-21. Dr. Kaplan repeated on cross that, "for a psychotic reason he told me he didn't want to go on with these proceedings. . . ." *Id*. at 31. As Dr. Kaplan stated succinctly, Mr. Corcoran "can't even conceive of reality as a normal person would," and "can't think straight [and] can't reason logically." *Id*. at 32.

Dr. Kaplan testified that while medications might help Mr. Corcoran, they only have a "variable effect," and even while medicated, Mr. Corcoran was still paranoid and experiencing delusions. *Id*. at 34 ("But, it didn't appear that any time he was not paranoid or not delusional."). In other words, while medications *might* temporarily diminish the manifestations of Mr. Corcoran's mental illness, they do not control or eliminate them, and he is always suffering some level of delusions and hallucinations.

Finally, Dr. Edmund Haskins confirmed that Mr. Corcoran suffers from paranoid schizophrenia with delusions. *Id*. at 66. Dr. Haskins described how Mr. Corcoran suffers from two recurrent delusions: "one, involving the notion that he has, um, involuntary speech, and the other one involving the notion that the guards in the prison have an ultrasound machine that they are using to torment him. On both counts, I believe that this indicates paranoid schizophrenia." *Id*.

Dr. Haskins opined that Mr. Corcoran's "psychoses do not permit him to reason and make a reasoned decision." *Id*. at 67. Dr. Haskins affirmed that Corcoran was desperate to escape the pain his delusions inflicted upon him. *Id*. at 68 (". . . he wants to escape in whatever way he can.

And the only way open to him, is to bring about his own death."); *id*. at 69-70 ("wanting to choose the only option that is going to bring him what he perceives, as being relief, which is his own death."). Additionally, Dr. Haskins noticed "the very strong feeling [Mr. Corcoran] was attempting to minimize the severity of his underlying psychosis." *Id*. at 71.

All three experts agreed that Mr. Corcoran's serious paranoid schizophrenia prevents him from making rational decisions. Dr. Kaplan testified that Mr. Corcoran's decision to waive his appeals was not rational because it was made on "the basis of a reality that doesn't exist." *Id*. at 17. Dr. Parker testified similarly, stating that Mr. Corcoran is unable to make a rational decision because his schizophrenia has "a direct bearing on his thought process" and his delusions are the reason he wants to be executed. *Id*. at 55. Dr. Haskins explained that Mr. Corcoran's "psychoses do not permit him to reason and make a reasoned decision in that way." *Id*. at 67.

All three experts also testified that Mr. Corcoran could not rationally consult with his counsel. Dr. Parker testified that because of the way Mr. Corcoran experiences life, "with its delusions and hallucinations and negative symptoms of schizophrenia, he is unable to process what, for most people would be reasonable advice regarding his legal proceedings." *Id*. at 59. Dr. Haskins noted this uncooperativeness is not a choice, but a result of his mental illness and "the psychotic perception that he is being tormented and has this illness." *Id*. at 70.

All three experts also testified that Mr. Corcoran wants to be executed because he wants to be relieved of the pain he experiences from his delusions and hallucinations, including the "pain and suffering of his involuntary speech disorder which really doesn't exist." *Id*. at 19, 55, 68. Furthermore, all three experts agreed that after specifically testing for it, Mr. Corcoran was not malingering or feigning his symptoms. *Id*. at 28, 56, 68, 71. Medical records from the Indiana

Department of Correction noted that Mr. Corcoran's "current accepted diagnosis" was schizophrenia. *Id*. at 44.

The State agreed Mr. Corcoran is mentally ill and presented no experts or evidence to contest Drs. Kaplan, Parker, or Haskins' diagnosis or conclusions as to Mr. Corcoran's detachment from reality. The state trial court noted the same:

- "The State concedes that Petitioner is mentally ill." PC R. 242;

- "The State of Indiana has conceded that the Defendant suffers from mental illness, and I think that is probably a wise concession, gentlemen, as the evidence that was presented at the competency hearing as well as the evidence presented at Mr. Corcoran's trial was that he suffers from a mental disease or defect of mental illness." PC Comp. Dec. Tr. at 4.

Mr. Corcoran's present condition

Considering the progressive nature of schizophrenia and the State's previous concession that Mr. Corcoran suffered from severe mental illness, it does not surprise that Mr. Corcoran remains compromised. Mr. Corcoran's paranoid schizophrenia, his delusions, and the pain he suffers as a result have persisted in the two decades since his post-conviction competency hearing.

Now in 2024, Mr. Corcoran continues to suffer the debilitating symptoms of his paranoid schizophrenia. As he has for over twenty years, he experiences auditory hallucinations, psychosis, and the ever-present delusions regarding the ultrasound machine he believes the prison guards are torturing him with and his sleep disorder. Although for over two decades, the Indiana Department of Correction has attempted medicating him with a myriad of psychotropic drugs, including Geodon, Haldol, Navane, and Cogentin, Mr. Corcoran's illness has proven to be resistant to treatment, and nothing during his incarceration has cured him of his paranoid schizophrenia. As recently as March 1, 2024, treating correctional personnel recorded:

Patient then began sharing information about what he believes to be an ultrasonic machine here at [Indiana State Prison] that can control his and others thoughts,

sleep, voice, etc. Patient reports it is 'top secret' but it bothers him 'endlessly all day.' Patient reports the machine does put him to sleep at night. Patient stated 'others think I'm delusional but I know its here.' Writer inquired if patient ever recognizes his own thoughts as delusional, patient avoided the question. . . . Patient denies MH symptoms and the expressed delusions are the only observable concern.

Attachment K (Excerpt of Mr. Corcoran's Indiana Department of Correction medical records) (206a-207a).

Furthermore, just months after the department noted Mr. Corcoran's delusions about the ultrasonic machine, Mr. Corcoran published a book titled, *A Whistle-blower Report Electronic Harassment*. Attachment H. The book provides a glimpse into Mr. Corcoran's recurring thoughts and beliefs—and into his continuing delusion. He describes:

- "My goal is to arm people with what victimizers do not want their victims to know: THE TRUTH." *Id*. p. 8 (176a);

- "…that people can be surveilled anywhere, in any place, and from great distances from a device that sits on a desk." *Id*. p. 13 (181a);

- "The answer is that I want to show that what I am describing is not a nut job conspiracy theory, but is basic electronics… ." *Id*.;

- "I suspect that many credentialled MDs do not even know about this phenomenon. The reason why they likely do not know is because it is undetectable by unaided observation. No one by simply talking to an individual, looking at them or even listening to them is able to tell if a person's throat vibrates when they think. In fact, it is so faint that it cannot even be felt. For all practical purposes it is undetectable and would not be an issue unless…" *Id*.;

- "So, in essence, a small percentage of people are susceptible to ultrasound surveillance; someone with one of those devices can pretty much listen to them think." *Id*. p. 14 (182a);

- "The same ultrasonic signal that captures audible sounds by modulation can be used to send audible sound. Furthermore, the modulating signal can also send an electronic charge." *Id*.;

- "So think of the possibilities with such equipment – and the enormous potential for abuse! With it an operator could send a quiet voice into someone's head and make them think that they are thinking the thought…" *Id*.;

- "Or maybe something extremely bad: a screaming, demonic voice in their head that only they can hear (aside from the operator talking into the box) that tells them to kill people." *Id*. pp. 14-15 (182a-183a);

- "The device can easily be used to make someone seriously paranoid…A person susceptible to ultrasonic surveillance would be the easiest to make paranoid. Since an individual can tell what the individual is thinking it would be easy to cause them to believe false things." *Id.* p. 15 (183a);

- "Therefore, using electricity to activate bodily processes is not limited to muscle movements and sleep cycles. Let's say, therefore, that there is an unfortunate man who some bad actor wants to wake up, make stand on his feet, run to a wall, and then pound on it angrily with a closed fist. After this the bad actor wants the poor man to feel dizzy, confused and then vomit." *Id.* p. 16 (184a);

- "So let's return to the unfortunate man. To wake him up, delivering an electrostatic charge to his midbrain via a modulating ultrasonic frequency will do the trick. To make him stand up, run to the wall, make a fist, and pound on it repeatedly you would simply target the right muscles, in the right order with the proper electrostatic charges. Obviously a cascade of functions must be done to accomplish this, which is very easily done electronically (i.e., a multitude of calculations per second). To make him angry an electrostatic charge can be delivered to the amygdala. To then make him dizzy simply target the vestibular apparatus within his inner ear. The prefrontal cortex would be targeted next to make him confused. For vomit you need only to target the correct places in the stomach, esophagus, and mouth — being dizzy would also help the matter. To some people all of this sounds like science fiction. Unfortunately it is not; it is basic electronics and basic physiology." *Id.* p. 17 (185a);

- "They can spy on people and deceive people virtually unnoticed. Moreover, they can abuse people with anonymity and virtual impunity." *Id.*;

- "[I]t is apparent to me that correctional staff and other individuals and/or agencies use ultrasonic surveillance devices on susceptible people for sport. However, the fact that institutions keep their possession of such equipment confidential would make it extremely difficult for those abused to expose the abuse." *Id.* p. 18 (186a);

- "In essence, they would treat the poor soul like a video game avatar rather than a real person whose life is going to be adversely affected by the nonsense they are afflicting the victim with." *Id.* p. 19 (187a);

- "And when you research and find inaccurate information that confirms the victimizers' deception, and you then put stock in it, it frankly makes you look like a mental case. Their goal is accomplished. They have a completely plausible cover for their wrongdoing." *Id.*;

- "The ignorance on the part of mental health professionals about this technology is taken advantage of by victimizers. If a credentialled medical person says a man is mentally ill, but he says that he is the victim of electronic harassment, who would people be more likely

21

to believe? So because of this the victimizer's cover is now seemingly backed up by medical science….Because of this they will likely be oblivious to the fact that mental illness can be mimicked electronically." *Id.* p. 20 (188a);

- "I recently discovered, by an experiment performed on me, how this is done. Someone need only to use the device to cause you to scratch yourself in your sleep. If done correctly you get the equivalent of a rug burn. As I write this I have a burn on my arm from this method that has been there for over a month." *Id.* pp. 20-21 (188a-189a);

- "No one should be forced to live with an electronically simulated mental illness, such as Tourette's, tics, auditor- hallucinations, pain, anger, or a host of other abuses." *Id.* p. 21 (190a).

In short, Mr. Corcoran's longstanding and documented mental illness continues to torment him as it did at the time of the 1997 offense. He is completely unable to think rationally and has no grasp of reality.

## "NEXT FRIEND" STANDING

Petitioner Tahina Corcoran seeks relief here on behalf of Mr. Corcoran as his "next friend." Attachment M. Under 28 U.S.C. § 2242, a petition for a writ of habeas corpus must be "in writing signed and verified by the person for whose relief it is intended **or by someone acting in his behalf**." (emphasis added). In other words, federal habeas petitions may be brought not only by the person for whom relief is sought, but also by that person's "next friend." *See also* 28 U.S.C. § 2254(a) ("The . . . court shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court."); *United States ex rel. Bryant v. Houston*, 273 F. 915, 916 (2d Cir. 1921) ("The practice of a next friend applying for a writ is ancient and fully accepted.").

To proceed as a "next friend" in a federal habeas case, the Supreme Court has adopted two requirements:

First, a "next friend" must provide an adequate explanation -- such as inaccessibility, mental incompetence, or other disability -- why the real party in interest cannot appear on his own behalf to prosecute the action. Second, the "next

> friend" must be truly dedicated to the best interests of the person on whose behalf he seeks to litigate and it has been further suggested that a "next friend" must have some significant relationship with the real party in interest. The burden is on the "next friend" clearly to establish the propriety of his status and thereby justify the jurisdiction of the court.

*Whitmore v. Arkansas*, 495 U.S. 149, 163-64 (1990). "Next friends" must establish they meet the requirements for next friend standing by a preponderance of the evidence, *Groseclose ex rel. Harries v. Dutton*, 594 F. Supp. 949, 952 (D.C. Tenn. 1984), and present "meaningful evidence" demonstrating that the real party in interest is unable to proceed on his own behalf and "was suffering from a mental disease, disorder or defect that substantially affected his capacity to make an intelligent decision." *Whitmore*, 495 U.S. at 166 (citing *Rees v. Peyton*, 384 U.S. 312 (1966)); A "next friend" petitioner has standing where she provides an "adequate explanation . . .why the real party in interest cannot on his own behalf to prosecute the action." *Id.* at 163.

That the state trial court in 2003 found Mr. Corcoran competent to waive state post-conviction appeals (despite three mental health experts' testimony that he was in fact incompetent and unable to assist counsel or truly understand his legal proceedings) is not dispositive of the mental incompetence determination in the federal habeas context. In *Whitmore*, the Supreme Court declined to hold that an earlier state court competency hearing decided the issue and continued its analysis on incompetence while acknowledging that the state had held a competency hearing. *Id.* at 165-66. Only a *federal* court can determine whether a real party in interest is competent to waive his federal right to habeas review—the state court's decades-old opinion is irrelevant. *See Franz v. Lockhart*, 700 F. Supp. 1005 (E.D. Ark. 1988).

Indeed, the 2003 post-conviction court denied relief using a different competency standard, not the *Ford/Panetti* standard applicable to these proceedings. Because the *Ford/Panetti* claim

23

became ripe only when Mr. Corcoran's execution date issued, the evidence had not been considered under the *Ford/Panetti* standard. In short, a different legal standard is at issue now.

Moreover, it would be improper to rely on a stale 20-year-old competency decision to bar consideration of his *Ford* claim. Any prior competent waiver of appellate review is subject to a change in circumstances that would alter the competence of the real party in interest, thus rendering him incompetent to waive review. *See Lonchar v. Thomas*, 517 U.S. 314 (1996) (habeas petitioner changed his mind about waiving litigation and the federal court was obligated to grant a stay of execution related to his first habeas petition regardless of its late-hour filing). A real party in interest's mental competency is variable over time. *See, e.g., Burt v. Uchtman*, 422 F.3d 557, 568 (7th Cir. 2005); *Pate v. Robinson*, 383 U.S. 375, 386-87 (1966); *see also Ferry v. State*, 453 N.E.2d 207, 211 (Ind. 1983). The Supreme Court has determined in the context of incompetency to stand trial:

> Even when a defendant is competent at the commencement of his trial, a trial court must always be alert to circumstances suggesting a change that would render the accused unable to meet the standards of competence to stand trial.

*Drope v. Missouri*, 420 U.S. 162, 181 (1975). In such a situation, the Supreme Court has mandated that the correct procedure is for the court to halt proceedings while a competency evaluation is completed. *Id.* Likewise, in Mr. Corcoran's situation, this Court must be alert to the circumstances indicating that Mr. Corcoran's competency has declined in the 21 years since the state trial court competency hearing, and that now in 2024, he is unable to meet competence standards. As described below, he is mentally incompetent and cannot proceed with this habeas action, even to save his life, on his own behalf.

Petitioner Tahina Corcoran presents, at the very least, "meaningful evidence" and an "adequate explanation" that the manifestations of Mr. Corcoran's paranoid schizophrenia currently

cause him to live in a delusional reality. Because he has no grasp on reality, Mr. Corcoran is incompetent to waive his right to proceed with this federal habeas action.

**I.    Mr. Corcoran's delusions and hallucinations remove him from reality and render him mentally incompetent.**

As demonstrated above, Mr. Corcoran suffers from serious mental illness that prevents him from having any grasp on reality—he is incapable of understanding and engaging with his legal proceedings in a rational way that serves his own best interests. *See* Factual Background, *supra*, at 13-19. He has been diagnosed with, among other things, paranoid schizophrenia. This illness manifests in auditory hallucinations and persistent delusions that he suffers from a sleep disorder that causes him to say inappropriate things for which people ostracize him (but there is no documentation or other medical evidence indicating he has, or has ever had, a sleep disorder) and that prison guards are using an ultrasound machine to torture him with ultrasonic waves (there is no indication any such ultrasound machine exists within the Indiana State Prison). These hallucinations and delusions completely remove Mr. Corcoran from reality. His entire life and existence are shaped by these delusions; his perception of the world and of his situation is through the lens of the excruciating pain of the ultrasonic torture and the social isolation and backlash brought on by his sleep disorder. That is *his* reality.

Because Mr. Corcoran is completely dislodged from true reality, he does not, and cannot, rationally understand the reason for his execution or the legal proceedings that have brought him to this point. He believes he wants to be executed, and in fact is eager for the execution, because he views the execution not as punishment, but as a relief—a way to escape the pain and suffering from the sleep disorder and ultrasound machine.

Accordingly, because he eagerly awaits his execution and does not rationally understand that he has been sentenced to death as a means of punishment but rather views it as a positive

development, Mr. Corcoran is incompetent to be executed. *See* Ground for Relief, *infra*. And since

he does not understand his death sentences in a realistic way, i.e., as punishment, and cannot

rationally understand what his legal proceedings entail or the potential consequences, he "cannot

appear on his own behalf to prosecute the action." *Whitmore*, 495 at 163-64. He is mentally

incompetent in regard to his ability to seek any sort of legal help, including habeas relief, and a

"next friend" petitioner is critical to protect Mr. Corcoran's constitutional rights. *See, e.g., Rohan*

*ex rel. Gates v. Woodford*, 334 F.3d 803, 816 (9th Cir. 2003), *cert. denied*, 540 U.S. 1069 (2003)

("Where a[n incompetent] petitioner tries to waive his claims, as in *Whitmore*, the next friend has

an obvious role to fill: The prisoner's incompetence renders him unable to make decisions in his

own best interests.").

Other federal courts have found "next friend" standing in cases involving similar facts. For

example, in *In re Heidnik*, 112 F.3d 105, 110-12 (3d Cir. 1997), Mr. Heidnik, the real party in

interest, like Mr. Corcoran, had paranoid schizophrenia with delusions and wanted to be executed.

Although he knew he was facing an impending execution, had substantial innate intelligence, had

acquired a delusional rationalization about the reason for his execution, and had been found to

have knowingly, intelligently, and voluntarily waived other rights, the court found him

incompetent. *Id.* The Third Circuit Court of Appeals explained that because he lacked "'a

reasonable degree of rational understanding— . . . a rational as well as factual understanding of

the proceedings against him'," he was incompetent to litigate his federal habeas case for himself.

The Third Circuit found the next friend burden to be satisfied by Mr. Heidnik's mental

incompetence and held that his daughter had next friend standing in his federal habeas proceedings.

*Id.*

"Next Friend" Petitioner Tahina Corcoran seeks to bring this habeas action, and specifically this *Ford/Panetti* claim regarding Mr. Corcoran's incompetence to be executed. Because of his mental incompetence, Mr. Corcoran cannot bring this action on his own behalf.

**II.    "Next friend" Petitioner Tahina Corcoran is Mr. Corcoran's wife and seeks to litigate this habeas action in his best interests.**

Further, Petitioner Tahina Corcoran stands in the requisite best interest, trying to stop the execution of a mentally incompetent person, and has a sufficient relationship as Mr. Corcoran's wife to stand in on his behalf. *See also Cartner v. Davis*, 988 F. Supp. 2d 33, 36 (D.D.C. 2013) ("A close relative, 'such as a parent, spouse, or sibling, who maintain[s] a close personal relationship with the aggrieved' could qualify as a next friend.") (quoting *Davis v. Austin,* 492 F. Supp. 273, 275 (N.D. Ga. 1980)); *cf. Schornhorst ex rel. Fleenor v. Anderson*, 77 F. Supp. 2d 944, 951 (S.D. Ind. 1999). Additionally, Mr. and Mrs. Corcoran have known each other since they were teenagers, so Mrs. Corcoran acts not only in pursuit of Mr. Corcoran's best interests, but also with his life story and circumstances in mind.

### **GROUND FOR RELIEF**

**Executing Mr. Corcoran would violate the Eighth Amendment because he is incompetent to be executed.**

**I.    Mr. Corcoran lacks a rational understanding of the reason for his impending execution, making his planned execution a violation of the Eighth and Fourteenth Amendments to the United States Constitution.**

The Eighth Amendment prohibits states from inflicting cruel and unusual punishment—this includes executing someone who is incompetent. *Panetti v. Quarterman*, 551 U.S. 930, 959-60 (2007); *Ford v. Wainwright*, 477 U.S. 399, 409-10 (1985); *see also Madison v. Alabama*, 586 U.S. 265 (2019). A person scheduled to be executed is incompetent when he cannot rationally

understand his execution or the reason for it. *Ford*, 477 U.S. at 417; *Panetti*, 551 U.S. at 959-60; *Madison*, 586 U.S. at 267.

In *Panetti*, the Supreme Court determined that a condemned person's mental illness involving delusional beliefs may make him unable to "reach a rational understanding of the reason for [his] execution." 551 U.S. at 958. Other mental impairments, such as dementia, may also render a condemned unable to truly understand the reasons for his execution. *Madison*, 586 U.S. at 274-77. The critical inquiry is whether a person has the "rational understanding" *Panetti* and *Ford* require. *Id*. If a person's "mental shortfalls . . . deprive a person of the capacity to comprehend why the State is exacting death as a punishment, then the *Panetti* standard will be satisfied." *Id*. at 277.

*Panetti* clarified that the competency standard requires rational, not merely factual, awareness. The state courts in Texas failed to provide adequate procedures for *Panetti's* claim, so the United States District Court considered the claim *de novo*, and applied the standard adopted by the Fifth Circuit Court of Appeals. *Panetti*, 551 U.S. at 941-42. "Ultimately, the Fifth Circuit test for competency to be executed requires the petitioner know no more than the fact of his impending execution and the factual predicate for the execution." *Panetti v. Dretke*, 401 F. Supp. 2d 702, 711 (W.D. Tex. 2004) (quoted in *Panetti*, 551 U.S. at 942). The Supreme Court held that the Fifth Circuit law was "too restrictive." The Supreme Court found the Fifth Circuit's standard inadequate because it "treat[ed] a prisoner's delusional belief system as irrelevant if the prisoner knows that the State has identified his crimes as the reason for his execution." *Panetti*, 551 U.S. at 958. "A prisoner's awareness of the State's rationale for an execution is not the same as a rational understanding of it." *Id*. at 959.

Mr. Corcoran has suffered from mental illness and cognitive impairments all his life, although when he was younger, his paranoid schizophrenia went undiagnosed. *See* Factual

Background, *supra*. Because of his longstanding and severe mental illness and corresponding delusions and hallucinations which produce irrational thoughts and beliefs, Mr. Corcoran does not have a rational understanding of the basis for his scheduled December 18th execution.

Mr. Corcoran has consistently suffered two recurring delusions: first, that prison guards are operating an ultrasound machine that causes his body to twitch and move uncontrollably and which inflicts pain upon him (PCR Comp. T. 12); and second, that he has a sleep disorder, as well as a speech disorder, that cause him to say things unconsciously and unknowingly that cause other people to be angry with him or make fun of him. *Id*. He continues to experience both of these persistent delusions to this day and firmly believes they are real. His reality involves near-daily torment from this ultrasound machine and constant feelings of embarrassment, alienation, and ostracization from the things he believes he involuntarily says. *See* Attachment H.

Accordingly, Mr. Corcoran's thought processes are dislodged from reality. As Dr. Kaplan explained, Mr. Corcoran's "paranoid schizophrenia is creating a reality in his mind that doesn't exist, and on the basis of the reality that doesn't exist, he is making decisions about whether he wishes to proceed with his defense against the death penalty or not." PCR Comp. T. 17. Dr. Parker opined that Mr. Corcoran's delusions and hallucinations have a "direct bearing on his thought process"," preventing Mr. Corcoran from making rational decisions, and that Mr. Corcoran associates stigma with his mental illness and tried to hide it, observing, "It speaks to how powerful the stigma is against serious mental illness, that he would rather be executed than admit that schizophrenia might be contributing to his desire to die." *Id*. at 56-57. Additionally, Dr. Haskins, who also diagnosed Mr. Corcoran with paranoid schizophrenia with delusions, determined that Mr. Corcoran's "psychoses do not permit him to reason and make a reasoned decision." *Id*. at 67. He

elaborated that Mr. Corcoran is "basing his judgments and his perceptions on the paranoid delusion." *Id*. at 69.

Moreover, all three experts opined that Mr. Corcoran was so removed from reality and lacked the ability to think rationally and logically that he could not rationally consult with counsel. Dr. Kaplan explained that because of the way Mr. Corcoran experiences life, "with its delusions and hallucinations and negative symptoms of schizophrenia, he is unable to process what, for most people would be reasonable advice regarding his legal proceedings." *Id*. at 59. Dr. Haskins also noted that Mr. Corcoran's inability to cooperate with counsel and the legal process was beyond his control, but rather was a product of his mental illness and "the psychotic perception that he is being tormented and has this illness." *Id*. at 70.

In short, Mr. Corcoran exists in a different reality because of his paranoid schizophrenia. He is unable to distinguish between his delusions and reality—to him, his delusions are reality. While he may say the death penalty is punishment, over the almost three decades-long span of this case, Mr. Corcoran's words and behavior reveal and reinforce his true belief — his death sentence is a means to end his delusional suffering which to him is not punishment. *See Panetti*, 551 U.S. at 959 ("A prisoner's awareness of the State's rationale for an execution is not the same as a rational understanding of it."). Indeed, he refused to accept a plea to save his life only if the State would agree to sever his vocal cords first.

By virtue of his paranoid schizophrenia, delusions, and hallucinations, Mr. Corcoran does not have a rational understanding of the reasons for his execution and is incompetent to be executed. His execution would subject him to cruel and unusual punishment in violation of the Eighth Amendment. *Panetti*, 551 U.S. at 959-60; *Ford*, 477 U.S. at 409-10, 417; *Madison*, 586 U.S. at 267.

30

**A. Mr. Corcoran satisfies the "substantial threshold" showing of incompetency and is entitled to fair process and a judicial hearing regarding his competency in accordance with *Ford* and *Panetti*.**

When a petitioner makes a substantial threshold showing of incompetency, he is entitled to a stay of execution for a judicial hearing regarding his competency:

> Once a prisoner seeking a stay of execution has made "a substantial threshold showing of insanity," the protection afforded by procedural due process includes a "fair hearing" in accord with fundamental fairness. This protection means a prisoner must be accorded an "opportunity to be heard," though "a constitutionally acceptable procedure may be far less formal than a trial,"

*Panetti*, 551 U.S. at 949 (quoting *Ford*, 477 U.S. at 424, 426, 427).

In *Panetti*, the facts establishing the "substantial showing" necessitating a competency hearing included merely "a letter and a declaration from two individuals, a psychologist and a law professor, who had interviewed petitioner while on death row on February 3, 2004." 551 U.S. at 935, 938. That evidence "demonstrated that petitioner did not understand the reasons he was about to be executed." *Id.* at 938. In *Madison*, the petitioner presented two affidavits from his legal team and references to prior medical records. *Madison v. State of Alabama*, No. CC-85-1385.80 (Ala. Cir. Ct. Feb. 12, 2016) (Petition for Suspension of Mr. Madison's Death Sentence Pursuant to Alabama Code § 15-16-23 Because He Is Incompetent to be Executed). The Supreme Court ruled that the evidence was sufficient to establish a prima facie case of incompetency. *Madison*, 586 U.S. at 282.

As in *Panetti* and *Madison*, the evidence Mr. Corcoran presented to the Indiana Supreme Court was factually sufficient under the *Panetti* standard to establish a substantial threshold of incompetency. 551 U.S. at 938, 949. Although no statute or case law explicitly defines a specific quantum of evidence necessary to establish this threshold showing, it cannot be equal to that required to meet the *ultimate* determination of incompetency. *Panetti*, 551 U.S. at 950 ("substantial

threshold showing of insanity" triggers requirement of further protections and **process allowing chance to prove ultimate burden**). Mr. Corcoran has brought evidence of his incompetence akin to that brought in *Panetti* and *Madison*, thus establishing the threshold showing and entitling him to the same type of evidentiary hearing the *Panetti* and *Madison* petitioners received.

Throughout the almost three decades of Mr. Corcoran's case, and even before that, there has been "extensive evidence of mental dysfunction considered in earlier legal proceedings." *Panetti*, 551 U.S. at 950. The evidence presented to the Indiana Supreme Court of Mr. Corcoran's paranoid schizophrenia, including his delusions and hallucinations, his disorganized impaired thought processes, and his unyielding belief in his own delusional reality—all of which lead him to sincerely believe that his December 18 execution is an upgrade rather than a punishment— like the evidence in *Panetti* and *Madison* was factually sufficient, under the *Panetti* standard to establish a substantial threshold of incompetency. *Panetti*, 551 U.S. at 938, 949; Attachment L (Goff, J., dissenting at 4) (242a) ("In his mind, Corcoran views execution not as punishment but as the only path to escaping the torment from which he suffers."). This evidence cannot simply be ignored, and the State of Indiana should not be allowed to plow forward with Mr. Corcoran's execution even though he has presented a multitude of evidence about his longstanding and fixed paranoid schizophrenia and psychosis. At minimum and as the Indiana Supreme Court should have found, Mr. Corcoran is entitled to a hearing on the mere baseline issue of whether he possesses a rational understanding of the reasons for his December 18, 2024 execution.

Nevertheless, three justices, over the dissent of two other justices, declined to give proper and due process. Without giving Mr. Corcoran the full and fair opportunity to be heard, the court denied Mr. Corcoran's petition, holding that he was competent to waive post-conviction review (and that he had in fact properly done so) and that he had not established the requisite threshold

32

showing of incompetency. Despite not holding a hearing in compliance with the principles of due process, the majority determined that Mr. Corcoran's paranoid schizophrenia and mental condition had remained the same since the last competency determination in 2011. They credited his recent affidavit, the stale competency findings from 2008, 2009, and 2011 (which were made by courts considering a totally different issue—not whether Mr. Corcoran was *incompetent to be executed*), and the testimony of Dr. Parker in *a separate case* involving a *separate defendant* to find that the evidence presented fell below the substantial threshold showing of *Panetti*. These findings do not translate to mean he is also now competent to be executed.

The Indiana Supreme Court's process of determining that Mr. Corcoran had not established the *Panetti* threshold showing, all while it simultaneously engaged in its own separate fact-finding process involving credibility determinations and without providing basic process or an opportunity for a full factual inquiry, rebuttal, or Mr. Corcoran's involvement at all, was fundamentally unfair. As the Supreme Court opined regarding the Texas state courts' processes, "[t]he fact finding procedures upon which the court relied were not 'adequate for reaching reasonably correct results' or, at a minimum, resulted in a process that appeared to be 'seriously inadequate for the ascertainment of the truth.'" *Panetti*, 551 U.S. at 954 (quoting *Ford*, 477 U.S. at 423-24).

Given that Mr. Corcoran has established the required threshold showing of incompetence and the Indiana Supreme Court's decisions was both contrary to and an unreasonable application of the standard set forth in *Panetti*, this Court should apply *de novo* review and provide Mr. Corcoran a fair hearing on his incompetence to be executed claim.

**B. This Court should grant *de novo* review because the Indiana Supreme Court majority decided Mr. Corcoran's claim under a state successor standard rather than the *Stewart v. Martinez-Villareal*, *Ford*, and *Panetti* standards this Court will use.**

When a state court applies a standard other than the federal standard, i.e., a state law-specific standard, a federal court review the claim *de novo* under the applicable federal standard. *See, e.g., Thomas v. Clements*, 789 F.3d 760, 767 (7th Cir. 2015) (reviewing *de novo* where the state court applied an erroneous prejudice standard); *Mosley v. Atchison*, 689 F.3d 838, 850 (7th Cir. 2012) ("The state appellate court did not merely recite the wrong standard or use and inapt shorthand expression of the standard. It applied an incorrect and more onerous standard, and the difference may well have been decisive. Because the state appellate court's analysis was contrary to *Strickland*, this court reviews the prejudice prong *de novo*."); *Martin v. Grosshans*, 424 F.3d 588, 592 (7th Cir. 2005) ("The Wisconsin court's prejudice analysis was contrary to *Strickland* and is not entitled to deference; we therefore review the issue of prejudice *de novo*, applying the correct standard.").

Other than in Indiana, it is well-established that *Ford/Panetti* claims are automatically not-successive claims. *See, e.g., Stewart v. Martinez-Villareal*, 523 U.S. 637 (1998); *Flores-Ramirez v. Foster*, 811 F.3d 861 (7th Cir. 2016); *United States v. Obeid*, 707 F.3d 898, 901 (7th Cir. 2013). A *Ford/Panetti* petitioner files their petition with the claim and is tasked with presenting evidence sufficient to meet the substantial threshold showing. After meeting the threshold, the petitioner is then entitled to an evidentiary hearing on the claim to present more evidence regarding his lack of rational understanding of the execution.

In Indiana, however, a petitioner must request permission from the Indiana Supreme Court to file a petition containing a *Ford/Panetti* claim as a successive post-conviction petition. *See Baird v. State*, 833 N.E.2d 28, 30 (Ind. 2005). In addition to the extra complication this added barrier

34

creates, in Mr. Corcoran's case specifically, the complication is exacerbated by his attempts to waive his appeals. Heavily crediting his recently filed affidavit and past testimony, the majority, in declining to grant permission to file the post-conviction petition, determined that Mr. Corcoran is competent to decide against appealing his sentence. The majority thus conflated the separate stages of this inquiry—in determining whether to allow as an initial matter review of the *Ford/Panetti* claim, the majority considered whether Mr. Corcoran possesses rational understanding of his legal proceedings so as to render him competent to waive his appeals. After determining that he does possess such a rational understanding (despite the evidence establishing he cannot rationally understand the world around him, much less the execution), the majority hastily and erroneously concluded that the incompetency to be executed standard overlaps with the incompetency to waive appeals standard, and thus he is also competent to be executed. This reasoning is circular and cuts off the possibility of presenting evidence regarding Mr. Corcoran's lack of rational understanding (of which his evidence is part of) before the process even begins (or should begin, under the federal standard).

In short, the majority utilized an Indiana state-specific standard and concocted a barrier not present in the federal standard to circularly deny Mr. Corcoran even the opportunity to have a post-conviction court fully and adequately consider his *Ford/Panetti* claim. Because the claim regarding Mr. Corcoran's incompetency to be executed has not been analyzed and decided under the federal standard, this Court can and now should consider this petition *de novo*.

**C. 28 U.S.C. § 2254(d) does not bar review of Mr. Corcoran's claim because the Indiana Supreme Court's denial of Mr. Corcoran's incompetence to be executed claim without fair process was contrary to or an unreasonable application of clearly established federal law and was based on an unreasonable determination of the facts in light of the evidence presented.**

Under 28 U.S.C. § 2254, this Court may grant habeas relief if the State court's decision on the merits was contrary to or involved an unreasonable application of clearly established federal law. This Court may also grant relief if the State court's merits ruling was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceedings. 28 U.S.C. § 2254(d). Here, Mr. Corcoran presented evidence similar to that in *Panetti* and *Madison* sufficient to establish the threshold showing. Moreover, the Indiana Supreme Court majority's decision denying Mr. Corcoran a fair hearing to assess his incompetence and instead finding he did not meet the required "substantial threshold" to show incompetence, while at the same time making credibility determinations and resolving factual disputes, was contrary to and an unreasonable application of the clearly established federal law set forth in *Ford* and *Panetti*. 551 U.S. at 948 ("We agree with petitioner that no deference is due. The majority's failure to provide the procedures mandated by *Ford* constituted an unreasonable application of clearly established law as determined by this Court.").

Additionally, the majority based its decision to deny Mr. Corcoran permission to file a post-conviction petition based on *Ford/Panetti* based on an unreasonable determination of fact. The majority relied virtually solely on Mr. Corcoran's affidavit and past testimony expressing his desire to be executed so that he may escape prison, decades-old competency determinations under standards other than the incompetency to be executed standard, and testimony from Dr. Parker about another defendant's mental illness. Each of these is troubling as a basis in their own right, but particularly in light of the rest of the evidence of Mr. Corcoran's incompetence, the majority's

36

reliance on these facts is unreasonable. Thus, § 2254(d) does not bar review of Mr. Corcoran's claim. This Court should apply *de novo* review.

### 1. The Indiana Supreme Court majority's decision was contrary to clearly established federal law.

The Indiana Supreme Court's decision was contrary to and an unreasonable application of the United States Supreme Court's holdings in *Ford* and *Panetti*, which require a "fair hearing" after the petitioner has made a "substantial threshold showing of insanity." *Panetti*, 551 U.S. at 949. The Supreme Court has held, "[a] state-court decision will certainly be contrary to our clearly established precedent if the state court applies a rule that contradicts the governing law set forth in our cases." *Williams v. Taylor*, 529 U.S. 362, 406 (O'Connor, J., for majority). The Court further held, "[a] state-court decision will also be contrary to this Court's clearly established precedent if the state court confronts a set of facts that are materially indistinguishable from a decision of this Court and nevertheless arrives at a result different from our precedent." *Id.*

As discussed above, the Indiana Supreme Court majority decided the issue of Mr. Corcoran's incompetency to be executed at the same time it decided whether to grant permission to file a successive post-conviction relief, meaning that the majority conflated the state law gateway standard with the substantial threshold showing inquiry. This conflation was contrary to the clearly established federal law as set forth in *Martinez-Villareal* and *Panetti.*

Having decided that Mr. Corcoran was competent to waive his appeals and thus that they would deny him permission to file his post-conviction petition, the majority nevertheless considered the merits of the claim, including some of the evidence presented, to determine whether Mr. Corcoran had met the substantial threshold showing of incompetence. The majority decided that there was overlap between the incompetence to waive and incompetence to be executed standards and found that both inquiries had been answered. Thus, the majority concluded, even

though they denied Mr. Corcoran further adjudicative review on the merits of his claim by denying permission to file a post-conviction petition, that he had not met the substantial threshold showing of incompetency.

In addition to using a standard for *Ford* claims that is contrary to the federal standard by requiring permission from the Indiana Supreme Court, the majority's method of assessing incompetency to be executed was fundamentally unfair. "The fundamental requirement of due process is the opportunity to be heard at a meaningful time and in a meaningful manner." *Matthews v. Eldridge*, 424 U.S. 319, 333 (1976). The court's engagement in fact-finding and credibility determinations regarding Mr. Corcoran's affidavits and testimony without allowing an evidentiary hearing to test the evidence submitted by both sides deprived Mr. Corcoran of due process. No court has ever heard testimony regarding Mr. Corcoran's *incompetency to be executed*, and he has never had the meaningful opportunity to confront the State's assertions.

The majority's circular conclusion that Mr. Corcoran should be denied further adjudicative relief because they found the evidence (which should be the subject of further adjudicative review) to indicate his competence to waive his appeals, and then using that evidence to subsequently indicate his competence to be executed, merges and totally muddles how competency claims are addressed under federal law. The majority's decision is contrary to clearly established Supreme Court law. It is not entitled to any deference from this Court.

> **2.    The Indiana Supreme Court majority's decision that Mr. Corcoran is competent to be executed was also based on an unreasonable determination of the facts in light of the evidence.**

The Indiana Supreme Court majority, without holding an evidentiary hearing or other type of proper due process, made credibility findings and placed weight on certain evidence. Principally, the majority relied on Mr. Corcoran's own statements, both from his recently filed affidavit and

38

from his past testimony, that he wants to be executed as a means to escape from prison, and the fact that courts in the past have found him competent to waive his appeals (and the majority's subsequent conclusion that nothing has changed in Mr. Corcoran's condition since then). It was unreasonable for the majority to rely on these facts in light of the wealth of other evidence, including evidence of Mr. Corcoran's vividly real delusions and lack of connection to reality.

### i. Mr. Corcoran's own statements are an unreliable gauge of whether he has a rational understanding of his execution and the majority's crediting of the statements was unreasonable.

The majority posits that Mr. Corcoran does have a rational understanding of why the State seeks to execute him, citing his recent affidavit statement that he "understand[s] that if this Court rejects [his] counsel's petition the death warrant will be carried out," "that he "will then be put to death for the heinous crime [he] committed," and that he understands the "execution will end [his] life." Attachment L (Majority Opinion pp. 24-25) (233a-234a); Attachment F at 163a. The majority also points to his testimony from past proceedings in which he made similar statements. The majority considers these statements to now show that Mr. Corcoran rationally understands that the State seeks to impose the death penalty as a form of punishment.

But the fact that these statements all came from Mr. Corcoran—the very person whose mental illness is at issue—renders them inherently suspect. Undoubtedly, Mr. Corcoran would make these sorts of statements, because his delusions cause him such pain that he believes execution is a sort of relief mechanism that allows him to escape the delusions. He says that he knows why the State wants to execute him because he thinks that is the best way to get what he wants, which is his execution.

His statements become even more suspect considering the three experts at his 2003 post-conviction competency hearing who all testified that he cannot make rational decisions because of

the all-consuming nature of his delusions. The State presented no experts to contradict that conclusion. What is more, those experts, in addition to two trial experts, Dr. Philip Coons and Dr. Eric Engum, also observed that Mr. Corcoran has learned to hide his delusions and downplay his mental illness; again, he knows that the best chance of getting his desired execution is by trying to convince the court he rationally understands the death penalty as punishment.

Indeed, in reviewing Mr. Corcoran's psychiatric and legal history, Dr. Angeline Stanislaus, M.D., a forensic psychiatrist, noted that "when we look at the full picture longitudinally, we see the signs and symptoms of schizophrenia, which has influenced his illogical decision making." Attachment N p. 11 (259a). Mr. Corcoran's 2023 and 2024 DOC therapy records reveal that "he is still very delusional and has no insight into his illness." *Id.* She opined, as other experts have, that he "minimizes and covers up his symptoms." *Id.* After reviewing his November 2024 affidavit, she explained that while "he makes it sound like his decision to forgo any further litigation is logical," his remark that "in execution his heart will stop, and all brain activity will cease" indicates that his decisions are still "tie[d] into his delusion of the ultrasonic machine inserting and broadcasting his thoughts from his brain." *Id.*

This all clearly establishes the true nature of Mr. Corcoran's statements: they are a product of his mental illness. As the dissent explained, "[Mr. Corcoran's statements] must be weighed against two-plus decades of evidence apparently establishing that his delusions about the ultrasound machine and sleep and speech disorders were and are very real to him." Attachment L (Goff, J., dissenting at 5) (243a). Relying on the statements of a person who is mentally incompetent as a basis to prove that person is competent is unreasonable. Relying on the statements of a mentally incompetent person that he is eager for his execution when there is expert evidence that he cannot rationally understand that execution is a punishment, and using the statements as a

basis to prove that he rationally understands that execution is a punishment, is even more patently unreasonable. *See id.* at 2-3 (240a-241a) ("To ignore these findings now and proceed with execution without a current competency evaluation amounts to enabling [Mr. Corcoran's] delusions—a state-sanctioned escape from suffering rather than a measured act of justice."). This Court does not owe any deference to the majority's decision.

> ii. **The majority's conclusion that nothing has changed since prior competency determinations is unfounded by the nature of competency, unsupported by the evidence, and is unreasonable as a factual basis, and contrary to competency precedent.**

The majority noted Mr. Corcoran's competency has been litigated previously, and several courts concluded that Mr. Corcoran was competent to waive post-conviction appeals. While this is true (and putting aside the fact that the competency to waive appeals inquiry is different from the competency to be executed inquiry), the majority then concluded that Mr. Corcoran's condition has not changed such that he is now incompetent, citing the public defender's statements that Mr. Corcoran continues suffering from the symptoms of his schizophrenia as evidence that nothing about Mr. Corcoran's condition has changed. This assumption is unsupported.

By its very nature, competency is variable over time, not static. The Supreme Court has explained that in the context of competency to stand trial, a defendant's competency must be evaluated at the time of trial. *See Drope v. Missouri*, 420 U.S. 162, 181 (1975); *Burt v. Uchtman*, 422 F.3d 557, 568 (7th Cir. 2005); *see also Pate v. Robinson*, 383 U.S. 375, 387 (1966) (importance of a contemporaneous competency hearing); *United States v. Diaz-Gaudarama*, Cause No. 4:07-cr-07-03-DFH-WGH (S.D. Ind. Mar. 13, 2009) ("Where a defendant is genuinely mentally ill, of course, his mental status and competency could change with passage of time."). A defendant's mental condition and mental state can change as proceedings unfold. *Drope*, 420 U.S. at 181.

The majority, however, failed to account for this possibility. Mr. Corcoran's last competency determination was in 2011, approximately 13 years ago. There is a strong possibility that in that time, his mental condition has changed, and specifically, deteriorated. This is especially the case when Mr. Corcoran's schizophrenia has been going untreated, Attachment N pp. 11-12 (259a-260a), and as he has aged.

Moreover, the majority ignores new evidence that demonstrates Mr. Corcoran's total disconnection from reality. In March of this year, Indiana Department of Correction staff noted Mr. Corcoran's delusions about the ultrasound machine. Although the majority is correct that this delusion is a longstanding one from which Mr. Corcoran has suffered for years, it does not take away from the fact that Mr. Corcoran's reality and decisions are driven almost entirely by his fear of the ultrasound machine—this is irrational. The majority also fails to account for Mr. Corcoran's book, in which he details his scientific explanation for how the ultrasound machine works and how it is used to torture people like him. While Mr. Corcoran has believed in the ultrasound machine's existence for years, this is new information that evidences how his delusions have removed him even further from reality.

All of this indicates a clear need for an evidentiary hearing. Despite the majority's conclusion that nothing has changed in Mr. Corcoran's condition, there is significant evidence demonstrating things *have* changed and that he lacks a rational understanding of the State's punitive reason for the execution. As the dissent stated, "[E]ven if it seems that Corcoran may understand why the State is seeking execution, the point is that we simply do not know."

The majority's reliance on this assumption that nothing has changed in Mr. Corcoran's mental illness or competency in over a decade is unreasonable. The Court does not owe any deference to the majority's decision.

## CONCLUSION

For all the foregoing reasons, this Court does not owe any deference to the Indiana Supreme Court's decision. This Court should apply *de novo* review and find that the evidence presented meets the substantial threshold showing of incompetency and hold an evidentiary hearing, in accordance with the Supreme Court's procedure set forth in *Panetti* and with the requirements of due process, to assess whether Mr. Corcoran is incompetent to be executed. Mrs. Corcoran on behalf of Mr. Corcoran further requests this Court to issue a writ of habeas corpus, vacate his sentence of death, and grant any other relief this Court deems just.

Respectfully Submitted,

*/s/ Laurence E. Komp*
Laurence E. Komp, MO Bar No. 40446
Faith J. Tan, IL Bar No. 6342729
Michelle M. Law, MO Bar No. 45487
Federal Public Defender
Western District of Missouri
1000 Walnut Street, Suite 600
Kansas City, MO 64106
816-675-0923
laurence_komp@fd.org
faith_tan@fd.org
michelle_law@fd.org

*Attorneys for Joseph E. Corcoran*

## CERTIFICATE OF SERVICE

I hereby certify that on December 11, 2024, I electronically filed the foregoing pleading with the Clerk of the Court using the CM/ECF system and sent it via email to Tyler Banks, Office of Indiana Attorney General, at Tyler.Banks@atg.in.gov.

/s/ Laurence E. Komp
Laurence E. Komp

VERIFICATION

Under penalty of perjury, the undersigned declares that she is the spouse of Mr. Joseph E. Corcoran, named in the foregoing petition and knows the contents thereof; that the pleading is true to the best of her knowledge; and that she is acting on behalf of Mr. Corcoran. 28 U.S.C § 2242.

DATED this 8th day of December 2024.

_Tahina Marie Corcoran_
Spouse/Next Friend of Petitioner