## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF INDIANA

| | | |
|---|---|---|
| TAHINA CORCORAN, | ) | |
|     as Next Friend on behalf of | ) | |
|     Joseph E. Corcoran, | ) | |
| | ) | |
| *Petitioner,* | ) | Case No. 24-970 |
| | ) | |
| v. | ) | CAPITAL HABEAS |
| | ) | |
| RON NEAL, WARDEN | ) | **EXECUTION SCHEDULED** |
| | ) | **DECEMBER 18, 2024** |
| *Respondent.* | ) | **BEFORE THE HOUR OF SUNRISE** |

**PETITION FOR WRIT OF HABEAS CORPUS BY A PERSON IN STATE CUSTODY UNDER 28 U.S.C. § 2254 RAISING RIPE CLAIM OF INCOMPETENCY TO BE EXECUTED UNDER *FORD V. WAINRIGHT*, *PANETTI V. QUARTERMAN*, AND *MADISON V. ALABAMA***

### APPENDIX

**Laurence E. Komp, MO Bar No. 40446**
Faith J. Tan, IL Bar No. 6342729
Michelle Law, MO Bar 45487
Federal Public Defender
Western District of Missouri
1000 Walnut Street, Suite 600
Kansas City, MO 64106
816-675-0923
laurence_komp@fd.org
faith_tan@fd.org
michelle_law@fd.org

*Attorneys for Joseph E. Corcoran*

Table of Appendix

11/15/2024 Successive Petition for Post-Conviction Relief and Supporting Exhibits …………………………………………………….…………….…....…….... Attachment A

11/15/2024 Motion for Stay of Execution …………………….……….….…………… Attachment B

11/19/2024 Indiana Supreme Court Scheduling Order ……………….…...….………… Attachment C

11/26/2024 Response in Opposition to Motions to Stay and Motions for Permission to File Successive Petitions for Post Conviction Relief and Supporting Exhibits……….…… Attachment D

12/03/2024 Reply in Support of Motions to Stay and Motions for Permission to File Successive Petitions for Post Conviction Relief ………….…………………….….…………… Attachment E

12/03/2024 Joseph Corcoran's Pro Se Affidavit……………………….…...….…..… Attachment F

12/05/2024 Indiana Supreme Court Denial……...……………….……….......……… Attachment G

Electronic Harassment: A Whistle-Blower Report …………………..….…………… Attachment H

Affidavit of Mark Thoma ………………………………………………………… Attachment I

Affidavit of John Nimmo ……………………………………………….…...…… Attachment J

March 1, 2024, Prison Indiana State Prison Medical Records ………………...…… Attachment K

Indiana Supreme Court Opinion …………………………………...…………….…... Attachment L

Tahina Corcoran's Next Friend Verification ………………………….….………… Attachment M

Report of Dr. Angeline Stanislaus ……………………………….….……………… Attachment N

# ATTACHMENT A

APPENDIX TO RULE PC 1

# FORM FOR SUCCESSIVE POST-CONVICTION RELIEF RULE 1 PETITIONS

*(To Be Filed With Petition For Post-Conviction Relief)*

IN THE SUPREME COURT OF INDIANA
STATE OF INDIANA

| | | |
|---|---|---|
| Joseph Edward Corcoran | ) | |
| Doc Number 992454 | ) | Cause No. 24S-SD-222 |
| | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| State of Indiana, | ) | |
| Respondent. | ) | |

## INSTRUCTIONS - READ CAREFULLY

If you have previously filed a Petition for Post-Conviction Relief directed to this conviction or these convictions and the earlier petition was decided on the merits, you must fill out this form and file it along with your Petition. It must be legibly handwritten or typewritten, signed by the petitioner, and affirmed under the penalties for perjury. Since this must be signed under oath, any false statement of a material fact herein may serve as the basis of prosecution and conviction for perjury. Exercise care to be sure all answers are true and correct.

You must mail the original and two copies of this form along with your petition to the Clerk of the Supreme Court and Court of Appeals, 200 West Washington Street, Room 216, Indianapolis, IN 46204-2732. The Clerk will refer your petition to the Supreme Court in death penalty cases and the Indiana Court of Appeals in all other cases. The court will then decide whether your petition may be filed in the trial court where your first Post-Conviction Remedy Rule 1 petition was adjudicated.

NOTE:  The court will allow a second or successive petition for post-conviction relief to be filed if the petitioner establishes a reasonable possibility that the petitioner is entitled to post-conviction relief.  However, a petitioner does not establish a reasonable possibility that the petitioner is entitled to post-conviction relief, for example, (1) if the petitioner only alleges grounds for relief that are not different from those which have already been decided on the merits, or (2) if the only grounds alleged, even if different, should have been alleged in an earlier proceeding.

**2a**

APPENDIX TO RULE PC 1

In addition to this form, you may submit no more than fifteen (15) pages, double-spaced, to provide supporting facts. You may also submit exhibits. Any citation of authorities should be avoided and is only appropriate if there has been a change in the law since the judgment you were attacking was entered. Your answer(s) should be confined to relevant facts and must not include legal arguments.

1. Were you represented by an attorney on your prior Petition for Post-Conviction Relief?

      Yes _X__ No ___

If yes, name(s) and address(es) of attorney(s).
      Laura Volk, One North Capitol, Suite 800, Indianapolis, IN 46204 _____
      Joanna Green, One North Capitol Suite 800, Indianapolis, IN 46204 _____

Proceedings at which each attorney represented you:

      Drafting Petition for Post-Conviction Relief _____X_____

      Hearing of Petition for Post-Conviction Relief _____X*_____

      Appeal of denial of Petition for Post-Conviction Relief _____X_____

      * Mr. Corcoran initially declined to sign the Petition for Post-Conviction Relief his attorneys prepared and sought to waive his post-conviction appeal. Because Mr. Corcoran suffers from paranoid schizophrenia, the post-conviction court held a competency hearing to determine whether Mr. Corcoran was competent to waive his post-conviction appeal. After the competency hearing, during which three experts testified as to Mr. Corcoran's mental illness, symptoms, and detachment from reality, Mr. Corcoran signed the petition and sought to file it, but he did not file the petition by the court-imposed deadline.

2. Was there a hearing on your prior Petition?

      Yes ___ No __X**_

      **At the request of Ms. Joanna Green and Ms. Laura Volk, this Court held a competency hearing on Mr. Corcoran's competency to waive his post-conviction appeal.

3. If the Petition was denied, did you appeal?

Yes _X***__ No ___

***Mr. Corcoran later attempted to file his verified and signed post-conviction petition, but this Court rejected it as untimely. Mr. Corcoran appealed that decision to the Indiana State Supreme Court.

If yes, please state result on appeal, date of decision and citation of case if known:

A hearing was held on Corcoran's competency to waive post-conviction relief, not on post-conviction claim. The decision that he was competent was appealed and affirmed at *Corcoran v. State,* 820 N.E.2d 655 (Ind. 2005). Corcoran filed a post-conviction petition later and the post-conviction court dismissed it as untimely. That decision was appealed and affirmed at *Corcoran v. State,* 845 N.E.2d 1019 (Ind. 2006).

4. If you are alleging ground(s) for relief which were raised in your previous Petition, explain why you feel consideration is merited:

Corcoran raised this issue in post-conviction but the Indiana Supreme Court did not decide the issue because Corcoran waived post-conviction. This issue merits consideration because an execution date is eminent, and Corcoran's execution would violate the state and federal constitution.

5. If your Petition raises new grounds which were not included in your prior Petition, explain why you are raising these grounds now. Your explanation should rely on FACTS,

not your opinions or conclusions:  _This issue was raised earlier but should be considered at this time because a national consensus has built since this issue was last in front of this court that the execution of a person with a serious mental illness violates the constitution.

/s/ Joanna Green                         /s/ Laura L. Volk
Joanna Green, Atty. No. 16724-53         Laura L. Volk, Atty. No. 18934-49
on behalf of Petitioner pursuant to Rule 11    on behalf of Petitioner pursuant to Rule 11

/s/ Laurence E. Komp
LAURENCE E. KOMP
Temporary Admission No. 118-95-TA
on behalf of Petitioner pursuant to Rule 11

**4a**

I affirm, under the penalties for perjury, that the foregoing representation(s) is (are) true.

/s/ Laura L. Volk
Laura L. Volk, Atty. No. 18934-49
on behalf of Petitioner pursuant to Rule 11


# Certificate of Service

I hereby certify that I have, this 15th day of November, 2024, served upon Tyler Banks, Supervising Deputy Attorney General, a copy of the above and foregoing **Form for Successive Petition for Post-Conviction Relief,** by electronic service through the Indiana E-filing System, filed electronically in the Indiana Supreme Court in the above-captioned cause of action.

/s/ Joanna Green
Joanna Green
Deputy Public Defender

Public Defender of Indiana
One North Capitol, Suite 800
Indianapolis, Indiana  46204-2026
Telephone:  (317) 232-2475

Memorandum in Support of Successive
Petition for Post-Conviction Relief – Joseph E. Corcoran

**IN THE
INDIANA SUPREME COURT**

**CASE No. 24S-SD-222**

| | |
|---|---|
| JOSEPH E. CORCORAN, )<br>)<br>*Appellant,* )<br>)<br>v. )<br>)<br>STATE OF INDIANA, )<br>)<br>*Appellee.* ) | **THIS IS A CAPITAL CASE**<br>Execution Date: December 18, 2024 |

**Memorandum in Support of
Successive Petition for Post-Conviction Relief**

Petitioner Joseph Corcoran, by and through counsel, respectfully request this Court grant him permission to file a successive post-conviction petition regarding the constitutionality of executing a person with severe mental illness under the Eighth and Fourteenth Amendments to the United States Constitution and Article One, Section Sixteen of the Indiana Constitution.

**I. Introduction**

Corcoran is severely mentally ill. The Indiana Supreme Court and the Seventh Circuit have recognized this. The State of Indiana concedes it. However, no court has decided whether Corcoran's execution would violate the state or federal constitution due to his serious mental illness. Because constitutional law has evolved since Corcoran was sentenced to death and his sentence was affirmed, further proceedings and legal argument are necessary.

**II. Jurisdictional Statement**

This Court has jurisdiction in this matter because Corcoran is sentenced to death. Indiana Appellate Rule 4(A)(1)(a). This Court has jurisdiction to authorize Corcoran's successive post-conviction petition under Indiana Post-Conviction Rule 1(12).

Memorandum in Support of Successive
Petition for Post-Conviction Relief – Joseph E. Corcoran

### III. Procedural History

Corcoran was convicted of four counts of murder and sentenced to death in 1999. Corcoran waived review of his convictions on direct appeal, but not his death sentence[1]. *Corcoran v. State,* 739 N.E.2d 649, 651 n.2 (Ind. 2000). The Indiana Supreme Court remanded the case to the trial judge because she improperly considered future dangerousness, a non-statutory aggravator. 739 N.E.2d at 657. On review after remand, this Court found Corcoran's mental illness made him "genetically predisposed to be a 'loner' or 'hermit'" and affirmed his death sentence. *Corcoran v. State,* 774 N.E.2d 495, 502 (Ind. 2002). Justice Rucker dissented, finding Corcoran's death sentence violated the Eighth Amendment and Article One, Section 16 of the Indiana Constitution because Corcoran is seriously mentally ill. *Id.*at 502-03.

Corcoran's post-conviction proceedings ("PCR") were "unusual" in a situation involving "the most irremediable and unfathomable of penalties." *Corcoran v. State,* 827 N.E.2d 542, 547 (Ind. 2005) (Rucker, J. dissenting). Corcoran initially did not sign his PCR petition. A competency hearing proceeded where all testifying experts found Corcoran to be incompetent and the Attorney General conceded Corcoran suffered from a mental illness. Contrary to the experts' unanimous opinions, the court found Corcoran competent and determined he waived PCR. Eventually Corcoran signed his petition, but the judge would not accept it. Corcoran requested he be allowed to proceed with PCR and dismiss the appeal. While embracing the extent of his mental illness, the Indiana Supreme Court denied the request and found him competent to waive post-conviction. *Corcoran v. State,* 820 N.E.2d 655, 663-64 (Ind. 2005). Corcoran then attempted to file his signed PCR petition. The PCR court rejected the filing as untimely. The Indiana Supreme Court agreed, holding "public policy reasons"

---

[1] An individual sentenced to death in Indiana cannot waive review of his sentence on direct appeal. *Judy v. State,* 416 N.E.2d 95, 102 (Ind. 1981).

Memorandum in Support of Successive
Petition for Post-Conviction Relief – Joseph E. Corcoran

of "achieving finality" outweighed allowing a mentally ill death row prisoner to litigate constitutional flaws in his conviction and death sentence. *Corcoran v. State,* 845 N.E.2d 1019, 1023 (Ind. 2006).

Subsequently, Corcoran petitioned for a writ of habeas corpus. The district court granted relief finding the State's offer to withdraw the death penalty request if Corcoran waived his right to a jury trial violated Corcoran's Sixth Amendment rights. *Corcoran v. Buss,* 483 F.Supp.2d 709 (N.D. Ind. 2007). The Seventh Circuit reversed. *Corcoran v. Buss,* 551 F.3d 703 (7th Cir. 2008). Judge Williams dissented from the decision that Corcoran was competent to waive PCR noting "No one contests that Corcoran suffers from a mental illness". *Id.* at 714-15.

The Supreme Court held the Seventh Circuit erred in failing to remand the case to the district court to decide the various addressed and unaddressed claims. *Corcoran v. Levenhagen,* 558 U.S. 1 (2009). On remand, the Seventh Circuit held the Indiana Supreme Court made an unreasonable determination of fact when it held the trial court did not rely on non-statutory aggravators in its new sentencing order. *Corcoran v. Levenhagen,* 593 F.3d 547, 551-52 (7th Cir. 2010). The Supreme Court reversed this decision, not because it was legally wrong, but because a federal court cannot grant relief based on the violation of a state rule. *Wilson v. Corcoran,* 562 U.S. 1 (2010). The case was remanded to the district court, who denied relief. The Seventh Circuit affirmed. *Corcoran v. Neal,* 783 F. 3d 676 (7th Cir. 2015).

**IV. Corcoran's death sentence violates the Eighth Amendment.**

Because Corcoran is severely mentally ill, his execution violates the Eighth Amendment. The Eighth Amendment restricts the ultimate sanction of capital punishment "to those offenders who commit 'a narrow category of the most serious crimes and whose extreme culpability makes them the most deserving of execution.'" *Kennedy v. Louisiana*, 554 U.S. 407, 420 (2008) (quoting *Roper v. Simmons*, 543 U.S. 551, 568 (2005)). The Court has forbidden death sentences for people who are intellectually disabled, *Atkins v. Virginia*, 536 U.S. 304, 321 (2002); juveniles, *Roper*, 543 U.S. at 578-

Memorandum in Support of Successive
Petition for Post-Conviction Relief – Joseph E. Corcoran

79; offenders who raped but did not kill, *Kennedy*, 554 U.S. at 420; *Coker v. Georgia*, 433 U.S. 584, 592

(1977); and offenders who did not himself kill or intend to kill a victim, *Enmund v. Florida*, 458 U.S.

782, 788 (1982).

One of the primary factors underpinning the Court's decisions restricting capital punishment

for certain offenders is "retribution and deterrence of capital crimes by prospective offenders." *Gregg*

*v. Georgia*, 428 U.S. 153, 183 (1976); *see also Kennedy*, 554 U.S. at 420; *Roper*, 543 U.S. at 553; *Atkins*,

536 U.S. at 319. In *Atkins* and *Roper*, the Court held that intellectual disability or being a juvenile

reduced the moral culpability of offenders and made them less likely to be deterred by the prospect

of a death sentence. *Atkins,* at 318-20; *Roper,* at 571.

Additionally, the Eighth Amendment mandates consideration of "the evolving standards of

decency that mark the progress of a maturing society." *Atkins*, 536 U.S. at 311-12 (citing *Trop v.*

*Dulles*, 356 U.S. 86, 100-01 (1958)); *see also Graham v. Florida*, 560 U.S. 48, 58 (2010); *Roper*, 543 U.S. at

561. In examining evolving standards, the Court looks to various factors, including whether there is

a national consensus, an international consensus, and a broader social and professional consensus

against executing individuals in that group. *Atkins*, 536 U.S. at 312; *Roper*, 543 U.S. at 564, 575-78.

While considering whether there is a consensus regarding punishment of a particular category of

offenders, the Court also assesses whether "there is reason to disagree with the judgment reached by

the citizenry and its legislators." *Atkins*, 536 U.S. at 313.

   **1. Corcoran's schizophrenia, which causes him to experience persistent**
     **delusions, renders him "severely mentally ill."**

"Severe mental illness" generally refers to "mental disorders that carry certain diagnoses,

such as schizophrenia, bipolar disorder, and major depression; that are relatively persistent (e.g.

lasting at least a year); and that result in comparatively severe impairment in major areas of

functioning." American Bar Association, *Severe Mental Illness and the Death Penalty*, 1 (Dec. 2016)

Memorandum in Support of Successive
Petition for Post-Conviction Relief – Joseph E. Corcoran

[Attached as Ex A]; *see also* American Bar Association, *Special Feature: Recommendations and Report on the Death Penalty and Persons with Mental Disabilities*, 30 Mental & Physical Disability L. Rep. 5, 668, 670-71 (2006) (severe mental illness generally refers to "a disorder that is roughly equivalent to disorders that mental health professionals would consider the most serious 'Axis I diagnoses.'"). The disorders included in the definition of "severe mental illness" are "typically associated with delusions (fixed, clearly false beliefs), hallucinations (clearly erroneous perceptions of reality), extremely disorganized thinking, or very significant disruption of consciousness, memory, and perception of the environment." *Id.*

Corcoran's diagnoses of paranoid schizophrenia and major depression are severe mental illnesses. *Severe Mental Illness and the Death Penalty* at 1. Corcoran experiences daily life through an elaborate delusional system. He believes there is an ultrasonic machine at the prison that can control his movements as well as insert thoughts into his mind. He believes he is a targeted victim of this machine because of his sleep disorder, which causes him to say things out loud in his sleep. These symptoms affected Corcoran's decision-making at every stage of his case, from rejecting plea offers unless he could have his vocal cords severed to waiving PCR. These symptoms fit squarely into the features of severe mental illness that most concern mental health professionals, legal observers, and legislators with regard to executing individuals with severe mental illness. *See Severe Mental Illness and the Death Penalty* at 2-3.

        2.      **The scientific and legal rationale for exempting the intellectually disabled and juveniles from execution applies to the severely mentally ill.**

In *Atkins*, the Court explained that, in addition to not serving the penological purposes of capital punishment, the impairments inherent in intellectual disability render the death penalty disproportionate for those offenders. 536 U.S. at 306-07, 318. Individuals with intellectual disability have "diminished capacities to understand and process information, to communicate, to abstract

Memorandum in Support of Successive
Petition for Post-Conviction Relief – Joseph E. Corcoran

from mistakes and learn from experience, to engage in logical reasoning, to control impulses, and to understand the reactions of others." *Id.* at 318. In *Roper*, the Court similarly pointed to the "lack of maturity and an underdeveloped sense of responsibility" of youth, which "often result in impetuous and ill-considered actions and decisions." 543 U.S. at 569. Regarding deterrence, the Court noted, "[t]he likelihood that the teenage offender has made the kind of cost-benefit analysis that attaches any weight to the possibility of execution is so remote as to be virtually nonexistent." *Roper*, 543 U.S. at 572 (citing *Thompson v. Oklahoma*, 487 U.S. 815, 837 (1988)). Likewise, for intellectually disabled offenders, "it is the same cognitive and behavioral impairments that make these defendants less morally culpable—for example, the diminished ability to understand and process information, to learn from experience, to engage in logical reasoning, or to control impulses—that also make it less likely that they can process the information of the possibility of execution as a penalty and, as a result, control their conduct based upon that information." *Atkins*, 536 U.S. at 320. The Court concluded that juveniles and people with intellectual disabilities are not "among the worst offenders," because of their diminished culpability and they are less likely to be deterred from committing capital crimes. *Roper*, 543 U.S. at 570-71; *Atkins*, 536 U.S. at 318-19 ("[i]f the culpability of the average murderer is insufficient to justify the most extreme sanction available to the State, the lesser culpability of the mentally retarded offender surely does not merit that form of retribution.").

Individuals with severe mental illness—particularly those whose mental illness results in psychosis, like Corcoran—have many of the same characteristics the Court found rendered the death penalty a disproportionate punishment for juveniles and those with intellectual disabilities. *See* Christopher Slobogin, *What Atkins Could Mean for People with Mental Illness*, 33 N.M. L. Rev. 293, 304 (2003).

> [P]eople with schizophrenia have difficulty focusing on essential information, are easily distracted by irrelevant stimuli, often experience 'thought blocking' (involving a complete halt to thinking), attribute elaborate meaning to what they see and hear, engage in

6

**11a**

Memorandum in Support of Successive
Petition for Post-Conviction Relief – Joseph E. Corcoran

> combative thinking (involving the reduction of impressions into unrealistic beliefs), and
> have difficulty forming abstract concepts clearly." *Id.* Furthermore, "people who suffer from
> psychosis also have great difficulty in communicating with and understanding others,
> engaging in logical cost-benefit analysis, and evaluating the consequences of and controlling
> their behavior." *Id.* Indeed, "[i]f anything, the delusions, command hallucinations, and
> disoriented thought process of those who are mentally ill represent greater dysfunction than
> that experienced by most 'mildly' retarded individuals . . . and by virtually any non-mentally
> ill teenager.

*Id.* As the ABA explained in their publication, *Severe Mental Illness and the Death Penalty*, at 3, drawing a

parallel to the impairments described by the Supreme Court in *Atkins*, "hallucinations, delusions,

grossly disorganized thinking—among other symptoms of mental illness—also significantly interfere

with an individual's thinking, behavior, and emotion regulation."

Additionally, severe mental illness can "strongly affect defendants' decision-making about

their defense, leading them to refuse to cooperate with their attorneys." *Id.* And "research has shown

that mental illness can be erroneously interpreted by jurors," especially "when a defendant has a

bizarre or flat affect in the courtroom." *Id.* As described in the DSM, "[d]elusions involve

'misinterpretations of perceptions and experiences,'" hallucinations are "usually auditory and consist

of 'pejorative or threatening voices,'" people experiencing schizophrenia tend to have "a high degree

of disorganized thought," and often have "'difficulties in performing activities of daily living.'"

Slobogin at 310 (quoting DSM-IV at 275-76, 282).[2]

---

[2] The DSM details the key features and diagnostic criteria of schizophrenia. American Psychiatric
Association, *Diagnostic and Statistical Manual of Mental Disorders, Text Revision*, 101, 113-14 (5th ed)
("DSM-V-TR"). It explains that delusions are "fixed beliefs that are not amendable to change in
light of conflicting evidence." *Id.* at 101. Hallucinations are "perception-like experiences that occur
without an external stimulus." *Id.* at 102. Auditory are the most common, and are "usually
experienced as voices, whether familiar or unfamiliar, that are perceived as distinct from the
individual's own thoughts." *Id.* Those suffering from schizophrenia experience disorganized
thinking, expressed by switching from one topic to another, giving unrelated answers to questions,
or through communication that is "nearly incomprehensible." *Id.* Further, the person maybe be
"grossly disorganized," which may manifest as "childlike silliness," unpredictable agitation, problems
performing daily tasks, and even catatonia, a decreased reactivity to one's environment. *Id.*

7

**12a**

Memorandum in Support of Successive
Petition for Post-Conviction Relief – Joseph E. Corcoran

Those are precisely the types of characteristics the Supreme Court identified in *Atkins* and *Roper* that rendered the death penalty inappropriate for the intellectually disabled and juveniles. Notably, the Supreme Court specified that the ultimate question was not whether those groups of offenders knew right from wrong or were legally competent. *Atkins*, 536 U.S. at 318; *see also Roper*, 543 U.S. at 563. Rather, the impairments those offenders possess "make it less defensible to impose the death penalty as retribution for past crimes and less likely that the death penalty will have a real deterrent effect." *Roper*, 543 U.S. at 563 (citing *Atkins*, 536 U.S. at 318-19).

Corcoran's symptoms and experiences are closely aligned with those noted above. Corcoran displayed flat affect, a symptom of his schizophrenia, throughout the guilt and penalty phase of his trial in front of the jury that decided whether he would live or die. In his closing argument, the prosecutor emphasized Corcoran's lack of emotion while his sister was testifying about finding the victims [T 2448]. Corcoran also experiences delusions and hallucinations. His psychosis includes believing his thoughts are being broadcast and an ultrasound or ultrasonic machine causes him to move and jerk involuntarily. Despite being treated with antipsychotic medication, Corcoran's symptoms prevail.

Numerous judges have recognized the parallels between severe mental illness, intellectual disability, and youth. Ohio Supreme Court Justice Paul Pfeifer explained in 2001, "Mental illness is a medical disease. Every year we learn more about it and the way it manifests itself in the mind of the sufferer. At this time, we do not and cannot know what is going on in the mind of a person with mental illness. As a society, we have always treated those with mental illness differently from those without. In the interest of human dignity, we must continue to do so." *State v. Scott*, 748 N.E.2d 11, 20 (Ohio 2001) (Pfeifer, J., dissenting).

In later Ohio cases, Justice Lundberg Stratton called for a reexamination of whether society should execute a person with serious mental illness. *State v. Lang*, 954 N.E.2d 596, 649 (Ohio 2011)

8

**13a**

Memorandum in Support of Successive
Petition for Post-Conviction Relief – Joseph E. Corcoran

(Lundberg Stratton, J., concurring); *see also State v. Ketterer*, 855 N.E.2d 48, 82 (Ohio 2006) (Lundberg Stratton, J., concurring). "If executing persons with mental retardation/developmental disabilities or executing juveniles offends 'evolving standards of decency,' then I simply cannot comprehend why these same standards of decency have not yet evolved to also prohibit execution of persons with severe mental illness at the time of their crimes." *Lang*, 954 N.E.2d at 649 (internal citation omitted).

Justice Robert D. Rucker advocated a similar position in Corcoran's case when he wrote "the underlying rationale for prohibiting executions of the mentally retarded is just as compelling for prohibiting executions of the seriously mentally ill, namely evolving standards of decency." *Corcoran*, 774 N.E.2d at 502-03. Justice Rucker reiterated that position in later cases, explaining further that "if a person who is mentally ill suffers from the same 'diminished capacities' as a person who is mentally retarded, then logic dictates it would be equally offensive to the prohibition against cruel and unusual punishment to execute that mentally ill person." *Overstreet v. State*, 877 N.E.2d 144, 175 (Ind. 2007); *see also Matheney v. State*, 833 N.E.2d 454, 458 (Ind. 2005) (Rucker, J., concurring) ("I continue to believe that a sentence of death is inappropriate for a person suffering a severe mental illness").

Evoking the *Atkins* Court, Justice James Zazzali of the New Jersey Supreme Court wrote in *State v. Nelson*, "if the culpability of the average murderer is insufficient to evoke the death penalty as our most extreme sanction, then the lesser culpability of Nelson, given her history of mental illness and its connection to her crimes, 'surely does not merit that form of retribution.'" 803 A.2d 1, 47 (N.J. 2002) (Zazzali, J., concurring) (quoting *Godfrey*, 446 U.S. at 433).

Memorandum in Support of Successive
Petition for Post-Conviction Relief – Joseph E. Corcoran

      **3.    There is a national consensus against subjecting severely mentally ill defendants to the death penalty.**

Numerous states, including Indiana, have introduced bills to ban the death penalty or execution for people with severe mental illness, including schizophrenia and schizoaffective disorder.

Before it later abolished the death penalty altogether, Connecticut passed a law precluding a seriously mentally ill defendant from execution. Conn. Gen. Stat. § 53a-46a (h)(3). The Ohio legislature passed a similar statute prohibiting the imposition or implementation of the death penalty for defendants who have been diagnosed with a severe mental illness, such as schizophrenia or schizoaffective disorder, and whose mental illness "significantly impaired the person's capacity to exercise rational judgment" in conforming his or her conduct to the law or appreciating the nature, consequences, or wrongfulness of his or her conduct. Ohio H.B. 136 (2019). Importantly, the legislature specified that the offender's condition need not meet the competency or insanity standards. *Id.* Kentucky followed suit in early 2022, exempting from the death penalty offenders with "active symptoms and a documented history, including a diagnosis," schizophrenia or schizoaffective disorder. Ky. H.B. 269 (2022). An offender who is found to fit those criteria "shall not be subject to execution." *Id.*

Before they abolished the death penalty, Virginia and Colorado legislatures also considered laws prohibiting the death penalty for the severely mentally ill. Virginia Senate Bill 1137; *Kentucky and South Dakota Advance Bills to Bar Death Penalty for People with Severe Mental Illness*, Death Penalty Information Center (Feb. 23, 2022), https://deathpenaltyinfo.org/news/kentucky-and-south-dakota-advance-bills-to-bar-death-penalty-for-people-with-severe-mental-illness.  In addition, laws that would prohibit the death penalty or execution for severely mentally ill defendants have been proposed in Arizona, Arkansas, Florida, Georgia, Idaho, Indiana, North Carolina, South Carolina,

Memorandum in Support of Successive
Petition for Post-Conviction Relief – Joseph E. Corcoran

South Dakota, Tennessee, Texas, and Missouri. *Id.*; *see also At Least Seven States Introduce Legislation Banning Death Penalty for People with Severe Mental Illness*; Death Penalty Information Center (Feb. 3, 2017), https://deathpenaltyinfo.org/news/at-least-seven-states-introduce-legislation-banning-death-penalty-for-people-with-severe-mental-illness. Although the laws in those states have not yet passed, many have received broad bipartisan support and proposed bills in at least three states, Indiana, Florida and South Dakota, were introduced by Republican legislators. The Indiana Bill was sponsored by Republican Jim Merritt and barred execution for people suffering from schizophrenia specifically.

States that have abolished the death penalty altogether must also be counted among those that prohibit capital punishment for the severely mentally ill. *Roper,* 543 U.S. at 574; *see also Hall v. Florida*, 572 U.S. 701, 716 (2014) (including states with effective moratoria on executions in the count of states on the "side of the ledger" with laws prohibiting the death penalty altogether and for particular classes of offenders). Twenty-six states and the District of Columbia have abolished the death penalty. *See* Death Penalty Information Center, State by State, https://deathpenaltyinfo.org/state-and-federal-info/state-by-state . Four additional states have declared a moratorium on executions, bringing the number of jurisdictions within the United States that effectively bar the execution of severely mentally ill defendants to 31, not including the 11 additional states that have been considering such bars in recent years.

There is widespread bipartisan support for prohibiting the execution of severely mentally ill individuals. In the 2003 Gallup poll cited by Ohio Supreme Court Justice Lundberg Stratton, 75% of Americans opposed the death penalty for the mentally ill. Thus, the growing legislative consensus against imposing or implementing the death penalty against severely mentally ill individuals is closely related to and has followed the broader societal consensus that emerged in the last two decades.

11

**16a**

Memorandum in Support of Successive
Petition for Post-Conviction Relief – Joseph E. Corcoran

4.    **A strong professional and scientific consensus exists against executing individuals who are severely mentally ill.**

In addition to the national consensus against executing the severely mentally ill that has developed legislatively and among individual voters, the scientific, psychological, and legal communities have developed a clear consensus against such executions. Leading mental health associations in the United States recommend exempting defendants with severe mental illness from the death penalty, including the American Psychiatric Association, the American Psychological Association, the National Alliance for the Mentally Ill, and Mental Health America. These organizations share a common belief that the penological purposes of capital punishment are not met in the case of defendants with severe mental illness, and the diminished personal moral culpability of these individuals should preclude their eligibility for a death sentence. The American Psychological Association has "urge[d] jurisdictions that impose capital punishment not to execute certain persons with mental disabilities." American Psychological Association, *Mental Disability and the Death Penalty* (2006), https://www.apa.org/about/policy/chapter-4b .

**V.  Corcoran's death sentence violates Article One, Section Sixteen of the Indiana Constitution because he is seriously mentally ill.**

"Because Indiana's constitution affords even greater protections than its federal counterpart, I would hold that a seriously mentally ill person is not among those most deserving to be put to death. To do so in my view violates the Cruel and Unusual Punishment provision of the Indiana Constitution. Because Corcoran is obviously severely mentally ill, he should be sentenced to life without possibility of parole, not death." *Corcoran,* 774 N.E.2d at 503 (Rucker, J., dissenting).

Ind. Const. art. I, § 16 states, in relevant part, "Cruel and unusual punishments shall not be inflicted. All penalties shall be proportioned to the nature of the offense." A punishment is "cruel and unusual" if it makes no measurable contribution to the acceptable goals of punishment, but rather constitutes only the purposeless and needless imposition of pain and suffering. *Dunlop v. State,*

12

**17a**

Memorandum in Support of Successive
Petition for Post-Conviction Relief – Joseph E. Corcoran

724 N.E.2d 592 (Ind. 2000); *Lindsey v. State*, 877 N.E.2d 190 (Ind. Ct. App. 2007). It applies to

"atrocious or obsolete punishments" and is "aimed at the kind and form of punishment, rather than

the duration and amount." *Ratliff v. Cohn*, 693 N.E.2d 530 (Ind. 1998). The execution of a seriously

mentally ill person makes no measurable contribution to the acceptable goals of punishment–

deterrence and retribution.

The Indiana Constitution also prohibits disproportionate sentences, and its provision sweeps

more broadly than its federal counterpart. *Knapp v. State,* 9 N.E.3d 1274, 1289 (Ind. 2014). No

defendant found guilty but mentally ill currently resides on Indiana's death row nor has been

executed since the death penalty was reinstated in 1977. *Prowell v. State,* 741 N.E.2d 704, 717, n.8

(Ind. 2001). Indiana has executed twenty people since the death penalty was reinstated. None of

them were diagnosed with schizophrenia. The Indiana Supreme Court has described a person with

paranoid schizophrenia as being "gravely mentally ill." *Gambill v. State,* 675 N.E.2d 668, 678 (Ind.

1996). It has also noted that using evidence of a defendant's demeanor before or after a crime to

disprove insanity is ordinarily acceptable but "when a defendant has a serious and well-documented

mental disorder, such as schizophrenia, one that causes him to see, hear, and believe realities that do

not exist, such logic collapses." *Galloway v. State,* 938 N.E.2d 699 (Ind. 2010) (citing *Moler v. State,* 782

N.E.2d 454 (Ind. Ct. App. 2003)). Schizophrenia is and should be viewed differently than other

mental illness. The severity of this mental illness makes a death sentence for someone who suffers

from it unconstitutionally disproportionate.

**VI. Because Corcoran is severely mentally ill, his execution also violates the Equal
Protection Clause of the Fourteenth Amendment to the United States Constitution.**

This Court should also find that because Corcoran is severely mentally ill, his execution

violates the Equal Protection Clause of the Fourteenth Amendment which "commands that no State

shall deny to any person within its jurisdiction the equal protection of the laws, which is essentially a

Memorandum in Support of Successive
Petition for Post-Conviction Relief – Joseph E. Corcoran

direction that all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985) (internal quotation marks omitted). Under this Clause, "[t]he State may not rely on a classification whose relationship to an asserted goal is so attenuated as to render the distinction arbitrary or irrational." *Id.* at 446.

In *Atkins* and *Roper*, the Supreme Court categorically prohibited the executions of people who are intellectually disabled and those who were juveniles at the time of their offense. Those decisions were based on the Court's conclusions that the qualities inherent in intellectual disability and youth—"diminished capacities to understand and process information, to communicate, to abstract from mistakes and learn from experience, to engage in logical reasoning, to control impulses, and to understand the reactions of others" in addition to susceptibility to outside influences and lack of control over their environments—rendered the penological purposes of capital punishment less applicable to those groups than to other defendants. *Atkins*, 536 U.S. at 318; *Roper*, 543 U.S. at 569-70.

Individuals who suffer from severe mental illness likewise have substantial impairments. Indeed, people with severe mental illness can experience "greater dysfunction" than that experienced by many individuals with relatively mild intellectual disability and by juveniles. Slobogin at 304; *see also People v. Danks*, 82 P.3d 1249, 1285 (Cal. 2004) (Kennard, J., concurring and dissenting in part) (comparing the diminished capacities of people with intellectual disabilities to those with schizophrenia and noting "the impairment may be equally grave," including the capacity to "understand and process information, to communicate, to abstract from mistakes and learn from experience, to engage in logical reasoning, to control impulses, and to understand the reactions of others.") (quoting *Atkins*, 536 U.S. at 318); *Bryan v. Mullin*, 335 F.3d 1207 (10th Cir. 2003) (Henry, J., concurring and dissenting in part) (the logic of the holding in *Atkins* that the deficiencies of people

14

**19a**

Memorandum in Support of Successive
Petition for Post-Conviction Relief – Joseph E. Corcoran

with intellectual disabilities diminish their culpability, "applies no less to those in Mr. Bryan's shoes
who suffer from severe mental deficiencies.").

In light of the similarities between intellectually disabled, juvenile, and severely mentally ill
offenders, there is no rational basis for excluding the first two categories of offenders from the
death penalty but allowing the punishment for the severely mentally ill. Severely mentally ill
defendants are "no more culpable or deterrable, nor any more dangerous" than juveniles or
intellectually disabled individuals. *See* Slobogin at 313. Continuing to execute the severely mentally ill
despite the parallels with juveniles and the intellectually disabled demonstrates the type of "irrational
prejudice" the *Cleburne* Court held unconstitutional and violates the Equal Protection Clause of the
Fourteenth Amendment. *See Cleburne*, 473 U.S. at 450.

## CONCLUSION

WHEREFORE, this Court should find there is a reasonable probability that he is entitled to
relief because, based on his severe mental illness, Corcoran's death sentence and execution violate
current standards of decency in violation of the Eighth Amendment or the Equal Protection Clause
of the Fourteenth Amendment to the United States Constitution and Article One, Section 16 of the
Indiana Constitution.

Respectfully Submitted,

AMY E. KAROZOS
PUBLIC DEFENDER OF INDIANA
Attorney No. 14429-49
One North Capitol, Suite 800
Indianapolis, IN 46204
(317) 232-2475
spd@pdo.in.gov

By: /s/ Joanna Green
    Joanna Green
    Deputy Public Defender
    Attorney No. 16724-53

15

**20a**

Memorandum in Support of Successive
Petition for Post-Conviction Relief – Joseph E. Corcoran

By: /s/ Laura L. Volk
Laura L. Volk
Deputy Public Defender
Attorney No. 18934-49

and

/s/ Laurence E. Komp
LAURENCE E. KOMP
Temporary Admission No. 118-95-TA
Federal Public Defender
Western District of Missouri
1000 Walnut Street, Suite 600
Kansas City, MO 64106
816-675-0923
laurence_komp@fd.org

*Attorneys for Appellant*

## CERTIFICATE OF SERVICE

I hereby certify that a true copy of the foregoing has been delivered through IEFS to the

following, this 15th day of November 2024.

Tyler Banks
Supervising Deputy Attorney General
Tyler.Banks@atg.in.gov

By: /s/ Joanna Green
Joanna Green
Deputy Public Defender
Attorney No. 16724-53

By: /s/ Laura L. Volk
Laura L. Volk
Deputy Public Defender
Attorney No. 18934-49

16

**21a**



americanbar.org/dueprocess

# Severe Mental Illness and the Death Penalty



**American Bar Association
Death Penalty Due Process Review Project
December 2016** Attachment A

Attachment A

# Table of Contents

Executive Summary ............................................................................................. 1

About the Project.................................................................................................. 5

Introduction ........................................................................................................ 6

The American Bar Association's Position on Mental Illness and the Death Penalty ............... 7

Part I: Severe Mental Illness and Its Relevance to Criminal Justice...........................................8

    Definition of Mental Illness and Severe Mental Illness.......................................... 9

    Mental Illness in the Broader Criminal Justice Context......................................... 15

    Prevalence of Violent Behavior and Being a Victim of Violence ..................................... 17

Part II:  Inadequacy of Existing Legal Mechanisms to Address Severe Mental Illness in Capital Cases............................................................................................................ 19

    Competency to Stand Trial...................................................................................... 19

    The Insanity Defense.............................................................................................. 20

    Mitigating Factors................................................................................................... 22

    Competency to be Executed .................................................................................. 24

Part III: Constitutional Challenges to the Execution of Defendants with Severe Mental Illness................................................................................................................... 25

    No Penological Justification................................................................................... 25

    A Violation of the Eighth Amendment Ban on Cruel and Unusual Punishment.............. 26

    The "Unreliability Principle"................................................................................. 31

    A Violation of the Equal Protection Clause........................................................... 33

Part IV: Significant Public Policy Concerns.................................................................... 33

    Higher Risk of Executing an Innocent Person...................................................... 33

    Opposition of Professional Organizations, International Institutions and a Majority of the American Public........................................................................................... 34

    Perspectives of Some Murder Victims' Families.................................................. 36

Conclusion........................................................................................................... 38

Acknowledgments................................................................................................ 39

Attachment A

# Executive Summary

## Introduction

*"Individuals with severe mental disorders or disabilities – present either at the time a capital crime is committed or as they are facing execution – should not be subject to capital punishment."*

In recent years, our society's improved understanding of mental illness has led to a growing recognition that, to ensure fairness, the American justice system should treat those with mental disorders and disabilities differently. Advocates, professional organizations, and many others are troubled by the overrepresentation of people with mental illness in the criminal justice system, and agree that these conditions need to be better taken into account by prosecutors and courts because of their relevance to culpability, sentencing, and meaningful participation in the legal process. This consideration is particularly critical in capital cases, when the stakes are the highest. For these reasons, among many others that will be discussed in this Paper, individuals with severe mental illness should not be subject to the death penalty.

It has now been 10 years since the American Bar Association (ABA), in conjunction with the American Psychiatric Association, American Psychological Association and National Alliance on Mental Illness (NAMI) adopted a policy opposing the death penalty for individuals with severe mental disorders or disabilities present at the time a crime is committed; and five years since Mental Health America adopted a similar position. As we reflect on these anniversaries, it is significant to note that, since 2006, none of the jurisdictions that use capital punishment have passed statutes to categorically prevent the execution of individuals with severe mental illness. Despite broader efforts to reform the criminal justice system's approach to mental illness, individuals with these types of conditions can still be sentenced to death and executed. It is, therefore, now time to convert the ABA's policy into a meaningful tool to help states pass laws that will establish clear standards and processes to prevent the execution of those with severe mental illness.

## Definition of Severe Mental Illness and its Relevance to Criminal Justice

The American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition (DSM-5), defines mental disorder as: "a syndrome characterized by clinically significant disturbance in an individual's cognition, emotion regulation, or behavior that reflects a dysfunction in the psychological, biological, or developmental processes underlying mental functioning…usually associated with significant distress in social, occupational, or other important activities."

Severe mental illness refers to a narrower set of diagnoses. According to the American Psychological Association, it includes "mental disorders that carry certain diagnoses, such as schizophrenia, bipolar disorder, and major depression; that are relatively persistent (e.g., lasting at least a year); and that result in comparatively severe impairment in major areas of functioning."

Although not an exhaustive list, the most recognized and common severe mental illnesses include schizophrenia and schizoaffective disorder, bipolar disorders, major depressive disorder, and post-traumatic stress disorder (PTSD).

Attachment A

## Inadequacy of Existing Legal Mechanisms to Address Severe Mental Illness in Capital Cases

None of the existing legal procedures afford complete or sufficient protection against death sentences and execution for individuals who had severe mental illness at the time of their crime.

*Competency to Stand Trial.* The competency standard is used to ensure that a defendant can adequately partake in his or her own defense. It is focused on a defendant's present mental abilities at the time of trial and does not address the question of state of mind at the time of the alleged offense, or legal culpability. If a defendant is found incompetent, he or she is moved to a medical facility to receive treatment to be restored, if possible, to competency so he or she can eventually face the charges against him or her. While mental illness often plays a role in a court's determination of a defendant's competence to stand trial, a history of mental illness "does not render the defendant mentally incompetent per se." The competency standard does not take into account a defendant's mental state at the time of crime, and does not preclude the death penalty for those with severe mental illness, unlike the ABA's proposed exemption.

*The Insanity Defense.* The insanity defense is an affirmative defense to a crime, intended to relieve a defendant of legal responsibility. A defendant found insane will be found not guilty of the crime and most likely sent to a psychiatric institution. However, the insanity defense is used in a very small number of cases, and is successful in even fewer. Indeed, it only applies to a narrow category of individuals with very particular manifestations of mental illness. The exemption endorsed by the ABA provides a middle ground protection for individuals who do not fit the extremely narrow insanity defense requirements, but who have significant mental impairments that make them undeserving of the death penalty.

*Mitigating Factors.* While jurors' consideration of mitigating factors related to mental illness is permitted in a death penalty sentencing phase, this has proven to be an unreliable method to ensure that a defendant's severe mental illness will be fully considered and given its proper weight. Significant jury research has shown that jurors frequently hold widespread and erroneous prejudices about mental illness and future dangerousness, and may make life or death decisions based on them. The Supreme Court expressed similar concerns with juries' consideration of defendants with intellectual disability or who are juveniles in capital cases, and found that categorical bars to the death penalty were the only appropriate protections. The proposed ABA exemption would provide a similar protection to those with severe mental illness.

*Competency to be Executed.* When looking at a defendant's competency to be executed, courts look at that person's mental state at the time near the execution date, which can occur many years after the crime. It is focused on whether defendants understand the reasons for their execution, and not on whether they were suffering from a severe mental disorder or disability that significantly impairs their understanding of reality and ability to control behavior at the time of the crime. Thus, this standard, like the other current mechanisms in the law, provides inadequate legal protection.


## Constitutional Challenges to the Execution of Defendants with Severe Mental Illness

*No Penological Justification.* The U.S. Supreme Court has identified two purposes served by capital punishment: retribution and deterrence. Neither of these purposes justifies the execution of individuals with severe mental illness.

To warrant the death penalty, a defendant must be more morally culpable than the average murderer – as capital punishment is intended for the "worst of the worst." Executing people with severe mental illness does not further the retributive goals of the punishment, as this population simply does not have the requisite moral culpability. Their illnesses can impair the ability to interpret reality accurately, comprehend fully the consequences of their actions, and control their actions. In addition, the theory that the death penalty can deter potential murderers is controversial and unsupported by conclusive evidence. Any possible deterrent effects are

Attachment A

further diminished among people who suffer from impairments that affect their cognition, emotion regulation, or behavior.

*A Violation of the Eighth Amendment Ban on Cruel and Unusual Punishment.* The Supreme Court's jurisprudence has created categorical bars on the death penalty for individuals with intellectual disabilities (in *Atkins v. Virginia*) and juvenile defendants (in *Roper v. Simmons*). In both cases, the Court noted that the Eighth Amendment's ban on cruel and unusual punishment must be interpreted through the standards of the time and should reflect contemporary society's view on punishment. Most significantly, the Court conducted independent analyses in which it listed the impairments that characterize intellectual disability and youth and concluded: "These deficiencies do not warrant an exemption from criminal sanctions, but diminish their personal culpability."

The impairments described by the Court in *Atkins* include "diminished capacity to understand and process information, to communicate, to engage in logical reasoning, to control impulses, and to understand others' reactions" and are very similar to impairments frequently caused by severe mental illness. Indeed, hallucinations, delusions, grossly disorganized thinking – among other symptoms of mental illness – also significantly interfere with an individual's thinking, behavior, and emotion regulation.

*The "Unreliability Principle."* The Supreme Court has consistently affirmed that capital punishment requires individualized sentencing because of its gravity and finality. The death penalty cannot be automatically applied for specific categories of crime, and jurors must make sentencing decisions based on unique considerations and facts in the case before them. The Supreme Court and many states' laws specify that mental illness can be part of that individualized consideration as a mitigating factor.

However, in practice, severe mental illness can end up being a significant impediment to the presentation of effective, individualized mitigation. It can strongly affect defendants' decision-making about their defense, leading them to refuse to cooperate with their attorneys or reject the presentation of any mitigating evidence related to their illness. Worse, research has shown that mental illness can be erroneously interpreted by jurors as an aggravating factor, and it is worsened when a defendant has a bizarre or flat affect in the courtroom. Plus, jurors hold many of the same unwarranted prejudices present in the general population about violence and mental illness, and may view people with mental illness as intrinsically dangerous – a view completely unsupported by empirical evidence.

Thus, there is a significant risk that a death sentence may be imposed because of – not simply in spite of – a defendant's mental illness. This is unconstitutional and unacceptable. Because mitigation may not be reliably assessed in cases involving these defendants, the constitutional requirement of an individualized sentencing may not be met. Only a categorical exemption can ensure that a defendant's severe mental illness does not hinder individualized sentencing.

*A Violation of the Equal Protection Clause.* The Fourteenth Amendment's requirement of equal protection guards against the differential treatment of similarly situated individuals under the law and, therefore, there is no constitutional justification for permitting the execution of defendants with severe mental illness while defendants with similar impairments are exempted from the ultimate punishment. This principle is arguably violated by continuing to allow the death penalty for these defendants while individuals with intellectual disabilities and juveniles have been constitutionally exempted.

## Significant Public Policy Concerns

*Higher Risk of Executing an Innocent Person.* One of the most persistent concerns with capital punishment is the risk of its imposition on the innocent, and individuals with severe mental illness are especially vulnerable to erroneous convictions. First, they are at a relatively higher risk of making false confessions. Second, once in court, the stigma of mental illness, including popular and unwarranted beliefs that they are inherently

Attachment A

dangerous, contributes to assumptions of guilt and more punitive sentencing. Finally, defendants with severe mental illness are less able to participate in their own defense because of their limited or impaired abilities. A ban on the execution of the individuals with severe mental illness would not prevent wrongful accusations or even convictions, but it would prevent the justice system from "committing the irreparable" against a more at-risk population.

*Opposition of Professional Organizations, Some Murder Victims' Families, International Institutions, and a Majority of the American Public*. The ABA, the American Psychiatric Association, the American Psychological Association, NAMI and Mental Health America have all called for jurisdictions that impose capital punishment to exempt defendants suffering from severe mental illness from the death penalty. In 2009, Murder Victims' Families for Human Rights and NAMI co-published "Double Tragedies," a report addressing the urgent need for treatment and prevention to diminish the likelihood that tragic events like murders by people with severe mental illness occur. Both groups believe that seeking the death penalty in those cases diverts resources and energy that could be used to address mental health issues in the community, decrease the likelihood of violence, and help murder victims' families heal through psychological and material support.

Additionally, major international institutions also oppose capital punishment in cases of defendants with severe mental illness. The United Nations, the European Union, the Council of Europe and the Inter-American Commission on Human Rights all urge countries that continue to use the death penalty not to impose it on defendants with mental illness. Finally, Americans are strongly in favor of a severe mental illness exemption. A 2015 multi-state poll found that 66% of Americans oppose the death penalty for persons with severe mental illness and this consensus follows across party lines. Support for the exemption rises to 72% after voters hear details about how it would work in practice.

## Conclusion

The death penalty is the ultimate punishment that should be reserved for the most blameworthy individuals who commit the worst crimes – and it does not serve any effective or appropriate purpose when it is applied to individuals with severe mental illness. The Supreme Court has already recognized that there are two other categories of individuals who have similar functional impairments to people with severe mental illness that are inherently "less culpable" to the point that it is unconstitutional to apply the death penalty in their cases. In light of this constitutional landscape, the growing consensus against this practice, and the fact that none of the current legal mechanisms afford adequate protection against the death penalty to those diagnosed with serious mental disorders or disabilities, it is time for the laws in U.S. capital jurisdictions to change.

Attachment A

# About the Project

The ABA Death Penalty Due Process Review Project (Project) conducts research and educates the public and decision-makers on the operation of capital jurisdictions' death penalty laws and processes in order to promote fairness and accuracy in death penalty systems. The Project encourages adoption of the ABA's Protocols on the Fair Administration of the Death Penalty; assists state, federal, and international stakeholders on death penalty issues; and develops new initiatives to support reform of death penalty processes.

The Project created the Mental Illness Initiative in 2015 to educate legal professionals, policy makers, and the public on the subject of severe mental illness and the death penalty and to support policy reform efforts to exempt individuals with severe mental illness from the death penalty. To further this mission, the Initiative seeks to: 1) serve as a national resource for lawyers, organizations, and policy makers interested in learning more about the issues surrounding severe mental illness and capital punishment; 2) provide policy materials to advocates and lawmakers who want to advance legislation to exempt individuals with severe mental illness from the death penalty; and 3) and support state coalitions that seek to end the execution of defendants with severe mental illness.

You can learn more about the work of the Project by visiting http://www.americanbar.org/dueprocess.

Attachment A

# Severe Mental Illness and the Death Penalty

## Introduction[1]

Individuals with severe mental disorders or disabilities – present either at the time a capital crime is committed or as they are facing execution – should not be subject to capital punishment. This is one part of a comprehensive position that the American Bar Association (ABA) has supported since 2006, when, in conjunction with the American Psychiatric Association, American Psychological Association, National Alliance on Mental Illness (NAMI), and other experts, it adopted a detailed Resolution opposing the use of the death penalty for individuals with severe mental illness.[2]

Although the ABA does not take a position supporting or opposing the death penalty generally, its policy is based largely on the rationale that the execution of people with severe mental illness is inconsistent with our existing legal prohibitions on executing people with intellectual disabilities or children under the age of 18 (often referred to as "juveniles" in the case law). The U.S. Supreme Court held in 2002 and 2005 respectively that executing defendants belonging to either of these two groups is unconstitutional. Indeed, our society considers these groups less morally culpable than the most blameworthy murderers for whom the death penalty is ostensibly intended. The legal system and science recognize that they are less able to appreciate the consequences of their actions and less able to participate fully in their own defense – characteristics that apply to certain people with mental illness, as well.

Executing people whose disorders or disabilities significantly impair their ability to appreciate the nature of their conduct, exercise rational judgment, or conform their behavior to the requirements of the law is fundamentally inconsistent with the retributive and deterrent goals of the death penalty. Furthermore, as a matter of public policy, our society is learning more about the too-frequent fallibility and high costs of the death penalty, the impacts of mental illness on our veterans and other citizens, and the scarcity of affordable and accessible psychological and psychiatric treatment. All of these issues are not lost on the people of the United States: 66% of them oppose the death penalty for people with mental illness, based on a 2015 multi-state poll.[3] After hearing further details about how a severe mental illness exemption would work in practice, voter support for the severe mental illness exemption rises to 72%.[4]

Despite increased awareness of the impacts of mental illness and growing public support for an exemption, almost none of the jurisdictions that use capital punishment have yet adopted policies to categorically prevent the execution of individuals whose severe mental illness was present at the time of their crime. Therefore, 10 years after these major organizations called for a severe mental illness exemption, now is the time to convert their policy positions into meaningful public education and advocacy tools to help establish clear standards and workable processes to prevent the execution of individuals with severe mental illness.

This Paper aims to provide readers with a complete explanation of the rationale behind the proposed exemption, as well as provide policy makers, legal professionals, and the public with all the information needed to comprehend this issue and work towards reform in state legislatures.

---

[1] The statements and analysis contained in this White Paper are the work of the American Bar Association Death Penalty Due Process Review Project, which is solely responsible for its content. The Board of Governors and House of Delegates of the American Bar Association have neither reviewed nor sanctioned its contents, with exception to its references to 2006 ABA Mental Illness Resolution 122-A. Accordingly, the views expressed herein should not be construed as representing the policy of the ABA. In addition, this White Paper is intended as background information. It is not intended as legal advice on particular cases.

[2] We chose to use "severe mental illness" as it is the most commonly used term in past and current bills attempting to exempt individuals with mental illness from the death penalty. There is no intent to conceptually distinguish "severe mental illness" from "serious mental illness" or "severe mental disorder."

[3] Multi-State Voter Survey: Death Penalty and Mental Illness, Survey conducted: November 30th – December 7th, 2015, DAVID BINDER RESEARCH (2015).

[4] Id. Additionally, a 2014 poll found that 58% of Americans supported a severe mental illness exemption. See National Survey Results, PUBLIC POLICY POLLING (Nov. 2014) (https://drive.google.com/file/d/0B1LFfr8Iqz_7R3dCM2VJbTJiTjVYVDVodjVVSTNJbHgxZWlB/view).

Attachment A

# The American Bar Association's Position on Mental Illness and the Death Penalty

The ABA has done extensive work to improve the fairness and accuracy of the American death penalty and has closely followed developments of many aspects of capital punishment law. As part of this work, the ABA has reflected about and adopted several policies expressing its concerns about the application of the death penalty to more vulnerable populations.[5] Its policy on mental illness and the death penalty is part of that long history.

In 2002, the U.S. Supreme Court held in *Atkins v. Virginia*[6] that the execution of people with mental retardation (now referred to as "intellectual disability")[7] violates the Eighth Amendment's ban on cruel and unusual punishment. The ABA's Section of Individual Rights and Responsibilities (now called "Section of Civil Rights and Social Justice")[8] recognized that this decision offered "a timely opportunity to consider the extent, if any, to which other types of impaired mental conditions ought to lead to exemption from the death penalty."[9]
 To do so, the Section convened the Task Force on Mental Disability and the Death Penalty, composed of 24 attorneys and mental health professionals, both practitioners and academics with diverse expertise, from across the country.[10] This group deliberated between April 2003 and March 2005 and proposed a resolution that was adopted by the ABA's House of Delegates in 2006.

ABA Resolution 122-A contains three sections: the first recommends that individuals with significant limitations in both intellectual functioning and adaptive skills be exempt from the death penalty. This section's primary purpose is to suggest practical standards to implement the *Atkins* decision, in particular by providing a medically based definition of "mental retardation" as a disability originating before the age of 18 that is "characterized by significant limitations both in intellectual functioning and in adaptive behavior as expressed in conceptual, social, and practical adaptive skills."[11] The language in this part of the Resolution was also meant to encompass dementia and traumatic brain injury, disabilities also characterized by significant limitations in intellectual functioning and adaptive behavior, but which may not be present before the age of 18.

The second section of the Resolution is the most relevant to this Paper and to the current work of the Death Penalty Due Process Review Project's Mental Illness Initiative. In this section, the ABA urges each jurisdiction that imposes capital punishment to implement the following policy:

Defendants should not be executed or sentenced to death if, at the time of the offense, they had a severe mental disorder or disability that significantly impaired their capacity (a) to appreciate the nature, consequences or wrongfulness of their conduct, (b) to exercise rational judgment in relation to conduct, or (c) to conform their conduct to the requirements of the law. A disorder manifested primarily by repeated criminal conduct

---

[5] *See ABA Death Penalty Policies*, ABA DEATH PENALTY DUE PROCESS REVIEW PROJECT, http://www.americanbar.org/groups/crsj/projects/death_penalty_due_process_review_project/resources/policy.html (last visited Nov. 21, 2016) (For a full list of ABA positions related to the death penalty).
[6] *Atkins v. Virginia*, 536 U.S. 304 (2002).
[7] "Intellectual disability" has been increasingly used by professional organizations, journals, agencies and published research as the preferred term for the disability historically referred to as mental retardation. Individuals with intellectual disability and others have advocated for this change as the term "mental retardation" does not communicate dignity or respect, and frequently results in the devaluation of such persons. In 2010, President Obama signed "Rosa's Law" requiring the federal government to replace the term "mental retardation" with "intellectual disability" in many areas of government, following a trend already established in many states and federal agencies. Rosa's Law, S.2781, 111th Cong. (2010).
[8] For more information about the activities of the ABA's Civil Rights and Social Justice Section, see *Civil Rights and Social Justice*, ABA, http://www.americanbar.org/groups/crsj.html (last visited Nov. 22, 2016).
[9] ABA, RECOMMENDATION 122-A, 2006 Ann. Mtg. (adopted Aug. 7-8, 2006), http://www.americanbar.org/content/dam/aba/migrated/2011_build/death_penalty_moratorium/mental_illness_policies.authcheckdam.pdf.
[10] *Id.* at 3, n.1 (includes a list of the Task Force's members).
[11] This definition was, at the time of the ABA's resolution, the most recently endorsed by the American Association of Mental Retardation (now American Association on Intellectual and Developmental Disabilities or AAIDD). The definition was also consistent with the most recent edition of the American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders. *See* AMERICAN PSYCHIATRIC ASSOCIATION, DIAGNOSTIC AND STATISTICAL MANUAL 49, (text rev. 4th ed. 2000) (hereafter DSM-IV-TR). The AAIDD currently uses a similar definition. *Definition of Intellectual Disability*, AAIDD, https://aaidd.org/intellectual-disability/definition#.WDNjzP6QzDc (last visited Nov. 21, 2016).

Attachment A

or attributable solely to the acute effects of voluntary use of alcohol or other drugs does not, standing alone, constitute a mental disorder or disability for purposes of this provision.[12]

The Resolution's accompanying report specifically notes that this paragraph is only meant to apply to those with "severe" mental disorders and disabilities, and specifically excludes from this exemption those whose conditions are manifested primarily by criminal behavior or voluntary substance use. That report explains that the rationale for recommending this exemption is based on the recognition that, similarly to individuals with intellectual disability and juveniles, those with severe mental illness are less morally culpable than the "average offender."

The third section of the Resolution addresses three different circumstances in which concerns about a defendant's mental competence and suitability for execution arise after a defendant is sentenced to death. The section provides in its first sub-paragraph that:

> (a) Grounds for Precluding Execution. A sentence of death should not be carried out if the prisoner has a mental disorder or disability that significantly impairs his or her capacity (i) to make a rational decision to forgo or terminate post-conviction proceedings available to challenge the validity of the conviction or sentence; (ii) to understand or communicate pertinent information, or otherwise assist counsel, in relation to specific claims bearing on the validity of the conviction or sentence that cannot be fairly resolved without the prisoner's participation; or (iii) to understand the nature and purpose of the punishment, or to appreciate the reason for its imposition in the prisoner's own case.[13]

Within a few months of the ABA's adoption of Resolution 122-A, the American Psychiatric Association and American Psychological Association, and the National Alliance on Mental Illness also adopted almost identical resolutions. [14] One of the Task Force on Mental Disability and the Death Penalty members, forensic psychologist and American Psychological Association representative Dr. Joel Dvoskin, noted that "to my knowledge, this is the very first time in history that those four organizations have adopted the same position on anything."[15] As noted by the American Psychological Association, "the task force members also hope that the policy will eventually influence state legislation on whether to execute mentally ill offenders."[16]

*"The rationale for recommending this exemption is based on the recognition that, similarly to individuals with intellectual disability and juveniles, those with severe mental illness are less morally culpable than the 'average offender.'"*

However, since these Resolutions have passed, no jurisdiction that retains a capital punishment statute has adopted policies to prevent the execution of those with severe mental illness. In light of that inaction and the Death Penalty Due Process Review Project's mission, we conducted significant research and created this comprehensive White Paper about the complex issue of severe mental illness and the death penalty.

# Part I: Severe Mental Illness and Its Relevance to Criminal Justice

What exactly is meant by severe mental illness and why does it matter in the context of criminal behavior? This Part will provide elements of a definition of severe mental illness according to medical professionals and experts, descriptions of some of the mental illness diagnoses that constitute "severe mental illness," and explanations of how severe mental illnesses affect individuals in ways relevant to criminal behavior and culpability. Finally, it will discuss some of the current issues regarding the intersection of mental health with the criminal justice system beyond the death penalty, to place the reform effort in its broader context.

---

[12] ABA, RECOMMENDATION 122-A, 2006, *supra*, note 9.

[13] *Id.*

[14] *Associations concur on mental disability and death penalty policy*, 38 MONITOR ON PSYCHOLOGY 14 (Jan. 2007), http://www.apa.org/monitor/jan07/associations.aspx (last visited Nov. 21, 2016).

[15] *Id.*

[16] *Id.*

Attachment A

## Definition of Mental Illness and Severe Mental Illness

The American Psychiatric Association's *Diagnostic and Statistical Manual of Mental Disorders,* (DSM) is one of the most authoritative classification and diagnostic guides for mental disorders. Its fifth edition (DSM-5), published in 2013, defines mental disorder as follows:

> "A mental disorder is a syndrome characterized by **clinically significant disturbance** in an individual's **cognition**, **emotion regulation**, or **behavior** that reflects a **dysfunction in the psychological, biological, or developmental processes underlying mental functioning**. Mental disorders are usually associated with **significant distress in social, occupational, or other important activities**. An expectable or culturally approved response to a common stressor or loss, such as the death of a loved one, is not a mental disorder. Socially deviant behavior (e.g., political, religious, or sexual) and conflicts that are primarily between the individual and society are not mental disorders unless the deviance or conflict results from a dysfunction in the individual, as described above."[17]

NAMI, a nationwide grassroots advocate group representing families and people affected by mental illness, uses the following definition:

> "A mental illness is a condition that impacts a person's **thinking, feeling** or **mood** and may affect his or her ability to **relate to others** and **function on a daily basis**. Each person will have different experiences, even people with the same diagnosis."[18]

Prevalence of mental illness in the U.S. [19]

Approximately 1 in 5 adults in the U.S.—43.7 million, or 18.6%—experiences mental illness in a given year. Approximately 1 in 25 adults in the U.S.—13.6 million, or 4.1%—experiences a severe mental illness in a given year that substantially interferes with or limits one or more major life activities.

People do not choose to have a mental illness, and no single cause has been identified for the disorders mentioned above. Rather, "research suggests multiple, interlinking causes. Genetics, environment and lifestyle combine to influence whether someone develops a mental health condition."[20] It is important to remember that, as expressed in a report by Amnesty International, "[m]ental illnesses cannot be overcome through "will power" and are not related to a person's "character" or "intelligence."[21]

Severe mental illness refers to a narrower set of diagnoses than mental illness. According to the American Psychological Association, it "refers to mental disorders that carry certain diagnoses, such as schizophrenia, bipolar disorder, and major depression; that are relatively persistent (e.g., lasting at least a year); and that result in comparatively severe impairment in major areas of functioning."[22] Severe mental illness can thus have a significant negative impact on a person's ability to function in a multitude of life spheres. This means that an individual with severe mental illness may have, for example, difficulty completing instrumental activities of

---

[17] Eric R. Maisel, *The New Definition of a Mental Disorder*, PSYCHOLOGY TODAY (July 23, 2013), https://www.psychologytoday.com/blog/rethinking-psychology/201307/the-new-definition-mental-disorder (Emphasis added).

[18] *Mental Health Conditions*, NATIONAL ALLIANCE ON MENTAL ILLNESS, http://www.nami.org/Learn-More/Mental-Health-Conditions (last visited Nov. 21, 2016) (Emphasis added).

[19] *Mental Health by the Numbers*, NATIONAL ALLIANCE ON MENTAL ILLNESS, http://www.nami.org/Learn-More/Mental-Health-By-the-Numbers (last visited Nov. 21, 2016) (Emphasis added).

[20] *Mental Health Conditions*, NATIONAL ALLIANCE ON MENTAL ILLNESS, http://www.nami.org/Learn-More/Mental-Health-Conditions (last visited Nov. 21, 2016).

[21] *USA: The Execution of Mentally Ill Offenders*, AMNESTY INTERNATIONAL, at 17 (Jan. 31 2006), https://www.amnesty.org/en/documents/AMR51/003/2006/en/.

[22] *Assessment and Treatment of Serious Mental Illness*, AMERICAN PSYCHOLOGICAL ASSOCIATION, at 5 (Aug. 2009), https://www.apa.org/practice/resources/smi-proficiency.pdf. The term "serious mental illness," or severe mental illness, came from a request by Congress to the Secretary of Health and Human Services to develop a federal definition of severe mental illness: "*See* Federal Definition of Severe Mental Illness, 58 Fed. Reg. 96, 29422-29425 (May 20, 1993). *See also* Thomas Insel, *Getting Serious About Mental Illness*, NATIONAL INSTITUTE OF MENTAL HEALTH (July 31, 2013), https://www.nimh.nih.gov/about/directors/thomas-insel/blog/2013/getting-serious-about-mental-illnesses.shtml.

Attachment A

daily life such as eating, dressing, bathing, or driving,[23] and may have difficulty communicating coherently[24] or difficulty maintaining full-time employment.[25]

Below are descriptions of some of the most common severe mental illnesses. Significantly, this is not an exclusive or comprehensive list of all diagnoses that could be considered "severe mental illness." Further, because many people can have dual diagnoses or co-occurring disorders,[26] and can have different experiences even within the same diagnosis, someone who has not been diagnosed with one of the following illnesses may still suffer from severe disturbance in their cognition, emotion regulation, and behavior.

### *Schizophrenia and Schizoaffective Disorder*

According to the American Psychiatric Association, **schizophrenia** is a "chronic brain disorder that affects about one percent of the population."[27] For a diagnosis of schizophrenia, the DSM-5 requires the presence of two of the five key symptoms listed in Criterion A, and that at least one symptom must be one of the first three (delusions, hallucinations, disorganized speech).[28]

Symptoms of schizophrenia – Criterion A, DSM-5:[29]

1. Delusions are fixed beliefs that are not amenable to change in light of conflicting evidence. Their content may include a variety of themes (e.g. persecutory, referential, somatic, religious, or grandiosity). Delusions are deemed bizarre if they are clearly implausible and not understandable to same-culture peers and do not derive from ordinary life experiences.

2. Hallucinations are perceptual experiences that occur even when there is no stimulus in the outside world generating the experiences. They can be auditory, visual, olfactory (smell), gustatory (taste), or somatic (touch).

3. Disorganized speech can include frequent derailment or incoherence.

4. Disorganized or catatonic behavior includes bizarre behavior or abnormal movements, and can include catatonia, which refers to a variety of behaviors that seem to reflect a reduction in responsiveness to the external environment

5. Negative symptoms are characterized by a loss of or a decrease in the ability to initiate plans, speak, express emotion, or find pleasure.

---

[23] Jennifer Sanchez et al., *Predicting quality of life in adults with severe mental illness: Extending the International Classification of Functioning, Disability, and Health*, 61 REHABILITATION PSYCHOL. 19, 19 (Feb. 2016).

[24] Thomas L. Patterson & Brent T. Mausbackh, *Measurement of Functional Capacity: A New Approach to Understanding Functional Differences and Real-world Behavioral Adaptation in Those with Mental Illness*, 6 ANN. REV. CLINICAL PSYCHOL. 139, 150 (Apr. 27, 2010), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3160788.

[25] *Getting to work, Promoting Employment of People with Mental Illness*, JUDGE DAVID L. BAZELON CENTER FOR MENTAL HEALTH LAW (Sept. 2014), http://www.bazelon.org/LinkClick.aspx?fileticket=TGW5AEIvqjs%3D&tabid=738.

[26] *See Co-occuring Disorders*, SUBSTANCE ABUSE AND MENTAL HEALTH SERVICES ADMINISTRATION, http://www.samhsa.gov/disorders/co-occurring (last visited Nov. 21, 2016); *Dual Diagnosis*, NATIONAL ALLIANCE ON MENTAL ILLNESS, http://www.nami.org/Learn-More/Mental-Health-Conditions/Related-Conditions/Dual-Diagnosis (last visited Nov. 21, 2016).

[27] *What is Schizophrenia?*, AMERICAN PSYCHIATRIC ASSOCIATION, https://www.psychiatry.org/patients-families/schizophrenia/what-is-schizophrenia (last visited Nov. 21, 2016).

[28] *About Schizophrenia*, SCHIZOPHRENIA AND RELATED DISORDER ALLIANCE OF AMERICA, http://www.sardaa.org/resources/about-schizophrenia/ (last visited Nov. 21, 2016); Deanna M. Barch, NOBA TEXTBOOK SERIES, http://nobaproject.com/modules/schizophrenia-spectrum-disorders (last visited Nov. 21, 2016).

[29] Rajiv Tandon et al., *Definition and description of schizophrenia in the DSM-5,* SCHIZOPHR. RES. (2013), https://pdfs.semanticscholar.org/b6df/6b113345da78988d707d753feb44bf50683d.pdf.

Attachment A

In addition, people with schizophrenia commonly have "anosognosia," which means "lack of insight," and are unaware of their illness.[30] What appears to observers as delusions are strongly held beliefs for a person with schizophrenia, and those affected by the illness may view the people around them as delusional for not having the same beliefs. This can make treatment significantly more complicated.

The typical age of onset for men is in their early twenties and for women in their late twenties to early thirties, although some signs of the illness may appear earlier in what is called the "prodromal period" (usually in the teenage years). Although there is no cure, drug treatment can greatly reduce the symptoms and reduce future relapses. However, according to the National Institute of Mental Health (NIMH), only 60% of adults with schizophrenia have received or sought treatment, leaving 40% of those living with this illness untreated.[31]

Lack of treatment is explained by many factors, which can vary depending on the individual and the illness. One reason may be the lack of insight into one's own illness, which, as noted above, is one of the symptoms of illnesses like schizophrenia. People convinced that they do not have an illness will not see why undergoing treatment is necessary or helpful. Other reasons that lead people to stop, avoid, or be denied treatment may include uncomfortable side effects, financial or other barriers to treatment, decisions to discontinue medications when the person seems to have improved or disordered thinking, a consequence of the illness itself that can, for example, cause the person to forget or deliberately stop taking prescribed medications.

**Schizoaffective disorder** is a chronic mental health condition characterized primarily by symptoms of schizophrenia and symptoms of a mood disorder, such as mania and depression.[32] Many people suffering from schizoaffective disorder are incorrectly diagnosed with bipolar disorder or schizophrenia because it shares symptoms of multiple mental health conditions.

The DSM-5 diagnostic criteria for schizoaffective disorder require:

> 1. An uninterrupted period of illness during which there is a major mood episode (major depressive or manic) concurrent with Criterion A of schizophrenia (the major depressive episode must include Criterion A1: Depressed mood.)

> 2. Delusions or hallucinations for two or more weeks in the absence of a major mood episode (depressive or manic) during the lifetime duration of the illness.

> 3. Symptoms that meet criteria for a major mood episode are present for the majority of the total duration of the active and residual portions of the illness.

> 4. The disturbance is not attributable to the effects of a substance (e.g., a drug of abuse, a medication) or another medical condition.[33]

*Bipolar Disorders*

**Bipolar disorders** are brain disorders that cause changes in a person's mood, energy, and ability to function. This is a category that includes three different conditions – bipolar I, bipolar II and cyclothymic disorder.[34]

---

[30] *Schizophrenia*, NATIONAL ALLIANCE IN MENTAL ILLNESS, http://www.nami.org/Learn-More/Mental-Health-Conditions/Schizophrenia (last visited Nov. 22, 2016).

[31] *Schizophrenia*, NATIONAL INSTITUTE OF MENTAL HEALTH https://www.nimh.nih.gov/health/statistics/prevalence/schizophrenia.shtml (last visited Nov. 22, 2016).

[32] *Schizoaffective Disorder*, NATIONAL INSTITUTE OF MENTAL HEALTH, http://www.nami.org/Learn-More/Mental-Health-Conditions/Schizoaffective-Disorder#sthash.GKewIQIV.dpuf (last visited Nov. 22, 2016).

[33] Dolores Melaspina et al., *Schizoaffective Disorder in the DSM-5*, 150 SCHIZOPHRENIA RES. 21 (2013), http://dx.doi.org/10.1016/j.schres.2013.04.026.

[34] Ranna Parekh, *What are Bipolar Disorders?*, AMERICAN PSYCHIATRIC ASSOCIATION (July 2015), https://www.psychiatry.org/patients-families/bipolar-disorders/what-are-bipolar-disorders.

Attachment A

For the purposes of this Paper, we will only focus on bipolar I, as bipolar II and cyclothymic disorder are considered less severe versions of the disorder. Although bipolar disorder can occur at any point in life, the average age of onset is 25 for both genders.[35] Every year, 2.9% of the U.S. population is diagnosed with bipolar disorder, with nearly 83% of cases being classified as severe.[36]

In bipolar I, a person can experience dramatic mood swings and alternate between manic episodes and depressive episodes, with periods of normal mood between the episodes.

A **manic episode** is a period of at least one week when a person is very high spirited or irritable in an extreme way most of the day and for most days, has more energy than usual and shows changes such as: exaggerated self-esteem or grandiosity, less need for sleep, increased risky behavior, easy distractibility, doing many activities at once, scheduling more events in a day than can be accomplished, or uncontrollable racing thoughts.[37]

During a **depressive episode**, a person will experience intense sadness or despair; feeling helpless, hopeless, or worthless and loss of interest in activities once enjoyed. The person may also experience some of the following: sleep problems, feeling restless or agitated, frequent thoughts of death or suicide, loss of energy, difficulty concentrating, feeling worthless or guilty.[38]

Bipolar disorder can be treated and managed, although not cured, in several ways: medications, psychotherapy, or self-management education and strategies. NIMH estimates that only 55.5% of individuals with this condition are receiving treatment,[39] for the reasons discussed above.

### *Major Depressive Disorder*

Although we hear the term depression frequently and sometimes casually, **Major Depressive Disorder** is a serious and distinct mental health disorder that negatively affects how a person feels (emotion regulation), thinks (cognition) and acts (behavior). It is more than just feeling sad or 'going through a rough patch.' According to the DSM-5, "an expectable or culturally approved response to a common stressor or loss, such as the death of a loved one, is not a mental disorder," no matter how painful it may feel.[40] To meet the DSM-5 criteria of a Major Depressive Episode, five or more of the following symptoms must be present nearly every day during the same two-week period (and for at least two years for Persistent Depressive Disorder):

1. Depressed mood most of the day;

2. Markedly diminished interest or pleasure in all, or almost all, activities most of the day;

3. Significant weight loss when not dieting or weight, or decrease or increase in appetite;

4. Insomnia or hypersomnia;

5. Psychomotor agitation or retardation;

6. Fatigue or loss of energy;

---

[35] *Bipolar Disorder,* NATIONAL ALLIANCE ON MENTAL ILLNESS, http://www.nami.org/Learn-More/Mental-Health-Conditions/Bipolar-Disorder (last visited Nov. 22, 2016).
[36] *Id.*
[37] Parekh, *supra* note 34.
[38] *Id.*
[39] *Bipolar Disorder Among Adults*, NATIONAL INSTITUTE OF MENTAL HEALTH, https://www.nimh.nih.gov/health/statistics/prevalence/file_148124.pdf (last visited Nov. 22, 2016).
[40] Maisel, *supra* note 17.

**36a**

Attachment A

7. Feelings of worthlessness or excessive or inappropriate guilt;

8. Diminished ability to think or concentrate, or indecisiveness;

9. Recurrent thoughts of death, recurrent suicidal ideation without a specific plan, or a suicide attempt or a specific plan for committing suicide.[41]

These symptoms must cause clinically significant distress or impairment in social, occupational or other important areas of functioning, and must not be attributable to the physiological effects of a substance or to another medical condition.[42] Sixteen million – or 6.9% of adults in the U.S. – had at least one major depressive episode in 2015.[43]

## *Post-traumatic Stress Disorder*

**Post-traumatic stress disorder (PTSD)** is a psychiatric disorder that can occur in people who have experienced or witnessed a traumatic event.[44] PTSD has been known by many names in the past, such as "shell shock" during the years of World War I and "combat fatigue" after World War II. In 1980, the DSM-III classified PTSD as an anxiety disorder, recognizing it as a legitimate psychological ailment.[45] Although PTSD is

often associated with combat veterans, it does not apply only to them. It can occur after a variety of distressing or catastrophic events in which a person experiences extreme trauma.

When in danger, the natural "fight-or-flight" response which typically takes place in life or body threatening circumstances is a healthy reaction meant to protect people from harm. But for those with PTSD, this reaction is changed or damaged. People who have PTSD may feel stressed or frightened even when they are no longer in danger.

Diagnostic criteria for PTSD in the DSM-5 include:[46]

1. A history of exposure to a traumatic event: the person was directly exposed to, witnessed, or learned that a close relative or friend was threatened with or experienced death, serious injury, or sexual violence.

2. Intrusion symptoms: the traumatic event is persistently re-experienced through recurrent, intrusive memories, traumatic nightmares, dissociative reactions (such as flashbacks), intense or prolonged distress after exposure to traumatic reminders or marked physiologic activity after exposure to trauma-related stimuli.

3. Avoidance: persistent effortful avoidance of distressing trauma-related stimuli (thoughts, feelings or external reminders) after the traumatic event.

---

[41] CECIL R. REYNOLDS & RANDY W. KAMPHAUS, BASICS 3 MAJOR DEPRESSIVE DISORDER, (Pearson 5th ed. 2013).
[42] Diagnose and Characterize Major Depression/Persistent Depressive Disorder with Clinical Interview, INSTITUTE FOR CLINICAL SYSTEMS IMPROVEMENT, https://www.icsi.org/guideline_sub-pages/depression/diagnose_and_characterize_major_depressionpersistent_depressive_disorder_with_clinical_interview/ (last visited Nov. 22, 2016).
[43] *Major Depression Among Adults*, NATIONAL INSTITUTE OF MENTAL HEALTH, https://www.nimh.nih.gov/health/statistics/prevalence/major-depression-among-adults.shtml (last visited Nov. 22, 2016) (Finding that in 2015, an estimated 16.1 million adults aged 18 or older in the United States had at least one major depressive episode in the past year).
[44] *What is Posttraumatic Stress Disorder?*, AMERICAN PSYCHIATRIC ASSOCIATION, https://www.psychiatry.org/patients-families/ptsd/what-is-ptsd (last visited Nov. 22, 2016).
[45] Matthew J. Friedman, *PTSD History and Overview*, U.S. DEPARTMENT OF VETERANS AFFAIRS, http://www.ptsd.va.gov/professional/PTSD-overview/ptsd-overview.asp (last visited Nov. 22, 2016).
[46] *DSM-5 Criteria for PTSD*, BRAINLINEMILITARY, http://www.brainlinemilitary.org/content/2014/06/dsm-v-tr-criteria-for-ptsd.html (last visited Nov. 22, 2016); *Post-traumatic Stress Disorder*, AMERICAN PSYCHIATRIC ASSOCIATION (2013), http://www.dsm5.org/Documents/PTSD%20Fact%20Sheet.pdf.

Attachment A

4. Negative alterations in cognitions and mood: inability to recall key features of the traumatic event, persistent (and often distorted) negative beliefs and expectations about oneself or the world, persistent distorted blame of self or others, persistent negative trauma-related emotions, markedly diminished interest in significant activities, feeling alienated from others or persistent inability to experience positive emotions.

5. Alterations in arousal and reactivity: irritable or aggressive behavior, self-destructive or reckless behavior, hyper vigilance, exaggerated startle response, problems in concentration, or sleep disturbance.

In veterans, a review of combat-related PTSD found that the prevalence of the condition in U.S. military veterans since the Vietnam War to range from 2-17%.[47]

Symptoms of PTSD usually begin within 3 months after a traumatic event, but occasionally emerge years afterward. It can be treated effectively through the use of medications, psychotherapy, self-management strategies or service animals.[48] Symptoms must last more than a month, and it is often accompanied by depression, substance abuse or another anxiety disorder.[49]

### *Traumatic Brain Injury*

**Traumatic Brain Injury (TBI)** occurs when a sudden trauma causes damage to the brain. It can result when the head suddenly and violently hits an object, or when an object pierces the skull and enters brain tissue.[50] The impacts of a moderate to severe brain injury can include, among others, cognitive deficits (including difficulties with executive functions, language processing, memory, speed of processing, etc.), speech, vision, hearing, and can also have social-emotional consequences such as dependent behaviors, aggression, depression, irritability, among others.[51]

Although, like PTSD, TBI is not specific to veterans, it is often associated with that population. This is due in particular to the fact the overall rate of TBI among active duty service members more than doubled from 2000 to 2011.[52] Since 2000, 352,619 military personnel have been affected by TBI, according to the Department of Defense.[53]

As mentioned above, this list includes the most common diagnoses considered severe mental illness, but is not exhaustive. In addition, the American Psychiatric Association regularly updates its Diagnostic and Statistical Manual, and some of the terminology may evolve in future years. However, it is clear that these disorders are all characterized by severe functional impairments for those who suffer from them, and that they are highly relevant to an individual's functioning and understanding of reality.

---

[47] Lisa K. Richardson et al., *Prevalence Estimates of Combat-Related PTSD: A Critical Review*, 44 AUSTL. N.Z. J. PSYCHIATRY 4, 4 (2010), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC2891773/. *See also* Richard C. Dieter, *Battles Scars: Military Veterans and the Death Penalty*, DEATH PENALTY INFORMATION CENTER (Nov. 11, 2015), http://deathpenaltyinfo.org/files/pdf/BattleScars.pdf (Includes a detailed discussion of PTSD prevalence rates for veterans of different wars, as well as a discussion of veterans on death row).

[48] *Post-Traumatic Stress Disorder*, NATIONAL ALLIANCE ON MENTAL ILLNESS, https://www.nami.org/Learn-More/Mental-Health-Conditions/Posttraumatic-Stress-Disorder (last visited Nov. 22, 2016).

[49] *Post-Traumatic Stress Disorder*, NATIONAL INSTITUTE OF MENTAL HEALTH (Feb. 2016), https://www.nimh.nih.gov/health/topics/post-traumatic-stress-disorder-ptsd/index.shtml.

[50] *NINDS Traumatic Brain Injury Information Page*, NATIONAL INSTITUTE OF NEUROLOGICAL DISORDER AND STROKE (Sept. 8, 2016), http://www.ninds.nih.gov/disorders/tbi/tbi.htm.

[51] *Severe TBI Symptoms*, TRAUMATICBRAININJURY.COM, http://www.traumaticbraininjury.com/symptoms-of-tbi/severe-tbi-symptoms (last visited Nov. 22, 2016).

[52] The CDC, NIH, DoD, and VA Leadership Panel, *Report to Congress on Traumatic Brain Injury in the United States: Understanding the Public Health Problem among Current and Former Military Personnel*. Centers for Disease Control and Prevention (CDC), the National Institutes of Health (NIH), the Department of Defense (DoD), and the Department of Veterans Affairs (VA) (2013), http://www.cdc.gov/traumaticbraininjury/pdf/report_to_congress_on_traumatic_brain_injury_2013-a.pdf.

[53] *DoD Worldwide Numbers for TBI*, DEFENSE AND VETERANS BRAIN INJURY CENTER (Aug. 12, 2016), http://dvbic.dcoe.mil/files/tbi-numbers/DoD-TBI-Worldwide-Totals_2000-2016_Q1-Q2_Aug-12-2016_v1.0_508_2016-09-20.pdf.


Attachment A

## Mental Illness in the Broader Criminal Justice Context

While the ABA's 2006 Resolution and this Paper are focused on the application of the death penalty to those with severe mental illness at the time of their crime, it is important to place this discussion within the broader one surrounding the interactions between the criminal justice system and individuals with mental illness.

The U.S. Department of Justice estimated in 2006 that 10% of inmates in state prisons had a severe mental illness,[54] an estimate considered conservative by many.[55] A 2009 study found 14.5% of male jail inmates and 31% of female jail inmates had symptoms of a severe mental illness.[56] Coupling these with less serious illnesses, more than half of current U.S. inmates have a mental health diagnosis.[57] The proportion of people in the U.S. with mental illnesses in correctional institutions is three to six times greater than that of the general public.[58] The Sentencing Project calls this phenomenon the "criminalization of the mentally ill," defined as "the increased likelihood of people with mental illness being processed through the criminal justice system instead of through the mental health system."[59] Beyond a mere problem, the American Psychiatric Association has labeled this an American "crisis."[60]

This was not always the case. In 1959, U.S. mental hospitals housed nearly 560,000 patients. However, after the deinstitutionalization of the 1970s, this dropped to about 130,000 in 1980.[61] Many of those expelled from the hospitals ended up behind bars.[62] A 2010 study estimated that "there are now more than three times more seriously mentally ill persons in jails and prisons than in hospitals."[63]

Given the numerous societal costs associated with the increasing criminalization of mental illness, many scholars, professional organizations, attorneys, politicians, and activists are advocating for reform of how individuals with these conditions are treated in the context of their interactions with the criminal justice system. To help address the issue, both the American Psychiatric Association and the National Commission on Correctional Health Care have suggested that mental health screenings be conducted immediately upon an individual's arrival into a correctional facility, so that if the person has a mental health problem, he may be "referred for appropriate mental health evaluation (assessment) and housed in an appropriate level of care."[64]

After this initial screening, they recommend a second, "more detailed, thorough, and structured intake mental

---

[54] Doris J. James & Lauren E. Glaze, *Mental Health Problems of Prison and Jail Inmates*, Special Report NCJ 213600, US BUREAU OF JUSTICE STATISTICS (Sept. 2006), http://bjs.gov/content/pub/pdf/mhppji.pdf.

[55] *How Many Individuals with Serious Mental Illness are in Jails and Prisons?*, TREATMENT ADVOCACY CENTER (Nov. 2014), http://www.treatmentadvocacycenter.org/storage/documents/backgrounders/how%20many%20individuals%20with%20serious%20mental%20illness%20are%20in%20jails%20and%20prisons%20final.pdf.

[56] Henry J. Steadman et al., *Prevalence of serious mental illness among jail inmates*, 60 PSYCHIATRIC SERVICES 761, 761 (2009).

[57] James & Glaze, *supra* note 54.

[58] *Id.*

[59] Beth Carter et al., *Mentally Ill Offenders in the Criminal Justice System: An Analysis and Prescription*, THE SENTENCING PROJECT (Jan. 2002), http://www.sentencingproject.org/wp-content/uploads/2016/01/Mentally-Ill-Offenders-in-the-Criminal-Justice-System.pdf.

[60] *Stepping Up*, AMERICAN PSYCHIATRIC ASSOCIATION FOUNDATION http://www.americanpsychiatricfoundation.org/what-we-do/public-education/stepping-up-initiative (last visited Nov. 22, 2016). Several other studies have shown that individuals with severe mental illness are overrepresented in the criminal justice system. *See, e.g.*, Seena Fazel & John Danesh, *Serious Mental Disorder in 23,000 Prisoners: A Systematic Review of 62 Surveys*, 359 LANCET 545, 548 (2002); Linda Teplin, *The Prevalence of Severe Mental Disorder Among Urban Male Jail Detainees: Comparison with the Epidemiologic Catchment Area Program*, 80 AM. J. PUB. HEALTH 663, 665 (1990); Jillian Peterson & Kevin Heinz, *Understanding Offenders with Serious Mental Illness in the Criminal Justice System*, 42 MITCHELL HAMLINE LAW REVIEW 537 (2016).

[61] *See, e.g., Impact of Mentally Ill Offenders on the Criminal Justice System: Hearing Before the Subcomm. On Crime, H. Comm. On the Judiciary*, 106th Cong. 18 (Sept. 21, 2000); Timeline: Treatments for Mental Illness, PBS, http://www.pbs.org/wgbh/amex/nash/timeline/timeline2.html (last visited Nov. 23, 2016).

[62] Sarah Varney, *By the Numbers: Mental Illness Behind Bars*, KAISER HEALTH NEWS (May 15, 2014), http://khn.org/news/by-the-numbers-mental-illness-jail/; *Stepping Up*, AMERICAN PSYCHIATRIC ASSOCIATION FOUNDATION, http://www.americanpsychiatricfoundation.org/what-we-do/public-education/stepping-up-initiative (last visited Nov. 22, 2016).

[63] Edwin Fuller Torrey et al., *More Mentally Ill Persons Are in Jails and Prisons Than Hospitals: A Survey of the States*, TREATMENT ADVOCACY CENTER & NATIONAL SHERIFFS' ASSOCIATION (May 2010), http://www.treatmentadvocacycenter.org/storage/documents/final_jails_v_hospitals_study.pdf.

[64] *Psychiatric Services in Jails and Prisons: a task force report of the American Psychiatric Association*, American Psychiatric Association (2nd Ed. 2000).

Attachment A

health screening" to determine where to place the individual.[65]

Another prominent national group, the Stepping Up Initiative, has formed to tackle the issue directly, and is "a collaboration between The Council of State Governments Justice Center, the National Association of Counties[,] and the American Psychiatric Foundation to help advance counties' efforts to reduce the number of people with mental and co-occurring substance use disorders in jails."[66] NAMI, the Major County Sheriff's Association, and the U.S. Department of Justice's Bureau of Justice Assistance also support the Initiative.[67] Stepping Up is highly concerned by the criminalization of individuals with mental illness, suggesting that the "human toll," as well as the cost to taxpayers, put the issue's resolution at the forefront of modern criminal justice reform efforts. As of June 2016, over 270 counties have issued resolutions in response to Stepping Up, calling for reform on behalf of this mental health and criminal justice crisis.[68]

Conservative politician and writer Newt Gingrich and liberal political commentator, attorney, and author Van Jones have joined hands across the political aisle to speak out on the issue, jointly writing: "When governments closed state-run psychiatric facilities in the late 1970s, they didn't replace them with community care, and by default, the mentally ill often ended up in jails….Our system is unfair to those struggling with mental illness.... These people are sick, not bad."[69] On the street, people with disabilities suffer considerable risk under law enforcement. They are more likely to be confronted by police or even shot – as shown in Virginia, for example, where 40% of the fatal police shootings since 2010 were of persons with disabilities.[70]

In courtrooms, persons with disabilities, often falsely labeled "violent," have "future dangerousness" risk assessments that can be biased by the "operative presumption that dangerousness is often a result of mental illness."[71] The stress of jail and prison often aggravates these individuals' symptoms, in particular if they are placed in solitary confinement.[72] With initiatives, researchers, activist groups, government officials, and politicians all joining together with the same conclusions, it is clear that this American crisis can no longer be ignored.

> **"Many agree that we need to readdress the way we deal with persons with mental illnesses in the context of the law and criminal justice."**

With the increasing recognition that the legal system should treat those with mental illness differently because of their conditions' relevance to culpability, sentencing, and meaningful participation in the legal process, it also makes sense to extend these considerations to the area of capital punishment. When it comes to capital defendants, Mental Health America estimates that at least 20% of people on death row have a severe mental illness.[73] However, this is only an estimate, and precise statistics are not available, so it remains difficult to determine exactly how many capital defendants live with a severe mental illness.

---

[65] *Id. See also*, Holly Hills et al., *Effective Prison Mental Health Services: Guidelines to Expand and Improve Treatment*, U.S. DEP'T OF JUSTICE: NATIONAL INSTITUTE OF CORRECTIONS (2004), http://static.nicic.gov/Library/018604.pdf; *Receiving Screening*, NATIONAL COMMISSION ON CORRECTIONAL HEALTH CARE, http://www.ncchc.org/spotlight-on-the-standards-25-1 (last visited Nov. 28, 2016).

[66] *The Stepping Up Initiative*, THE HUFFINGTON POST, http://www.huffingtonpost.com/the-stepping-up-initiative/ (last visited Nov. 23, 2016).

[67] *The Stepping Up Initiative*, NATIONAL ASSOCIATION OF COUNTIES, http://www.naco.org/resources/programs-and-initiatives/stepping-initiative (last visited Nov. 23, 2016).

[68] *The Stepping Up Initiative, supra*, note 66; *Mental Health Services: Guidelines to Expand and Improve Treatment,* DEP'T OF JUSTICE: NATIONAL INSTITUTE OF CORRECTIONS (2004), http://static.nicic.gov/Library/018604.pdf; *see also* American Psychiatric Association, *Psychiatric Services in Jails and Prisons: a task force report of the American Psychiatric Association* (2nd Ed. 2000); *Receiving Screening*, NATIONAL COMMISSION ON CORRECTIONAL HEALTH CARE, http://www.ncchc.org/spotlight-on-the-standards-25-1 (last visited Nov. 28, 2016).

[69] Newt Gingrich & Van Jones, *Mental Illness Is No Crime*, CNN.COM (May 27, 2015), http://www.cnn.com/2015/05/27/opinions/gingrich-jones-mental-health.

[70] Gary A. Harki, *Virginia Is Outpacing the Nation in Police Shootings of the Mentally Ill*, THE VIRGINIAN-PILOT (June 4, 2016), http://pilotonline.com/news/government/virginia/virginia-is-outpacing-the-nation-in-police-shootings-of-the/article_de1e5f1d-d893-51fb-9d9d-4c47f034ba66.html.

[71] Robert M. Phillips, *Predicting the Risk of Future Dangerousness*, 14 Am. Med. Ass'n J. Ethics, 472, 473 (2012), http://journalofethics.ama-assn.org/2012/06/pdf/hlaw1-1206.pdf.

[72] Jeffrey L. Metzner & Jamie Fellner, *Solitary Confinement and Mental Illness in U.S. Prisons: A Challenge for Medical Ethics*, 38 J. AM. ACAD. PSYCHIATRY & LAW, 104 (2010).

[73] *Position Statement 54: Death Penalty and People with Mental Illness*, MENTAL HEALTH AMERICA (June 14, 2016), http://www.mentalhealthamerica.net/positions/death-penalty.

**Attachment A**

Nonetheless, the exemption recommended in the 2006 ABA Resolution is a restrictive standard that only includes the most serious forms of mental illness, ensuring that this would remain a limited exclusion. Many mental health diagnoses – and many people with any given diagnosis – would not meet the requirements of the exemption supported by the ABA, American Psychological Association, American Psychiatric Association, and NAMI.

## Prevalence of Violent Behavior and Being a Victim of Violence

While people with mental illness are overrepresented in the criminal justice system, there is little evidence that they are more violent than those without mental illness. Instead, other factors contribute to explain this overrepresentation, including: the higher than average prevalence of substance abuse, the inadequacy of community mental health services and lack of available treatment options, as well as a policy of zero tolerance in regards to drug crimes effective in many jurisdictions, among others.[74]

In addition, the links between mental illness and violence are frequently misunderstood and mischaracterized, and people often face prejudices because of their disorders. This problem pervades the entire criminal justice system, where judges, prosecutors, correctional officers, law enforcement and defense attorneys often do not receive training on how to properly react to defendants with mental illness.[75] Mental disability law expert Professor Michael Perlin argues that "sanism," or "an irrational prejudice against people with mental illness," is present in the criminal justice system.[76]

Popular conceptions of those suffering from severe mental illness trade on stereotypes of violence and dangerousness, which are perpetuated by the media. A new study found that "nearly four in 10 news stories about mental illness analyzed by Johns Hopkins Bloomberg School of Public Health researchers connect mental illness with violent behavior toward others, even though less than five percent of violence in the United States is directly related to mental illness."[77] Similarly, 66% of television news stories about those with mental illness emphasized the dangerousness of the individual.[78]

Overall, people with severe mental illness contribute very little to the rate of violence, and they are much more likely to be victims of violence than perpetrators. Less than 3 to 5% of crimes involve people with mental illness as defendants[79] while people with severe mental illness are 11 times more likely to be victims of a violent crime than the general population.[80] As David Kopel and Clayton Cramer explain in a 2015 article: "when we examine the data on serious mental illness and violent crime, it is clear that the problem of victimization is

---

[74] In a 2001 study of people with a mental illness in prison, two-thirds of their crimes were related to substance use and were usually non-violent. *See* Mark R. Munetz et al., *The Incarceration of Individuals with Severe Mental Disorders,* 37 COMMUNITY MENTAL HEALTH J., 361 (2001). Indeed, accompanying risks of mental illness like poverty, unemployment, and poor social skills, lead those with mental illness to situations with higher exposure to psychoactive substances. Corinne Henderson, *Why People with a Mental Illness are Over-represented in the Criminal Justice System,* RESEARCHGATE (Jul. 19, 2015), https://www.researchgate.net/publication/237568921_Why_people_with_a_mental_illness_are_Over-represented_in_the_Criminal_Justice_System.

[75] The ABA Death Penalty Due Process Review Project conducted Assessments on the death penalty in 12 states. Florida, Indiana, Ohio, Kentucky, Missouri, Texas, Virginia and Pennsylvania were found "partially in compliance" with the recommendation that "all actors in the criminal justice system, including police officers, court officers, prosecutors, defense attorneys, judges, and prison authorities, should be trained to recognize mental illness in capital defendants and death-row inmates" and Tennessee was found not in compliance. This evaluation is not available for Alabama, Arizona and Georgia. See American Bar Association Death Penalty Due Process Review Project, State Death Penalty Assessments, http://www.americanbar.org/groups/crsj/projects/death_penalty_due_process_review_project/state_death_penalty_assessments.html (last visited Nov. 27, 2016).

[76] Michael L. Perlin, *Sanism and the Law,* 15 AM. MED. ASS'N. J. ETHICS, 878, 878 (October 2013), http://journalofethics.ama-assn.org/2013/10/msoc1-1310.html.

[77] *Study: News Stories Often Link Violence With Mental Health Illness, Even Though People With Mental Health Illness Are Rarely Violent,* JOHN HOPKINS BLOOMBERG SCHOOL OF PUBLIC HEALTH (June, 6 2016), http://www.jhsph.edu/news/news-releases/2016/study-news-stories-often-link-violence-with-mental-health-lllness-even-though-people-with-mental-health-illness-are-rarely-violent.html/.

[78] Peter Byrne, *Stigma of Mental Illness and Ways of Diminishing it,* 6 ADVANCES PSYCHIATRIC TREATMENT 65, 66 (2000). Also important is what is almost never portrayed in media accounts of mental illness—stories of rehabilitation or representations of individuals with mental illness as active, valuable members of a community. *See* Otto F. Wahl, *News Media Portrayal of Mental Illness,* 46 AM. BEHAV. SCIENTIST 1594, 1597 (2003).

[79] Jonathan M. Metzl et al., *Mental Illness, Mass Shootings, and the Politics of American Firearms,* 105 AM. J. PSYCHIATRY 240, 241 (2015) (citing to Paul S. Appelbaum, *Violence and mental disorders: data and public policy,* 163 AM. J. PSYCHIATRY 1319, 1319 (2006)).

80 Linda Teplin et al., *Crime victimization in adults with severe mental illness,* 62 ARCHIVES OF GENERAL PSYCHIATRY 911, 911 (2005).

Attachment A

far larger than the problem of perpetration."[81] Or, as Thomas Insel, former Director of NIMH, puts it: "Most people with severe mental illness are not violent, and most violent acts are not committed by people with severe mental illness."[82] Dr. Insel further notes that violence by individuals with mental illness is often directed towards themselves, notably in the form of suicide.[83]

For a long time, studies found no link between increased risk of violence and severe mental illness.[84] However, a growing body of research is suggesting that there may be such a link when mental illness goes untreated and is associated with other risk factors.[85] Indeed, "understanding the link between violent acts and mental disorder requires consideration of its association with other variables such as substance abuse, environmental stressors, and history of violence."[86] In their 2009 study, Eric Elbogen and Sally Johnson found that "severe mental illness alone did not predict future violence; it was associated instead with historical (past violence, juvenile detention, physical abuse, parental arrest record), clinical (substance abuse, perceived threats), dispositional (age, sex, income), and contextual (recent divorce, unemployment, victimization) factors."[87] Even though under some circumstances, people with severe mental illness may be more likely to be violent than an average person without a mental health diagnosis, other elements need to be taken into account to fully understand the relationship between severe mental illness and violence, and "the relationship is much more complex than just the immediate effects of the disorder itself."[88]

NAMI's position on the issue also reflects these research findings and recognizes "that acts of violence by people with mental illness are usually the result of lack of needed mental health services."[89] This is why most mental health organizations advocate for early screening, diagnosis, and effective treatment as the best way to prevent violence by people with severe mental illness.

People on death row with severe mental illness have also frequently encountered the criminal justice system prior to being charged with a capital crime. According to the American Psychiatric Association, "[p]eople with serious mental illnesses who come into contact with the criminal justice system are often poor, uninsured, homeless, and living with co-occurring substance abuse and mental disorders. They are likely to continually recycle through the mental health, substance abuse, and criminal justice systems."[90] This revolving door phenomenon highlights the current inadequacy of the response of the criminal justice system to individuals who suffer from severe impairments. Some defendants may eventually end up committing a capital crime and be sentenced to death. However, had they had access to and received treatment in a manner appropriate to their impairment, such deadly violence may have been much less likely, or avoided altogether.

---

[81] David B. Kopel & Clayton E. Cramer, *Reforming Mental Health Law to Protect Public Safety and Help the Severely Mentally Ill*, 58 HOW. L.J. 715, 726 (2015).

[82] Thomas Insel, *Understanding Severe Mental Illness*, NATIONAL INSTITUTE OF MENTAL HEALTH (Jan. 11, 2011), http://www.nimh.nih.gov/about/director/2011/understanding-severe-mental-illness.shtml.

[83] *Id.*

[84] Heather Stuart, *Violence and Mental Illness: An Overview*, 2 WORLD PSYCHIATRY 2, 121, 122 (2003) ("Prior to 1980, the dominant view was that the mentally ill were no more, and often less likely to be violent.")

[85] *See, e.g.,* Richard Van Dorn et al., *Mental Disorder and Violence: Is There a Relationship Beyond Substance Use?*, 47 SOC. PSYCHIATRY & PSYCHIATRIC EPIDEMIOLOGY, 487 (2012); Richard A. Friedman, *Violence and Mental Illness—How Strong Is the Link?*, 355 NEW ENG. J. MED 2064 (2006); Jeffrey Swanson et al., *The social-environmental context of violent behavior in persons treated for severe mental illness*, 92 AM. J. PUB. HEALTH 1523 (2002); Jeffrey W. Swanson et al., *Violence and Psychiatric Disorder in the Community: Evidence from Epidemiologic Catchment Area Surveys*, 41 HOSP. & COMMUNITY PSYCHIATRY 761 (1990).

[86] Epidemiologic Catchment Area Surveys, 41 HOSP. & COMMUNITY PSYCHIATRY 761 (1990). Eric B. Elbogen & Sally C. Johnson, *The Intricate Link Between Violence and Mental Disorder Results From the National Epidemiologic Survey on Alcohol and Related Conditions*, 66 ARCHIVES GEN. PSYCHIATRY 152, 152 (2009).

[87] *Id.*

[88] Kopel & Cramer, *supra* note 81, at 731.

[89] *Violence and Gun Reporting Laws*, NATIONAL ALLIANCE ON MENTAL ILLNESS https://www.nami.org/Learn-More/Mental-Health-Public-Policy/Violence-and-Gun-Reporting-Laws (last visited: Nov. 27, 2016). Mental Health America also states in its Policy Statement 72 that "While untreated or undertreated mental health conditions, when accompanied by untreated or undertreated substance use conditions, may be associated with an increased risk of violence, this does not justify discrimination against people with mental health conditions as a class." *Position Statement 72: Violence: Community Mental Health Response*, MENTAL HEALTH AMERICA, http://www.mentalhealthamerica.net/positions/violence (last visited: Nov. 27, 2016).

[90] PSYCHIATRIC SERVICES IN JAILS AND PRISONS: TASK FORCE TO REVISE THE APA GUIDELINES ON PSYCHIATRIC SERVICES IN JAILS AND PRISONS (American Psychiatric Association ed., 2000).

Attachment A

# Part II:  Inadequacy of Existing Legal Mechanisms to Address Severe Mental Illness in Capital Cases

There are currently several points in a criminal trial at which a judge or jury may be asked to take a defendant's mental illness into account. However, these existing procedures do not adequately protect individuals with severe mental illness from being sentenced to death or executed, as they apply to very few cases and can (and do) allow people with profound impairments to slip through the cracks.

## Competency to Stand Trial

All criminal defendants in the U.S. have a due process right to a fair trial under the Fifth and Fourteenth Amendments.[91] This concept includes a right not to be tried if they are "incompetent to stand trial" – in other words, if they suffer from a mental disability such that they lack the present ability to consult with their lawyer

with a reasonable degree of rational understanding or lack a rational as well as factual understanding of the proceedings against them.[92] The justification for this protection "has been viewed as a byproduct of the ban against trials in absentia, as the mentally incompetent defendant, although physically present in the courtroom, is in reality afforded no opportunity to defend himself."[93]

The competency standard is used to ensure that a defendant can adequately participate in his own defense before and at trial, and is focused on a defendant's present mental abilities. It does not in any way address the question of a defendant's state of mind at the time of the alleged offense, or his legal culpability for the crime committed. If a defendant is found incompetent, he or she is typically moved to a medical facility to receive treatment to help him or her be restored, if possible, to legal competency and eventually face the charges against him or her. Many times competency is legally restored through psychotropic medications. However, some defendants cannot ever be restored to competency, even with medication. In those instances, depending on the charges and the circumstances, it is possible for an incompetent person to be hospitalized indefinitely and never face trial for the crime that he or she is accused of committing.[94]

As articulated above, the standard for competency is very low and only requires a defendant to have "sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding" and a "rational as well as factual understanding of the proceedings against him."[95] A person can have a severe mental illness and yet still possess the necessary attributes to be considered legally competent to stand trial. While mental illness often plays a role in a court's determination of a defendant's competence to stand trial and can be a factor in the competency determination, "[a] defendant's history of mental illness does not render the defendant mentally incompetent *per se*."[96]

*The exemption endorsed by the ABA differs from the competency to stand trial standard in several ways. First, the competency to stand trial standard looks at the defendant's mental state at the time of trial* – and not at the time of the offense. *The ABA exemption would apply to defendants who had significant impairments due to a severe mental disorder at the time of the crime. In addition, competency to stand trial does not address the question of the penalty that a defendant should receive – like the exemption does – but looks at whether a defendant can partake in his own defense. A defendant could be found incompetent to stand trial, have his or her competency restored, and again be eligible for the death penalty. The competency standard does not allow the sentencer to take into account a defendant's mental state at the time of crime, and does not preclude the death penalty for those with mental illness.*

---

91 *Pate v. Robinson*, 383 U.S. 375 (1966).
92 *Dusky v. United States*, 362 U.S. 402 (1960).
93 40 AM. JUR. 2D *Proof of Facts* § 171 (1984).
94 Bruce J. Winick, R*estructuring Competency to Stand Trial*, 32 UCLA L. REV. 921, 924 (1985).
95 *Dusky v. United States*, 362 U.S. 402, 402 (1960).
96 Haleigh Reisman, *Competency of the Mentally Ill and Intellectually Disabled in the Courts*, 11 J. HEALTH & BIOMEDICAL L. 199, 212 (2015).

Attachment A

# CASE EXAMPLE: *Scott Panetti*



### Scott Panetti
*Texas*

- Hospitalized 14 times in 11 years due to symptoms of his paranoid schizophrenia.
- Represented himself at his 1995 trial, dressed in a purple cowboy outfit.
- Currently on Texas death row, appeals pending.

Scott Panetti, a man with severe mental illness currently on Texas death row, was found to be competent to stand trial after a second competency hearing. Prior to his arrest, Mr. Panetti was hospitalized more than a dozen times for mental health related reasons. He was diagnosed with schizophrenia and suffered severe hallucinations. After a judge declared him competent to stand trial, Mr. Panetti waived his right to counsel, and decided to represent himself. At his trial, Mr. Panetti wore a cowboy costume and attempted to subpoena the Pope, John F. Kennedy, and Jesus Christ. A jury sentenced Mr. Panetti to death in 1995.

In the subsequent years that Mr. Panetti has been on death row it has become clear that he continues to suffer from severe mental illness, which includes schizophrenic delusions, hallucinations and a steadfast belief that he is being persecuted for preaching the gospel. Although Mr. Panetti has a severe mental illness, the competency standard did not prevent him from getting a death sentence. His case is just one example of why the competency standard alone does not effectively prevent individuals with severe mental illness from receiving a death sentence.

Information about Scott Panetti's case can be found at: Scott Panetti, TEXAS DEFENDER SERVICES, http://texasdefender.org/scott-panetti/ (last visited Nov. 27, 2016).

## The Insanity Defense

In contrast to the question of competency to stand trial, the insanity defense does focus on a defendant's mental state at the time of the alleged offense, rather than on his or her ability to rationally understand the proceedings and case against him. Not Guilty by Reason of Insanity (NGRI), or the insanity defense, is an affirmative defense to a crime, intended to allow a "not guilty" verdict at the end of a trial and relieve the defendant of responsibility for the crime based on mental illness.[97]

The current standard for the insanity defense in the majority of states is based on the *M'Naghten* Rule, which holds that a person is not criminally liable if "at the time of the committing of the act, the party accused was labouring under such a defect of reason, from disease of mind, as not to know the nature and quality of the act he was doing; or, if he did know it, that he did not know he was doing what was wrong."[98] Other states follow the Model Penal Code test for insanity, which states that a person is not responsible if at the time of the crime, "as a result of mental disease or defect he lacks substantial capacity either to appreciate the criminality [wrongfulness] of his conduct or to conform his conduct to the requirements of law."[99] A small number of states adhere to the "irresistible impulse" test for legal insanity, which requires a showing that the defendant was so lacking in volition due to a mental defect or illness that he could not have controlled his actions.[100]

---

[97] *See, e.g.*, Michael L. Perlin, *Unpacking the Myths: The Symbolism Mythology of Insanity Defense Jurisprudence*, 40 CASE W. RES. L. REV. 599 (1989).

[98] *M'Naghten's Case*, 10 Cl. & Fin. 200, 210, 8 Eng. Rep. 718, 722 (1843); *see also* Michael J. Shoptaw, *M'Naughten is a Fundamental Right: Why Abolishing the Traditional Insanity Defense Violates Due Process*, 84 MISS. L.J. 1101 (2015).

[99] Model Penal Code, § 4.01.

[100] Emanuel Francone, *Insanity Defense*, LEGAL INFORMATION INSTITUTE (Jul. 2016), https://www.law.cornell.edu/wex/insanity_defense. For a list of the insanity defense legal standards used in each of the 50 U.S. states *see The Insanity Defense Among the States*, FINDLAW, http://criminal.findlaw.com/criminal-procedure/the-insanity-defense-among-the-states.html (last visited Nov. 27, 2016).

Attachment A

While many of us have heard about this concept, the reality is that the insanity defense is asserted in an extremely small number of cases, and is successful in an even smaller number. Nationally, it is raised in approximately 1% of all criminal cases and successful only 25% of the time.[101] In Virginia, for example, this translates into 35 NGRI acquittals on average per year.[102]

While the test for legal insanity varies by state, in most jurisdictions the definition is so narrow that it excludes many individuals with severe mental illness. Even if a defendant indisputably suffered from severe mental illness at the time of the crime, a defendant still does not qualify as legally insane in a jurisdiction that adheres to the *M'Naghten* standard unless his mental illness also rendered him completely unable to appreciate that what he was doing was wrong. So, for example, that standard would exclude from the insanity defense people "who have a mood disorder with psychotic features [and who] might understand the wrongfulness of their acts, but nonetheless feel impervious to punishment because of delusion-inspired grandiosity."[103]

Moreover, because the legal definition of insanity is so narrow in most jurisdictions, and because jurors are often inherently skeptical of the defense, many defendants with severe mental illness and their lawyers elect not to assert the defense at trial knowing it is either inapplicable or unlikely to succeed. This may be in part because jurors in capital cases must be "death-qualified," or capable of considering both life and death as potential punishments upon conviction.[104] Research shows that death-qualified jurors are "more likely to endorse certain insanity myths."[105] These myths include the idea "that the insanity defense is used on a frequent basis, that the insanity defense is a "legal loophole," and that if a person if found NGRI, he or she is released immediately back into society."[106] This is another reason why the insanity defense cannot reliably protect many individuals with severe mental illness who are prosecuted capitally.

Returning to the example of Scott Panetti, highlighted earlier, it is easy to see how the insanity defense can fail. After being found competent to stand trial, Mr. Panetti waived his right to counsel and represented himself at trial. Although he has severe schizophrenia and attempted to assert the insanity defense amid his bizarre trial presentation, he was unsuccessful and sentenced to death.

*A defendant found not guilty by reason of insanity is not convicted of the crime and is typically sent to a psychiatric institution. With the exemption endorsed by the ABA, a defendant could be prosecuted, convicted and sentenced to life without parole if found guilty. In addition, the insanity defense only applies to a very narrow category of individuals with severe mental illness. This exclusion provides a middle ground protection for individuals with severe mental illness who do not fit the extremely narrow insanity defense, but have significant mental impairments that make them undeserving of the death penalty.*

---

[101] *Not Guilty by Reason of Insanity: Reference Manual for Community Services Boards & Behavioral Health*, VIRGINIA DEPARTMENT OF BEHAVIORAL HEALTH & DEVELOPMENTAL SERVICES (2016), http://www.dbhds.virginia.gov/professionals-and-service-providers/forensic-services/ngri-manual.

[102] *Id.*

[103] ABA, RECOMMENDATION 122-A, 2006, *supra*, note 9.

[104] Jurors in capital trials must undergo a process called death qualification. Death qualification is a part of *voir dire* during which prospective jurors are questioned regarding their beliefs about capital punishment. This process serves to eliminate jurors whose attitudes toward the death penalty would prevent them from being fair and impartial in deciding the fate of a defendant. In order to sit on a capital jury, a person must not feel so strongly about the death penalty that his or her belief would "prevent or substantially impair the performance of [his or her] duties as a juror" Brooke J. Butler, *The Role of Death Qualification in Jurors' Susceptibility to Pretrial Publicity*, 37 J. APPLIED SOC. PSYCHOL., 1744, 1744 (2007).

[105] Brooke J. Butler & Adina Wasserman, *The Role of Death Qualification in Venirepersons' Attitudes Toward the Insanity Defense*, 36 J. APPLIED SOC. PSYCHOL., 1744, 1752 (2006).

[106] *Id.*

Attachment A

## CASE EXAMPLE: Kelsey Patterson



**Kelsey Patterson**
*Texas*

- Diagnosed with paranoid schizophrenia in 1981. Found incompetent to stand trial and deemed insane in prior assaults.
- Believed he had a "permanent stay of execution."
- Executed in 2004.

This case provides another striking example of how the insanity defense is insufficient to ensure adequate consideration of a defendant's mental illness in capital proceedings. Mr. Patterson had a long history of mental illness, and was diagnosed with paranoid schizophrenia in 1981. He spent much of the 1980s in and out of mental hospitals. In three separate occurrences in 1980, 1983 and 1986, Mr. Patterson assaulted a co-worker and was later found either incompetent to stand trial or no charges were filed because of his mental health status.

However, in 1992, Kelsey Patterson randomly shot and killed a local business owner, Louis Oates, and his secretary, Dorothy Kay Harris. After the shooting, he put down the gun, stripped to his socks, and paced at the scene, shouting incomprehensibly until the police arrived. But at his subsequent competency hearing in this case, two physicians (who did not dispute the existence of his mental illness) found him competent to stand trial. The controversial doctor who had diagnosed him with schizophrenia 12 years earlier testified that Mr. Patterson had been sane at the time of the 1992 crime. Despite Mr. Patterson's incoherent ramblings to the jury about the conspiracies against him, the jury rejected his insanity defense and sentenced him to death. Mr. Patterson's mental illness continued throughout his time on death row, where he believed he had a "permanent stay of execution."

On May 17, 2004, the Texas Board of Pardons and Paroles issued an extremely rare recommendation of clemency for Mr. Patterson because of his mental illness; the vote was 5-1 and was only the second such recommendation in the board's history. Then Governor of Texas Rick Perry rejected the recommendation and the execution took place the next day.

*USA: The Execution of Mentally Ill Offenders,* AMNESTY INTERNATIONAL, at 74 (Jan. 31 2006), https://www.amnesty.org/en/documents/AMR51/003/2006/en/. (Additionally, the controversial doctor in Mr. Patterson's case, psychiatrist Dr. Grigson, was known as "Dr. Death" because his testimony was instrumental in sending so many people to death row. He later was expelled from the American Psychiatric Association and Texas Society of Psychiatric Physicians because of his unethical, unscientific testimony in such cases.)

## Mitigating Factors

While jurors are permitted to consider evidence presented by the defense related to mental illness in a death penalty sentencing phase, this use of "mitigation" has proven to be an unreliable method to ensure that a defendant's severe mental illness will be fully considered and given its proper weight. Although some have argued that this sufficiently protects those with severe mental illness from receiving a death sentence, practice has shown that this is untrue, and that individuals with severe mental illness are still regularly sentenced to death.

In fact, jurors often treat mental illness as an aggravating factor rather than a mitigating factor in capital cases.[107] They may view defendants with severe mental illness as inherently dangerous or may lack enough expert understanding of the ways mental illness can impair an individual and change their behavior. A study conducted by David Baldus revealed that in fact, a defendant's insanity or incompetence claim was one of the strongest correlates with a death sentence, suggesting that most jurors view mental illness as aggravating rather than mitigating.[108] A jury's misinterpretation of a defendant's actions might also extend to a failure to recognize that severe mental illness is a mitigating, and not an aggravating, factor. In a case cited by Professor Scott Sundby, in which all parties and experts, including the state's psychiatrist, agreed that the defendant suffered from severe mental illness, a "juror summarized the jury's decision in the case […] when asked about the strongest factor

---

[107] *See e.g.* Stephen P. Garvey, *The Emotional Economy of Capital Sentencing,* 75 N.Y.U. L. REV. 26, 57 (2000); Ellen F. Berkman, *Mental Illness as an Aggravating Circumstance in Capital Sentencing,* 89 COLUM. L. REV. 291, 299 (1989).
[108] DAVID BALDUS ET AL., EQUAL JUSTICE AND THE DEATH PENALTY (Northeastern University Press ed., 1990).

Attachment A

for and against the death penalty: 'For: His incurability. Against: 'His illness.'[109]Moreover, if jurors are simply provided with a list of mitigating factors related to mental illness without further explanation, they may be left confused and uninformed about the sentencing implications of those factors.[110] These biases interfere with jurors' ability to appropriately assess the weight to be given to the mitigating factor of a defendant's mental illness, which is unacceptable when a defendant's life is at stake.

In addition, severe mental illness may significantly interfere with a defendant's ability to effectively participate in his defense. The illnesses that are characterized by a lack of insight can make it extremely complicated for a lawyer to present mitigating evidence about a mental disorder that the defendant him or herself denies. Persons with schizophrenia, for instance, are often forgetful, have difficulty organizing thoughts and struggle to make decisions. They may also suffer from paranoid delusions that make them distrustful of their attorneys and their motives.

Persons with schizophrenia are often extremely concrete thinkers and have limited insight; they may also exhibit alogia, or diminished speech output, and may be relatively unhelpful or inaccurate historians about their lives.[111] Difficulty communicating, disorganized thoughts, and psychotic symptoms all get in the way of effective representation, and put defendants with severe mental illness at a significant disadvantage when defending themselves from a death sentence: "The very characteristic that diminishes the mentally ill defendants' culpability jeopardizes his attorney's ability to prepare and present the case that would persuade the jury to return a life sentence."[112] The stigma of mental illness can also lead defendants to refuse any mitigating evidence to be presented about their illness. Furthermore, in cases where trauma is mingled with the severe mental illness, defendants will want to avoid reliving the traumatizing evidence and thus try to avoid the presentation of potentially life-saving evidence about the trauma they suffered.

Another way in which a defendant's severe mental illness may interfere with an effective presentation of mitigating evidence is that the symptoms may create "an unwarranted impression of lack of remorse."[113] Indeed, while suffering from a psychotic episode, they may become agitated, unable to control their movements, or make inappropriate comments – all of which can be interpreted by jurors as dangerous, impulsive behavior and thus increase the likelihood of jurors finding the death sentence appropriate.[114] Conversely, when heavily medicated, defendants may not exhibit such florid symptoms but may instead display a flat demeanor or look (and even fall) asleep as a side-effect of the medication, all of which gives the impression that he or she is remorseless, another element to which jurors give a strong weight.[115] It is often difficult for jurors to reconcile the defendant's behavior during a crime with their demeanor in court when they are heavily medicated.

Indeed, the U.S. Supreme Court found in *Atkins* and *Roper* that the mitigation phase did not effectively protect individuals with intellectual disability or juveniles from receiving the death penalty: "reliance on mental retardation as a mitigating factor can be a two-edged sword that may enhance the likelihood that the aggravating factor of future dangerousness will be found by the jury."[116]

*Likewise, it is not possible to rely on this stage of the capital sentencing process to fully protect individuals with severe mental illness. While jurors' consideration of mitigating factors related to mental illness is permitted, this is not an absolute guarantee that it will be fully considered and given its proper weight. Research has shown that jurors may hold widespread and erroneous prejudices about mental illness and future dangerousness, and may make life or death decisions based on those. The Supreme Court expressed similar concerns in the case of*

---

[109] Scott Sundby, *The True Legacy of Atkins and Roper: The Unreliability Principle, Mentally Ill Defendants, and the Death Penalty's Unraveling*, 23 Wm. & Mary Bill Rts. J. 487, 519 (2014).

[110] Garvey, *supra* note 107.

[111] Joe Hennell, *Mental Illness on Appeal and the Right to Assist Counsel* 29 J. Contemp. Health L. & Pol'y 350, 354 (2013).

[112] Sundby, *supra* note 109, at 514.

[113] *Atkins* at 321.

[114] Stephen P. Garvey, *Aggravation and Mitigation in Capital Cases: What Do Jurors Think?*, 98 Colum. L. Rev. 1538, 1599 (1998).

[115] Ronald S. Honberg, *The Injustice of Imposing Death Sentences on People With Severe Mental Illness*, 54 Cath. U. L. Rev. 1153 (2005).

[116] *Atkins* at 321.

Attachment A

*defendants with intellectual disability and juveniles, and found that a categorical bar was the only appropriate protection. The proposed ABA exemption would provide a similar protection to those with severe mental illness.*

## Competency to be Executed

Finally, in *Ford v. Wainwright*, the U.S. Supreme Court held that the Eighth Amendment forbids states from executing prisoners if they are "insane."[117] In reaching this decision, the Court noted the lack of "retributive value of executing a person who has no comprehension of why he has been singled out and stripped of his fundamental right to life."[118] In 2007, the Court clarified that the determination of whether an inmate is "insane" such that he or she is incompetent to be executed requires an analysis of whether the inmate has a rational understanding of the government's reason for executing him or her, noting, "[a] prisoner's awareness of the State's rationale for an execution is not the same as a rational understanding of it."[119] This "competency to be executed" standard requires an assessment of an inmate's mental state at the time of the impending execution, rather than at the time of the offense or at the time of trial.

*Ford* further held that defendants must have an opportunity to litigate the issue of their competency to be executed. While declining to set forth a specific procedure that states must follow, the Court noted that "the lodestar of any effort to devise [such a] procedure must be the overriding dual imperative of providing redress for those with substantial claims and of encouraging accuracy in the fact-finding determination."[120] Within this framework, the competency assessment varies in administration from state to state. As with the competency to stand trial standard, the competency to be executed standard sets a very high bar, leaving it entirely possible to have severe mental illness and still purportedly have a rational understanding of the reason for one's pending execution, proving that this standard does not provide adequate safeguards to protect individuals with severe mental illness against execution.

The case of Kelsey Patterson, noted above, who was executed despite the fact that he believed he had a "permanent stay of execution," provides one example demonstrating that it can be extremely difficult for defendants to establish that they are incompetent to be executed, despite ample evidence of severe mental illness.

In addition to failing to provide adequate safeguards against execution for inmates with severe mental illness, the competency to be executed standard also often creates significant ethical dilemmas for mental health professionals asked to evaluate such inmates.[121] On one hand, a physician's first duty is to their patients, and "typically, the only effective means of treatment for the inmate's symptoms of a serious mental illness is to provide appropriate medications."[122] On the other hand, "[m]ost mental health professionals believe it is unethical to provide treatment for the purpose of restoring a person's competence to enable a state to carry out an execution."[123] Thus, this requirement creates an ethical quandary for mental health professionals to provide treatment to an inmate in order to facilitate their execution. Yet it may also be problematic for such a professional to refuse to treat an inmate's severe mental illness, when such treatment would be in the inmate's best medical interest and would alleviate the person's symptoms and degree of suffering.[124]

*When looking at a defendant's competency to be executed, courts look at that individual's mental state at the time near the execution date – which can occur many years after the crime. The standard is focused on whether defendants understand the rationale for their execution, and not on whether they were suffering from a severe*

---

[117] *Ford v. Wainwright*, 477 U.S. 399, 399 (1986).
[118] *Id.* at 409.
[119] *Panetti v. Quarterman*, 551 U.S. 930, 933 (2007).
[120] *Ford* at 417.
[121] Rochelle Graff Salguero, *Medical Ethics and Competency to be Executed*, 96 YALE L.J. 167 (1986).
[122] Brian D. Shannon & Victor R. Scarano, *Incompetency to Be Executed: Continuing Ethical Challenges & Time for A Change in Texas*, 45 TEX. TECH L. REV. 419, 425 (2013).
[123] *Id.* at 424.
[124] *Id.* at 425.

Attachment A

mental disorder or disability that significantly impairs their understanding of reality and ability to control behavior at the time of the crime. Thus, this standard, like the other current mechanisms in the law, provides inadequate legal protection.

Clearly, each of the current legal mechanisms that attempt to account for a defendant's mental illness

**"These existing procedures do not adequately protect individuals with severe mental illness from being sentenced to death or executed as they apply to very few cases and allow people with profound impairments to slip through the cracks"**

at various stages in the criminal justice process is limited in scope and applicability. Even taken together, these mechanisms do not and cannot provide meaningful protection against death sentences and execution for individuals with severe mental illness. The ABA Resolution's proposed exemption would better ensure that defendants with severe mental illness are protected from the death penalty and given the proportional and appropriate punishment.

# Part III: Constitutional Challenges to the Execution of Defendants with Severe Mental Illness

## No Penological Justification

The Supreme Court has identified "two principal social purposes" served by capital punishment: retribution and deterrence.[125] However, neither of them justifies the execution of individuals with severe mental illnesses.

First, the retributive rationale for the death penalty is conditioned on an offender's level of responsibility, a question that goes beyond whether he or she committed the crime. A defendant can be found guilty of first degree murder beyond a reasonable doubt, but may not possess the level of personal moral culpability that makes him or her deserving of the death penalty. Indeed, the vast majority of murders in this country do not result in a death sentence.[126] As the Supreme Court noted in *Atkins*, "[w]ith respect to retribution—the interest in seeing that the offender gets his 'just deserts'—the severity of the appropriate punishment necessarily depends on the culpability of the offender."[127] As well, the Court's analysis of whether a death sentence is excessive has always been based on the idea that "punishment should be directly related to the personal culpability of the criminal defendant."[128] In other words, the individual's culpability and the punishment must be proportional.

To warrant the death penalty, a defendant must be more morally culpable than the average murderer. As Laurie Izutsu puts it, "the reality that not every defendant in a capital case is sentenced to death reflects the attitude that 'only the most deserving' should be executed."[129]

Punishing people with severe mental illness does not further the retributive goals of the punishment because this population simply does not have the requisite moral culpability as their illness can impair their ability to interpret reality accurately, to comprehend fully the consequences of their actions, and to control their actions.[130] As such, it is contradictory that a person belonging to a more vulnerable group in society, would also, at the same time, be among the most culpable individuals who possess the highest level of culpability. As U.S. District

Judge William Wayne Justice noted in another context, "[i]f we reject the moral necessity to distinguish between those who willingly do evil, and those who do dreadful acts on account of unbalanced minds, we will do injury

---

[125] *Gregg v. Georgia*, 428 U.S. 153, 183 (1976).

[126] *Publications & Products: Felony Sentences in State Courts*, U.S. Dep't of Justice, Bureau of Justice Statistics, http://www.bjs.gov/index.cfm?ty=pbse&sid=28 (last visited Nov. 27, 2016).

[127] *Atkins* at 319.

[128] *Thompson v. Oklahoma*, 487 U.S. 815, 834 (citing *California v. Brown*, 479 U.S. 538, 545 (1987)).

[129] Laurie Izutsu, *Applying Atkins v. Virginia to Capital Defendants with Severe Mental Illness*, 70 Brook. L. Rev. 995, 999 (2005).

[130] ABA, Recommendation 122-A, 2006, *supra*, note 9.

Attachment A

to these people."[131]

Second, the theory that the death penalty in general deters potential murderers is controversial and unsupported by conclusive evidence.[132] However, any possible deterrent effect is necessarily further diminished among people who, as with people intellectual disability, have a "diminished ability to understand and process information, to learn from experience, to engage in logical reasoning, or to control impulses."[133] As the Supreme Court observed, "the death penalty has little deterrent force against defendants who have reduced capacity for considered choice."[134]

> **"The death penalty has little deterrent force against defendants who have reduced capacity for considered choice."**

People with mental illness did not choose their condition. In addition, impairments like hallucinations, delusions, impaired cognition, or disorganized thinking create a "reduced capacity for considered choice," as detailed in Part I of this Paper. In light of this, defendants with severe mental illness have little in common with the offenders the death penalty is intended to target and likely could not have been deterred from committing a crime that occurred while they were experiencing symptoms of their condition.

## A Violation of the Eighth Amendment Ban on Cruel and Unusual Punishment

As noted earlier, the U.S. Supreme Court has recognized categorical constitutional bars on the death penalty for individuals with intellectual disability and juvenile defendants, noting significant mental similarities and rationales between these two vulnerable groups.

### *The constitutional bar on the execution of defendants with intellectual disability*

In *Atkins v. Virginia*, the Court concluded that "death is not a suitable punishment for a mentally retarded criminal."[135] With *Atkins*, the Court "announced a rule of *per se* diminished responsibility required by the Constitution" – the execution of people with intellectual disability was unconstitutional "based upon their diagnosis alone."[136] The bar to execution rests solely on the fact that defendants have intellectual disability, which is enough in itself to justify a sentence other than death. However, defendants with intellectual disability can still be found guilty of murder and sentenced to life without parole.

In explaining its reasoning, the Court first noted that the Eighth Amendment's ban on cruel and unusual punishment must be interpreted through the standards of the time, and reflect contemporary society's view on punishment. As far back as 1910, the Supreme Court had stated that the Amendment "is progressive and does not prohibit merely the cruel and unusual punishments known in 1689 and 1787, but may acquire meaning as public opinion becomes enlightened by humane justice."[137] In 1958, the Court confirmed this line of reasoning by affirming that the definition of cruel and unusual punishment must draw its meaning from "the evolving standards of decency that mark the progress of a maturing society."[138]

---

[131] James Kimberly, *Judge Defends Mentally Ill in Speech*, HOUSTON CHRONICLE (Sept. 26, 2002), http://www.chron.com/news/houston-texas/article/Judge-defends-mentally-ill-in-speech-2122274.php.
[132] *See generally, Discussion of Recent Deterrence Studies*, DEATH PENALTY INFORMATION CENTER, http://www.deathpenaltyinfo.org/discussion-recent-deterrence-studies (last visited Nov. 27, 2016) ("A report released on April 18, 2012, by the prestigious National Research Council of the National Academies based on a review of more than three decades of research concluded that studies claiming a deterrent effect on murder rates from the death penalty are fundamentally flawed […] The committee concludes that research to date on the effect of capital punishment on homicide is not informative about whether capital punishment decreases, increases, or has no effect on homicide rates.").
[133] *Atkins* at 320.
[134] *Skipper v. South Carolina*, 476 U.S. 1, 13 (1986) (Powell, J., concurring).
[135] *Atkins* at 321.
[136] Bruce Winick, *The Supreme Court's Emerging Death Penalty Jurisprudence: Severe Mental Illness as the Next Frontier*, 50 B. C. L. REV. 785, 786 (2009).
[137] *Weems v. United States*, 217 U.S. 349, 378 (1910).
[138] *Trop v. Dulles*, 356 U.S. 86, 101 (1958).

Attachment A

Next, the *Atkins* Court observed that a significant number of states had outlawed the execution of individuals with intellectual disability in the 13 years that had passed since it had previously upheld the execution of these individuals in *Penry v. Lynaugh* in 1989. The Court specifically noted "the consistency of the [legislative] change" (particularly significant in a context that generally favors anticrime legislation rather than the protection of violent criminals) and the fact that even in the states where the practice was not illegal, executing offenders with intellectual disability was uncommon.[139]

The Court also conducted an "independent evaluation" and concluded that:

> Mentally retarded persons frequently know the difference between right and wrong and are competent to stand trial, but, by definition, they have **diminished capacities to understand and process information, to communicate, to abstract from mistakes and learn from experience, to engage in logical reasoning, to control impulses, and to understand others' reactions**. Their deficiencies **do not warrant an exemption from criminal sanctions**, but **diminish their personal culpability**.[140]

The Court found that, in light of these deficiencies, "there is a serious question whether either justification underpinning the death penalty – retribution and deterrence of capital crimes – applies to mentally retarded offenders." It continued:

> Mentally retarded defendants in the aggregate face a special risk of wrongful execution because of the possibility that they will **unwittingly confess to crimes they did not commit**, their **lesser ability to give their counsel meaningful assistance**, and the facts that **they are typically poor witnesses** and that **their demeanor may create an unwarranted impression of lack of remorse** for their crimes.[141]

Twelve years after *Atkins,* the Court later strengthened the protection for individuals with intellectual disability in *Hall v. Florida*.[142] In *Hall*, the Court struck down a Florida statute that strictly foreclosed further exploration of a capital defendant's intellectual disability if his or her IQ score was higher than 70. The Court relied on "established medical practice" and the expertise of professionals who have "long agreed that IQ test scores should be read as a range" to rule that the Florida statute was unconstitutional.[143] It further relied on the fact that the majority of states reject a strict 70-point cutoff, stating that "in summary, every state legislature to have considered the issue after *Atkins*, save Virginia's – and whose law has been interpreted by its courts has taken a position contrary to that of Florida."[144]

In *Hall*, the Court recognized the complexity of intellectual disability and the fact that no definitive scientific measurement can be used as a cutoff:

> Florida's rule disregards established medical practice in two interrelated ways. It takes an IQ score as final and conclusive evidence of a defendant's intellectual capacity, when experts in the field would consider other evidence. It also relies on a purportedly scientific measurement of the defendant's abilities, his IQ score, while refusing to recognize that the score is, on its own terms, imprecise.[145]

While some may argue that it is easier to protect those with intellectual disability from execution than those with severe mental illness because the impairment is easier to diagnose, this shows the Court itself recognizes that the complexity of a diagnosis should not be an impediment to protection from execution. As the Court summarized, "Intellectual disability is a condition, not a number."[146]

---

[139] *Atkins* at 315.
[140] *Id.* at 318 (emphasis added).
[141] *Id.* at 321 (emphasis added).
[142] *Hall v. Florida*, 134 S.Ct. 1986 (2014).
[143] *Id.* at 1988 (2014).
[144] *Hall* at 1998.
[145] *Id.* at 1995.
[146] *Id.* at 2001.

Attachment A

Importantly, the Court reiterated in *Hall* that "no legitimate penological purpose is served by executing a person with intellectual disability" because "those with intellectual disability are, by reason of their condition, likely unable to make the calculated judgments that are the premise of the deterrence rationale" and "retributive values are also ill-served by executing those with intellectual disability."[147] Likewise, and as discussed earlier, the goals of retribution and deterrence are not met by executing a person with severe mental illness.

### *The constitutional bar on the execution of juveniles*

Three years after *Atkins*, the U.S. Supreme Court recognized another important categorical exemption from the death penalty by ruling that the execution of children under the age of 18 is unconstitutional in *Roper v. Simmons*.[148] Again, the Court reiterated the necessity of taking into account "the evolving standards of decency that mark the progress of a maturing society" and directly relied on the reasoning in *Atkins*. The Court again found that in the case of juveniles, the "indicia of national consensus" – in this case 30 states outlawing the execution of juveniles – supported a finding of unconstitutionality.[149] As in *Atkins*, the Court also conducted an independent analysis, discussing the intrinsic characteristics of juveniles that show that they "cannot with reliability be classified among the worst offenders."[150]

First, the Court found that juveniles' **susceptibility to immature and irresponsible behavior** means "their irresponsible conduct is not as morally reprehensible as that of an adult."[151] In addition, the Court continued: "their own **vulnerability and comparative lack of control** over their immediate surroundings mean juveniles have a **greater claim than adults to be forgiven for failing to escape negative influences** in their whole environment"[152] and "the reality that juveniles **still struggle to define their identity** means it is less supportable to conclude that even a heinous crime committed by a juvenile is evidence of irretrievably depraved character."[153]

The *Roper* Court also noted the "overwhelming weight of international opinion" against the juvenile death penalty, which "although not controlling," "provides respected and significant confirmation for the Court's determination."[154]

### *Extending the constitutional bar on execution to those with severe mental illness*

Much of the reasoning in *Atkins* and *Roper* can be applied virtually word-for-word to defendants with severe mental illness. Indeed, "[m]ental illness bears striking similarities to both mental retardation and juvenile status."[155] As many scholars agree, "the parallels between the severely mentally ill and the individuals protected by *Atkins* and *Roper* are remarkable."[156]

> **"Much of the reasoning in *Atkins* and *Roper* can be applied virtually word-for-word to defendants with severe mental illness."**

While it is important to make clear that "mental illness" and "intellectual disability" are two separate diagnoses, it does not mean that they are always mutually exclusive. While a diagnosis of intellectual disability requires an inquiry into a person's intelligence, mental illness can strike a person of any intelligence level. In addition, intellectual disability is a permanent,

---

[147] *Id.* at 1993.
[148] *Roper v. Simmons*, 543 U.S. 551, 551 (2005).
[149] *Roper* at 553. (These 30 states include 12 that had abolished the death penalty at the time, and 18 that retained it. The Court notes also that "even in the 20 States without a formal prohibition, the execution of juveniles is infrequent.").
[150] *Roper* at 553.
[151] *Roper* at 553. (Emphasis added.)
[152] *Id.* at 553. (Emphasis added.)
[153] *Id.* (Emphasis added.)
[154] *Id.* at 554.
[155] Winick, *supra* note 136, at 788.
[156] Lyn Entzeroth, *The Challenge and Dilemma of Charting A Course to Constitutionally Protect the Severely Mentally Ill Capital Defendant From the Death Penalty*, 44 AKRON L. REV. 529, 559 (2011).

Attachment A

life-long condition that typically becomes evident in infancy and must be established by the age of 18. Conversely, mental illness can manifest at any age, with many of the more severe mental illnesses (e.g., bipolar disorder and schizophrenia) first appearing in adulthood and is potentially treatable. It can be a temporary condition, be experienced in cycles, or episodes may recur throughout life.

However, a careful comparison of the language used in *Atkins* to describe the characteristics of intellectual disability that lower a defendant's culpability and the symptoms characteristic of severe mental illness, shows how much the reasoning of the Court applies with equal force to defendants with mental illness. For example, consider the following similar traits:[157]

- **"Diminished capacity to understand and process information**:" The American Psychiatric Association refers to mental illness as health conditions involving significant changes in thinking, among others.[158] For example, symptoms of schizophrenia include confused and disordered thinking, trouble with logical thinking, problems with attention and declining educational performance. People with bipolar disorder can have "uncontrollable racing thoughts" when in a manic episode, and difficulty concentrating when in a depressive episode. PTSD also affects the capacity to understand and process information, making people hyper-vigilant and over-react to perceived threats. They may also experience dissociative thoughts and experiences of reliving trauma, all of which interfere with a person's capacity to understand and process information.

- **"Diminished capacity to communicate**:" Many individuals with severe mental illness also have an impaired capacity to communicate. For example, symptoms of schizophrenia can include a loss or a decrease in the ability to initiate plans, speak or express emotion. Delusional disorders and extreme paranoia can also interfere with the ability to communicate, as persons with such an illness may not trust those around them with important information. In certain cases, defendants with those types of disorders refuse to speak about their disorder altogether, including to their attorney or close family members.

- **"Diminished capacity to abstract from mistakes and learn from experiences**:" People with severe mental illness may exhibit delusional or paranoid thinking. As a result, they are less able to logically analyze past mistakes and experiences and draw appropriate conclusions. Those exhibiting symptoms of mania have a heightened and often unrealistic sense of their capacities which can lead to risky behavior.

- **"Diminished capacity to engage in logical reasoning**:" Mental illness can impair an individual's capacity to engage in logical reasoning in a variety of ways. Delusions and paranoid thinking can obviously interfere with a person's ability to engage in logical thought. In addition, a person going through a depressive episode, a person may be overwhelmed by his or her feelings of hopelessness and worthlessness, hindering logical reasoning. The hyper vigilance characteristic of PTSD also leads to an assessment of risks not based in logical reasoning.

- **"Diminished capacity to control impulses**:" Many mental illnesses can result in poor impulse control. Schizophrenia symptoms can include bizarre behavior or abnormal movements, while bipolar disorder, especially when manifested through a manic episode can lead to increased risky behavior. PTSD can include being startled very easily, feeling tense, or having outbursts of anger, which can in turn lead a person to overreact to perceived threats

- **"Diminished capacity to understand others' reactions**:" For the same reasons that severe mental illness impairs understanding and processing of information as well as logical reasoning and learning from mistakes, mental illness also impairs the capacity to understand others' reactions and respond appropriately to them. Anosognosia, the lack of insight into one's own illness, can only reinforce this diminished capacity to understand others' reactions.

---

[157] *Atkins* at 318.

[158] *What is Mental Illness*, AMERICAN PSYCHIATRIC ASSOCIATION (Nov. 2015), https://www.psychiatry.org/patients-families/what-is-mental-illness.

Attachment A

This is only a limited, and certainly non-exhaustive, list of examples that illustrate how the functional impairments brought about by mental illness create the same kind of diminished capacities that *Atkins* relied on to find the execution of those with intellectual disability unconstitutional.

In *Atkins*, the Court also wrote: "[m]entally retarded defendants in the aggregate face a special risk of wrongful execution because of the possibility that they will unwittingly confess to crimes they did not commit, their lesser ability to give their counsel meaningful assistance, and the facts that they are typically poor witnesses and that their demeanor may create an unwarranted impression of lack of remorse for their crimes."[159] As will be discussed in Part IV, defendants with severe mental illness are similarly more vulnerable to giving false confessions, less able to meaningfully assist their counsel, less likely to be good witnesses and their behavior may be interpreted to their detriment by a jury.

Indeed, several state and federal court judges have already noted the similarity between impairments due to intellectual disability and mental illness, and have concluded that there is no justification for failing to categorically exempt individuals with severe mental illness from the death penalty while providing such an exemption for individuals with intellectual disability.

For example, Indiana Supreme Court Justice Robert D. Rucker asserted in a 2002 dissent that the "underlying rationale for prohibiting executions of the mentally retarded is just as compelling for prohibiting the executions of the seriously mentally ill, namely evolving standards of decency."[160] Justice Rucker reiterated that position in further separate concurrences in 2005 and 2007.[161] Similarly, Justice James Zazzali of the New Jersey Supreme Court wrote in *State v. Nelson* that "if the culpability of the average murderer is insufficient to evoke the death penalty as our most extreme sanction, then the lesser culpability of Nelson, given her history of mental illness and its connection to her crimes, 'surely does not merit that form of retribution.'"[162] In 2003, Judge Robert Henry of the U.S. Court of Appeals for the Tenth Circuit that the imposition of the death penalty against mentally ill Oklahoma death row inmate Robert Bryan, "contributes nothing" to the goals of retribution and deterrence, noting *Atkins*.[163] Although Judge Henry was joined by three other judges on the court, it was not enough to stop Robert Bryan from being executed in June 2004.[164]

In 2001 in *State v. Scott,* Ohio Supreme Court Justice Paul Pfeifer dissented from a majority opinion affirming the death sentence of man with schizophrenia:

> I cannot get past one simple irrefutable fact: he has chronic, undifferentiated schizophrenia, a severe mental illness. Mental illness is a medical disease. Every year we learn more about it and the way it manifests itself in the mind of the sufferer. At this time, we do not and cannot know what is going on in the mind of a person with mental illness. As a society, we have always treated those with mental illness differently from those without. In the interest of human dignity, we must continue to do so.[165]

While Justice Pfeifer recognized that the defendant was not "a sympathetic man" but rather a "twice-convicted murder who does not appear to express remorse for his crimes," he strongly affirmed that "[e]xecuting Jay Scott says more about our society than it says about him."[166] Mr. Scott was nevertheless executed in June 2001.[167]

In 2011, former Ohio Supreme Court Justice Evelyn Stratton wrote a separate concurrence in *State v. Lang*, explaining that: "[i]f executing persons with mental retardation/developmental disabilities or executing

---

159 *Atkins* at 317-321.

160 *Corcoran v. State*, 774 N.E. 2d 495, 502 (Ind. 2002).

161 *Overstreet v. State*, 877 N.E.2d 144 (Ind. 2007) (Rucker J., concurring); *Matheney v. State*, 834 N.E.2d 658 (Ind. 2005) (Rucker J., concurring).

162 *State v. Nelson*, 803 A.2d 1, 47 (N.J. 2002) (Zazzali J., concurring).

163 *Bryan v. Mullin*, 335 F.3d 1207, 1228 (10th Cir. 2003) (Henry J., concurring in part and dissenting in part).

164 *State inmate executed for aunt's death in 1993*, THE OKLAHOMAN (June 10, 2004), http://newsok.com/article/1906240.

165 *State v. Scott*, 748 N.E. 2d 11, 20 (Ohio 2001) (Pfeifer, J., dissenting).

166 *Id.* at 20.

167 Spencer Hunt, *Killer Scott is Executed by Injection,* THE CINCINNATI ENQUIRER (June 15, 2001), http://enquirer.com/editions/2001/06/15/loc_killer_scott_is.html.

Attachment A

juveniles offends 'evolving standards of decency,' then I simply cannot comprehend why these same standards of decency have not yet evolved to also prohibit execution of persons with severe mental illness at the time of their crimes."[168] Since then, she has reiterated that position in front of the Ohio Senate in October 2015,[169] and is one of the leading supporters of Ohio's Senate Bill 162, a bill introduced in May 2015 that would exempt those with severe mental illness from the death penalty.[170]

More recently, Judge Richard Teitelman of the Supreme Court of Missouri, wrote in a dissent: "I would hold that the reasoning in *Ford v. Wainwright*, *Atkins v. Virginia*, and *Roper v. Simmons*, applies to individuals who… were severely mentally ill at the time the offense was committed."[171]

## The "Unreliability Principle"

The U.S. Supreme Court has consistently affirmed that capital punishment requires individualized sentencing because of its gravity and finality. The same day that it reinstated the death penalty in *Gregg v. Georgia* in 1976 by approving guided discretion schemes, the Court also struck down mandatory death penalty statutes and made clear that jurors were required to make decisions about sentencing based on individualized consideration in *Roberts v. Louisiana* and *Woodson v. North Carolina*.[172] The Court found that North Carolina and Louisiana's laws, which would trigger an automatic imposition of capital punishment, did not resolve "the constitutional vice of mandatory death sentence statutes – lack of focus on the circumstances of the particular offense and the character and propensities of the offender."[173]

It is clear then that a death sentence can only be applied when full consideration and full weight have been given to the "diverse frailties of humankind" that may be found in a defendant.[174] But what happens when, as in the case of people with severe mental illness, these mitigating factors cannot be reliably weighed and taken into account?

As noted earlier, all death penalty states and the federal government allow a defendant to present mitigating evidence of mental illness as a reason not to impose death.[175] Many of these provisions specifically refer to

impairment due to a "mental disease or defect" or "mental illness." However, severe mental illness is sometimes an impediment to the efficient presentation of mitigation, or, worse, is interpreted as an aggravating factor.

As Professor Scott Sundby puts it, "where mitigation defied reliable assessment, the only constitutional answer was a categorical removal of those cases from the death penalty."[176] Professor Sundby analyzes factors used by the Court for "flagging 'special difficulties' that might place a mitigating factor beyond a sentencer's reliable evaluation" and how these factors apply in the case of severe mental illness.[177]

---

[168] *State v. Lang*, 954 N.E.2d 596, 649 (Ohio 2011) (Lundberg Stratton J., concurring).
[169] Alan Johnson, *Don't execute mentally ill, lawmakers told*, THE COLUMBUS DISPATCH (Oct. 14, 2015), http://www.dispatch.com/content/stories/local/2015/10/14/death_penalty_bill.html.
[170] *See* S.B. 162, 131st Gen. Assemb., Reg. Sess. (Ohio 2015), https://www.legislature.ohio.gov/legislation/legislation-summary?id=GA131-SB-162. As of November 27, 2016, the bill is still being considered by the committee.
[171] *State ex rel. Strong v. Griffith*, 462 S.W.3d 732, 739 (Mo. 2015) (Teitelman, J., dissenting). Further dissents of state supreme court judges on the issue of severe mental illness and the death penalty include: *Com. v. Baumhammers*, 960 A.2d 59 (Pa. 2008) (Todd J., concurring); *State v. Ketterer*, 855 N.E.2d 48 (Ohio 2006) (Lundberg Stratton, J., concurring); *Baird v. State*, 833 N.E.2d 28 (Ind. 2005) (Boehm, J., dissenting).
[172] *Roberts v. Louisiana*, 428 U.S. 325 (1976); *Woodson v. North Carolina*, 428 U.S. 280 (1976).
[173] *Roberts* at 333.
[174] *Woodson v. North Carolina*, 428 U.S. 280, 304 (1976). In *Lockett v. Ohio*, 438 U.S. 586 (1978), the Court further reinforced this trend, when it ruled unconstitutional an Ohio "guided discretion" statute that limited the capital sentencer's consideration of mitigating factors to a list of only three factors. The court held that the constitutional mandate of individualized sentencing required that "any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death" may be considered by the sentence. *See also Eddings v. Oklahoma*, 455 U.S. 104 (1982); *Williams v. Taylor* 529 U.S. 362 (2000), *Tennard v. Dretke* 542 U.S. 274 (2004).
[175] Lyn Entzeroth, *The Challenge and Dilemma of Charting A Course to Constitutionally Protect the Severely Mentally Ill Capital Defendant From the Death Penalty*, 44 AKRON L. REV. 529, 568 (2011).
[176] Sundby, *supra* note 109, at 506.
[177] *Id*.

Attachment A

They include the following concerns:

- Severe mental illness can impair the defendant's cooperation with his lawyer and the lawyer's ability to prepare a defense.

In *Atkins*, the Court directly mentioned the lesser ability of people with intellectual disabilities to effectively assist their counsel. In *Graham v. Florida*, a case in which the Court held that juveniles could not be sentenced to life in prison without parole for a non-homicide crime, the Court wrote: "[j]uveniles mistrust adults and have limited understanding of the criminal justice system and the roles of the institutional actors within it."[178] The same reasoning can be applied with equal, if not stronger force to defendants with mental illness.

- Severe mental illness can interfere with the defendant's decision-making.

In addition to interfering with a defendant's ability to make informed decisions regarding presentation of mitigating evidence related to mental illness (as discussed in Part II of this Paper), severe mental illness also strongly affects decision-making about other aspects of the case. For example, depressive episodes can lead defendants to waive their appeals, which some consider akin to making the death penalty a "state-assisted suicide."[179] Our legal system should not accept the likelihood that a severe mental illness will interfere with a defendant's decision-making in a way that is detrimental to him or her at some point in the proceedings – for example, deciding to waive *Miranda* rights,[180] to plead guilty or not, to cooperate with defense attorneys, to represent themselves. These decisions could result in the perverse effect that a defendant's mental illness itself increases the risk of getting a death sentence, when it is legally intended to be a mitigating factor only.

- Mental illness can make defendants poor witnesses.

The fact that severe mental illness may create "an unwarranted impression of lack of remorse" due to the defendant's psychotic behavior and/or the side effects of psychotropic medication, as discussed earlier, creates an additional risk that the mitigating value of mental illness will be misunderstood by jurors.

- Mental illness is a double-edged sword when it acts as both a mitigating and aggravating factor.

Jurors' sentencing decisions are often based on their assessment of future dangerousness and lack of remorse, while mitigation evidence is ignored.[181] This poses a problem for defendants with severe mental illness, who might, even without corroborating evidence, appear to pose a threat of future dangerousness.

- Mental illness may play a role in the perception of the defendant's dangerousness and the brutality of their crime.

Finally, the brutality of a crime often plays an important role in the defendant's perceived future dangerousness and may overpower mitigation. "The danger is especially acute for a mentally ill defendant, because the illness sometimes will sometimes result in crimes being committed in a particularly bizarre, brutal or sadistic manner."[182] Crimes committed by individuals with mental illness might also appear to lack a clear motive, which may generate fear in jurors of similar acts in the future, especially when the state highlights that possibility.[183]

> **"There is a strong risk that mitigation will not be reliably assessed in cases involving defendants with severe mental illness."**

---

[178] *Graham v. Florida*, 560 U.S. 48, 78 (2010).

[179] John H. Blume, *Killing the Willing: "Volunteers," Suicide and Competency,* 103 Mich. L. Rev. 939, 942 (2005).

[180] William C. Follette et al., *Mental Health Status and Vulnerability to Police Interrogation Tactics*, 22 Crim. Just. (2007), available at http://www.americanbar.org/content/dam/aba/publishing/criminal_justice_section_newsletter/crimjust_cjmag_22_3_mentalhealthstatus.authcheckdam.pdf.

[181] Marla Sandys et al., *Aggravation and Mitigation: Findings and Implications*, 37 J. Psychiatry & L. 189 (2009).

[182] Sundby, *supra* note 109, at 522.

[183] *USA: The Execution of Mentally Ill Offenders, supra*, note 21, at 74.

**Attachment A**

All of these elements show how and why there is a strong risk that mitigation will not be reliably assessed in cases involving defendants with severe mental illness, and thus that the constitutional requirement of an individualized sentencing will not be met. As in the case of defendants with intellectual disability, the more effective and fairer remedy is a categorical ban on execution of those with severe mental illness.

## A Violation of the Equal Protection Clause

In his article *Mental Illness and the Death Penalty*, Professor Christopher Slobogin, a member of the Task Force on Mental Disability and the Death Penalty, explains that "[i]n sharp contrast with the immunity from execution granted children and people with mental retardation, no state prohibits execution of a person who was mentally ill at the time of offense. The Fourteenth Amendment's injunction requiring equal protection under the law is violated by this difference in treatment because there is no good reason for it."[184]

Professor Slobogin additionally anticipates counter-arguments to this conclusion. One of them is that youth and intellectual disability are easier to identify than mental illness. He argues that SMI is actually easier to diagnose reliably than intellectual disability, but that if courts disagree, the correct response is to place a higher burden on the party alleging that condition.[185] With respect to concern about malingering, he notes that many studies prove that it is difficult to convincingly pretend to have a mental illness.[186] To the argument that severe mental illness can be successfully treated, whereas people with intellectual disability and juveniles do not have that option, , Slobogin explains that, as noted earlier, treatment options for those with severe mental illness are limited, and that in any event in all but rare circumstances people with SMI should be held responsible for failing to pursue them. Finally, Slobogin notes that "the base rate for violence among those with mental illness is no greater than the violence base rate for those with mental retardation and is much lower than the violence base rate for youthful offenders,"[187] which renders void the argument that defendants with severe mental illness are more dangerous than the two exempt categories and therefore do not deserve a categorical ban from execution.

In light of all of this, there is no sound constitutional justification for permitting the execution of defendants with severe mental illness while defendants with similar impairments are exempted from capital punishment.

# Part IV: Significant Public Policy Concerns

In addition to the legal and constitutional arguments that support the concept of a severe mental illness exemption from the death penalty, there are also additional public policy concerns regarding the use of capital punishment for people with mental illness that should be considered. Some of these issues have been raised by legal and mental health professional organizations, the international community, and some murder victim family members, among others.

## Higher Risk of Executing an Innocent Person

One of the most persistent concerns with capital punishment is the imposition of the death penalty on the innocent. Individuals with severe mental illness are especially vulnerable to erroneous convictions. First, they are at a relatively higher risk of making false confessions. Second, once in court, the stigma of mental illness, including popular and unwarranted beliefs that individuals with mental illness are inherently dangerous contribute to assumptions of guilt and more punitive sentencing. Finally, defendants with severe mental illness

---

[184] Christopher Slobogin, *Mental Illness and the Death Penalty*, 1 Cal. Crim. L. Rev. 3, 7 (2000) (Article provides a detailed analysis of Supreme Court cases dealing with differences of treatment between intellectually disabled and mentally ill people.).

[185] *See* Christopher Slobogin, *What Atkins Could Mean for People with Mental Illness*, 33 N. M. L. Rev. 293, 303-305, 307 (2003) ("When focused solely on gross impairment related to psychosis, studies show a much higher rate of reliability (i.e., agreement between diagnosticians) despite the softness of the criteria, and other research indicates that successful malingering is very difficult.")

[186] *See, e.g*, Michael Perlin, The Jurisprudence Of Insanity, 238-241 (Carolina Academic Press ed., 1994).

[187] Slobogin, *supra* note 184, at 14.

**Attachment A**

are less able to participate in their own defense because of their limited abilities, which magnifies the impact of that stigma. This confluence of factors generates an intolerable risk that those suffering from severe mental illness will be convicted and, where the death penalty is an option, sentenced to death and executed.

False confessions are a well-documented phenomenon in general interrogations.[188] Those suffering from mental illness, however, are especially susceptible to confessing to crimes they did not commit, a claim borne out in empirical study. Even more than those without mental illness, they might be unable to appreciate their *Miranda* rights.[189] A 2007 study found that only 10% of individuals with mental illness had a good understand of Miranda.[190] They could therefore be incapable of asking for a lawyer or might feel as though they have no choice but to comply with what officers want. Moreover, because individuals suffering from mental illness frequently are unable to be assertive, they might lack the capacity to invoke their constitutional rights, even if they understand that those rights exist. Abundant empirical evidence demonstrates the increased vulnerability of those with mental illness to false confessions. A 2010 study found that 22% of those with mental illness reported giving a false confession.[191] Other measures have demonstrated that persons with mental illness or intellectual disability account for nearly a third of false confessions.[192] While a consistent measure of false confessions in individuals without mental illness in the United States is lacking, a study of European prisoners suggests that this number is between 3 and 14%, far below that of those with mental illness.[193]

Those with mental illness also risk wrongful conviction and execution because their disorder impairs their ability to assist in their own defense, as mentioned earlier. They might be generally unassertive and unwilling to provide vigorous objection to the prosecution's claims. Mental illness can make them poor witnesses in their own case, as they may forget or confuse exculpatory evidence. Their symptoms could also render communication with counsel very difficult, complicating their attorneys' already challenging task of securing an innocent verdict.

Defendants with severe mental illness are more vulnerable to being wrongfully accused and convicted because of their diminished ability to accurately perceive reality and to rationally express their thoughts. A ban on the execution of the individuals with severe mental illness would not prevent wrongful accusations or even convictions, but it would prevent the justice system from "committing the irreparable" against a vulnerable population.

## Opposition of Professional Organizations, International Institutions and a Majority of the American Public

### *The leading legal and mental health professional organizations recommend a ban on the use of capital punishment for those with severe mental illness*

As noted earlier, after the U.S. Supreme Court ruled that people with intellectual disability are categorically exempt from the death penalty in 2002, the ABA took an interest in helping ensure there were logical processes for how to actually implement that ruling in the courts. The ABA also recognized that similar legal rationales for excluding those with intellectual disability also equally applied to people with severe mental disorders. The ABA ultimately adopted Resolution 122-A in 2006, urging jurisdictions that impose capital punishment to

---

[188] *See, e.g.,* Saul M. Kassin, *False Confessions: Causes, Consequences, and Implications for Reform,* 17 CURRENT DIRECTIONS IN PSYCHOL. SCI. 249 (2008).

[189] *See* Jodi L. Viljoen et al., *An Examination of the Relationship Between Competency to Stand Trial, Competency to Waive Interrogation Rights, and Psychopathology,* 26 LAW & HUM. BEHAV. 481 (2002).

[190] Richard Rogers et al., *Knowing and Intelligent: A Study of Miranda Warnings in Mentally Disordered Defendants,* 31 LAW & HUM. BEHAV. 401 (2007).

[191] Allison D. Redlich et al., *Self-Reported False Confessions and False Guilty Pleas Among Offenders with Mental Illness,* 34 LAW & HUM. BEHAV. 79 (2010).

[192] Steven A. Drizin, S. & Richard A. Leo, *The Problem of False Confessions in the Post-DNA World,* 82 N. C. L. REV. 891 (2004).

[193] Redlich et al., *supra* note 191, at 80.

Attachment A

exempt defendants suffering from severe mental illness from the death penalty.[194] An almost identical policy was adopted within a few months by the American Psychiatric Association, the American Psychological Association and NAMI.[195] In 2011, Mental Health America adopted a similar position.[196] All of these organizations share a common belief that the penological purposes of capital punishment are not met in the case of defendants with severe mental illness, and that these individuals' diminished personal moral culpability should preclude them from being eligible for a death sentence.

### *Major international institutions and foreign countries that use the death penalty oppose its use in cases of defendants with severe mental illness*

Additionally, there is a strong international consensus against the execution of individuals with mental illness. The United Nations (U.N.) Commission on Human Rights has long called for all states that maintain the death penalty "not to impose it on a person suffering from any form of mental disorder; not to execute any such person."[197] Most recently, the U.N. General Assembly called for those countries that continue to apply the death penalty not to impose it on "persons with mental or intellectual disabilities."[198]

In 2014, two U.N. Human Rights experts urged the U.S. and Texas authorities to halt the execution of Scott Panetti, arguing that, "[i]t is a violation of death penalty safeguards to impose capital punishment on individuals suffering from psychosocial disabilities."[199] They added that implementing the sentence "may amount to arbitrary execution."[200]

For the same occasion, U.N. Special Rapporteur on torture and other cruel, inhuman and degrading treatment or punishment Juan E. Méndez reminded the U.S. that "international law considers the imposition and enforcement of the death penalty on persons with mental disabilities a violation of the prohibition of torture and other cruel, inhuman and degrading treatment or punishment."[201]

The European Union (E.U.), which condemns the use of the death penalty in general, calls for countries that still maintain executions to comply with certain "minimum standards," which include a requirement that capital punishment not be imposed on "persons suffering from any mental illness."[202] The reaffirmed this position in a letter to the Texas Board of Pardons and Parole regarding the case of Scott Panetti, discussed earlier.[203] The E.U. wrote that it strongly believes that "the execution of persons suffering from a mental disorder is contrary to widely accepted human rights norms and in contradiction to the minimum standards of human rights set forth in several international human rights instruments", including U.N. Economic and Social Council resolution 1989/64 and Resolution 2004/94.

---

[194] *Supra*, note 9.

[195] *Mental Disability and the Death Penalty* (2006), AMERICAN PSYCHOLOGICAL ASSOCIATION COUNCIL POLICY MANUAL, Chapter: IV, http://www.apa.org/about/policy/chapter-4b.aspx; *Death Penalty*, NATIONAL ALLIANCE ON MENTAL ILLNESS, https://www.nami.org/Learn-More/Mental-Health-Public-Policy/Death-Penalty (last visited Nov. 28, 2016).

[196] *Position Statement 54: Death Penalty and People with Mental Illness*, *supra* note 73.

[197] *Commission on Human Rights Resolution 2000/65 The question of the death penalty*, UN COMMISSION ON HUMAN RIGHTS(Apr. 27, 2000), http://www.refworld.org/docid/3b00f29a14.html (last visited Nov. 28, 2016), this was reiterated in two further resolutions in 2004 and 2005: *Commission on Human Rights Resolution 2004/67 The question of the death penalty*, UN COMMISSION ON HUMAN RIGHTS (Apr. 21, 2004) and Human Rights Resolution 2005/59 The question of the Death Penalty, UN COMMISSION ON HUMAN RIGHTS (Apr. 20, 2005).

[198] G.A. Res. 69/186, ¶ 5(d) (Feb. 4, 2015), http://www.un.org/en/ga/search/view_doc.asp?symbol=A/RES/69/186 (last visited Nov. 28, 2016).

[199] *Death row: UN expert urge US authorities to stop execution of Scott Panetti, a mentally ill prisoner*, UNITED NATIONAL HUMAN RIGHTS OFFICE OF THE HIGH COMMISSIONER (Dec. 2, 2014), http://www.ohchr.org/EN/NewsEvents/Pages/DisplayNews.aspx?NewsID=15369&LangID=E (last visited Nov. 28, 2016).

[200] *Id*.

[201] *Id*.

[202] *See* Council Common Guidelines on Death Penalty (EU). No.8416/13 Annex of 12 Apr.2013 at 5,  http://data.consilium.europa.eu/doc/document/ST-8416-2013-INIT/en/pdf (stating the European Union's policy on the death penalty).

[203] *Letter from EU Presidency to Texas Board of Pardons and Parole*, DELEGATION OF THE EUROPEAN UNION TO THE UNITED STATES (Jan. 15, 2004), http://www.euintheus.org/what-we-do/policy-areas/democracy-and-human-rights/torture-and-capital-punishment/death-penalty/death-penalty-archive-2004/ (last visited Nov. 28, 2016).

Attachment A

The Council of Europe, an organization independent from the E.U. and comprised of 45 member states, has also expressed its opposition to the use of capital punishment for people with severe mental illness. In welcoming the decision of a U.S. federal court of appeal to stay Scott Panetti's execution, the Council of Europe's General rapporteur declared: "While the Council of Europe is against the death penalty in all circumstances, it must be underlined that executing persons suffering from severe mental illnesses constitutes a violation of international human rights law, and it is also a breach of the Eighth Amendment to the United States Constitution."[204]

In 2014, the World and European Day Against the Death Penalty was specifically focused on ensuring that all states using the death penalty prohibit it for persons with mental health issues.[205] The World Coalition Against the Death Penalty recommended at this occasion that there be an "immediate implementation of existing standards barring the imposition of death sentences or executions on […] who are seriously mentally ill" and called for renewed efforts to "(i) ensure that all states have laws that embed international protections in their domestic legislation; (ii) extend protection to those with serious mental illness not covered by existing proscriptions against executing persons affected by 'insanity.'"[206]

The Inter-American Commission on Human Rights (IACHR), a principal and autonomous human rights body representing the thirty-five countries making up the Organization of American States, also stated in deciding the case of *Lackey v. United States*, that "[i]t is a principle of international law that persons with mental disabilities, either at the time of the commission of the crime or during trial, cannot be sentenced to the death penalty."[207]

### *The general public favors a severe mental illness exemption*

Finally, the people in the United States are also strongly in favor of an exemption from the death penalty for those with severe mental illness. A 2015 national poll found that 66% of voters support such a severe mental illness exemption.[208] After hearing further details about how the proposed exemption would work, support for the exemption rises to 72%.  The poll also shows that support for the exemption is consistent across party lines: indeed, 62% of Republicans, 72% of Democrats and 67% of Independents oppose the use of the death penalty for persons with mental illness. While Americans remains divided on the issue of the death penalty as a whole, they agree by a wide margin that our society should not execute those with severe mental illness.

The United States' continued sanctioning of the execution of those with severe mental illness is out of step with the consensus of many important and relevant stakeholders: legal and mental health professional organizations, major international institutions and even a majority of the American public.

## Perspectives of Some Murder Victims' Families

In 2009, Murder Victims' Families for Human Rights (MVFHR) and NAMI co-published "Double Tragedies," a report of a group of "families of victims killed by persons suffering from severe mental illness, who oppose the death penalty in these cases….[and whose] reasons for opposing the death penalty should be part of the public

---

[204] *General rapporteur welcomes the decision to stay the execution of Scott Panetti*, PARLIAMENTARY ASSEMBLY (Dec. 5, 2014), http://assembly. coe.int/nw/xml/News/News-View-en.asp?newsid=5334&lang=2.

[205] *12th World Day Against the Death Penalty: Mental Health*, WORLD COALITION AGAINST THE DEATH PENALTY, http://www.worldcoalition.org/worldday2014.html (last visited Nov. 28, 2016).

[206] *Id.*

[207] *See* Cases 11.575, 12.333 & 12.341, INTER-AM. C.H.R., Report No. 52/13 (2013). For further discussion of the death penalty and mental illness in international human rights law, *see* Richard J. Wilson, *The Death Penalty and Mental Illness in International Human Rights Law: Toward Abolition*, 73 (2) WASHINGTON AND LEE LAW REVIEW (Summer 2016).

[208] *Multi-State Voter Survey: Death Penalty and Mental Illness*, Survey conducted: November 30th – December 7th, 2015, DAVID BINDER RESEARCH (2015).

Attachment A

conversation."[209] The report also aimed to include the families of individuals with mental illness who were executed, to allow them to share their "repeated, and thwarted, efforts to get treatment for their relatives with mental illnesses" and to show that "prevention, not execution" is an effective way of addressing violence.

The report argues that "the death penalty is not only inappropriate and unwarranted for persons with severe mental illness but that it also serves as a distraction from problems within the mental health system that contributed or even led directly to tragic violence."[210] Both groups believe that seeking or imposing the death penalty diverts resources and energy that could be better used to address mental health issues in the community, to decrease the likelihood of violence, or help families heal through psychological and material support.

Murder victims' families have many questions when they lose a loved one to the violence of a person with severe mental illness, including whether the crime could have been prevented. As Amnesty International reported, "[i]n some cases involving mentally impaired defendants, there are indications that individuals within wider society failed to heed warnings that could have averted a tragedy. This is not to suggest that crimes committed by mentally impaired people are to be condoned or excused. It is, however, to ask whether society could devote its energies and resources more constructively."[211]

The MVFHR/NAMI report highlights the stories of family members who lost loved ones to murders committed by a person with severe mental illness. For example, one mother, Pat Webdale, lost her daughter Kendra as she was pushed under New York subway tracks by Andrew Goldstein, a man diagnosed with schizophrenia. They later learned that he had been convicted of assault 13 times prior to this fatal assault and wondered why nothing was done to stop this pattern.[212]  In another case in Florida, Linda Gregory, the wife of Deputy Sheriff Gene Gregory, recalls first learning about mental illness after her husband was murdered by Alan Singletary, a man with a mental health disorder.[213] That defendant's family wrote her a letter explaining how they had not been able to get the help they wanted and how they knew something like this would eventually happen. The warning signs had been numerous, but ignored.

This unique report also takes into account the point of view of family members of capital defendants with mental illness. Tina Morris recalls how her brother James Colburn suffered from very severe hallucinations throughout his life, and how despite the family using all of their savings and trying to get all the help they could for him, he never got sufficient treatment and attention, largely because his family could not afford it anymore. Lois Robison, the mother of Larry Robison, a man with mental illness recalls how her son would be discharged from each hospital after 30 days because he was not determined to be violent. The options for care eventually ran out, and he murdered five people. He went from being discharged from the hospital for not being violent directly to death row.[214]

> "His last statement was, 'I won't be a part of the problem no more.' He looked over at the victim's family and apologized. I sat there and watched him take his last breath, and that will be a memory that I'll never forget. Watching my brother be executed was the hardest thing I ever, ever had to do in my life. … I don't understand how they can execute mentally ill people when they don't try to treat them first."
>
> Tina Morris, James Colburn's sister

The murder victims' families and families of individuals with severe mental illness on death row whose experiences were highlighted in the MVFHR/NAMI report agree that

---

[209] *Double Tragedies, Victims Speak Out Against the Death Penalty For People with Severe Mental Illness*, Murder Victim's Families for Human Rights, National Alliance on Mental Illness, at 2 (2009), http://www.deathpenaltyinfo.org/files/DoubleTragedies.pdf. It is important to note here that the views of murder victims' families on the death penalty are extremely varied, and that the view expressed in "Double Tragedies" only reflects the opinion of some of them.
[210] *Id.* at 3.
[211] *USA: The Execution of Mentally Ill Offenders, supra,* note 21 at 56.
[212] *Double Tragedies, Victims Speak out Against the Death Penalty for People with Severe Mental Illness, supra* note 209 at 4.
[213] *Id.* at 5.
[214] *Id.* at 9.

Attachment A

treatment and prevention are urgently required to diminish the likelihood that such tragic events occur. Although they cannot and do not purport to speak for all victims' families, for them, the death penalty does nothing to address this need, it even diverts resources from it. Further, capital punishment is inadequate for people who are paranoid, delusional, suffer from hallucinations or consequences of war trauma or other symptoms of severe mental illness.

## Conclusion

The death penalty, the ultimate punishment reserved for the most blameworthy who commit the worst actions, does not serve any purpose when it is applied to individuals with severe mental illness. Capital punishment is unlikely to deter individuals with severe mental illness, and it does not serve any retributive purpose for those whose impairments significantly interfere with their ability to appreciate the nature, consequences or wrongfulness of their conduct, to exercise rational judgment in relation to conduct, or to conform their conduct to the requirements of the law. The Supreme Court has already recognized that there are categories of individuals – individuals with intellectual disability and juveniles – that are inherently "less culpable" to the point that it is unconstitutional to apply the death penalty in their cases. The Court based its reasoning on an "independent analysis" of these individuals' impairments, which are strikingly similar to the impairments brought about by severe mental illness.

In addition, and contrary to popular belief, current mechanisms in the criminal justice process do not adequately protect defendants with severe mental illness against death sentences and executions. While mental illness may be a factor in various respects before, during and after trial, none of the current mechanisms afford complete protection against the death penalty to those diagnosed with serious mental disorders or disabilities. Examples such as those of Scott Panetti and Kelsey Patterson, two individuals diagnosed with paranoid schizophrenia sentenced to death, demonstrate that individuals who have a severe mental illness and whose capacity to appreciate the wrongfulness of their actions is significantly impaired are still capable of being executed in the United States.

However, a growing consensus is emerging against this practice. The general public, major legal and mental health organizations, some state appellate judges, some murder victim's family members, and international institutions have all made their voice heard in opposition to the death penalty for individuals with severe mental illness. The American Bar Association's Mental Illness Initiative will continue to work to educate legal professionals, policy makers, and the public on this important and timely subject and to support policy reform efforts to exempt individuals with severe mental illness from the death penalty.

Attachment A

# Acknowledgements

The Death Penalty Due Process Review Project would like to thank Mental Illness Initiative Fellow Aurélie Tabuteau Mangels for her primary authorship of this paper.

The Project also extends its sincere appreciation to Vincent Atchity, Lauren Beebe King, Tanya Greene, Kirk Heilbrun, Kristin Houlé, Alli Kielsgard, Kristen Nelson, Kimberly Rosenfeld, Meredith Martin Rountree, Christopher Slobogin, Russell Stetler, Ronald Tabak, and Misty Thomas for their careful reviews and helpful feedback. Additionally, the Project would also like to recognize former ABA interns and law clerks Anissa Badea, Anthony Sampson, Gretchen Shumaker, Ash Smith, and Alexandra Stephens for their varied contributions to the paper. Finally, we thank the Proteus Fund and the Eighth Amendment Project for their continued support of the Project's work on mental illness and the death penalty.

Attachment A

Attachment A



Death Penalty
Due Process
Review Project

AMERICAN BAR ASSOCIATION

americanbar.org/dueprocess

Attachment A

# ATTACHMENT B

Motion for Stay of Execution
Joseph E. Corcoran

**IN THE**
**INDIANA SUPREME COURT**

**CASE No. 24S-SD-222**

| | | |
|---|---|---|
| JOSEPH E. CORCORAN, | ) | |
| | ) | |
| *Appellant*, | ) | |
| | ) | |
| v. | ) | **THIS IS A CAPITAL CASE** |
| | ) | Execution Date: December 18, 2024 |
| STATE OF INDIANA, | ) | |
| | ) | |
| *Appellee*. | ) | |

## Motion for Stay of Execution

Petitioner Joseph Edward Corcoran, by and through counsel, respectfully moves this Court to stay his impending execution currently scheduled for December 18, 2024, to be carried out before the hour of sunrise. For virtually his entire life, Mr. Corcoran has been plagued by symptoms of psychosis and cognitive dysfunction. These symptoms continue to this day, and numerous mental health experts have diagnosed him with paranoid schizophrenia or precursors to the schizophrenic diagnosis.

There is colorable evidence that Mr. Corcoran is incompetent to be executed pursuant to *Panetti v. Quarterman*, 551 U.S. 930 (2007), and *Ford v. Wainwright*, 477 U.S. 399 (1986). It is unchallengeable and law of this case the extent of the seriousness of the mental illness – paranoid schizophrenia. *Corcoran v. State*, 820 N.E.2d 655, 660 (Ind. 2005). Further, Mr. Corcoran seeks a change in the law regarding the application of the successor provisions. He relies on the Attorney General's accepted concession in federal court that a *Ford* claim is not ripe and further state court proceedings were necessary. *Corcoran v. Wilson*, Case No. 3:05-cv-00389 Doc. 96 p. 20 (N.D. Ind.) ("As this Court correctly determined, as there is no current execution date set in Corcoran's case, this claim is unripe. Further, Corcoran must first

1

**67a**

Motion for Stay of Execution
Joseph E. Corcoran

exhaust this claim in the state courts through Indiana's post-conviction procedures."). The

State is bound by this prevailing contention from federal court.

This Court should enter a stay to permit the full and fair consideration of these

colorable arguments not rebutted by the record.

### A. Mr. Corcoran's longstanding serious mental illness presents a colorable *Ford* claim.

According to Mr. Corcoran, he is tortured and has been for decades by the State of

Indiana. He constantly suffers painful and frightening delusions and auditory hallucinations,

namely that Indiana Department of Correction prison guards are using an ultrasound

machine to torture him and that he has a sleep disorder that causes him to unconsciously and

unknowingly say inappropriate things that make people angry and retaliate against him. He

also believes he can hear people talking about him through the walls of his prison cell.

The Attorney General conceded this point and has never presented contrary evidence.

- Trial court finding that: "The State concedes that Petitioner is mentally ill." PC R. 242;

- Trial court statement that: "[t]he State of Indiana has conceded that the Defendant suffers from mental illness, and I think that is probably a wise concession, gentlemen, as the evidence that was presented at the competency hearing as well as the evidence presented at Mr. Corcoran's trial was that he suffers from a mental disease or defect of mental illness." PC Comp. Dec. T. at 4;

- This Court noted: "The post-conviction court here acknowledged in its written findings that Corcoran suffers from a mental illness. The State also concedes that Corcoran suffers from a mental illness. At the competency hearing, the State Public Defender presented the testimony of three mental health experts, each of whom concluded that Corcoran suffers from paranoid schizophrenia. One of the symptoms of Corcoran's condition, according to the three experts, are recurrent delusions that Department of Correction prison guards are torturing him through the use of an ultrasound machine, causing him substantial pain and uncontrollable twitching." *Corcoran*, 820 N.E.2d at 660;

2

**68a**

Motion for Stay of Execution
Joseph E. Corcoran

- Justice Rucker again dissented, noting Corcoran's serious mental illness: "It is apparent that since July 1997 Corcoran's mental state has deteriorated significantly. So much so that his personality disorder has now developed into full-blown paranoid schizophrenia. In short, Corcoran is seriously mentally ill. And how does his mental illness manifest itself? Corcoran is under the paranoid delusion that prison guards are torturing him with sound waves. As a result, Corcoran wants the State to execute him in order to end the pain. I am not willing to accommodate him." *Id.* at 665 (Rucker, J., dissenting).

The symptoms have not gone away. They persist. Now in 2024, Mr. Corcoran continues to suffer the debilitating symptoms of his paranoid schizophrenia. As he has for twenty years, he experiences auditory hallucinations, psychosis, and the ever-present delusions regarding the ultrasound machine he believes the prison guards are torturing him with and his sleep disorder. For instance, correction records will establish that he has received psychotropic medications to treat the symptoms of schizophrenia for two decades, specifically Geodon, Haldol, Navane, and Cogentin.

Although the Indiana Department of Correction has attempted medicating him, his illness has proven to be resistant to treatment, and nothing during his incarceration has cured him of his paranoid schizophrenia. As recently as **March 1, 2024**, treating correctional personnel noted:

> Patient then began sharing information about what he believes to be an ultrasonic machine here at ISP that can control his and others thoughts, sleep, voice, etc. Patient reports it is 'top secret' but it bothers him 'endlessly all day.' Patient reports the machine does put him to sleep at night. Patient stated 'others think I'm delusional but I know its here.' Writer inquired if patient ever recognizes his own thoughts as delusional, patient avoided the question. ... Patient denies MH symptoms and the expressed delusions are the only observable concern.

Attachment A. The above delusion is consistently expressed to counsel.

In addition, on **September 8, 2024**, Mr. Corcoran published a book under the pseudonym JC Chase. The book is entitled *A Whistle-blower Report Electronic*

3

**69a**

Motion for Stay of Execution
Joseph E. Corcoran

*Harassment.* Attachment B. It is a glimpse into the continuing delusion, where he

describes:

- "My goal is to arm people with what victimizers do not want their victims to know: THE TRUTH." *Id.* p. 8;

- "…that people can be surveilled anywhere, in any place, and from great distances from a device that sits on a desk." *Id.* p. 13;

- "The answer is that I want to show that what I am describing is not a nut job conspiracy theory, but is basic electronics… ." *Id.*;

- "I suspect that many credentialled MDs do not even know about this phenomenon. The reason why they likely do not know is because it is undetectable by unaided observation. No one by simply talking to an individual, looking at them or even listening to them is able to tell if a person's throat vibrates when they think. In fact, it is so faint that it cannot even be felt. For all practical purposes it is undetectable and would not be an issue unless…" *Id.* p. 13;

- "So, in essence, a small percentage of people are susceptible to ultrasound surveillance; someone with one of those devices can pretty much listen to them think." *Id.* p. 14;

- "The same ultrasonic signal that captures audible sounds by modulation can be used to *send* audible sound. Furthermore, the modulating signal can also send an electronic charge." *Id.* (emphasis in original);

- "So think of the possibilities with such equipment – and the enormous potential for abuse! With it an operator could send a quiet voice into someone's head *and* make them think that they are thinking the thought…" *Id.* (emphasis in original);

- "Or maybe something extremely bad: a screaming, demonic voice in their head that only they can hear (aside from the operator talking into the box) that tells them to kill people." *Id.* p. 14-15;

- "The device can easily be used to make someone seriously paranoid…A person susceptible to ultrasonic surveillance would be the easiest to make paranoid. Since an individual can tell what the individual is thinking it would be easy to cause them to believe false things." *Id.* p. 15;

- "Therefore, using electricity to activate bodily processes is not limited to muscle movements and sleep cycles. Let's say, therefore, that there is an unfortunate

4

Motion for Stay of Execution
Joseph E. Corcoran

man who some bad actor wants to wake up, make stand on his feet, run to a wall, and then pound on it angrily with a closed fist. After this the bad actor wants the poor man to feel dizzy, confused and then vomit." *Id.* p. 16;

- "So let's return to the unfortunate man. To wake him up, delivering an electrostatic charge to his midbrain via a modulating ultrasonic frequency will do the trick. To make him stand up, run to the wall, make a fist, and pound on it repeatedly you would simply target the right muscles, in the right order with the proper electrostatic charges. Obviously a cascade of functions must be done to accomplish this, which is very easily done electronically (i.e., a multitude of calculations per second). To make him angry an electrostatic charge can be delivered to the amygdala. To then make him dizzy simply target the vestibular apparatus within his inner ear. The prefrontal cortex would be targeted next to make him confused. For vomit you need only to target the correct places in the stomach, esophagus, and mouth — being dizzy would also help the matter. To some people all of this sounds like science fiction. Unfortunately it is not; it is basic electronics and basic physiology." *Id.* p. 17;

- "They can spy on people and deceive people virtually unnoticed. Moreover, they can abuse people with anonymity and virtual impunity." *Id.*;

- "[I]t is apparent to me that correctional staff and other individuals and/or agencies use ultrasonic surveillance devices on susceptible people for sport. However, the fact that institutions keep their possession of such equipment confidential would make it extremely difficult for those abused to expose the abuse." *Id.* p. 18;

- "In essence, they would treat the poor soul like a video game avatar rather than a real person whose life is going to be adversely affected by the nonsense they are afflicting the victim with." *Id.* p. 19;

- "And when you research and find inaccurate information that confirms the victimizers' deception, and you then put stock in it, it frankly makes you look like a mental case. Their goal is accomplished. They have a completely plausible cover for their wrongdoing." *Id.*;

- "The ignorance on the part of mental health professionals about this technology is taken advantage of by victimizers. If a credentialled medical person says a man is mentally ill, but he says that he is the victim of electronic harassment, who would people be more likely to believe? So because of this the victimizer's cover is now seemingly backed up by medical science….Because of this they will likely be oblivious to the fact that mental illness can be mimicked electronically." *Id.* p. 20;

5

**71a**

Motion for Stay of Execution
Joseph E. Corcoran

- "I recently discovered, by an experiment performed on me, how this is done. Someone need only to use the device to cause you to scratch yourself in your sleep. If done correctly you get the equivalent of a rug burn. As I write this I have a burn on my arm from this method that has been there for over a month." *Id.* p. 20-21;

- "No one should be forced to live with an electronically simulated mental illness, such as Tourette's, tics, auditor- hallucinations, pain, anger, or a host of other abuses." *Id.* p. 21;

In short, Mr. Corcoran's longstanding and documented mental illness continues to torment him and there is a colorable basis to explore *Ford* competency.

Mr. Corcoran's paranoid schizophrenia completely removes him from reality. He cannot distinguish between reality and his delusions and hallucinations—his delusions are his reality. And because his reality is informed by his delusions and hallucinations, he is incapable of rational thought. Throughout his legal proceedings, he has been unable to assist counsel with his defense and has been unable to make rational decisions about his case. Indeed, currently, Mr. Corcoran wants to be executed, and is in fact eager for his execution, because he believes execution will relieve him from the pain of the ultrasound machine and sleep disorder.

Because he lacks the ability to engage in rational thought, Mr. Corcoran also lacks the ability to rationally understand the world and reality around him. Accordingly, he lacks any sort of rational understanding of his impending execution. While he may be able to parrot what his attorneys and other jurists have told him, that the death penalty is punishment, over the almost three decades-long span of this case, Mr. Corcoran's words and behavior reveal and reinforce his true belief—his death sentence is a means to end his delusional suffering, which to him is not punishment. *See Panetti*, 551 U.S. at 959 ("A prisoner's awareness of the State's rationale for an execution is not the same as a rational understanding of it."). In other

6

**72a**

Motion for Stay of Execution
Joseph E. Corcoran

words, he does not truly and rationally understand that he was sentenced to death as punishment for being convicted of four counts of murder. The evidence presented in his proposed post-conviction petition of his inability to rationally understand his sentence at the very least meets the threshold showing under *Ford*. Thus, Mr. Corcoran is incompetent to be executed. *Ford*, 477 U.S. 399; *Panetti*, 551 U.S. 930.

Carrying out Mr. Corcoran's execution despite his lack of rational understanding of his capital punishment would violate the Eighth and Fourteenth Amendments to the United States Constitution and Article One, Section Sixteen of the Indiana State Constitution. Mr. Corcoran has concurrently requested permission from this Court to file a successive post-conviction petition in the Superior Court of Allen County on this *Ford/Panetti* incompetence to be executed claim and has requested a judicial hearing, as is required under *Panetti* because Mr. Corcoran satisfies the threshold showing of incompetence. *Panetti*, 551 U.S. at 949 ("Once a prisoner seeking a stay of execution has made 'a substantial threshold showing of insanity,' the protection afforded by procedural due process includes a 'fair hearing' in accord with fundamental fairness." (quoting *Ford*, 477 U.S. at 424)).

*Panetti*, 551 U.S. at 950, requires due process for consideration of a *Ford* claim and faulted the Texas courts' failure to provide it. "[T]he fundamental requisite of due process of law is the opportunity to be heard." *Ford*, 477 U.S. at 413. Which requires, a state court's determination of competency to be executed must be premised upon a process that allows the presentation of "material relevant of the ultimate decision." *Id. Panetti* quoted *Ford*: the due process clause requires a "'fair hearing' in accord with fundamental fairness." *Panetti*, 551 U.S. at 949, quoting *Ford*, 477 U.S. at 426 (Powell, J., concurring in part and concurring in judgment).

7

**73a**

Motion for Stay of Execution
Joseph E. Corcoran

Every expert subject to adversarial testing this millennium has indicated that Mr. Corcoran does not possess a rational understanding of the world. The post-conviction trial court set those opinions aside two decades ago. However, recent correction records and his own writings demonstrate a medically resistant strain of schizophrenia—in Mr. Corcoran's world, he continues to be tortured. Any previous competency determination upon which the Attorney General might rely is stale and requires a contemporaneous assessment and a fair and meaningful hearing—the exact point they previously argued in federal court.

A stay should issue to permit this Court to proceed as it did in Mr. Timberlake's case, where an expert was appointed to perform an evaluation. *Timberlake v. State*, No. 49S00-0606-SD-235 (Ind. Sept. 18, 2006) (unpublished order for mental examination). A stay should issue to permit an evaluation to occur.

### B. Mr. Corcoran's newly ripened claim should be exhausted as the Attorney General successfully argued in federal court.

According to the Attorney General's accepted concession in federal court, a *Ford* claim is not ripe and further state court proceedings were necessary. *See Corcoran v. Wilson*, Case No. 3:05-cv-00389 Doc. 96 p. 20 (N.D. Ind.) ("As this Court correctly determined, as there is no current execution date set in Corcoran's case, this claim is unripe. Further, Corcoran must first exhaust this claim in the state courts through Indiana's post-conviction procedures."). The federal court relied on that and passed on considering the *Ford* claim. *Corcoran v. Buss*, Cause No. 3:05-CV-389 JD, 2013 U.S. Dist. LEXIS 4499, at *19 n.6 (Jan. 10, 2013).

Incompetence to be executed claims become ripe only when an execution date has been set. *See, e.g., Panetti*, 551 U.S. at 942-43; *Stewart v. Martinez-Villareal*, 523 U.S. 637 (1998); *Purvis v. United States*, 662 F.3d 939, 943-44 (7th Cir. 2011); *Baird v. State*, 833 N.E.2d 28, 29 (Ind. 2005) ("A *Ford* claim is one that by its nature arises after the usual channels of appeal

8

**74a**

Motion for Stay of Execution
Joseph E. Corcoran

have been exhausted."); *Matheny v. Anderson*, 60 F. Supp. 2d 846, 868 (N.D. Ind. 1999). "[I]t is only at the time that the execution becomes 'imminent' and the petitioner's 'competency to be executed' can be determined. *Lee v. Kelley*, 854 F.3d 544, 547 (8th Cir. 2017) (Kelly, J., concurring). Mr. Corcoran could not have brought this claim earlier and received merits review. Additionally, Mr. Corcoran notes that most other jurisdictions, federal and state, consider *Ford/Panetti* claims to automatically be non-successive, and thus do not require permission to file.

This Court has held to the contrary and has held that *Ford* claims are subject to successor provisions. *See, e.g., Overstreet v. State,* 993 N.E.2d 179, 180 (Ind. 2013); *Timberlake v. State*, 858 N.E.2d 625, 627 (Ind. 2006); *Baird v. State*, 833 N.E.2d 28, 29-30 (Ind. 2005). This question of law should be reconsidered in the context of the Attorney General's concession and the weight of authority on the other side of this legal question.

**C. Conclusion.**

Mr. Corcoran presents a colorable *Ford* claim; a *Ford* claim that the Attorney General argued in federal court needed to be presented in state court **after** an execution date was set. This Court should stay Mr. Corcoran's December 18, 2024 execution so that the newly-ripened *Ford* claim may be provided the required process that is due. A stay is warranted so that Mr. Corcoran may have the meaningful opportunity to present his *Ford* claim given that a colorable claim has been presented.

9

Motion for Stay of Execution
Joseph E. Corcoran

Respectfully Submitted,

AMY E. KAROZOS
PUBLIC DEFENDER OF INDIANA
Attorney No. 14429-49
One North Capitol, Suite 800
Indianapolis, IN 46204
(317) 232-2475
spd@pdo.in.gov

By:  /s/ Joanna Green
Joanna Green
Deputy Public Defender
Attorney No. 16724-53

By: /s/ Laura L. Volk
Laura L. Volk
Deputy Public Defender
Attorney No. 18934-49

and

/s/ Laurence E. Komp
LAURENCE E. KOMP
Temporary Admission No. 118-95-TA
Federal Public Defender
Western District of Missouri
1000 Walnut Street, Suite 600
Kansas City, MO 64106
816-675-0923
laurence_komp@fd.org

*Attorneys for Appellant*

10

**76a**

Motion for Stay of Execution
Joseph E. Corcoran

## CERTIFICATE OF SERVICE

I hereby certify that a true copy of the foregoing has been delivered through IEFS to

the following, this 15th day of November 2024.

        Tyler Banks
        Supervising Deputy Attorney General
        Tyler.Banks@atg.in.gov

        By: /s/ Joanna Green
           Joanna Green
           Deputy Public Defender
           Attorney No. 16724-53

        By: /s/ Laura L. Volk
           Laura L. Volk
           Deputy Public Defender
           Attorney No. 18934-49

ATTACHMENT C

# In the
# Indiana Supreme Court

Joseph E. Corcoran,
    Appellant,

v.

State of Indiana,
    Appellee.

Supreme Court Case Nos.
02S00-0508-PD-350
24S-SD-222

Trial Court Case No.
02D04-9707-CF-465



FILED
Nov 19 2024, 3:09 pm
CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

## Order

On November 15, 2024, Appellant, by counsel, filed two "Motion[s] for Stay of Execution." In support of the first motion, Appellant states as follows: (1) multiple mental health experts have diagnosed him with paranoid schizophrenia; (2) carrying out his death sentence violates the Eighth Amendment to the U.S. Constitution and Article 1, Section 16 of the Indiana Constitution because he is seriously mentally ill; and (3) this Court should stay his execution and permit him to pursue successive post-conviction relief based on this constitutional challenge. In support of the second motion, Appellant states as follows: (1) he experiences psychosis and cognitive dysfunction related to his paranoid schizophrenia; (2) he is incompetent for the State to carry out his death sentence under *Ford v. Wainwright*, 477 U.S. 399 (1986) and *Panetti v. Quarterman*, 551 U.S. 930 (2007); and (3) this Court should stay his execution and permit him to litigate his *Ford/Panetti* competency claim. Contemporaneous to his requests for a stay of his execution date, Appellant seeks permission from this Court to file a petition for successive post-conviction relief.

Being duly advised, the Court ORDERS the State to respond to both Appellant's "Motion[s] for Stay of Execution" *and* Appellant's petition to file for successive post-conviction relief no later than **12:00 p.m.** on **Tuesday, November 26, 2024**. The Court further orders Appellant to file any reply to the State's responses no later than **12:00 p.m.** on **Tuesday, December 3, 2024**. No extensions of time shall be granted absent extraordinary circumstances.

Done at Indianapolis, Indiana, on   11/19/2024   .

Loretta H. Rush
Chief Justice of Indiana

All Justices concur.

# ATTACHMENT D

IN THE
INDIANA SUPREME COURT

No. 24S-SD-222

| | |
|---|---|
| JOSEPH E. CORCORAN,<br>*Petitioner*, | Appeal from the<br>Allen Superior Court 4, |
| v. | No. 02D04-9707-CF-465, |
| STATE OF INDIANA,<br>*Respondent.* | The Honorable Frances C. Gull,<br>Judge. |

**RESPONSE IN OPPOSITION TO MOTIONS TO STAY AND
MOTIONS FOR PERMISSION TO FILE SUCCESSIVE PETITIONS FOR
POST-CONVICTION RELIEF**

THEODORE E. ROKITA
Indiana Attorney General
Attorney No. 18857-49

TYLER BANKS
Supervising Deputy Attorney General
Attorney No. 30514-36

Office of Indiana Attorney
General Todd Rokita
IGCS, Fifth Floor
302 W. Washington St.
Indianapolis, IN 46204-2770
(317) 234-7016
Tyler.Banks@atg.in.gov

*Counsel for Respondent*

1

**81a**

State of Indiana
Response in Opposition to Motions to Stay
and Successive Post-Conviction Review

## TABLE OF CONTENTS

Table of Authorities ..............................................................................4

I.   Because Corcoran's attorneys' proposed petitions are unsigned,
     they are legally insufficient. And because the motions to stay
     are based on those improperly filed petitions, no stay should be
     entered ...........................................................................................8

II.  Corcoran's attorneys have not made the threshold showing that
     Corcoran is incompetent to be executed .................................................13

     A.  Corcoran's attorneys must establish a reasonable possibility
         that they can make the threshold showing of incompetence
         to be executed ...........................................................................14

     B.  This Court's precedent calls for Corcoran's attorneys'
         request for successive post-conviction review to be denied ............15

     C.  Corcoran has admitted to fabricating the delusion upon
         which his attorney's case for further review rests .........................18

     D.  Other evidence, both old and new, proffered by Corcoran's
         attorneys does not meet the threshold showing to rebut the
         presumption that Corcoran is competent to be executed ..............19

III. Corcoran's attorneys' claim that execution of "severely
     mentally ill" persons violates the U.S. and Indiana
     Constitutions is procedurally defaulted and meritless .......................22

     A.  Corcoran's attorneys' claim that Corcoran's mental
         illness precludes him from being executed is procedurally
         defaulted ...................................................................................22

     B.  Corcoran is not entitled to relief under the Eighth
         Amendment ...............................................................................24

         1.  Corcoran's attorneys' proposed standard is unworkable..........25

         2.  The scientific and legal rationale for exempting juveniles
             and intellectually disabled offenders does not apply to
             offenders who are mentally ill ...............................................30

**82a**

State of Indiana
Response in Opposition to Motions to Stay
and Successive Post-Conviction Review

3. Corcoran's attorneys have failed to show that a national consensus has emerged against executing "severely mentally ill" offenders...................................................34

C. Corcoran is not entitled to relief under the Indiana Constitution....................................................................38

D. Corcoran is not entitled to relief under the Equal Protection Clause ...........................................................................41

Conclusion...............................................................................................42

Word Count Certificate..........................................................................43

Certificate of Service..............................................................................43

State of Indiana
Response in Opposition to Motions to Stay
and Successive Post-Conviction Review

## TABLE OF AUTHORITIES

**Cases**

*Albright v. Oliver*, 510 U.S. 266 (1994) ........................................................ 41

*Atkins v. Virginia*, 536 U.S. 304 (2002) ...............................................*passim*

*Baer v. State*, 942 N.E.2d 80 (Ind. 2011)................................... 29, 33, 38, 39

*Baird v. State*, 831 N.E.2d 109 (Ind. 2005)..................................................... 38

*Baird v. State*, 833 N.E.2d 28 (Ind. 2005)............................................. 13, 30

*Chapman v. United States*, 500 U.S. 453 (1991) ....................................... 42

*Cole v. Roper*, 783 F.3d 707, 710 (8th Cir. 2015) ........................... 21, 36, 37

*Cole v. Trammell*, 358 P.3d 932 (Okla. Crim. App. 2015) ................... 15, 21

*Corcoran v. State*, 774 N.E.2d 495 (Ind. 2002) ........................................... 23

*Corcoran v. State*, 820 N.E.2d 655 (Ind. 2005) ...................................*passim*

*Daugherty v. Robinson Farms, Inc.,* 858 N.E.2d 192
    (Ind. Ct. App. 2006), *trans. denied*.................................................... 12, 14

*DeLage Landen Fin. Svcs., Inc. v. Community Mental Health Ctr., Inc.,*
    965 N.E.2d 693 (Ind. Ct. App. 2012), *trans. denied* ............................. 12

*Ford v. Wainwright*, 477 U.S. 399 (1986) ..........................................*passim*

*Fulks v. Watson*, 4 F.4th 586 (7th Cir. 2021)............................................... 33

*Graham v. Connor*, 490 U.S. 386 (1989) ..................................................... 41

*Graham v. Florida*, 560 U.S. 48 (2010)......................................................... 36

*Gregg v. Georgia*, 428 U.S. 153 (1976) ......................................................... 37

*Hall v. Florida*, 572 U.S. 701 (2014) ............................................................. 31

*Harris v. State*, 499 N.E.2d 723 (Ind. 1986) ............................................... 38

*Holman v. Page*, 95 F.3d 481, 485-86 (7th Cir. 1996), *overruled on other grounds* .. 41

*Isom v. State*, 235 N.E.3d 150 (Ind. 2024) ...................................... 11, 22, 23

State of Indiana
Response in Opposition to Motions to Stay
and Successive Post-Conviction Review

*Madison v. Alabama*, 586 U.S. 265 (2019)..................................................... 14, 17, 24, 33

*Matheney v. State*, 834 N.E.2d 685 (Ind. 2005) .............................................. 22, 30, 38

*McCoy v. Louisiana*, 584 U.S. 414 (2018) ..................................................................... 9

*Moore v. Texas*, 581 U.S. 1 (2017) ............................................................................. 31

*Panetti v. Quarterman*, 551 U.S. 930 (2007)......................................................*passim*

*Ratliff v. Cohn*, 693 N.E.2d 530 (Ind. 1998) .............................................................. 38

*Ritchie v. State*, 875 N.E.2d 706 (Ind. 2007)............................................................. 22

*Roper v. Simmons*, 543 U.S. 551 .................................................................. 30, 31, 36

*Ross v. State*, 729 N.E.2d 113 (Ind. 2000).................................................................. 12

*Timberlake v. State*, 858 N.E.2d 625 (Ind. 2006)................................................*passim*

*Williams v. State*, 808 N.E.2d 652 (Ind. 2004)........................................................... 22

**Statutes**

Ind. Code § 35-36-2-4(a)................................................................................ 32

Ind. Code § 35-41-3-6.................................................................................... 32

Ind. Code § 35-41-3-6(a)......................................................................... 13, 38

Ind. Code § 35-50-2-9(c).......................................................................... 32, 33

Ind. Code § 35-50-2-9(c)(2)...................................................................... 32, 39

Ind. Code § 35-50-2-9(c)(6)...................................................................... 32, 39

Ind. Code § 35-50-2-9(d)............................................................................... 29

Ind. Code § 35-50-2-9(e)............................................................................... 29

**Other Authorities**

U.S. Const. amend. VIII ........................................................................*passim*

State of Indiana
Response in Opposition to Motions to Stay
and Successive Post-Conviction Review

U.S. Const. amend. XIV.............................................................................. 41, 42

Article 1, Section 16 of the Indiana Constitution ....................................... 38

Am. Bar Assoc. Death Penalty Due Process Review Project, *Severe Mental Illness and the Death Penalty*, 1 (2016), *available at* https://www.americanbar.org/content/dam/aba/administrative/crsj/deathpenalty/severe-mental-illness-death-penalty-white-paper ......................................... 25, 28

Am. Bar Assoc., *Special Feature: Recommendations and Reports on Death Penalty and Persons with Mental Disabilities*, 30 Mental & Physical Disability L. Rep. 5, 668, 670-71 (2006) ..................................................................................... 27

Am. Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 656 (5th ed. 2013) ................................................................................... 40

*Capital Punishment*, Legal Information Institute, *available at* law.cornell.edu/wex/capitalpunishment (last viewed Nov. 20, 2024)................... 35

Death Penalty Information Center, State by State, https://deathpenaltyinfo.org/state-and-federal-info/state-by-state (last visited Nov. 25, 2024) ........................................................................................... 35

Ind. General Assembly, *Senate Bill 155*, https://iga.in.gov/legislative/2017/bills/senate/155/details (last visited Nov. 26, 2024)............................................................................ 37

Ky. H.B. 269 (2022).................................................................................. 35

Ohio H.B. 136 (2019) .............................................................................. 35

Ind. Post-Conviction Rule 1(3)(b) ..................................................... 8, 9, 11

Ind. Post-Conviction Rule 1(8) ............................................................. 11, 22

Ind. Post-Conviction Rule 1(12) .............................................................*passim*

Ind. Trial Rule 11.......................................................................................... 11

6

**86a**

State of Indiana
Response in Opposition to Motions to Stay
and Successive Post-Conviction Review

This Court should deny both requests from Corcoran's attorneys to stay his execution so that they may litigate additional petitions for post-conviction relief. Neither proposed successive petition from Corcoran's attorneys includes Corcoran's personal affirmation as required by the post-conviction rules, and his counsel offer no evidence that Corcoran himself wishes to pursue this litigation. Permission to proceed further should be denied on this basis alone.

But the proposed petitions also fail on the merits. Counsel's bare allegations that Corcoran is incompetent to be executed are unsupported by contemporary evidence that he presently lacks understanding of either his sentence or its purpose. Instead, their allegations rest almost exclusively on a delusion that Corcoran himself has admitted he completely fabricated. Finally, Corcoran's attorneys' continuing argument that the federal and state constitutions prohibit executing a person with a "severe mental illness" is procedurally defaulted and meritless. His legal challenge to the constitutionality of his sentence based on his alleged mental-health status was known and available in his prior post-conviction litigation, and he has failed to prove that either the state or federal constitution forbids the execution of someone merely alleging mental illness of some nebulously defined severity. Corcoran's execution date should stand, and all of his attorneys' motions should be denied.[1]

_____

[1] Corcoran's attorneys filed numerous documents on November 15, 2024, and they can be organized as two motions seeking permission to file successive post-conviction relief, two proposed successive petitions, and two motions to stay should

State of Indiana
Response in Opposition to Motions to Stay
and Successive Post-Conviction Review

# I.

## Because Corcoran's attorneys' proposed petitions are unsigned, they are legally insufficient. And because the motions to stay are based on those improperly filed petitions, no stay should be entered.

Corcoran's attorneys' proposed petitions are improper, and their motions for successive post-conviction review and a stay should be denied. Post-Conviction Rule 1(3)(b) requires a post-conviction petitioner to verify, under oath, "the correctness of the petition, the authenticity of all documents and exhibits attached to the petition, and the fact that he has included every ground for relief under Sec. 1 known to the petitioner." Ind. Post-Conviction Rule 1(3)(b). The proposed post-conviction petitions filed on November 15, 2024, do not contain this oath and affirmation (Docket). Corcoran's signature is required as a condition for filing. *Corcoran v. State*, 820 N.E.2d 655, 657 (Ind. 2005) ("A Petition for Post-Conviction Relief must be signed by the petitioner.").

Not only is Corcoran's signature required as a legal matter, but it is not even clear that Corcoran himself wants further post-conviction review. His attorneys have signed proposed successive petitions "on behalf of [Corcoran]," but they

---

this Court grant Corcoran's attorneys successive post-conviction review (Docket). One set of these documents focus on his claim that he is incompetent under *Ford v. Wainwright*, 477 U.S. 399 (1986), and *Panetti v. Quarterman*, 551 U.S. 930 (2007). The other set of these documents focus on Corcoran's counsels' allegations that he is "severely mentally ill" and that executing "severely mentally ill" persons is unconstitutional. To differentiate, the State will cite the name of the document and use the designation (Competency) to indicate the document referring to claims under *Ford* and *Panetti*. And the State will cite documents about the "severely mentally ill" allegation using the designation (SMI). All page citations are to the PDF page number of the cited document. Additionally, the Court should consider this document as a response to all of Corcoran's attorneys' pending motions.

8

**88a**

State of Indiana
Response in Opposition to Motions to Stay
and Successive Post-Conviction Review

recognize that as long ago as 2003, "he wanted to be executed" (S. Pet'n (Competency) at 4; S. Pet'n (SMI) at 30). Corcoran previously waived post-conviction review and demanded the waiver of federal habeas review; he has maintained a consistent view (Exs. 1, 2). *Corcoran*, 820 N.E.2d at 660–61. And as of the time of Corcoran's attorneys' most recent filings, they represent that "he believes he wants to be executed" (S. Pet'n (Competency) at 4). It is entirely unclear from his counsel's filings whether Corcoran personally desires further post-conviction review, and his filings appear to be his attorneys' unilateral decision to pursue further review without his consent, which is evidenced by the absence of Corcoran's personal endorsement of these proposed petitions. *See* P-C.R. 1(3)(b); *McCoy v. Louisiana*, 584 U.S. 414, 417–18 (2018) ("With individual liberty—and, in capital cases, life—at stake, it is the defendant's prerogative, not counsel's, to decide on the objective of his defense[.]").

What is clear from the record is that Corcoran, in 2003, both wanted to be executed and had a rational understanding of the reason for his execution, as he personally told the post-conviction court:

> See, I want to waive my appeals because I am guilty of murder. I think that I should be executed for what I have done and not because I am supposedly tortured with ultrasound or whatever. I am guilty of murder. I should be executed. That is all there is to it. That is what I believe. I believe the death penalty is a just punishment for four counts of murder, and I believe that I should be executed since I am guilty of four counts of murder.

*Corcoran*, 820 N.E.2d at 660–61.

9
**89a**

State of Indiana
Response in Opposition to Motions to Stay
and Successive Post-Conviction Review

He continued to express both a rational understanding of and the same preference for resolution of his situation three years later. In a letter he sent to a federal district court in 2006 trying to waive habeas review, he wrote:

> Well let's weigh the options. On the one side of the balance I could win on appeal and then have to spend the rest of my life in prison. That's a con. On the other side is a great weight; I could waive my appeals and die and escape prison. That's a pro because I don't want to live in prison for the rest of my life—and no reasonable rational person would. And on the pro side is another great weight; the fact that I am guilty of murder. I intentionally killed four people knowing that such an act was wrong and that I would probably go to jail yet I did it anyway. I believe that such a person should be executed and I'm sure most people would agree.

(Ex. 1 at 2).[2] *See also Corcoran*, 820 N.E.2d at 662 (this Court recounting how Corcoran disagreed with his counsel filing a motion to determine his competency during initial post-conviction proceedings). His request should be honored despite what his counsel wants to file without his endorsement.

Notably, Corcoran's attorneys make no assertion that his alleged incompetence is motivating his desire to forgo further dilatory review. They have simply signed a petition on his behalf with no indication that their client desires the relief that they seek. And the historical record shows that their client does not desire the relief that they seek, which is contemporaneously evidenced by the fact that the proposed successive petitions are not personally signed by Corcoran. And

---

[2] The letter, Exhibit 1 to this response, can also be found on the docket for the U.S. District Court for the Northern District of Indiana under cause number 3:05-cv-389-JD at Docket Entry 19.

State of Indiana
Response in Opposition to Motions to Stay
and Successive Post-Conviction Review

his signature is required by the post-conviction rules and this Court's precedent.

Because those proposed petitions are improper without Corcoran's personal oath

and affirmation, they cannot present a reasonable possibility of success under Post-

Conviction Rule 1(12). Therefore, Corcoran's attorneys' motions for successive post-

conviction review and motions to stay should be denied with no examination of their

merits.

Corcoran's attorneys have attempted to substitute their signatures for

Corcoran's own under Trial Rule 11, which is improper and does not comply with

Post-Conviction Rule 1(3)(b)'s verification requirement. Rule 1(3)(b) mandates that

"the petitioner shall verify" the various affirmations required by the rule. And these

affirmations include the "correctness of the petition" and that it "include[s] every

ground for relief … known to the petitioner." P-C.R. 1(3)(b). Those two subjects, and

especially the second one, rely on knowledge that can only be known by the

petitioner, not someone acting on his behalf. And this requirement is even more

salient given the strict waiver and procedural-default rules that apply to post-

conviction petitions. *See* P-C.R. 1(8); *Isom v. State*, 235 N.E.3d 150, 151–53 (Ind.

2024) (denying permission to file a successive petition for post-conviction relief

because all of the proposed claims were procedurally defaulted or *res judicata*).

Allowing Corcoran's attorneys to sign on his behalf, especially when there is no

indication that he has personally authorized them to do so and considering that he

previously and validly waived post-conviction review, risks him being held to future

procedural defaults.

11

State of Indiana
Response in Opposition to Motions to Stay
and Successive Post-Conviction Review

Further, the post-conviction rules are specialized rules for the precise procedure before this Court, and while the Indiana Trial Rules are generally applicable, more specialized rules trump more general ones. *See Ross v. State*, 729 N.E.2d 113, 116 (Ind. 2000) ("When faced with a general statute and a specific statute on the same subject, the more specific one should be applied."); *DeLage Landen Fin. Svcs., Inc. v. Community Mental Health Ctr., Inc.*, 965 N.E.2d 693, 698 (Ind. Ct. App. 2012) (citing *Daugherty v. Robinson Farms, Inc.*, 858 N.E.2d 192, 197 (Ind. Ct. App. 2006), *trans. denied*) ("Thus, when two rules cover the same subject matter and one does so generally where the other does so specifically, the more specific rule prevails."), *trans. denied*. Because Corcoran has not personally verified his proposed successive petitions, as required by the post-conviction rules, his motions to pursue successive post-conviction relief should be denied.

State of Indiana
Response in Opposition to Motions to Stay
and Successive Post-Conviction Review

## II.
### Corcoran's attorneys have not made the threshold showing that Corcoran is incompetent to be executed.[3]

Corcoran's attorneys have failed to make the requisite threshold showing to be entitled to any further review or relief, and their petition to file a successive petition for post-conviction relief to challenge Corcoran's competency to be executed should be denied. The Eighth Amendment, as held by the controlling opinion in *Ford v. Wainwright*, 477 U.S. 399, 419–27 (1986) (Powell, J., concurring), forbids the execution of those who are insane,[4] and a prisoner facing execution is insane only if he is "unaware of the punishment [he is] about to suffer and why [he is] to suffer it." "At this stage of the proceedings," Corcoran "is presumed to be" competent to be executed. *Timberlake v. State*, 858 N.E.2d 625, 628 (Ind. 2006) (citing *Ford*, 477 U.S. at 426 (Powell, J., concurring). In other words, at this time, the law presumes Corcoran to be sane and competent to be executed. *Id.*

---

[3] While Corcoran's attorneys argue that he should not have to ask permission under Post-Conviction Rule 1(12) to raise his claim of being incompetent to be executed because his claim only became ripe after an execution date was set (Mot. to Stay (Competency) at 8–9), merely because a ripe claim exists does not prove that it can be validly raised by any means outside of accepted procedures. This Court has already held that *Ford* claims such as Corcoran's are "among those that our post-conviction rule on successive post-conviction petitions was designed to address." *Baird v. State*, 833 N.E.2d 28, 29 (Ind. 2005).

[4] This is entirely different than the notion of insanity in the context of the insanity defense of being found not guilty or not responsible because of a mental disease or defect that rendered the defendant "unable to appreciate the wrongfulness of the conduct at the time of the offense." Ind. Code § 35-41-3-6(a).

13

**93a**

State of Indiana
Response in Opposition to Motions to Stay
and Successive Post-Conviction Review

## A. Corcoran's attorneys must establish a reasonable possibility that they can make the threshold showing of incompetence to be executed.

To be entitled to fully litigate post-conviction proceedings on the question of his competence to be executed, Corcoran must make a "substantial threshold showing" that any mental illness "prevents him from 'rational[ly] understanding' why the State seeks to impose" the death penalty. *Madison v. Alabama*, 586 U.S. 265, 267 (2019) (quoting *Panetti v. Quarterman*, 551 U.S. 930, 959 (2007)) (alteration added in *Madison*); *Panetti*, 551 U.S. at 949 (quoting *Ford*, 477 U.S. at 424, 426). In other words, Corcoran's attorneys must have presented this Court with sufficient "substantial" indication that his "'concept of reality' is 'so impair[ed]' that he cannot grasp the execution's 'meaning and purpose' or the 'link between [his] crime and its punishment.'" *Madison*, 586 U.S. at 269 (quoting *Panetti*, 551 U.S. at 958, 960) (alteration added in *Madison*). When these standards for competency are combined with the standard to obtain permission to file a petition for successive post-conviction relief, he must prove a "reasonable possibility" that he has rebutted the presumption that he is competent to be executed and made the substantial evidentiary showing for further evidentiary development. P-C.R. 1(12); *Panetti*, 551 U.S. at 949; *Timberlake*, 858 N.E.2d at 267.

Corcoran has had ample opportunity to obtain evidence and present it to the Court to satisfy the threshold burden for further review, and he has failed to meet that burden. This Court's procedure for successive post-conviction review is "constitutionally acceptable" and meets the "basic requirements" of due process

14

State of Indiana
Response in Opposition to Motions to Stay
and Successive Post-Conviction Review

because it has afforded the "opportunity to submit 'evidence and argument from the prisoner's counsel, including expert psychiatric evidence that may differ from the State's own psychiatric examination.'" *Panetti*, 551 U.S. at 949–50 (quoting *Ford*, 477 U.S. at 424, 427 (Powell, J., concurring)). Only the "basic requirements" of due process apply here, and the U.S. Supreme Court has given states "substantial leeway to determine what process best balances the various interests at stake[.]" *Id.* (quoting *Ford*, 477 U.S. at 427) (Powell, J., concurring)). Because Corcoran's attorneys have failed to make their threshold showing under this state's constitutionally acceptable procedure, they are not entitled to any further adjudicative process. *See Cole v. Trammell*, 358 P.3d 932, 938 (Okla. Crim. App. 2015) (quoting *Panetti*, 551 U.S. at 949–50) (recognizing that an adjudication on the question of competency is not required until the petitioner's threshold burden is met).

**B. This Court's precedent calls for Corcoran's attorneys' request for successive post-conviction review to be denied.**

Corcoran's attorneys have failed to make the threshold showing of incompetence to justify further review, and their requests should be denied—a result consistent with this Court's precedent. This Court denied the filing of a successive petition for post-conviction relief based on claim of incompetence to be executed in *Timberlake*, 858 N.E.2d at 627–28. Timberlake suffered from "a major psychiatric disorder with psychotic features, the focus of which [was] a paranoid delusional system resulting in his belief that a secret machine, operated by the

State of Indiana
Response in Opposition to Motions to Stay
and Successive Post-Conviction Review

government, controls, monitors[,] and tortures people through their brains." *Id.* at 629. Yet despite this delusion borne of "chronic paranoid schizophrenia," this Court held that Timberlake "present[ed] no behavior or aspect of his mental state suggesting" he lacked the necessary understanding to be executed and denied him permission to pursue successive post-conviction relief. *Id.* at 629–30.

The allegations that Corcoran is incompetent to be executed are based on prior claims of experiencing delusions of a similar nature as Timberlake's, and Corcoran's allegations have already been presented to this Court. Much, if not all, of his attorneys' case for a stay and further review relies on their allegation that Corcoran is incompetent because he believes he is being tortured by Department of Correction officials with some type of ultrasound-producing machine and has been diagnosed with schizophrenia in the past (S. Pet'n (Competency) at 2–3, 9–15, 17–22). Assuming Corcoran harbors such a delusion (and, as will be proved, he does not), the existence of that delusion was before this Court when Corcoran was determined to be competent. In 2005, this Court affirmed that Corcoran was competent to waive post-conviction review and relied, in part, on his on-the-record comments that he "should be executed for what [he] ha[s] done and not because [he is] supposedly tortured with ultrasound or whatever." *Corcoran*, 820 N.E.2d at 660–61. He said the same in an affidavit he filed in a federal district court during habeas proceedings in December 2005:

> I believe that since I am guilty of murder I should be executed. If I were innocent[,] I would have every reason to appeal[,] but the fact is I am guilty. I think that the death penalty is a just punishment for

16

State of Indiana
Response in Opposition to Motions to Stay
and Successive Post-Conviction Review

> someone who is guilty of four counts of murder[;] therefore[,] I think I
> should be executed. That is really all there is to it. In essence I am
> taking the [S]tate's side against myself because I have done wrong,
> which I believe is the right thing to do.

(Ex. 2).

Further, the experts who evaluated Corcoran during his initial post-conviction proceedings made findings showing that he was competent to be executed. Dr. George Parker, after an evaluation, testified that Corcoran had "a very clear awareness of the status of his case." *Corcoran*, 820 N.E.2d at 661.[5] Dr. Robert Kaplan, "who also evaluated Corcoran, testified that Corcoran was aware that by not continuing with post-conviction review that he would be executed." *Id*. Back then, this Court unequivocally held that "[t]he evidence supports the trial court's conclusion that Corcoran has both a rational understanding of and can appreciate his legal position." *Id*. at 662. *See Madison*, 586 U.S. at 275 (the Eighth Amendment does not prohibit the execution of a person who "remains oriented in time and place; he can make logical connections and order his thoughts; and he comprehends familiar concepts of crime and punishment."). Thus, even if Corcoran does experience the claimed delusion, like Timberlake, it does not impede his ability to appreciate the link between his crimes and the punishment, so this Court should deny Corcoran's attorneys further review as it did in *Timberlake*.

---

[5] Corcoran's attorneys contradict themselves on the value of prior evaluations. In their successive-petition arguments they rely heavily on the evaluations created in initial post-conviction litigation (S. Pet'n (Competency) at 9–14, 20–21). But in their motion to stay, they assert that "[a]ny previous competency determination upon which the Attorney General might rely is stale" (Mot. to Stay (Competency) at 8).

17

State of Indiana
Response in Opposition to Motions to Stay
and Successive Post-Conviction Review

## C. Corcoran has admitted to fabricating the delusion upon which his attorney's case for further review rests.

Corcoran has said he does not suffer the delusion about an ultrasound machine upon which his attorneys base the majority of their case for further delay and review (S. Pet'n (Competency) at 2–3, 9–15, 17–22; Exs. 1, 2). Corcoran has admitted he fabricated this delusion. He wrote about this fictional delusion in a letter to a federal district court in 2006:

> And I admit that in about August of the year 2000, or maybe earlier, I made up a story that the prison is tormenting me with ultrasound. According to my story they use ultrasound to cause muscle spasms, abnormal feelings, and to make sound effects appear out of no where. Also according to this story I have an involuntary speech disorder where I involuntarily say things in such a way that I don't hear but in a way the prison can monitor it and as they do they make me spasm and experience abnormal feelings and make sound effects at me.
>
> <div align="center">***</div>
>
> I tried to hint to [attorneys] that these things don't really happen but I got accused of down playing my symptoms—symptoms I do not have but I made up such as hearing sound effects or taunting music. They saw this as evidence of hallucinations but I made up the whole thing. I never realized before this that psychiatrists could be so gullible.…I do not believe that I am being tormented with ultrasound and that I involuntarily say things. As I said, it is a fictional story.

(Ex. 1 at 4).

He said the same in an affidavit he sent to the district court in December 2005:

> In the past lawyers and psychiatrists have claimed that I wanted to waive my appeals and get executed because: (a) I wanted to escape a sleep disorder that I don't have; (b) to escape delusions I have that the prison is tormenting me with ultrasound; (c) to escape an involuntary speech disorder I don't have. They have also claimed that my delusions prevent me from making a rational choice. And no doubt my lawyer will make such claims. But the fact is I made such stories up. All their

<div align="center">18</div>

<div align="center">**98a**</div>

State of Indiana
Response in Opposition to Motions to Stay
and Successive Post-Conviction Review

> information comes from letters I wrote my sister where I made up
> stories. Also I lied to psychiatrists to get medication to help me sleep. If
> I try to explain this to psychiatrists I get accused of downplaying my
> symptoms. But the truth is no mental illness or delusions or
> hallucinations are influencing my decision to waive my appeals. The
> fact is I am guilty of murder and I think I should therefore be executed.

(Ex. 2). Corcoran is competent to be executed, and his attorneys' case for

incompetence rests on a factual premise that Corcoran admits is a lie.

**D.  Other evidence, both old and new, proffered by Corcoran's attorneys
    does not meet the threshold showing to rebut the presumption that
    Corcoran is competent to be executed.**

Corcoran's attorneys' further factual case for incompetency rests on evidence

that was already in the record at the time of direct appeal and post-conviction

review. His attorneys rely on old evidence to claim that the same mental illness that

he suffered "at the time of the 1997 offense" "continues to torment him" (S. Pet'n

(Competency) at 15). Half of the section headed "Mr. Corcoran's Present Condition"

in the request for a successive petition looks backward to facts that "various jurists

have recognized Mr. Corcoran's mental illness," that "during the trial, even the trial

court found Mr. Corcoran under the influence of a mental or emotional

disturbance," that in 2000 this Court acknowledged his mental illness, and that

three mental-health professionals diagnosed him with paranoid schizophrenia in

2003 (S. Pet'n (Competency) at 13–14). This Court has seen and considered all of

this evidence before and denied Corcoran relief. *Corcoran*, 820 N.E.2d at 662.

To the extent that Corcoran's attorneys also point to contemporaneous

evidence of Corcoran's mental status from a Department of Correction medical

State of Indiana
Response in Opposition to Motions to Stay
and Successive Post-Conviction Review

record created in March 2024, that record does not satisfy the threshold showing

under *Panetti* and overcome the presumption that he is competent to be executed.

The record attached to the successive petition merely reiterates Corcoran's story

about "an ultrasonic machine," but the author of the report indicates that any

"delusions are not causing harm to himself or others at this time" (S. Pet'n

(Competency), Ex. A at 3–4). Further, this Department of Correction document

reports that Corcoran's "[j]udgment" is "[w]ithin normal limits," his "[p]erception" is

"[w]ithin normal limits," his "[s]peech is "[c]lear," and his "[c]ognition" is "[w]ithin

normal limits" (S. Pet'n (Competency), Ex. A at 1–2).

Other contemporaneous evidence of mental status also supports that

Corcoran is competent to be executed. A doctor at the Department of Correction

wrote as recently as June 2024 that Corcoran "denies hearing or seeing things that

are not there," that he is "oriented to person, place, time and situation," that his

"speech is linear, goal-oriented and future oriented [and] [i]t is not tangential or

circumstantial," and that his "[i]nsight" and "[j]udgment are "[f]air" (Ex. 3). Even in

the attached psychotherapy report in Corcoran's attorneys' filings, he talks about

wanting to "help" an "old romantic interest" because he "tends to focus on others

rather than himself because that is the 'right' thing to do" (S. Pet'n (Competency),

Ex. A at 3). This is a statement that he understands that helping others is good and,

by implication, murdering others is bad. No contemporaneous evidence proves that

some mental illness has severed Corcoran's ability to rationally understand the

relationship between his murder of four people and his sentence.

State of Indiana
Response in Opposition to Motions to Stay
and Successive Post-Conviction Review

Again, *Ford* and *Panetti* only require further process if the substantial

threshold showing of incompetence to be executed is met. *See Cole*, 358 P.3d at 938

(quoting *Panetti*, 551 U.S. at 949–50) (recognizing that an adjudication on the

question of competency is not required until the petitioner's threshold burden is

met). Here, the State vigorously contests any claim that Corcoran has no rational

understanding between crime and punishment, especially considering that the

claims in his attorneys' motions to stay and requests for successive post-conviction

relief are primarily based on a delusion that Corcoran admits he fabricated. But

even if this Court were to take Corcoran's attorneys' claims as genuine, those

allegations and supporting documentation do not prove that Corcoran does not

understand *why* the State will execute him. While his attorneys write that he wants

to be executed because he wants "relief from the torment" he believes an ultrasound

device causes him (S. Pet'n (Competency) at 2), that he may harbor this belief says

nothing about his understanding of the connection between the punishment and

why it is to be imposed. He is entitled to no further process to examine his

competency to be executed. *See Cole v. Roper*, 783 F.3d 707, 710 (8th Cir. 2015)

(holding the Missouri Supreme Court did not unreasonably apply *Ford* and *Panetti*

when it denied an original action after the petitioner "was afforded the opportunity

to offer his own expert opinion and attorney affidavits in support of his claims").

This Court should deny the motions for a stay and to pursue successive post-

conviction relief on his claim that he is incompetent to be executed.

State of Indiana
Response in Opposition to Motions to Stay
and Successive Post-Conviction Review

### III.
### Corcoran's attorneys' claim that execution of "severely mentally ill" persons violates the U.S. and Indiana Constitutions is procedurally defaulted and meritless.

Corcoran's attorneys should not be granted successive post-conviction review to pursue an argument that it would be unconstitutional to execute him based on his allegation that he is "severely mentally ill" (S. Pet'n (SMI) at 4). This claim has no reasonable possibility of resulting in relief because it is procedurally defaulted and meritless.

**A. Corcoran's attorneys' claim that Corcoran's mental illness precludes him from being executed is procedurally defaulted.**

This Court has said time and again that it will not grant relief or further review for claims that could have been properly raised in an earlier proceeding and were not. *See Ritchie v. State*, 875 N.E.2d 706, 712 n.1 (Ind. 2007) (citing *Williams v. State*, 808 N.E.2d 652, 659 (Ind. 2004)) (finding claims waived for failing to raise them when available in an earlier proceeding). Our post-conviction rules require that "[a]ll grounds for relief available to a petitioner under this rule must be raised in his original petition." P-C.R. 1(8). This Court has consistently and strictly enforced this rule. Just this past summer, the Court denied a motion for permission to pursue successive post-conviction review from a capital petitioner and wrote, "Unraised claims that should have been raised previously are waived or 'procedurally defaulted.'" *Isom*, 235 N.E.3d at 152 (quoting *Matheney v. State*, 834 N.E.2d 685, 662 (Ind. 2005)). Claims that were not properly raised in an initial post-conviction petition "are barred by procedural default." *Id.*

22
**102a**

State of Indiana
Response in Opposition to Motions to Stay
and Successive Post-Conviction Review

      Claims that it would be unconstitutional for the State to execute Corcoran because of his mental illness have been known and available since his initial sentencing hearing in 1999. Those claims are defaulted. Corcoran could have raised them in his initial post-conviction proceedings, but he waived post-conviction review—a decision that the post-conviction court held was made competently and that this Court affirmed. *Corcoran*, 820 N.E.2d at 658–62. When a claim was known and available for litigation in a prior proceeding and not raised, it is procedurally defaulted. *Isom*, 235 N.E.3d at 152. Defaulted claims have no reasonable possibility of success under Post-Conviction Rule 1(12). Therefore, Corcoran's attorneys should not be given permission to raise a claim that will ultimately be found to have been defaulted.

      Moreover, this Court has considered claims regarding Corcoran's mental health before. On direct appeal, this Court reviewed the imposition of the death penalty and Corcoran's arguments that his mental illness rendered his sentence manifestly unreasonable. *Corcoran v. State*, 774 N.E.2d 495, 501–02 (Ind. 2002). And after Corcoran chose to waive post-conviction review, this Court addressed claims that his mental illness rendered him incompetent to waive collateral review of his sentence. *Corcoran*, 820 N.E.2d at 660-662. As such, this Court has twice considered—and twice rejected—Corcoran's argument that his mental illness renders the death penalty improper in his case. Since that time, Corcoran has not developed any new evidence. Instead, his attorneys continue to rely on his diagnosis of paranoid schizophrenia from 1999 to argue broadly that people like Corcoran who

State of Indiana
Response in Opposition to Motions to Stay
and Successive Post-Conviction Review

suffer from "severe mental illnesses" should be exempt from the death penalty. His argument is defaulted, and his attorneys provide no valid excuse for this default.

## B. Corcoran is not entitled to relief under the Eighth Amendment.

Corcoran's sentence is not unconstitutional under the Eighth Amendment. The U.S. Supreme Court has never held that the execution of a mentally ill defendant violates the Eighth Amendment. *See Madison*, 586 U.S. at 267 (holding the Eighth Amendment does not forbid execution of a prisoner with "a mental disorder [that] has left him without any memory of committing his crime"). What the Eighth Amendment does prohibit, as was discussed above, is the execution of a prisoner who is incompetent to be executed. *Ford*, 477 U.S. at 409–10. Thus, the only categorical exclusion relevant to this case is the ban on carrying out an execution of a person "whose mental illness prevents him from comprehending the reasons for the penalty or its implications" until he is able to comprehend. *Id.* at 417–18. And as discussed above, the Eighth Amendment does not prohibit Corcoran's execution under this standard.

Nevertheless, Corcoran's attorneys invite this Court to broaden the scope of the Eighth Amendment and craft a new rule in which "severely mentally ill" defendants are exempt from the death penalty (Memo (SMI) at 4). Citing the American Bar Association, they define "severe mental illness" as "mental disorders that carry certain diagnoses such as schizophrenia, bipolar disorder, and major depression; that are relatively persistent (e.g. lasting at least a year); and that result in comparatively severe impairment in major areas of functioning" (Memo

State of Indiana
Response in Opposition to Motions to Stay
and Successive Post-Conviction Review

(SMI) at 4). Presumably, "severely mentally ill" defendants are those that fall somewhere on the vast spectrum of mental illnesses but that do not reach the level of incompetency that would prohibit their execution under *Ford* and *Panetti*. But neither this Court nor the U.S. Supreme Court have ever extended the protections of the Eighth Amendment to defendants categorically based on the alleged severity of their diagnosis alone. And this Court should not do so now because the standard Corcoran's attorneys propose is unworkable, the justifications for exempting juveniles and offenders with intellectual disabilities from the death penalty do not apply with equal force to offenders with "severe mental illnesses," and no national consensus has emerged supporting his argument for expansion of the Eighth Amendment's protections.

### 1. Corcoran's attorneys' proposed standard is unworkable.

Corcoran's attorneys ask this Court to change the law and hold it is categorically unconstitutional to execute a vague class of offenders who are "severely mentally ill." This Court should not do so because such a categorical exclusion would construct a vague and amorphous boundary between persons who could be executed and persons who could not. The definition provided in Corcoran's papers creates no workable legal standard to rationally distinguish between those who are and are not eligible to be executed (Memo (SMI) at 4–5) (quoting Am. Bar Assoc. Death Penalty Due Process Review Project, *Severe Mental Illness and the Death Penalty*, 1 (2016), *available at* https://www.americanbar.org/content/dam/

25

**105a**

State of Indiana
Response in Opposition to Motions to Stay
and Successive Post-Conviction Review

aba/administrative/crsj/deathpenalty/severe-mental-illness-death-penalty-white-

paper).

Corcoran's attorneys propose that the American Bar Association's definition of "severe mental illness" differentiates between those who should and should not be eligible for execution (Memo (SMI) at 4). They explain that the term "'severe mental illness' generally refers to 'mental disorders that carry certain diagnoses, such as schizophrenia, bipolar disorder, and major depression; that are relatively persistent (e.g. lasting at least a year); and that result in comparatively severe impairment in major areas of functioning'" (Memo (SMI) at 4–5). This definition is entirely unworkable.

As an initial point, Corcoran's attorneys have not explained precisely which diagnoses or disorders they believe qualify as "severe mental illnesses" (Memo (SMI) at 4). Instead, they explain that their proposed standard would apply *"generally"* to a subset of disorders that may or may not be considered "severe" if the disorder lasts at least one year (with no justification why that should be the temporal benchmark) and results in "comparatively severe impairment in major areas of functioning" (Memo (SMI) at 4–5) (emphasis added). How comparatively should be defined in this context and to what it should be compared and what constitutes a major area of functioning are unanswered questions in the proposed standard.

Corcoran's attorneys go on to provide a list of symptoms that are "*typically* associated" with the kinds of disorders that would fit their definition of "severe"

State of Indiana
Response in Opposition to Motions to Stay
and Successive Post-Conviction Review

(Memo (SMI) at 5) (emphasis added). And they explain that "severe mental illness *generally* refers to 'a disorder that is roughly equivalent to disorders that mental health professionals would consider the most serious Axis I diagnosis'" (Memo (SMI) at 5) (citing Am. Bar Assoc., *Special Feature: Recommendations and Reports on Death Penalty and Persons with Mental Disabilities*, 30 Mental & Physical Disability L. Rep. 5, 668, 670-71 (2006) (emphasis added)). Thus, the standard proposed by Corcoran's attorneys is no standard at all. Instead, it deals with generalities that provide no guidance for our mental-health professionals or courts.

Moreover, the definition of "severe mental illness" provided by Corcoran's attorneys raises more questions than it answers. They explain that "severe mental illness" generally refers to "a disorder that is roughly equivalent to disorders that mental health professionals would consider the most serious Axis I diagnosis" (Memo (SMI) at 5). But reasonable mental health professionals might disagree about which conditions they would consider "the most serious" disorders or diagnoses. The question remains as to who would ultimately decide whether a particular diagnosis was "severe" enough to qualify in the first instance. And even if mental health professionals all agreed that a particular disorder or diagnosis was "severe" enough to meet the definition of "severe mental illness," the symptoms and impairments caused by a mental illness are not uniform but come in gradations of severity themselves and manifest in a plethora of qualitatively different symptoms. Corcoran's attorneys' proposed standard does not provide guidance on what a trial court, or a reviewing court, should do with those varying levels of expressed

27
**107a**

State of Indiana
Response in Opposition to Motions to Stay
and Successive Post-Conviction Review

symptoms or with conflicting diagnoses. Corcoran, for example, has been diagnosed

with major depression, adjustment disorder with depressed mood, schizoid

personality disorder, paranoid personality disorder, schizotypal personality

disorder, and paranoid schizophrenia (2003 PCR App. Vol. II 115). How a trial court

or a finder of fact should reconcile these varying and potentially conflicting

diagnoses goes unexplained by the proposed standard. Further, the procedural

mechanism to implement the proposed standard is also unexplained by the

proposed petitions.

Even the American Bar Association, upon which Corcoran relies, recognizes

that a "severe mental illness," standing alone, is insufficient to make an offender

"less culpable and less deterrable than the average murderer." Am. Bar Assoc.,

*Special Feature: Recommendations and Reports on Death Penalty and Persons with*

*Mental Disabilities*, 30 Mental & Physical Disability L. Rep. 5, 668, 670-71 (2006).

Rather, the ABA recommended precluding death sentences for only those offenders

who have a "severe mental illness" which "significantly impair[ed] cognitive and

volitional functioning at the time of the offense." *Id.* The ABA found that "preclusion

of a death sentence based on diagnosis alone would not be sensible, because the

symptoms of these disorders are much more variable than those associated" with

intellectual disabilities. *Id.* Thus, the source of Corcoran's porous definition of

"severe mental illness" does not ultimately support his position that this Court

should hold him ineligible to be executed.

State of Indiana
Response in Opposition to Motions to Stay
and Successive Post-Conviction Review

Moreover, Corcoran's attorneys' proposed standard for "severe mental illness" is based on a multiaxial approach that has been abandoned by the American Psychiatric Association. The APA stopped classifying disorders into different axes in the fifth edition of the Diagnostic and Statistical Manual of Mental Disorders. This means that mental-health professionals are no longer able to point to an "Axis I diagnosis" to suggest that a particular disorder is "severe" according to the definition Corcoran's attorneys have provided. This Court simply cannot adopt such a vague, incomplete, and uncertain standard to define a categorial exclusion from a punishment that our legislature has validly enacted and has been found to be constitutional.

In fact, this Court has previously refused to establish a brightline rule for mentally ill prisoners in recognition of the "fact that 'mental illness' is a very elastic term." *Baer v. State*, 942 N.E.2d 80, 103 (Ind. 2011). For that reason, this Court held that mental illness is not well suited to "bright lines that would place a defendant as eligible or ineligible." *Id*. Instead, this Court has held that "the relative seriousness or mildness of a defendant's illness" is best left to the weighing process the jury already undertakes under our death-penalty statute. *Baer*, 942 N.E.2d at 103; *see* I.C. § 35-50-2-9(d), -9(e). Thus, not only has this Court correctly determined that mental illness is not a subject well suited to brightline rules, but the rule that Corcoran's attorneys have proposed should not be implemented because of its facial flaws, ambiguities, and general unworkability.

State of Indiana
Response in Opposition to Motions to Stay
and Successive Post-Conviction Review

### 2. The scientific and legal rationale for exempting juveniles and intellectually disabled offenders does not apply to offenders who are mentally ill.

Contrary to Corcoran's attorney's assertions, the scientific and legal rationale for exempting juvenile and intellectually disabled offenders from being executed does not apply with equal force to offenders who are mentally ill. The U.S. Supreme Court explained in *Atkins v. Virginia*, 536 U.S. 304, 318 (2002), that prisoners who are intellectually disabled "have diminished capacities to understand and process information, to communicate, to abstract from mistakes and learn from experience, to engage in logical reasoning, to control impulses, and to understand the reactions of others." As such, the Court found that intellectually disabled offenders are less culpable for their criminal conduct and less deserving of the death penalty. *Atkins*, 536 U.S. at 318–19. For those same reasons, the Court also found that it was less likely that the death penalty served as a meaningful deterrent for intellectually disabled offenders. *Id.* at 319–20. This Court has previously rejected a request to pursue successive post-conviction relief upon a claim that "mentally ill persons are on the same footing as [*Atkins*-ineligible] persons." *Matheney*, 833 N.E.2d at 458.

And those with what Corcoran's attorneys have identified as "severe mental illness" are unlike juveniles. The U.S. Supreme Court in *Roper v. Simmons*, 543 U.S. 551, 570, found that "juvenile offenders cannot with reliability be classified among the worst offenders" and that juveniles often lack maturity and have an "underdeveloped sense of responsibility." The Court went on to explain that juveniles are more "vulnerable or susceptible to negative influences and outside

State of Indiana
Response in Opposition to Motions to Stay
and Successive Post-Conviction Review

pressures" and that their character is not "as well formed as that of an adult" meaning that their conduct is "not as morally reprehensible as that of an adult." *Id.* at 569. But the arguments in the successive-petition requests say nothing about the lack of maturity, underdeveloped sense of responsibility, or vulnerability to third-party influence sufficient to make them equal to those with mental illness of some undefined extra severity above some other comparative group of those with mental illness.

Notably also, the categories of both juveniles and intellectually disabled persons are well defined—age is a bright line and intellectual disability is defined by the Diagnostic and Statistical Manual, IQ scores, and Supreme Court case law. *See Moore v. Texas*, 581 U.S. 1, 12–13 (2017) (citing *Hall v. Florida*, 572 U.S. 701, 721–22 (2014)) (discussing the standards for intellectual disability under *Atkins* and invoking IQ scores and "the views of medical experts"). Thus, unlike the nebulous category of people with "severe mental illness," juveniles and intellectually disabled persons can be clearly determined.

The clearly determinable characteristics of juveniles and those suffering intellectual disability are unlike those of persons suffering some mental illness. Corcoran's attorneys argue that individuals with "severe mental illnesses" have many of the same characteristics the U.S. Supreme Court found significant when exempting juvenile and intellectually disabled offenders from the death penalty (Memo (SMI) at 6). Specifically, they argue that "severely mentally ill" offenders have disturbed thought processes and impaired decision-making abilities making

31

**111a**

State of Indiana
Response in Opposition to Motions to Stay
and Successive Post-Conviction Review

them less morally culpable for their conduct than offenders without "severe mental illnesses" (Memo (SMI) at 7-8).

Corcoran's argument fails to consider, however, that Indiana law already provides protections for those who are not morally or criminally responsible for their conduct due to mental disease or defect from being sentenced to death. I.C. § 35-41-3-6. If an offender raises an insanity defense, and the factfinder determines that he suffers from a mental disease or defect and that he was unable to appreciate the wrongfulness of his conduct at the time of the offense, then the factfinder is required to return a verdict of not guilty—or not responsible—by reason of insanity. I.C. § 35-36-2-4(a). At that point, the offender is subject to commitment proceedings. *Id.* He is certainly no longer eligible for the death penalty. *Id.*

And, in cases where an offender has a mental illness that does not rise to the level of "mental disease or defect" as that term is defined by our legislature, he can still present evidence about his mental illness during the penalty phase of his trial as a mitigating circumstance. Indiana Code Section 35-50-2-9(c) establishes that it is a mitigating circumstance if the offender was "under the influence of extreme mental or emotional disturbance when the murder was committed" or that their "capacity to appreciate the criminality of [their] conduct or to conform that conduct to the requirements of law was substantially impaired as a result of mental disease or defect." I.C. § 35-50-2-9 (c)(2), -(c)(6). The jury is then given the opportunity to determine if the offender suffers from a mental illness and whether that mental illness relieves the offender of some degree of culpability.

State of Indiana
Response in Opposition to Motions to Stay
and Successive Post-Conviction Review

This approach is consistent with this Court's previous refusal to establish a brightline rule for mentally ill offenders. *Baer*, 942 N.E.2d at 103. Corcoran's attorneys make no valid case why this protection is insufficient to protect the rights of mentally ill murderers eligible for the death penalty or why this protection is insufficient to distinguish death-penalty-eligible offenders from juveniles or those with an intellectual disability.

From there, the Eighth Amendment provides further protection. While the insanity defense precludes an offender from being sentenced to death, and Indiana Code Section 35-50-2-9(c) permits a mentally ill offender to argue that his mental illness is a mitigating factor, the Eighth Amendment prohibits a State from *carrying out* a lawfully imposed death sentence if the offender has since "lost his sanity." *Panetti*, 551 U.S. at 958 (emphasis added); *see also Fulks v. Watson*, 4 F.4th 586, 594 (7th Cir. 2021) (*Ford*'s "prohibition on *carrying out* a death sentence is distinct from the holding in *Atkins*, which bars the *imposition* of a capital sentence in the first place.") (emphasis in original). The holdings in *Ford* and *Panetti* reflect the understanding that mental illness is not static throughout life and take into consideration an offender's mental health at the time the execution is to be carried out. An execution will not be held if an offender can make a "substantial threshold showing" that the current state of his mental illness "prevents him from 'rationally understanding' why the State seeks to impose" the death penalty. *Madison*, 586 U.S. at 267 (quoting *Panetti*, 551 U.S. at 959).

State of Indiana
Response in Opposition to Motions to Stay
and Successive Post-Conviction Review

Thus, there is no reason for this Court to wade into new waters and expand the scope of the Eighth Amendment because a "severely mentally ill" offender who cannot appreciate the wrongfulness of his conduct at the time of the offense due to mental disease or defect would not be sentenced to death pursuant to Indiana law. And one who may have been mentally ill—but not so "severely mentally ill" as to be considered insane—has the opportunity to argue at both the penalty phase of his trial and at sentencing that his mental illness is a mitigating circumstance that makes him less morally or criminally culpable. From there, a mentally ill offender is still shrouded in the protections already afforded by the Eighth Amendment if he has since "lost his sanity." *Panetti*, 551 U.S. at 958. The arguments in Corcoran's attorneys' proposed petitions and motions to stay have failed to prove that there is a reasonable possibility that Corcoran is entitled to relief because he has failed to prove that his alleged "severe mental illness" should categorically exclude him from execution or that the rationale for exempting juvenile or intellectually disabled offenders from the death penalty apply with equal force to mentally ill offenders.

### 3. Corcoran's attorneys have failed to show that a national consensus has emerged against executing "severely mentally ill" offenders.

Corcoran's attorneys have also failed to show that a national consensus has emerged against executing "severely mentally ill" offenders or even established a reasonable probability that they can prevail on this claim. *See* P-C.R. 1(12). The U.S. Supreme Court has looked to three kinds of objective indicia to determine whether there is a national consensus against a challenged sentencing practice.

34

**114a**

State of Indiana
Response in Opposition to Motions to Stay
and Successive Post-Conviction Review

First is the number of states that have overtly rejected the challenged practice,

either through legislative or judicial action. *See Atkins*, 536 U.S. at 312 ("We have

pinpointed that the clearest and most reliable objective evidence of contemporary

values is the legislation enacted by the country's legislatures.").

Twenty-seven states, the U.S. federal government, and the U.S. Military still

have the death penalty. *Capital Punishment*, Legal Information Institute, *available

at* law.cornell.edu/wex/capitalpunishment (last viewed Nov. 20, 2024). Of the 29

U.S. jurisdictions that implement the death penalty, only two, Ohio and Kentucky,

have enacted legislation prohibiting the execution of those who are "severely

mentally ill." *See* Ohio H.B. 136 (2019), Ky. H.B. 269 (2022). Six other death-penalty

states and the U.S. federal government have mere moratoriums in effect. *See* Death

Penalty Information Center, State by State, https://deathpenaltyinfo.org/state-and-

federal-info/state-by-state (last visited Nov. 25, 2024). So 20 states and the U.S.

Military have no ban prohibiting the execution of those with mental illness solely by

virtue of their mental illness, which falls short of showing a nationwide consensus

against judicial prohibition on the execution of those with, what Corcoran's

attorneys term, "severe mental illness" (Memo (SMI) at 3).[6]

The second objective criteria used by the Supreme Court is how frequently

the challenged sentencing practice is actually used. *See, e.g.*, *Atkins*, 536 U.S. at 316

_____

[6] Each of the jurisdictions that has prohibited the execution of an offender with a
"severe mental illness" has done so through a policy decision made by either the
executive branch through moratoriums on executions or by the legislative branch
through specific legislation.

State of Indiana
Response in Opposition to Motions to Stay
and Successive Post-Conviction Review

("[E]ven in those States that allow the execution of [intellectually disabled]
offenders, the practice is uncommon."); *Roper*, 543 U.S. at 564 ("[E]ven in the 20
States without a formal prohibition on executing juveniles, the practice is
infrequent."); *Graham v. Florida*, 560 U.S. 48, 62 (2010) ("Here, an examination of
actual sentencing practices in jurisdictions where the sentence in question is
permitted by statute discloses a consensus against its use."). Corcoran's attorneys
have presented no evidence or argument concerning how often jurisdictions that
implement the death penalty execute mentally ill defendants that meet his
proposed definition of "severe mental illness" (Memo (SMI) at 10–11).

 The final type of objective indicia is trends among the states, including the
direction and pace of change regarding the challenged sentencing practice. *See, e.g.*,
*Atkins*, 536 U.S. at 315 ("It is not so much the number of these States that is
significant, but the consistency of the direction of change."); *Roper*, 543 U.S. at 565–
66 (discussing both consistency and pace of change compared to *Atkins*); *Graham*,
560 U.S. at 108–09 (Thomas, J., dissenting) (arguing that lack of consistency and
direction of change counseled against the majority's decision). Corcoran's attorneys
have not established that the direction and pace of change regarding the imposition
of the death penalty for "severely mentally ill" offenders, of which it is uncertain
Corcoran is one, favors his position (Memo (SMI) at 10-11).

 Corcoran's attorneys note that laws that would prohibit the death penalty or
execution for "severely mentally ill" defendants have been proposed in Arizona,
Arkansas, Florida, Georgia, Idaho, Indiana, North Carolina, South Carolina, South

State of Indiana
Response in Opposition to Motions to Stay
and Successive Post-Conviction Review

Dakota, Tennessee, Texas, and Missouri (Memo (SMI) at 10-11). It is telling,

however, that those laws did not, or have not, passed. *See Roper*, 543 U.S. at 566–67

(finding it significant that the "direction of change" was consistent). It is also

significant that such a law was proposed in Indiana and failed to even make it out

of committee.  *See* Indiana General Assembly, *Senate Bill 155*,

https://iga.in.gov/legislative/2017/bills/senate/155/details (last visited Nov. 26,

2024).

Finally, Corcoran's attorneys ask this Court to "exercise its own judgment to

exempt Corcoran from execution due to his severe mental illness" (S. Pet'n (SMI) at

18). But U.S. Supreme Court jurisprudence requires a review of objective indicia

indicating that a new national consensus has emerged and counsels against a

finding of unconstitutionality unless based on solid data illuminating the nation's

values and standards on the sentencing framework at issue. *Gregg v. Georgia*, 428

U.S. 153, 173 (1976). This underpinning ensures principled constitutional analysis

that is not premised on the subjective sensibilities of individual judges. *Id.* Thus,

Corcoran's attorneys' invitation for this Court to make its own judgment

irrespective of a national consensus is inappropriate. This Court should not create a

new categorical exclusion under the Eighth Amendment for those diagnosed by

their attorneys as "severely mentally ill."

State of Indiana
Response in Opposition to Motions to Stay
and Successive Post-Conviction Review

## C. Corcoran is not entitled to relief under the Indiana Constitution.

Corcoran is not entitled to relief under the Indiana Constitution either.

Article 1, Section 16 of the Indiana Constitution provides that "cruel and unusual

punishments shall not be inflicted." Ind. Const. art. 1, § 16. Corcoran's sentence

only violates Article 1, Section 16 if it "makes no measurable contribution to

acceptable goals of punishment, but rather constitutes only purposeless and

needless imposition of pain and suffering." *Ratliff v. Cohn*, 693 N.E.2d 530, 542

(Ind. 1998). This Court has been called upon several times to consider the

constitutionality of the death penalty for those who are mentally ill under Indiana's

Constitution. Yet, this Court has never held that our constitution prohibits the

execution of a person based on a mere allegation of "severe mental illness," as

Corcoran proposes (Memo (SMI) at 4). *See, e.g., Baer*, 942 N.E.2d at 103;

*Timberlake*, 858 N.E.2d at 628–30; *Baird v. State*, 831 N.E.2d 109, 115–16 (Ind.

2005); *Matheney*, 833 N.E.2d at 456–58; *Corcoran,* 774 N.E.2d at 501–02; *Harris v.

State*, 499 N.E.2d 723, 727 (Ind. 1986).

Corcoran's attorneys' argument again ignores that Indiana law already

provides mentally ill offenders several opportunities to refute their culpability

because of their mental illness. For example, those who are unable to appreciate the

wrongfulness of their conduct at the time of the offense can lodge an insanity

defense. I.C. § 35-41-3-6(a). Offenders against whom the State seeks the death

penalty can argue in mitigation that they were "under the influence of extreme

mental or emotional disturbance when the murder was committed" or that their

State of Indiana
Response in Opposition to Motions to Stay
and Successive Post-Conviction Review

"capacity to appreciate the criminality of [their] conduct or to conform that conduct to the requirements of law was substantially impaired as a result of mental disease or defect." I.C. § 35-50-2-9 (c)(2), -(c)(6). The jury is then given the opportunity to determine if the offender suffers from a mental illness and whether that mental illness relieves the offender of some degree of culpability sufficient to impose a sentence less than death. This approach is consistent with this Court's previous refusal to establish a brightline rule for mentally ill offenders. *Baer*, 942 N.E.2d at 103.

Corcoran took advantage of the opportunity to present evidence of his mental illness as a mitigating factor. Corcoran presented testimony in the penalty phase of his trial from Dr. Engum who explained that he had diagnosed Corcoran with schizotypal personality disorder (R. Vol. XI 133–34). Dr. Engum explained that schizotypal personality disorder is hereditary and that it is "right on the borderline of severe mental disease. But we're not there yet …" (R. Vol. XI 134). He testified that Corcoran had a "reduced" perception of himself and that he considered himself to be "inferior or different from others" which made it difficult for him to relate to other people (R. Vol. XI 135). Dr. Engum explained that Corcoran "wasn't just withdrawn and slightly shy" but that "he really did have major social interaction problems. He really did have suspiciousness and paranoia" (R. Vol. XI 137). Corcoran's suspicion and paranoia were fueled by "ideas of reference" which Dr.

State of Indiana
Response in Opposition to Motions to Stay
and Successive Post-Conviction Review

Engum explained as the belief that "people are thinking about you, typically in a negative fashion" (R. Vol. XI 145–47).[7]

Dr. Engum opined that the "suspiciousness and paranoid ideations" that accompany a diagnosis of schizotypal personality disorder defined the way Corcoran "perceived virtually everyone in the world" (R. Vol. XI 147–48). And Corcoran's above-average IQ exacerbated that paranoia and suspiciousness because he was "bright enough" to take innocuous stimuli and assign them "significant meaning" (R. Vol. XI 152, 175).

Corcoran also presented evidence on how his schizotypal personality disorder contributed to his decision to commit quadruple homicide. Dr. Engum explained:

> I look at a young man who basically had had a marginal existence, up to that point, was a loner. He lived with his brother and sister. It is my understanding he lived in a room where he basically cut himself off from everybody else in his family …. You have an individual who was, to some degree, dependent upon the shelter in the home that his brother and sister provided him. And my understanding is that that tranquility, that consistency was being threatened …. So you have somebody who is agitate[d], feeling threatened and it heightens his sense of paranoia that we've talked about. And on the day in question, again, based upon the records, his confession and my discussion with him, he comes home … and hears his brother and three friends talking. And in his mind, we talked about ideas of reference, he thinks they're talking about him. Never really specifically heard the content of the conversations, but immediately concluded that they were talking about him and proceeded to get his rifle, load his rifle.

---

[7] The Diagnostic and Statistical Manual provides that "ideas of reference" are "incorrect interpretations of casual incidents and external events as having a particular and unusual meaning specifically for the person." American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 656 (5th ed. 2013).

State of Indiana
Response in Opposition to Motions to Stay
and Successive Post-Conviction Review

(R. Vol. XI 153–54).

Corcoran built upon Dr. Engum's testimony in his closing argument and argued that his mental illness contributed to his decision to commit quadruple homicide (R. Vol. XII 85). His counsel reiterated for the jury that people with schizotypal personality disorder suffer from paranoid thoughts and that Corcoran's paranoia that people were talking about him and that he would be abandoned by his family led to his decision to kill (R. Vol. XII 89–90). Despite this evidence and argument, the jury determined that Corcoran's mental illness did not absolve him of his responsibility and that it was not significant enough to persuade them not to impose the death penalty. And this Court affirmed that decision upon review. *Corcoran*, 774 N.E.2d at 501–02.

## D. Corcoran is not entitled to relief under the Equal Protection Clause.

Corcoran has no equal protection claim. The U.S. Supreme Court has held that "where a particular amendment [to the Constitution] 'provides an explicit textual source of constitutional protection' against a particular sort of government behavior, 'that Amendment, not the more generalized notion of substantive due process, must be the guide for analyzing these claims.'" *Albright v. Oliver*, 510 U.S. 266, 273 (1994) (quoting *Graham v. Connor*, 490 U.S. 386, 395 (1989)). The same is true for an equal protection claim. *Holman v. Page*, 95 F.3d 481, 485-86 (7th Cir. 1996), *overruled on other grounds in Owens v. United States*, 387 F.3d 607 (7th Cir. 2004)). A defendant fails to state a claim upon which relief may be granted where, as Corcoran's attorneys have claimed here, the defendant argues that it violates the

41

**121a**

State of Indiana
Response in Opposition to Motions to Stay
and Successive Post-Conviction Review

Equal Protection Clause not to extend an Eighth Amendment protection to the facts

of his case. *Id.* All that the Equal Protection Clause requires is some rational

connection between the sentence imposed and the offense committed. *Chapman v.*

*United States*, 500 U.S. 453, 465 (1991). It cannot be disputed that Corcoran's death

sentence has a rational connection to the quadruple homicide he committed. There

is no reasonable possibility that Corcoran is entitled to relief under an equal-

protection theory. This Court should deny his request.

## CONCLUSION

This Court should deny all of Corcoran's pending motions for permission to

file a successive petition for post-conviction relief and for a stay of his execution

date.

<div style="margin-left: 40%;">

Respectfully submitted,

THEODORE E. ROKITA
Indiana Attorney General
Attorney No. 18857-49

/s/ Tyler Banks
Tyler Banks
Supervising Deputy Attorney General
Attorney No. 30514-36

</div>

State of Indiana
Response in Opposition to Motions to Stay
and Successive Post-Conviction Review

## WORD COUNT CERTIFICATE

      I verify that this brief contains no more than 14,000 words.  The word count was conducted by selecting all portions of the brief not excluded by Indiana Appellate Rule 44(C) and selecting Review/Word Count in Microsoft Word, the word-processing program used to prepare this brief.


                    /s/ Tyler Banks
                    Tyler Banks
                    Supervising Deputy Attorney General


## CERTIFICATE OF SERVICE

      The undersigned hereby certifies that on November 26, 2024, I electronically filed the foregoing document using the Indiana E-Filing System ("IEFS"). I also certify that this document was served November 26, 2024, upon opposing counsel via IEFS:

      Amy Karozos
      akarozos@pdo.in.gov

      Joanna Green
      jgreen@pdo.in.gov

      Laura Volk
      lvolk@pdo.in.gov

                    /s/ Tyler Banks
                    Tyler Banks
                    Supervising Deputy Attorney General


OFFICE OF INDIANA ATTORNEY GENERAL TODD ROKITA
Indiana Government Center South, 5th Floor
302 West Washington Street
Indianapolis, IN 46204-2770
Telephone: (317) 234-7016
Email: Tyler.Banks@atg.in.gov

3:05CV389 AS

Joseph E Corcoran
992454      X104
P.O. Box 41
Michigan City, IN 46361

FILED
2006 APR -4 PM 1:26
STEPHEN R. LUDWIG CLERK
U.S. DISTRICT COURT
FOR THE NORTHERN DISTRICT
OF INDIANA

3/31/06

Most Honorable Allen Sharp:

I am the same Joseph Edward Corcoran whom you ordered to appear before you on March 31, 2006. For some reason unknown to me federal marshals never picked me up to transport me to the hearing. I had planned to read a letter to the Court stating why I want to waive my appeals. I will submit my statement to the Court with this letter. Perhaps by reading it you will understand my position and see no need for another hearing. The grammar is not perfect, but you should get the idea. Perhaps you will want to send copies of it to the Attorney General and my attorney. I am hereby filing this letter to the Court, cause no. 3:05-cv-389-AS-CAN. Thank you.

Sincerely,

Joseph E Corcoran

The reason why I want to waive my appeals is because I am guilty of murder and, if truth be told, because I don't want to ~~live~~ spend the rest of my life in prison. Dr. Haskins at a competency hearing said that he believes that I don't have the capacity to make a rational choice. He said, and I quote:

The reason is that in order to make a rational decision, one has to adequately hold in mind the available options one is considering. You have to consider the options. You have to make reasoned judgments, weighing the pros and cons of both options or whatever the options happen to be.

Well, let's weigh the options. On the one side of the balance I could win on appeal and then have to spend the rest of my life in prison. That's a con. On the other side is a great weight; I could waive my appeals and die and escape prison. That's a pro because I don't want to live in prison for the rest of my life — and no reasonable rational person would. And on the pro side is another great weight; the fact that I am guilty of murder. I intentionally killed four people knowing that such an act was wrong and that I would probably go to jail yet I did it anyway. I believe that such a person should be executed and I'm sure most people would agree. And if I were innocent I would have every reason in the world to appeal but the fact is I am not innocent. Therefore, I think the right ~~decision~~ thing to do is meekly and humbly accept my punishment.

There is also another reason why I want to waive my appeals, a reason that no lawyer or psychiatrist understands. I have come to believe the God of the Bible. I believe that I am a sinner. I believe that Jesus died for my sins and that by his shed blood I have forgiveness of sins and have been made right with God. Therefore I want to see God fulfill the promises he made in Scripture. I want to die and go home to be with the Lord. As the apostle Paul said in his letter to the Philippians, "For to me to live is Christ and to die is gain." And in the Book of Revelation it says, "Blessed are those who die in the Lord from now on. Yes, says the Spirit, they are blessed indeed, for they will rest from all their toils and trials; for their good deeds follow them." Am I delusional for believing the promises of God and putting my faith in him? In fact it

It is my faith that impels me to waive my appeals. I have done wrong and I believe that the right thing to do is accept my punishment, which in this case is death, and I want to die and go home to be with the Lord. This fact no psychiatrist or lawyer understands, yet is key to my decision making and is a great weight on the pro side. Thus in weighing the pros and cons waiving my appeals seems to be of a greater weight and is the more attractive option and thus wins out.

The fact is I never wanted to appeal. The truth be known the only reason why I signed the Petition for Post Conviction Relief is that I thought that the Indiana Supreme Court would find me incompetent. So it was just an attempt to avoid the judgment of the Court. When they found me competent I withdrew it. And the only reason why I signed papers to appeal to federal court is not because I wanted to but because my wife put heavy pressure on me at the urging of the Indiana public defenders. I guess I did not want her to lose her husband. But I realized I should have not given in to her emotional appeals. I asked the lawyers to disregard the papers I signed but they would not and filed a Habeas Corpus Petition against my wishes. I asked them to withdraw it but they refused. It seemed that my only option was to file a pro se petition and that is what I did. So I ask you to grant my petition to withdraw the Habeas Corpus appeal since I do not nor ever wished to appeal.

Also, I think it is important to note that my lawyer would have you believe, based on the records, that I want to waive my appeals to escape a sleep disorder that I don't have and to escape an involuntary speech disorder that I don't have and to escape delusions that the prison is tormenting me with ultrasound.

About my sleep disorder, the fact is that everybody who sleeps around me tells me that I talk in my sleep. I even sent letters from people saying that I do to my lawyers. In fact these people said that I scream in my sleep. Also it is in the officers log that I was yelling at a time when I knew that I was sleeping. I guess I am delusional for believing all this evidence of a sleep

disorder. But the fact is I am not waiving my appeals to escape it. I do believe that I will have this disorder until the day I die but that is not why I am waiving my appeals and if my lawyer says it is then he is twisting my words to mean something they don't in order for him to make a point in his favor.

And I admit that in about August of the year 2000, or maybe earlier, I made up a story that the prison is tormenting me with ultrasound. According to my story they use ultrasound to cause muscle spasms, abnormal feelings, and to make sound effects appear out of no where. Also according to this story I have an involuntary speech disorder where I involuntarily say things in such a way that I don't hear but in a way the prison can monitor it and as they do they make me spasm and experience abnormal feelings and make sound effects at me. This story was told in letters to my sister over a period of years. I would say things like, "They're making me spasm and playing taunting music at me" or "They projected such and such sound effect at me" or "They're hurting me." Then I would say something like, "I can't wait to die and escape this." Lawyers subpoenaed the letters and gave them to psychiatrists. It is no wonder they said that I was delusional and hallucinating but what they did not realize was that it is all a made up story. I tried to hint to them that these things don't really happen but I got accused of down playing my symptoms — symptoms I do not have but made up such as hearing sound effects or taunting music. They saw this as evidence of hallucinations but I made up the whole thing. I never realized before this that psychiatrists could be so gullible. It seems that anybody who would wish to be found incompetent and get a lesser sentence could make up such a story and dupe psychiatrists.

I may in fact have a mental illness. I am depressed. And it is no wonder psychiatrists think I'm mentally ill based on the stories I made up. But I do not believe that I am being tormented with ultrasound and that I involuntarily say things. As I said, it is a fictional story. I do believe that I talk in my sleep based on the fact that people tell me I do but

I am not waiving my appeals to try to escape it. I am certainly not basing my decision to waive my appeals on a made up story about ultrasound. The real reason why I want to waive my appeals is because I am guilty of murder and think that I should be punished. Therefore I ask this Court to grant my petition to waive my appeals. I have been found competent to waive my appeals by both the Post Conviction Court and the Indiana Supreme Court. I am obviously voluntarily and knowingly waiving my appeals since no one or no delusions of torture or persecution is compelling me to do this. And I believe it to be an intelligent choice when one is guilty to humbly and meekly accept one's punishment rather than fight against it like my lawyers want to do.

And I wish to say that if this Court will not accept the state court's finding of competence as binding then I ask this Court to hire new psychiatrists so that I can explain to them that I made up the story about being tormented with ultrasound and then hold a new competency hearing. However I ask this Court to accept the state court's finding of competence as the deputy attorney general has suggested in his response to my petition and please allow me to waive my appeals. Thank you.

Signed,

Joseph E Corcoran
992454    X 104
P.O. Box 41
Michigan City, IN 46361

128a

3:05 cv 389 AS

# AFFIDAVIT OF JOSEPH CORCORAN

FILED

2005 DEC 28 AM 11:50

1.) I am the same Joseph Edward Corcoran who has filed a pro se Petition to Halt All Future Appeals with the United States District Court in South Bend, Indiana.

2.) In July of 1997 I murdered four men. I knew before I did it that such an act was wrong and I knew that if I committed such an act I would go to jail, yet I did it anyway. I knowingly and intentionally took four lives for a motive that I have revealed to no one.

3.) I believe that since I am guilty of murder I should be executed. If I were innocent I would have every reason to appeal but the fact is I am guilty. I think that the death penalty is a just punishment for someone who is guilty of four counts of murder therefore I think I should be executed. That is really all there is to it. In essence I am taking the state's side against myself because I have done wrong, which I believe is the right thing to do.

4.) In the past lawyer's and psychiatrists have claimed that I wanted to waive my appeals and get executed because: (a) I wanted to escape a sleep disorder that I don't have; (b) to escape delusions I have that the prison is tormenting me with ultrasound; (c) to escape an involuntary speech disorder I don't have. They have also claimed that my delusions prevent me from making a rational choice. And no doubt my lawyer will make such claims. But the fact is I made such stories up. All their information comes from letters I wrote my sister where I made up stories. Also I lied to psychiatrists to get medication to help me sleep. If I try to explain this to psychiatrists I get accused of downplaying my symptoms. But the truth is no mental illness or delusions or hallucinations are influencing my decision to waive my appeals. The fact is I am guilty of murder and I think that I should therefore be executed.

5.) I know and understand that if I waive my appeals I will die by lethal injection. No one is forcing me to waive my appeals nor is any delusion influencing my decision. I know and understand that I am guilty of murder and think that I should therefore be executed.

I, Joseph Edward Corcoran, swear or affirm under the penalty of perjury that the foregoing statements are true.

Signed this 23rd day of December, 2005    X [signature]

129a

Joseph Edward Corcoran
992454    X404
P.O. Box 41
Michigan City, IN 46361

12/23/05

Judge Allen Sharp
204 S. Main St. Room 102
South Bend, IN 46601

Most Honorable Judge Allen Sharp,

I am the same Joseph Edward Corcoran who has filed a pro se Petition to Halt All Future appeals with this Court (Cause no 3:05-CV-389 AS). You have ordered my Counsel and the Attorney General to file a response to my Petition by January 30, 2006. I am hereby submitting an affidavit to this Court stating why I want to waive my appeals since neither my Counsel nor the Attorney General knows my thought process or my reasons and therefore cannot know whether I am knowingly, voluntarily, and intelligently attempting to waive my appeals. Thus, I ask this Court to please take my sworn statement into consideration.

Sincerely,

Joseph E. Corcoran #992454

130a

# ATTACHMENT E

Reply in Support of Motions to Stay and
Motions for Permission to File Successive
Petitions for Post-Conviction Relief –
Joseph Corcoran

**IN THE**
**INDIANA SUPREME COURT**

**CASE No. 24S-SD-222**

| | |
|---|---|
| JOSEPH E. CORCORAN, | ) |
| | ) |
| *Petitioner*, | ) |
| | ) |
| v. | ) |
| | )    **THIS IS A CAPITAL CASE** |
| STATE OF INDIANA, | )    Execution Date: December 18, 2024 |
| | ) |
| *Respondent*. | ) |

**REPLY IN SUPPORT OF MOTIONS TO STAY AND MOTIONS FOR PERMISSION TO FILE SUCCESSIVE PETITIONS FOR POST-CONVICTION RELIEF**

The beginning and ending point for many of the State's arguments in opposition is this simple proposition from the United States Supreme Court: "A prisoner's awareness of the State's rationale for an execution is not the same as a rational understanding of it." *Panetti v. Quarterman*, 551 U.S. 930, 959 (2007). While the State discusses evidence that suggests an awareness of **rationale**, there simply exists here **no rational understanding**. Corcoran's irrationality is the hallmark of the case: his decisions rejecting a life plea offer, refusing to pursue post-conviction relief, and seeking his own execution are not motivated by clear thinking, but are instead the product of his desire to relieve the pain he feels from delusions (and his desire to prove his delusions—which to him are very real—are not actually delusions).

Long before the crime, Corcoran's mental illness twisted his perception of reality. The day of the crime—even though he sat in a soundproof room (which he himself sound proofed due to his paranoia)—he "heard" people talking about him. Sparked by this auditory hallucination, a

1

Reply in Support of Motions to Stay and
Motions for Permission to File Successive
Petitions for Post-Conviction Relief –
Joseph Corcoran

tragedy unfolded. There exists a nexus between this tragic incident and his debilitating mental illness—if Corcoran was not mentally ill, the crimes never would have happened.

Corcoran's mental illness also affected the trial proceedings. Where the State sought to avoid the death penalty by extending plea offers for life sentences, Corcoran conditioned acceptance on an irrational precondition: only if the State would sever his vocal cords first because his involuntary speech allowed others to know his innermost thoughts. Corcoran was so distressed by this involuntary broadcast of his private thoughts, which he attributed to a sleep disorder—yet another delusion—that he entreated counsel to get him treatment for his sleep disorder. When counsel failed to act on his request, because the sleep disorder did not exist, Corcoran complained to the trial court: "Um, I feel that they've failed to get me treatment for my sleeping disorder." T. 2587-88.

Even with Corcoran's obvious irrationality, the trial court improperly belittled and castigated Corcoran at sentencing by leveling the accusation that: "It's shameful that you would come into this court, Mr. Corcoran, and try to characterize your illness as a mental illness to the disrespect of all people in this country that are in fact mentally ill." T. 2909. In reality then (and now), Corcoran didn't believe he was mentally ill and made every effort to mask his symptoms.

At the time of trial, two mental health experts questioned Corcoran's competency to proceed. They noted Corcoran was not competent to stand trial because his mental illness rendered him incapable of assisting counsel in his own defense. Dr. Philip Coons explained that Corcoran's "refusal to accept either a plea bargain or a bench trial without the death penalty was a product of his mental illness." Dr. Larry Davis agreed. Trial counsel have recently signed affidavits asserting that had they fully understood the extent of Corcoran's mental illness, and had they realized how

2

Reply in Support of Motions to Stay and
Motions for Permission to File Successive
Petitions for Post-Conviction Relief –
Joseph Corcoran

his mental illness prevented them from "consulting with Corcoran in a rational or logical manner," they would have requested a competency hearing. Attachment C (Affidavit of Mark Thoma);[1] Attachment D (Affidavit of John Nimmo). But they did not have this understanding, and the trial proceeded, even though Corcoran was so mentally ill that he could not assist in his own defense to save his life.

In post-conviction, Corcoran continued to act irrationally. Again, three mental health professionals unanimously agreed he was not competent to waive post-conviction. While Corcoran understood the implications of waiver—that he would be executed—he did not possess a rational understanding of the choice. Rather, Corcoran's decision-making regarding whether to pursue state post-conviction review was irrational because it was motivated by a delusion that the prison tortured him with an ultrasound machine. PC T. 14, 53, 66-67. The State did not present any contrary expert testimony and conceded the serious mental illness. PC T. 242 (trial court finding: "The State concedes that Petitioner is mentally ill.")

While this Court accepted the trial court's rejection of the unanimous opinion of the experts, this Court noted:

> The State also concedes that Corcoran suffers from a mental illness. At the competency hearing, the State Public Defender presented the testimony of three mental health experts, each of whom concluded that Corcoran suffers from paranoid schizophrenia. One of the symptoms of Corcoran's condition, according to the three experts, are recurrent delusions that Department of Correction prison guards are torturing him through the use of an ultrasound machine, causing him substantial pain and uncontrollable twitching.

*Corcoran v. State*, 820 N.E.2d 655, 660 (Ind. 2005); *id.* at 665 (Rucker, J., dissenting) ("Corcoran is under the paranoid delusion that prison guards are torturing him with sound waves. As a result,

---

[1] Mr. Corcoran previously filed Attachments A and B.

Reply in Support of Motions to Stay and
Motions for Permission to File Successive
Petitions for Post-Conviction Relief –
Joseph Corcoran

**Corcoran wants the State to execute him in order to end the pain**. I am not willing to accommodate him.") (emphasis added).

After signing documents to initiate federal habeas proceedings, Corcoran flip-flopped from wanting to pursue relief to claiming he no longer wanted to pursue habeas review. This decision was tied to his mental illness and his desire to end the agony caused by his delusions. His decisions are not rational—rather they are a response to the treatment-resistant paranoid schizophrenia that continues to torment him. As the trial and post-conviction experts universally agreed, he does everything he can to minimize his symptoms. *See, e.g.,* T. 2318 ("He's trying to hide it. He's very secretive, again consistent with paranoia and suspiciousness."); PC T. 71 ("[T]he very strong feeling [Corcoran] was attempting to minimize the severity of his underlying psychosis.").

Indeed, Corcoran recently noted that mental health professionals participate in victimizing him by labeling he considers electronic torture, mental illness:

> And when you research and find inaccurate information that confirms the victimizers' deception, and you then put stock in it, it frankly makes you look like a mental case. Their goal is accomplished. They have a completely plausible cover for their wrongdoing. … The ignorance on the part of mental health professionals about this technology is taken advantage of by victimizers. If a credentialled medical person says a man is mentally ill, but he says that he is the victim of electronic harassment, who would people be more likely to believe? So because of this the victimizer's cover is now seemingly backed up by medical science….Because of this they will likely be oblivious to the fact that mental illness can be mimicked electronically.

Attachment B at 19-20. He knows what to confabulate to conceal his mental illness from mental health professionals who, he believes, want the victimization to continue.

Corcoran's paranoid schizophrenia removes him from reality. He cannot distinguish between reality and his delusions and hallucinations—they are his reality. And because his reality is informed by his delusions and hallucinations, he is incapable of rational thought. Throughout

4

**135a**

Reply in Support of Motions to Stay and
Motions for Permission to File Successive
Petitions for Post-Conviction Relief –
Joseph Corcoran

his legal proceedings, he could never assist counsel with his defense and could not make rational

decisions about his case. Corcoran lacks the ability to rationally understand the world and reality

around him. Corcoran now lacks any rational understanding of his impending execution—he

simply wants to expedite the ending of the torture that is not real.

I.     **Corcoran's delusions and hallucinations establish, at minimum, a prima facie case of incompetence to be executed, entitling him to further adjudicative review.**

    A. **The totality of the evidence in the post-conviction petition satisfies the threshold showing under this Court's precedent and standard.**

The State argues that Corcoran has failed to meet the "substantial threshold showing" that

entitles him to an evidentiary hearing because he did not "submit 'evidence and argument from the

prisoner's counsel, including expert psychiatric evidence that may differ from the State's own

psychiatric examination.'" *Panetti*, 551 U.S. at 949-50. The State has no expert saying Corcoran

is competent and conceded the extent of the mental illness. All evaluating mental health

professionals have questioned his competence. Thus, Corcoran satisfies *Panetti.*

Under this Court's own standard, which does not require a recent expert opinion to clear

the threshold showing, Corcoran has presented evidence sufficient to meet that showing. *See*

*Timberlake v. State*, 858 N.E.2d 625, 627 (Ind. 2006). Other kinds of evidence, like attorney

observations and older psychological assessments, can suffice. *Id.*; *see also Baird v. State*, 833

N.E.2d 28, 30-32 (Ind. 2005). This is precisely the evidence Corcoran has presented to this Court,

in addition to contemporaneous evidence like Corcoran's book.

The most recent mental health professionals have all questioned Corcoran's competence

under trial and post-conviction standards. They have concluded:

Reply in Support of Motions to Stay and
Motions for Permission to File Successive
Petitions for Post-Conviction Relief –
Joseph Corcoran

| Expert | Field of Expertise | Diagnosis | Opinion |
|--------|-------------------|-----------|---------|
| Dr. Philip Coons | Psychiatrist | Schizophrenia | Incompetent at time of trial. |
| Dr. Larry Davis | Psychiatrist | Schizophrenia | Incompetent at time of trial. |
| Dr. Edmund Haskins | Neuropsychologist | Schizophrenia | Incompetent to waive post-conviction. |
| Dr. Robert Kaplan | Clinical Psychologist | Schizophrenia | Incompetent to waive post-conviction. |
| Dr. George Parker | Forensic Psychiatrist | Schizophrenia | Incompetent to waive post-conviction. |

The State itself once also agreed that Corcoran suffered from mental illness—this admission should carry forward to these current proceedings. *See Weinberger v. Boyer*, 956 N.E.2d 1095, 1105 (Ind. Ct. App. 2011) ("[A]n admission in a current pleading or made during the course of trial . . . is conclusive upon the party making it and relieves the opposing party of the duty to present evidence on that issue."). Further, contemporaneous evidence of Corcoran's delusions, like Corcoran's book and the prison note, give added weight to Dr. Kaplan's conclusion that Corcoran's mental illness is so severe, psychotropic medication has little effect.  PC T. 33-34. The prison note and Corcoran's book demonstrate that his delusions have not abated even with prison-administered psychotropic medication.

The State also argues that because this Court has reviewed this evidence previously and denied relief, it should do so now. But the Court denied relief using a different competency standard, not the *Ford/Panetti* standard applicable to these proceedings. Because the *Ford*/*Panetti* claim became ripe only when this Court set Corcoran's execution date, this Court has not considered this evidence under the *Ford*/*Panetti* standard. Because a different legal standard is at issue now, Corcoran's position that previous expert opinions are relevant to the *Ford/Panetti*

Reply in Support of Motions to Stay and
Motions for Permission to File Successive
Petitions for Post-Conviction Relief –
Joseph Corcoran

determination is not inconsistent with his position that previous competency findings do not bar his *Ford/Panetti* claim.

Setting aside that a different competency standard was employed, it would be improper to rely on a stale 20-year-old competency decision to bar consideration of his *Ford* claim. Competency is not static, it is variable. Simply, it would be improper to rely on a two-decade-old competency conclusion from a trial court.

The State never addresses the significance of Corcoran's recently published book, *Electronic Harassment: A Whistle-blower Report*. The book alone demonstrates the throes of the mental illness and how resistant to treatment it remains. And the State's argument that Corcoran's delusions do not make him dangerous misses the point because dangerousness is not the issue under *Ford/Panetti*. Likewise, whether Corcoran's speech is linear, and he is properly oriented does not answer whether he rationally understands the reason for his execution.  As the State correctly notes, Corcoran recently told prison staff he is suffering the effects of the ultrasound machine which *is* contemporaneous evidence relevant to the *Ford/Panetti* standard because it demonstrates Corcoran's disconnection from reality.

The State argues there is no connection between. Corcoran's desire to be executed to escape the pain caused by the ultrasound machine and his understanding of why the death sentence is to be imposed. This too misses the point. Corcoran equates his execution as the avenue to relieve his pain and suffering (which, although he believes it is real, is caused by his delusions) and not as punishment at all. His fixed belief in the ultrasound machine and the torment it causes so pervades his perception that he cannot rationally understand the true reason for his execution. Corcoran

Reply in Support of Motions to Stay and
Motions for Permission to File Successive
Petitions for Post-Conviction Relief –
Joseph Corcoran

cannot determine whether he is experiencing things because he cannot distinguish reality from his

fixed delusions.

Corcoran's reality is this: for years, prison guards have painfully tortured him with an

ultrasound machine all while he fights a humiliating sleep and speech disorder causing him to blurt

out his innermost thoughts and permit others to read his thoughts. With his execution date, the

State will finally stop tormenting him and allow him to escape. State's Response Ex. 1 p. 2 ("I

could waive my appeals and die and **escape prison**.") (emphasis added). Escape prison to where,

a rational person would ask. But Corcoran does not possess that rationality. Corcoran's ability to

parrot what he has been told about why he is being executed does not mean he internalizes or

rationally understands why he is being executed. *See Panetti*, 551 U.S. at 2862. An understanding

that he faces execution differs from an understanding about *why* he is being executed. *See id.*

Corcoran is aware the State seeks to execute him because of his murder convictions. But he sees

execution not as a punishment, but rather his chance to escape prison torture and the painful

delusions that haunt him.

The State completely relies on *Timberlake* to refute Corcoran's arguments. Competency is

not a one-size fits all determination. This Court came to that conclusion only after it ordered

contemporaneous testing—which this Court should enter a stay and do again herein. The last five

evaluating mental health experts have documented Corcoran's incompetence and  irrationality of

his decisions. They provide a nexus for the mental illness's pervasive effect on Corcoran's rational

understanding—which did not exist in *Timberlake*.

8

**139a**

Reply in Support of Motions to Stay and
Motions for Permission to File Successive
Petitions for Post-Conviction Relief –
Joseph Corcoran

Because Corcoran has no grasp on reality and instead lives in a "reality" that exists only in his mind, he lacks a rational understanding of why he is to be executed. This satisfies the substantial threshold showing of incompetence and overcomes the presumption of competence.

### B. Corcoran has tried to conceal his schizophrenia, but significant evidence establishes his delusions are real to him.

The State cites two of Corcoran's statements, in which he wrote to the district court that he made up a story about his delusions as evidence that Corcoran fabricated these delusions and does not actually suffer from them. Corcoran's statements, however, reflect only the dissonance of someone attempting to mask their mental illness.

Evidence that spans the course of two decades and establishes Corcoran's delusions about the ultrasound machine and sleep and speech disorders were and are very real to him. His denials are feeble considering the evidence, and simply prove his desire to mask his illness. That these proclamations of fabrication came from the person whose paranoid schizophrenia removes him from reality and causes erratic thoughts and behavior alone renders the statements suspect. *See, e.g., Pate v. Robinson*, 383 U.S. 375, 384 (1966) ("[I]t is contradictory to argue that a defendant may be incompetent, and yet knowingly or intelligently 'waive' his right to have the court determine his capacity to stand trial."); *St. Pierre v. Cowan*, 217 F.3d 939, 948-49 (7th Cir. 2000) ("Given the circumstances of this case and the history of St. Pierre's behavior, the acceptance of St. Pierre's May 2 letter as the 'final' word does not meet the standards for waiver that the Supreme Court established in *Gilmore* and in *Baal*. ... We are not unsympathetic to the predicament in which both the Circuit Court of Cook County and the Illinois Supreme Court found themselves, in the face of St. Pierre's ceaseless changes of heart. This does not, however, relieve any court of the duty to ensure that a definitive waiver has occurred before it deprives the petitioner of remedies that are

9

Reply in Support of Motions to Stay and
Motions for Permission to File Successive
Petitions for Post-Conviction Relief –
Joseph Corcoran

available under state law."); *Taylor v. United States*, 282 F.2d 16, 23 (8th Cir. 1960) ("[I]f one is mentally incompetent, then, by definition, he cannot be expected to raise that contention before the trial court and thus cannot be prejudiced by his failure to do so.").

Corcoran expressed his desire to be executed so the prison guards will stop torturing him with the ultrasound machine and others will stop ostracizing him for his utterances caused by the sleep disorder; it is thus unsurprising, because the federal district court was considering his mental illness as an impediment to the desired execution, that he would try to convince the court that he was actually fine. Furthermore, mental health experts unanimously testified that Corcoran was not malingering or feigning his symptoms—he suffers from these delusions. PC T. 28, 56, 68, 71. The State not only did not contest the mental illness, but conceded it thus, they have waived any argument to the contrary.

Corcoran's attempts to hide the manifestations of his mental illness by declaring they "don't exist" are unsurprising also given the testimony regarding the nature of paranoid schizophrenia generally and Corcoran's paranoid schizophrenia specifically. Dr. Coons testified at Corcoran's trial that a "person with paranoid schizophrenia generally minimizes their symptoms and doesn't bring attention to them . . . unless you know what doors to open, what questions to ask, you may well miss it because they keep it to themselves," T. 2706. Dr. Coons further explained that Corcoran's behavior was consistent with those with paranoid schizophrenia, in that he tried to minimize his symptoms. Dr. Coons noted, "Had I not known about some kind of sleep problem, I don't think I would have uncovered this delusional system." *Id.* Dr. Eric Engum, another trial expert, agreed and explained Corcoran was "trying to mask it. He's trying to hide it. He's very

10

**141a**

Reply in Support of Motions to Stay and
Motions for Permission to File Successive
Petitions for Post-Conviction Relief –
Joseph Corcoran

secretive, again consistent with paranoia and suspiciousness." *Id.* at 2318. Corcoran's attempts to

hide his delusions are well-documented.

He continues to experience these same delusions to this day. Reports from the Department

of Correction note that Corcoran just a few months ago was talking about "an ultrasonic machine."

Attachment A. Moreover, Corcoran's recently published book, details his experience with the

ultrasound machine and his thoughts on the torture inflicted upon him. This book is clear evidence

that despite his earlier writings to the district court that he lied about the machine, he does believe

the ultrasound machine exists and is being used to torment him.

In addition to his explanation of how the machine works, he declares that mental health

professionals are "ignorant" of such a machine and how it is used to victimize people like him. He

warns, "If a credentialled medical person says a man is mentally ill, but he says that he is the victim

of electronic harassment, who would people be more likely to believe? So because of this the

victimizer's cover is now seemingly backed up by medical science . . . . Because of this they will

likely be oblivious to the fact that mental illness can be mimicked electronically." Attachment B

at 20. In other words, Corcoran's experience with mental health professionals is that they are not

to be trusted to help him or protect him against the machine's torment. Rather, according to

Corcoran, they help the victimizer perpetrate the torture. Thus, the book is further,

contemporaneous evidence that not only are the delusions of the ultrasound machine and disorders

very real to Corcoran, but that he has adapted the way he talks about his delusions to conceal them.

The State asserts a recent doctor's note supports his competence. Setting aside the limited

nature of Corcoran's interaction with the doctor, which diminishes the significance of the

conclusion, the fact the State asserts it at all creates a material dispute of fact which needs further

Reply in Support of Motions to Stay and
Motions for Permission to File Successive
Petitions for Post-Conviction Relief –
Joseph Corcoran

development. The Seventh Circuit has noted critical testimony regarding the credibility of the

doctors treating those persons on Indiana's death row. The court noted:

> The judge may not have noticed that Dr. Matias also said that "having mental health
> get involved with [Holmes] would be a good thing, but we have to be very careful
> about this, especially in light of the legal process that he is involved in.... I do not
> think it is a good idea to get pulled into something that would go against the state's
> agenda with" Holmes. The state's agenda is to execute him and Dr. Matias is an
> employee of the state.

*Holmes v. Levenhagen*, 600 F.3d 756, 762 (7th Cir. 2010). Indiana punishes pastoral and religious

actors if they act contrary to state's execution agenda. *Schornhorst ex. rel. Fleenor v. Anderson*, 77

F. Supp. 2d 944, 953-54 (S.D. Ind. 1999) (warden denied death row defendant access to his

Catholic priest when he provided observations regarding individual's mental health). Thus, there

exists a substantial credibility challenge to the evidence presented by the State, and this Court

should allow the filing of the *Ford* petition to give Corcoran the chance to subject it to an

adversarial process.

Corcoran suffers from paranoid schizophrenia that causes painful, frightening delusions

and hallucinations. He wholeheartedly believes and has reported that prison staff have access to

an ultrasound machine that they use regularly to torture him. That is his reality regardless of any

protestation to the contrary.

### C. This Court should reconsider its treatment of *Ford* claims as automatic successor requests.

Relegated to a footnote, the State cites *Baird* indicating that Indiana law is clear that *Ford*

claims are to be treated as successors. Corcoran does not contest that is the *current* state of the law;

however, he seeks Indiana to join all other jurisdictions in not treating them as successors. *See,*

*e.g., Stewart v. Martinez-Villareal*, 523 U.S. 637 (1998); AR Code § 16-90-506; AZ Rev. Stat. §

12

**143a**

Reply in Support of Motions to Stay and
Motions for Permission to File Successive
Petitions for Post-Conviction Relief –
Joseph Corcoran

13-4022; Fl. R. Crim. P. 3.811(d); GA Code § 17-10-63; LA Rev. Stat. § 15:567.1; Okla. Stat. tit.

22 § 1005.1; Tex. Code of Crim. P. Art. 46.05; *see also State v. Scott,* 748 N.E.2d 11, 14 (Ohio

2001); *Heck Van Tran v. State*, 6 S.W.3d 257, 266-68 (Tex. 1999). Corcoran is not aware of any

other jurisdiction that treats competence to be executed claims as successors and doing so is

contrary to *Panetti*. His request seeks to move Indiana in line with other jurisdictions. This is a

colorable issue, and this Court should enter a stay and seek full briefing and argument before

deciding it. As a policy matter, given Indiana seeks to resume executions after a decade and a half

lull, and the serious mental illnesses of many remaining on Indiana's death row, this Court should

act to provide guidance.

### D. The signatures of Corcoran's attorneys as his representatives are proper, and requiring Corcoran's personal signature penalizes him for being mentally ill.

Undersigned respectfully contest the State's interpretation of whose signature is proper and

sufficient—the State suggests only Corcoran's signature will do. However, if this Court accepted

this argument, this Court would render agency theory moot, and strip attorneys of their role as their

client's representative. Undoubtedly, attorneys are agents of their clients. *See, e.g.,* American

Heritage Dictionary 140 (Second College ed. 1982*)* (defining an "attorney" as "A person legally

appointed to act for another."); Black's Law Dictionary (12th ed. 2024) (defining an attorney as

"deputy, authorized representative, legal representative . . . Strictly, one who is designated to

transact business for another; a legal agent."); *Sharp v. Moffitt*, 94 Ind. 240, 242 (1884); *Mirka v.*

*Fairfield of Am.*, 627 N.E.2d 449, 450 n.1 (Ind. Ct. App. 1994); *Marion Cnty. Election Bd. V.*

*Bowes*, 53 N.E.3d 1203, 1207-08 (Ind. Ct. App. 2016).

As Corcoran's appointed attorneys, Ms. Green, Ms. Volk, and Mr. Komp may act in his

place. They have signed his petitions for post-conviction review in their capacities as his attorneys

Reply in Support of Motions to Stay and
Motions for Permission to File Successive
Petitions for Post-Conviction Relief –
Joseph Corcoran

and thus on his behalf. Their signatures are proper and legally sufficient. The State's assertion that the lack of Corcoran's signature creates an insufficiency is unsupported—his attorneys as his agents have signed in his stead.

What is requested here is well-accepted in Indiana. Indiana state courts have accepted motions for permission to file successive post-conviction relief signed not by the real party in interest himself, but rather by his attorney. *See, e.g., Royer v. Indiana*, Cause No. 20D03-0309-MR-155 (Ind. Ct. App. 2019) (Verified Motion for Permission to File Successive Petition for Post-Conviction Relief); *Hubbell v. Indiana*, Cause No. 03C01-9808-CF-1191 (Ind. Ct. App. 2023) (Verified Motion for Leave to File Successive Petition for Post-Conviction Relief). This Court should likewise consider Corcoran's petition because it has been signed and verified by his attorneys.

The State cites *McCoy v. Louisiana*, 584 U.S. 414, 417–18 (2018), suggesting that a defendant always controls his litigation. *McCoy* is a Sixth Amendment case relating to critical phases of trial, and it does not stand for the proposition that a defendant controls all aspects of litigation in perpetuity. *Cf United States v. McClinton*, 23 F.4th 732, 737 (7th Cir. 2022) (distinguishing *McCoy* in a direct appeal circumstance). Likewise, *McCoy* has implicitly limited application in post-conviction proceedings because, according to the Supreme Court, there is no genuine responsibility to consult with a client in collateral habeas proceedings—they do not even have to be competent. *See Ryan v. Gonzales,* 568 U.S. 57, 69 (2013).

This Court should consider as a policy question whether it makes sense to deprive a mentally ill person access to the court to litigate competency simply because they do not sign a petition. Subjecting the seriously mentally ill to such requirements imposes a penalty for suffering

14

**145a**

Reply in Support of Motions to Stay and
Motions for Permission to File Successive
Petitions for Post-Conviction Relief –
Joseph Corcoran

from a mental illness. It would, in effect, deprive them access to the courts to evaluate their mental

illness because of their mental illness. Particularly, in cases such as Corcoran's, where they seek

to minimize their mental illness, an attorney must be able to litigate their competency on their

behalf.

Corcoran has presented a prima facie case of his incompetence to be executed and simply

asks this Court to allow the lower court to review whether Corcoran's mental illness prevents him

from rationally understanding his sentence, thus making him incompetent to be executed. If his

mental illness prevents him from affixing his signature to a claim that he is severely mentally ill,

it would be a Catch-22 (and an unconstitutional one, at that), to still require his signature. He would

be prevented from litigating his mental illness because he is mentally ill. Such a principle would

be neither a good policy nor practice required by this Court. Rather, it would violate Corcoran's

rights by denying the opportunity to challenge whether he is competent to be executed in violation

of the Eighth Amendment to the United States Constitution, and Art. 1, Sec. 16 of the Indiana

Constitution.

The Catch-22 is best exemplified by the State's unreasonable argument that the verification

requirement protects Corcoran now because it "risks him being held to future procedural defaults."

The State argues allowing him to be executed— even when he is arguably incompetent—is "okay"

because to litigate his *Ford* incompetence claim risks the default of other constitutional claims.

Respectfully, Corcoran being executed while incompetent represents the actual risk.

Corcoran's attorneys have signed and verified his petitions. That is proper and sufficient.

Requiring compliance with *pro se* form requirements makes no sense for someone represented by

counsel. It vitiates and intrudes upon the attorney client relationship and quite literally puts a *pro*

Reply in Support of Motions to Stay and
Motions for Permission to File Successive
Petitions for Post-Conviction Relief –
Joseph Corcoran

*se* form over the substance of a filing prepared by counsel. The State is correct —while the more

specialized *pro se* rules should govern *pro se* situations – their applicability gives way to Rule 11

in the full representation context.

**II.     Corcoran's serious mental illness should prohibit his execution.**

**A.  Evolving Standards of Decency**

Under the Eighth Amendment, courts must look to "'the evolving standards of decency

that mark the progress of a maturing society' to determine which punishments are so

disproportionate as to be cruel and unusual." *Roper v. Simmons,* 543 U.S. 551, 561 (2005) (citing

*Trop v. Dulles,* 356 U.S. 86, 100-01 (1958)). Consequently, courts reconsider decisions in light of

evolving community standards. *Roper,* 543 U.S. at 555 (second time they considered the issue in

the last decade and a half); *Atkins v. Virginia,* 536 U.S. 304 (2002) (reversed course from

previous decision in *Penry v. Lynaugh,* 492 U.S. 302 (1989)). This Court should grant the

successor petition to allow the claim that the evolving standards of decency now prevent the

execution of the seriously mentally ill.

**B.  The scientific and legal rationale of ineligibility for the death penalty of other classes
of offender are similar to a prohibition for the seriously mentally ill.**

Two distinct social purposes are served by the death penalty: retribution and deterrence.

*Atkins,* 536 U.S. at 319. In considering whether to allow intellectually disabled persons to be

executed, the Supreme Court discussed how these rationales apply, stating: "Unless the

imposition of the death penalty on a mentally retarded person 'measurably contributes to one or

both of these goals, it is nothing more than the purposeless and needless imposition of pain and

suffering,' and hence an unconstitutional punishment." *Atkins* (citing *Enmund v. Florida,* 458

US. 782, 798 (1982)).

16

**147a**

Reply in Support of Motions to Stay and
Motions for Permission to File Successive
Petitions for Post-Conviction Relief –
Joseph Corcoran

With respect to retribution, the severity of the appropriate punishment necessarily depends on the culpability of the offender. Because intellectually disabled offenders are less culpable, they do not merit retribution in the form of the most severe sentence—execution.

A similar principle applies to the notion of deterrence. The same cognitive and behavioral impairments that make people with intellectual disability disorder less morally culpable, also make them less likely to be deterred by capital punishment. Those impairments include diminished ability to understand and process information, to learn from experience, to engage in logical reasoning, or to control impulses. *Atkins,* 536 U.S. at 319-20.

Similarly, the death penalty is an inappropriate form of retribution for youthful offenders. The Supreme Court reasoned the low likelihood juveniles will engage in the kind of cost-benefit analysis that attaches any weight to the possibility of execution makes it an ineffective means of deterrence. *Roper,* 543 U.S. at 561-62. It also considered their "impetuous and ill-considered actions and decisions" as another quality that makes the death penalty inappropriate for this class of offenders. *Id.* at 569.

Corcoran has paranoid schizophrenia. People with schizophrenia have many of the same deficits which lessen the moral culpability of young people and people with intellectual disability. They have great difficulty "communicating with and understanding others, engaging in logical cost-benefit analysis, and evaluating the consequences of and controlling their behavior." Chistopher Slobogin, *What Atkins Could Mean for People with Mental Illness,* 33 N.M.L.Rev. 293, 304 (2003). Dr. Coons' opinion, which occurred close in time to the trial, was Corcoran was having difficulty thinking, his perceptions were abnormal due to psychosis, and the murders

Reply in Support of Motions to Stay and
Motions for Permission to File Successive
Petitions for Post-Conviction Relief –
Joseph Corcoran

were unplanned and motiveless. Supp. Appx. 78. Dr. Davis agreed that Corcoran was psychotic

and unable to reason logically. Supp. Appx. 99.

The State argues this Court need not constitutionally bar the execution of people who are

seriously mentally ill because Indiana provides the jury with the opportunity to weigh the

person's mental illness in deciding whether to recommend the death penalty. At one point, the

same was true for a jury's ability to consider youth and intellectual disability. Ultimately, the

Supreme Court determined that was not adequate. With youth, "an unacceptable likelihood exists

that the brutality or cold-blooded nature of any particular crime would overpower mitigating

arguments based on youth" and a defendant's youth "may even be counted against him." *Roper*,

543 U.S. at 573.

Similarly, the Supreme Court determined the availability of intellectual disability as a

mitigating factor was insufficient to avoid "a special risk of wrongful execution." *Atkins,* 536

U.S. at 321. "The risk 'that the death penalty will be imposed in spite of factors which call for a

less severe penalty'" was too high without a constitutional exclusion. *Atkins,* 536 U.S. at 320

(quoting *Lockett v. Ohio,* 438 U.S. 586, 605 (1978)). This is true, in part, because people with

intellectual disability are less able to give meaningful assistance to their counsel, make a

persuasive showing of mitigation, and "their demeanor may create an unwarranted impression of

lack of remorse for their crimes." *Atkins,* 536 U.S. at 320-21. In fact, intellectual disability can be

a double-edged sword potentially leaving jurors and judges with the impression that the

defendant will be a future danger. *Id.* Likewise, the risk that a severely mentally ill person will be

sentenced to death is also unacceptably high because jurors frequently equate severe mental

illness with a greater likelihood of future dangerousness and, thus, may consider mental illness

Reply in Support of Motions to Stay and
Motions for Permission to File Successive
Petitions for Post-Conviction Relief –
Joseph Corcoran

an aggravator rather than a mitigator. *Overview of Task Force Proposal on Mental Disability and the Death Penalty,* Taback, Ronald, 54 Cath. U.L.Rev. 1123, 1128-29, Summer 2005.

These risks came to fruition in Corcoran's case. He laughed during his death penalty trial, a textbook example of inappropriate affect schizophrenics display. T. 2713. Mr. Corcoran had a "striking bluntness of affect, this aloofness" in his videotaped confession. T. 2726. The State took advantage of Corcoran's demeanor to argue to the jury that he had no remorse replaying the videotape of his confession and arguing he was not even willing to look at his sister because he lacked remorse. T. 2444, 2248. The trial court seized upon the same stating, "I don't think in this county we've had a mass murder such as yourself. It makes you, Mr. Corcoran, a very dangerous, evil mass murderer. And I am convinced in my heart of hearts, Mr. Corcoran, if given the opportunity, you will murder again." T. 2916.

The Supreme Court noted that intellectually disabled persons can distinguish between right and wrong, and their actions "do not warrant an exemption from criminal sanctions, but they do diminish their personal culpability." *Atkins,* 536 U.S. at 318. The same should be said for the seriously mentally ill.

**C. "Seriously mentally ill" is a workable exclusion.**

The State argues a constitutional prohibition on executing people with serious mental illness is unworkable because there is no bright line. The Supreme Court acknowledged that the issue of where to draw the line always raises objections. *Roper,* 543 U.S. at 574. However, the problem incurred in line-drawing was not a reason to shy away from implementing constitutional protection of certain categories of offenders who are less morally culpable. The State cannot overcome that two contiguous states have drawn the line and are applying it without problems—

19

**150a**

Reply in Support of Motions to Stay and
Motions for Permission to File Successive
Petitions for Post-Conviction Relief –
Joseph Corcoran

nor can the State contest that if Corcoran were in Ohio or Kentucky he **could not be executed**

**due to his serious mental illness**.

The American Bar Association (ABA), working with the American Psychiatric

Association, American Psychological Association, and the National Alliance on Mental Illness

(NAMI), has a workable definition of severe mental illness. The definition was developed to

guide courts and legislative bodies to ensure fairness in the American justice system, particularly

in capital cases where stakes are the highest. Attachment A.[2]

According to the State, another element of the unworkability of constitutional protection

for the seriously mentally ill is experts have differing opinions. This does not hold up in a case

where the State has conceded the existence of a serious mental illness. Setting that aside, this was

not a reason to fail to protect individuals with intellectual disability. The very case holding the

execution of people with intellectual disabilities had disagreement among experts. *Atkins,* 536

U.S. at 309. Experts disagree regarding evidence from fingerprints to DNA to mental health

diagnoses. This has not led courts to disregard the evidence.

**D. Article One, Section Sixteen**

The State correctly argues this issue has been considered previously by this Court, most

recently in 2011 in *Baer v. State,* 942 N.E.2d 80, 103 (Ind. 2011). In most of the cases cited by

the State, justices concurred or dissented and expressed concerns about the constitutionality of

executing the mentally ill. Justice Rucker opined that the rationale of *Atkins* is just as compelling

in prohibiting the execution of a person with severe mental illness and found Corcoran was

---

[2] This references Attachment A to the Memorandum in Support of Successive Petition for Post-
Conviction Relief related to the serious mental illness claim.

Reply in Support of Motions to Stay and
Motions for Permission to File Successive
Petitions for Post-Conviction Relief –
Joseph Corcoran

severely mentally ill. *Corcoran,* 774 N.E.2d at 502-03. Justices Boehm and Rucker both

dissented in *Timberlake*, finding while bound by Supreme Court precedent, "nothing prohibits a

state from acting more cautiously in applying the death penalty" when there was genuine doubt

about Timberlake's mental health. 858 N.E.2d at 631. In other words, while the federal

Constitution provides a floor above which states must provide protection, state Constitutions are

free to provide more protections. This Court can and should find, in keeping with evolving

standards of decency as evidenced by trends in other states including our neighbors, that the

Indiana State Constitution prohibits executing the seriously mentally ill.

One or more Indiana Supreme Court Justice has had concerns about executing defendants

who are seriously mentally ill. Since the time the cases cited by the State were decided almost

twenty years ago, a national consensus has taken hold reflecting the evolving standards of

decency. That consensus is reflected in the two states closest to Indiana that still have the death

penalty, Ohio and Kentucky, passing law prohibiting the execution of defendants with serious

mental illness.

### E.  Procedural Default

The State argues Corcoran's claim is procedurally defaulted both because he did not

previously raise it and because he did. This Court's previous consideration of the evidence of

Corcoran's mental illness to determine whether his death sentence was manifestly unreasonable

and whether he was competent to waive post-conviction does not have any bearing on the claim

that executing a person with serious mental illness violates the Eighth Amendment or Article

One, Section Sixteen of the Indiana Constitution.

Reply in Support of Motions to Stay and
Motions for Permission to File Successive
Petitions for Post-Conviction Relief –
Joseph Corcoran

This claim is available now because it is based on the evolving standards of decency. The cases where this issue was decided in a similar posture were decided almost twenty years ago. *Timberlake,* 858 N.E.2d 625; *Matheney v. State,* 833 N.E.2d 454 (Ind. 2005); *Baird v. State,* 831 N.E.3d 109 (Ind. 2005). Since that time, the ABA, along with professional mental health associations, have come up with a workable definition of severe mental illness that should render a defendant ineligible for the death penalty. Additionally, as addressed in the Memorandum in Support of a Successor Post-Conviction Relief Petition, a national consensus against executing those with severe mental illness has evolved since that time. The seeds of this movement were seen in the dissents and concurrences of Justices Rucker and Boehm in those cases. The claim was unavailable until recent developments, particularly in Kentucky and Ohio, created this consensus.

## III. This Court should stay the execution.

By nature of his paranoid schizophrenia and the persistent, painful delusions he suffers from, Corcoran is detached from reality. He has met the threshold showing he lacks a rational understanding of his impending execution, entitling him to an evidentiary hearing to determine his incompetence to be executed. Corcoran thus requests that this Court grant permission for him to file his successive petition for post-conviction relief and grant a stay of execution to allow the Superior Court of Allen County to hold this evidentiary hearing. *See Pate*, 383 U.S. at 378 (finding a conviction based on an incompetent person's plea is a denial of due process); *cf. Sena v. New Mexico State Prison*, 109 F.3d 652, 655 (10th Cir. 1997) ("If evidence exists which creates a genuine, reasonable doubt about the defendant's competence, the court must hold a hearing to resolve the doubt. Furthermore, once doubt is raised, the court cannot dispel it simply by relying

22

**153a**

Reply in Support of Motions to Stay and
Motions for Permission to File Successive
Petitions for Post-Conviction Relief –
Joseph Corcoran

on contrary evidence. The protections of an adversary proceeding must be afforded the defendant."

(citations omitted)).

The request follows this Court's treatment of *Ford* claims. In *Timberlake*, this Court only

went to the next step after permitting an evaluation. Given the weight of mental health evidence

here, a stay should issue and this Court should act in conformity with *Timberlake v. State*, 859

N.E.2d 1209, 1211-12 (Ind. 2007).

By introducing contrasting evidence from the Department of Correction, the State has

created a material dispute of fact. Appellate courts are not well situated to make such credibility

determinations. As previously discussed, the Seventh Circuit noted in *Holmes* and the federal

district court wrote in *Fleenor,* there is a substantial suggestion that correctional personnel must

toe-the-line or be dismissed. *Holmes*, 600 F.3d at 762; *Fleenor*, 77 F. Supp. 2d at 953-54. Thus,

there exists substantial credibility determinations to be made at an adversarial proceeding.

There exist serious concerns about Corcoran's mental state as his execution looms. But two

things are clear: Corcoran suffers from severe paranoid schizophrenia, and the manifestations of

that schizophrenia prevent him from rationally understanding that the State intends to execute him

because a jury found him guilty of murder. He does not understand why he is about to be executed,

and there is no deterrence or retribution served. His execution would serve no purpose other than

to inflict unconstitutionally inhumane cruel and unusual punishment.

This Court should stay Corcoran's execution and permit Corcoran to file his successive

petitions for post-conviction relief in the Superior Court of Allen County.

Reply in Support of Motions to Stay and
Motions for Permission to File Successive
Petitions for Post-Conviction Relief –
Joseph Corcoran

Respectfully Submitted,

AMY E. KAROZOS
PUBLIC DEFENDER OF INDIANA
Attorney No. 14429-49
One North Capitol, Suite 800
Indianapolis, IN 46204
(317) 232-2475
spd@pdo.in.gov

By:  /s/ Joanna Green
Joanna Green
Deputy Public Defender
Attorney No. 16724-53

By: /s/ Laura L. Volk
Laura L. Volk
Deputy Public Defender
Attorney No. 18934-49

and

/s/ Laurence E. Komp
LAURENCE E. KOMP
Temporary Admission No. 118-95-TA
Federal Public Defender
Western District of Missouri
1000 Walnut Street, Suite 600
Kansas City, MO 64106
816-675-0923
laurence_komp@fd.org

*Attorneys for Appellant*

Reply in Support of Motions to Stay and
Motions for Permission to File Successive
Petitions for Post-Conviction Relief –
Joseph Corcoran

## VERIFICATION OF WORD COUNT

Joseph Corcoran, by counsel, files this verified certification that the total amount of words

in the Reply in Support has not exceeded 7,000 words.

/s/ Joanna Green
Joanna Green
Deputy Public Defender

## CERTIFICATE OF SERVICE

I hereby certify that a true copy of the foregoing has been delivered through IEFS to the

following, this 3rd day of December 2024.

Tyler Banks
Supervising Deputy Attorney General
Tyler.Banks@atg.in.gov

By:  /s/ Joanna Green
Joanna Green
Deputy Public Defender
Attorney No. 16724-53

By:  /s/ Laura L. Volk
Laura L. Volk
Deputy Public Defender
Attorney No. 18934-49

25

**156a**

Affidavit of Mark Thoma

I, Mark Thoma, swear and affirm the following are true to the best of my memory;

1. I am an attorney in good standing. I have been licensed to practice law in Indiana since 1983. My law office is located at 800 South Calhoun Street, Fort Wayne, Indiana.

2. I was appointed to represent Joseph Corcoran in 1997. John Nimmo was my co-counsel. Corcoran was charged with four counts of murder. The State sought the death penalty. Both Nimmo and I were Criminal Rule 24 qualified. Steve Brock was part of our team as a mitigation specialist.

3. Prior to John and me entering the case, Corcoran was represented by Robert Bechert. Bechert filed a Notice of Intention to Interpose the Defense of Insanity and Determine Defendant's Competence to Stand Trial.

4. Drs. Fawver, Vodde and Heinemann were appointed to evaluate Corcoran for sanity and competency to stand trial.

5. We filed a motion to withdraw the motion to determine competency and sanity after Drs. Fawver and Vodde had reported their findings to the court. After the State filed its request for the death penalty, we asked Judge Gull to make a ruling regarding Corcoran's competency rather than withdrawing the motion without a ruling.

6. The State offered to drop its request for the death penalty if Corcoran pled guilty. Later, the State offered to drop its request for the death penalty if Corcoran would waive a jury trial and have a bench trial. We had extensive discussions with Corcoran about both offers. His reasons for rejecting each offer defied logic given the strength of the evidence against him.

7. We hired Dr. Eric Engum to evaluate Corcoran before trial. Dr. Engum diagnosed Corcoran with schizotypal personality disorder which he described as right on the borderline of severe mental disease. Dr. Engum believed Corcoran was competent to stand trial.

8. Prior to sentencing, we hired Dr. Phillip Coons, a forensic psychiatrist who had twenty-nine years of experience treating people with mental illness. Dr. Coons evaluated Corcoran and diagnosed Corcoran with paranoid schizophrenia. Dr. Coons unearthed delusions Corcoran tried to hide. It was the discovery of these delusions that led to the diagnosis of schizophrenia.

9. Dr. Coons opined Corcoran was not competent to stand trial because he was unable to assist counsel in his own defense. In his report, Dr. Coons further explained that Corcoran's "refusal to accept either a plea bargain or a bench trial without the death penalty was a product of his mental illness."

10. Dr. Coons testified Corcoran was under the influence of an extreme mental or emotional disturbance when he committed the murders and his capacity to appreciate the criminality of his conduct or to conform that conduct to the requirements of law was substantially impaired as the result of a mental disease or defect. This testimony supports two statutory mitigating circumstances. I.C. 35-50-2-9(c)(2) & (6).

11. We consulted with Dr. Larry Davis, M.D. in March of 1999. He questioned Corcoran's competency to stand trial. Dr. Davis opined that Corcoran's underlying psychosis rendered him incompetent to work with his trial counsel effectively.

12. I believe we eventually obtained the correct diagnosis for Corcoran, paranoid schizophrenia, by hiring Dr. Coons and Dr. Davis. Unfortunately, we did not uncover the accurate diagnosis in time to present it to the jury or to re-raise the issue of Corcoran's competency.

13. Had we had Dr. Coons evaluate Corcoran prior to trial, we would have requested a competency hearing. Dr. Coons' opinion went a long way to helping us understand Corcoran's illogical approach to the plea bargains that would have saved his life.

14. Additionally, had Dr. Coons evaluated Corcoran prior to trial, we would have presented him during the penalty phase of Corcoran's trial and would have had the evidence to support the statutory mitigating circumstances. I.C. 35-50-2-9(c)(2) & (6).

15. The opinions of Dr. Coons and Dr. Davis reflect the difficulties we had consulting with Corcoran in a rational or logical manner.

I affirm under the penalties for perjury that the foregoing representations are true.


_____
    Mark Thoma, Attorney at Law

Affidavit of John Nimmo

I, John Nimmo, swear and affirm the following are true to the best of my memory;

1. I am an attorney in good standing. I have been licensed to practice law in Indiana since 1982. I worked for many years as a criminal defense attorney and now work in the Allen County Prosecutor's Office.

2. I was appointed to represent Joe Corcoran in his death penalty case in 1997. Mark Thoma was my co-counsel.

3. I have reviewed Mr. Thoma''s signed affidavit regarding our representation of Mr. Corcoran. My memory is consistent with the content of his affidavit.

I affirm under the penalties of perjury that the foregoing representations are true.


*John S. Nimmo*

John Nimmo, Attorney at Law

**160a**

# ATTACHMENT F

IN THE
INDIANA SUPREME COURT

CASE No. 24S-SD-222

JOSEPH E. CORCORAN,  )
    Appellant,  )
    v.  )
STATE OF INDIANA,  )
    Appellee.  )

CAPITAL CASE

Case No. 24S-SD-222

POSTMARKED ON:

NOV 2 2 2024

GREGORY R. PACHMAYR
CLERK OF COURTS - STATE OF INDIANA

AFFIDAVIT

I, Joseph Edward Corcoran, swear under the penalties for perjury that the following statement to this Court is truthful, correct, and accurate:

1. I am the same Joseph Edward Corcoran who was convicted in Allen County in 1999 of four counts of murder and sentenced to death. I am the same Joseph Edward Corcoran who has a very extensive appeal history. Having lost all appeals this Court has issued a death warrant to be carried out December 18, 2024 before sunrise.

2. My assigned counsel, has petitioned this Court on my behalf. They seek to further litigate this case. Their goal, which was explained to me by counsel, is to delay any and all executions through endless litigation. They hope to set a precedent so all future death penalty cases can be endlessly litigated effectively putting an end to all executions.

3. I, Joseph Edward Corcoran, do not wish to litigate my

1.

case further. I am guilty of the crime I was convicted of, and accept the findings of all the appellate courts. The long drawn out appeal history has addressed all the issues I wished to appeal, such as the issue of competency. Therefore, I am hereby making this statement to the Court through this affidavit: I do not wish to proceed with more and/or endless litigation. Thus, I urge this Court to not accept my counsel's motion and petition to litigate further.

4. I understand that if this Court rejects my counsel's petition the death warrant will be carried out. I will then be put to death for the heinous crime I committed. I understand that the execution will end my life. I understand medically my heart will stop and all brain activity will cease. I do not know, however, what will happen metaphysically. (But neither does anyone else.) I understand the execution, in the interest of judgment, serves as both a punishment and a deterrent.

5. I, Joseph Edward Corcoran, give this affidavit to the Court of my own free will. I was not coerced into making this statement, nor was I promised anything. I remind this Court that my competence to waive my appeals has been adjudicated throughout the extensive appeal process. Therefore, of my own free will and completely voluntarily, without coercian or promise of anything, being adjudicated competent, withdraw the motion counsel filed on my behalf. I do not wish to litigate further. However, if this Court refuses to withdraw the motion outright, I ask this Court to reject it on the basis that I, the appellant, have no desire nor wish to engage in further appeals or litigation whatsoever.

I, Joseph Edward Corcoran, swear under the penalties for perjury that all of the forgoing statements are true and accurate.

Affiant

2.

**163a**

Before me, the undersigned Notary Public, personally appeared    Joseph Edward Corcoran, the above named Affiant, and upon his oath affirms and acknowledges that this Affidavit was voluntarily and willingly given by the above named Affiant for the purpose stated therein.

Subscribed and sworn before me this 21st day of Nov., in the year 2024.

Bessie E. Somand.
Notary Public Signature

BESSIE E. LEONARD
Notary Public, State of Indiana
LaPorte County
Commission Number NP0755739
My Commission Expires
April 8, 2022
SEAL

BESSIE E. LEONARD
Notary Public Printed Name

My commission expires: _
4-8-32

3.

**164a**

ATTACHMENT G

# In the
# Indiana Supreme Court

Joseph E. Corcoran,
    Petitioner,

    v.

State of Indiana,
    Respondent.

Supreme Court Case Nos.
02S00-0508-PD-350
24S-SD-222

Trial Court Case No.
02D04-9707-CF-465



FILED
Dec 05 2024, 4:27 pm
CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

## Published Order

On November 15, 2024, counsel for Joseph E. Corcoran filed two "Motion[s] for Stay of Execution" and two petitions seeking permission from this Court to litigate on successive post-conviction review: (1) whether Corcoran's execution would violate the Eighth and Fourteenth Amendments to the United States Constitution or Article One, Section 16 of the Indiana Constitution; and (2) whether he is currently competent to be executed pursuant to *Panetti v. Quarterman*, 551 U.S. 930 (2007) and *Ford v. Wainwright*, 477 U.S. 399 (1986). On November 26, 2024, the State filed a response in opposition to all of the motions and petitions filed by Corcoran's counsel. On December 3, 2024, the Court received an Affidavit from Corcoran, postmarked November 22, 2024. That same day, Corcoran's counsel filed a Reply in Support of Motions to Stay and Motions for Permission to File Successive Petitions for Post-Conviction Relief.

Having considered the matter before us, the "Motion[s] for Stay of Execution" and the petitions seeking permission to litigate successive post-conviction relief claims are DENIED. The Court will promptly issue a written opinion explaining its reasons.

Done at Indianapolis, Indiana, on   12/5/2024   .

_____
Loretta H. Rush
Chief Justice of Indiana

Massa, Slaughter, and Molter, JJ., concur.
Rush, C.J., and Goff, J., dissent.

**166a**

ATTACHMENT H



A Whistle-blower Report

Electronic Harassmen

J C Chase

1

**170a**

# ELECTRONIC HARRASSMENT

## A Whistle-blower Report

## J.C.Chase

3

© 2024 J.C.Chase

July 2024

# Contents

Introduction                                          7

A Little Background                                   8

How Does it Work?                                     9

Beyond the Science                                    17

Some Thoughts on Human Psychology                     18

For the Victims                                       19

A Final Plea                                          21

6

**174a**

## Introduction

At the outset I am going to bring to your mind several publicly known and published events. See if you can guess what this short list has in common:

- News outlets reported on a mysterious illness dubbed *The Havana Syndrome*. It resulted from a sonic attack on embassy workers in Cuba and China. Foreign diplomats in other countries have also reported such attacks. But what's more, people within the US capital and other US cities have also reported experiencing symptoms of the mysterious illness.

- A number of years ago a documentary aired on cable TV called *The Town that Caught Tourette's*. It documented a town in New York State where mainly young women were afflicted with unexplained muscle movements and verbal tics.

- In the 1980s a pastor published a pamphlet in which he claimed that God had audibly spoken to him while he was praying. According to the pastor he was praying in his home out loud when a voice came from seemingly nowhere claiming to be God. He searched the house and found no one. This voice then proceeded to give him a revelation based on his prayer.

- British TV aired a show in which an atheist staged a mock religious service where he was able to get unsuspecting people to have simulated charismatic experiences. However, he refused to reveal how he had done it.

- *Penn and Teller's Fool Us* has featured performers who were able to secretly send and receive information. When the performers use a particular technology they generally win a trophy for being able to deceive.

- In recent memory a man scratched *My ELF Weapon* on a shotgun and killed several people with it in a naval shipyard. News outlets reported that *ELF* likely stood for *electromagnetic frequency*; and, therefore, the man believed that the Navy was harassing him with ELF. Ranking military officials released a statement to the effect that the US military does not have electromagnetic weapons, which is true but it does not tell the whole story.

7

**175a**

So, what do these and other seemingly related events have in common? The answer: a little known technology that has been around since at least the 1970s.

As someone who has an electrical engineering background *and* has had contact with the very device that can cause these things – a device that can be used to push someone over the edge to commit a horrific act – I wish to expose this hidden reality. I must add that I am *not* a conspiracy-minded individual, nor am I drawn to conspiracy forums, nor do I usually even listen to them. In fact, I am fairly skeptical about most things; I tend to withhold judgment until something can be confirmed. I do, however, like to know how things work. I also like to teach others how things work, which is what I am attempting to do in this book. In doing this I hope to verify a hidden reality. I hope this verification will help people who claim to be "Targeted," as well as those who tend to be dismissive of such claims, not to be further ensnared by deceptive, ignorant conspiracy theories.  My goal is to arm people with what victimizers do not want their victims to know: THE TRUTH.

**A Little Background**

In my childhood I was fascinated with electronics. At a very young age I could read a schematic, tell you what components were used for and how they worked. I could even build complex circuits, and spent endless hours on solderless breadboards doing so. I became so knowledgeable that the 5th grade science teacher pulled me out of my other classes to teach his class about electronics. (Not fun for a shy kid.)

In the mid-90s I sought to further my love of electronics at the local college. Around that time I began working at a factory that made parts for a department of defense computer and for the automative industry. It was a job to help pay for college and the cost of living. I also learned valuable technical skills while working there.

The owner of this factory was a Russian national. In his office he had an electronic device packaged in a metallic silver box with the word *ultrasound* on it. (The device also has other more modern packaging.) He obtained this device at a trade show. It was an ultrasonic surveillance device that he used to monitor the factory floor. However, it could do much more than just "listen" to people.

8

**176a**

I now wish to answer two revealing questions: How does this device work? And what other capabilities does it have? The reason why I believe these questions are important should become evident.

## How Does it Work?

### *Frequency and Modulation*

Everyone is familiar with radio frequency. You get into your car, tune into the radio station of your choice, and sing along with your favorite songs on your commute. You can travel 45 or more miles from the radio tower, through short tunnels, up and down hills, and still receive the station. But do you know what radio frequency actually is?

When you pass a current through a conductor of any kind, such as a wire, a metal part, etc., it will produce an electromagnetic field and an electrostatic field. These two fields will radiate from the conductor at right angles from each other at the speed of light. How strong these fields are is determined by the strength of the current traveling through the conductor. If a strong enough alternating current is passed through a conductor within a specific frequency range these lines of force can be transmitted over long distances. These frequency lines of force are called radio frequencies, or RF for short.

Frequencies, as you may know, are measured in hertz (abbreviated Hz). A hertz is a cycle per second. So, for example, in the US household current is around 60Hz, meaning that it is an alternating current that changes polarity (positive and negative) 60 times per second. A kilohertz (kHz) frequency has 1,000 or more cycles per second; a megahertz (MHz) frequency has 1,000,000 or more cycles per second; and a gigahertz (GHz) frequency has 1,000,000,000 or more cycles per second. I would also not be surprised if an engineer has figured out how to produce frequencies over a trillion Hz. Therefore, you can think of a frequency as a signal that frequently changes; a hertz measures how many times per second the signal changes.

The wave form of a frequency can be seen on an oscilloscope. A few

  

examples:

9

**177a**



a sine wave          a rectangular wave          a sawtooth wave

a triangular wave          a human voice          a descending sawtooth

The AM frequency band is between 530 to 1700 kHz. AM stands for amplitude modulation. Modulation refers to the process of one signal frequency controlling another. So in the AM radio band one signal, known as the program signal, controls the amplitude of another signal known as the carrier signal. You can think of amplitude as the peak of a frequency wave. A wave will have a top peak and a low peak, as seen in the above illustrations.

AM radio frequency can be illustrated thus:



←Program frequency
←Carrier frequency
←Program frequency

I spoke at length about frequencies, and AM radio frequency in particular, for one reason: to illustrate how modulation works, which is the principle on which the surveillance device I mentioned is based. So one frequency modulating another is as old as AM radio; it is nothing new. However, before we get to a better understanding of how the device works more basic electronics needs to be explained.

Before I continue I think it is necessary to make one thing clear: there is no evidence to indicate that the electromagnetic or electrostatic fields produced by all electronics are harmful to humans. In fact, the earth itself is a gigantic magnet; without its magnetic field life could not exist on this planet. Furthermore, all of us are bombarded with electrostatic frequencies virtually every second of our lives, some from solar activity; and no rational thinking person notices them in their body or worries about them. So with this in mind, don't fall for sensationalist theories regarding such fields. No need to worry about electrostatic fields unless…(read on).

10

**178a**

As we return to modulation a relevant question needs to be answered: In the AM radio band one RF signal modulates (controls) another RF signal, so could a sound frequency be used to control another frequency, whether sound or electrostatic? The answer is, yes, a sound frequency can modulate both. You may have just learned something, namely, that a sound frequency can modulate an electrostatic frequency.

*Transducers*

Have you ever heard of the piezoelectric effect? I'm guessing that if you are not an electronics nerd you probably have not. It refers to a crystal, such as quartz or some other kind of material, resonating ("ringing") from an axis when a current is passed through the perpendicular axis. These axes are called the X axis and the Y axis. So, if current passes through the X axis the Y axis will resonate; if it passes through the Y axis the X axis will resonate. But what would happen if you put some type of mechanical stress on either axis? The perpendicular axis will produce a small voltage that will vary in step with the stress.

The resonant frequency a crystal was designed for is called its fundamental. The fundamental (resonant frequency) is determined mainly by the thickness of the crystal slab and its size. But a crystal can be made to resonate at integer multiples of the fundamental (i.e., the fundamental frequency multiplied by 2, the fundamental multiplied by 3, etc.; which are called the second harmonic, the third harmonic, and so forth). However, the crystal will resonate to lesser degrees the    greater    the                                                     multiple.

Enlarged View of a Crystal Slab (From Top)



Why have I mentioned the piezoelectric effect? Because it is the principle behind almost all transducers. At this point you may be asking, what is a transducer?

Imagine a beautiful summer morning at the lake. The sky is starting to lighten before the sun appears over the horizon. You are in your bass boat looking for the right spot. So you push the power button on the fish finder to see what might be lurking in its depths. This sends a current to the underwater transducer which then produces a sound frequency that is directed down. The sound frequency travels through the water, "hits" various fish, producing an echo from each

11

**179a**

one. Some of the sound frequency also hits the lake bottom and bounces back. All of these echoes are then received by the same transducer that produced the original sound. This somewhat familiar concept illustrates the piezoelectric effect. The transducer has a crystal in it that resonates when a voltage is applied to it. This produces a sound frequency. After a finite amount of time echoes of the frequency return to the transducer which puts mechanical stress on the crystal. This creates a small voltage with each echo that the fish finder is designed to interpret.

So you can think of a transducer as a kind of speaker, though able to produce frequencies that a speaker cannot. Some transducers can even receive frequencies utilizing the same principles as a microphone with a crystal element, though often within a specific frequency range rather than a broad range of frequencies. A transducer with a number of different crystals in it can produce a number of different sound frequencies ranging from an audible sound to inaudible ultrasound (sound frequency above 20 kHz).

*Oscillators*

I have talked a lot about frequencies, but in practical electronics, what circuit actually produces a frequency? Most complex electrical devices, such as computers, game consoles, cell phones, TVs, radios, etc., have an oscillator. Generally, the purpose of any oscillator is to produce an alternating frequency of a desired wave form. The frequency is used for a range of things – from a system clock (i.e., regulating the speed at which the circuit operates), to making another signal more manageable (i.e., converting a signal to a different type), to several other operations. So, to find a device with an oscillator in it you need not look far. You likely can end your quest by reaching into your pocket and pulling our your cell phone.

But in many applications an oscillator that produces a single wave type is often not enough to meet the need. It might be desired to produce a whole host of wave types and frequencies to accomplish various tasks. An oscillator that does this very thing is often called a function generator. You can think of a function generator, by way of analogy, as a musical synthesizer. Just as the keys can be programmed to make a whole range of sounds, a function generator can create a range of wave types and frequencies. (What do you suppose creates the sound types in that particular instrument? Hmmm…) But for all practical purposes the terms oscillator and function generator are synonymous. No need to get picky here.

12

**180a**

So, I spoke about function generators, piezoelectric transducers, and modulating frequencies. Perhaps now it is time to put these components together and see how the device I mentioned works.

## The Device

The surveillance device I described would use ultrasound (inaudible sound frequency above 20 kHz) like AM radio frequency. A function generator would produce the signal, and other frequencies, which would be emitted by the piezoelectric transducer. In essence, an emitted ultrasonic frequency would capture audible sound by modulation. The ultrasonic signal with the modulated sound is then received by the transducer within a very finite amount of time, very close to instantaneously. This signal is then electronically decoded so that the modulated sound frequency will translate to a speaker. Obviously that is done so the user of the device is able to hear what was captured. But what's more, just as an RF signal can travel great distances and go virtually anywhere, the ultrasonic signal produced by the device has similar properties. That means, therefore, that people can be surveilled anywhere, in any place, and from great distances from a device that sits on a desk.

You might be asking yourself why I am going into all this detail to explain how a piece of equipment works. The answer is that I want to show that what I am describing is not a nut job conspiracy theory, but is basic electronics that has been around for quite some time. But unfortunately, the science behind the device is about to get more frightening than any idiot having the ability to surveil others without wiretaps or scanners; and even more frightening than those being surveilled having no possible way of escape.

One additional note on the surveillance aspect. You likely do not know that some people, whenever they think in their mind, their throat vibrates in the same way as when they or anyone else talks. However, this vibration is not as pronounced as when they talk audibly. I suspect that many credentialled MDs do not even know about this phenomenon. The reason why they likely do not know is because it is undetectable by unaided observation. No one by simply talking to an individual, looking at them, or even listening to them is able to tell if a person's throat vibrates when they think. In fact, it is so faint that it cannot even be felt. For all practical purposes it is undetectable and would not be an issue unless…

13

**181a**

It is time to share a secret: the ultrasonic device can detect those very faint vibrations in the throat of such individuals and convert them to an audible voice at the receiver. So, in essence, a small percentage of people are susceptible to ultrasonic surveillance; someone with one of those devices can pretty much listen to them think.

I suspect that the vast majority of people who claim to be "Targeted" fall within the category of being susceptible to ultrasonic surveillance. When some weird voyeur with such equipment goes "fishing" with it (for lack of a better word), and happens upon such a person who may be committing all manner of sexual immorality, that voyeur is going to think, *Jackpot*! Then the susceptible individual with have someone's undivided attention.

### What Other Capabilities Does the Device Have?

### Modulated Sound

As frightening as that reality may be to some it does not end there. The same ultrasonic signal that captures audible sound by modulation can be used to *send* audible sound. Furthermore, the modulating signal can also send an electrostatic charge. So any place that an ultrasonic signal is able to capture sound – which is literally every place except a vacuum – it can also send sound and electrostatic signals.

A somewhat simplified way to think of how an ultrasonic frequency can send an audible sound great distances is to think of the ultrasonic signal as an enclosure of the audible sound. The controlling frequency, in essence, sends the audible sound frequency to a specific point to release it there. That specific point could be within an enclosed room 30 miles away, within an object, a wall, or even within a living being. It could even be the open air or the sky. The possibilities are endless.

The ultrasonic device itself has a microphone within it, a sound effects generator, and the ability to sample and manipulate sound. So think of the possibilities with such equipment – and the enormous potential for abuse! With it an operator could send a quiet voice into someone's head *and* make them think that they are thinking the thought: "I'd better get back to work"; "The part is in the other bin"; "Do not steal." Or something more sinister: "Take off your pants"; "Steal something"; "Buy this ring." Or maybe something extremely bad: a screaming, demonic voice in

14

**182a**

their head that only they can hear (aside from the operator talking into the box) that tells them to kill people.

If someone was listening to a song an operator could sample a portion of it, play it on an endless loop while projecting it into their head, and annoy them to death. Or annoy them by making them believe that their ears are ringing. And what should be obvious is that most of the people who are so victimized, and practically everyone else for that matter, will assume all of the above to be auditory hallucinations.

The device can easily be used to make someone seriously paranoid. For example, if someone was strung out on drugs, and thinking irrationally as a result, an operator could cause him to hear the sound of a SWAT team running up the stairs. Or an operator could cause an individual to hear people a short distance away talking about robbing and killing him when, in fact, they are unconcerned about him. If that man is unstable to begin with it could be a recipe for disaster.

A person susceptible to ultrasonic surveillance would be the easiest to make paranoid. Since an operator can tell what the individual is thinking it would be easy to cause them to believe false things. For example, the operator may be able to tell that the susceptible individual needs to urinate. So every time that happens he could project into an adjoining wall the sound effect of a neighbor running water. This could get the individual to believe that the neighbor is spying on him, there are sensors in the walls, he has a "computer chip" in his head that enables the neighbor to know, etc. The operator could then cause people he comes into contact with to sneeze, or scratch their nose, causing him to believe that they are part of the conspiracy. Furthermore, the operator could collect his passwords and PIN numbers to cause even more heartache and loss.

So the potential for abuse should be crystal clear at this point. But we have only scratched the surface. The frightening potential is about to get exponentially worse, though I just hinted at it.

*Modulated Electric Charge*

Have you ever watched a really bad black and white movie about *Frankenstein* or read the book? The original novel was written by Mary Shelley and published in 1818. In the novel Dr. Frankenstein reanimates a dismembered dead body by utilizing captured lightning. It has been

15

**183a**

suggested that the author got the idea for the novel from seeing experiments where current was applied to dismembered frog legs which made them move.

Such experiments have shown that electricity can stimulate nerve endings in muscle tissue and activate the tissue. Experiments with rats have also shown that if you apply an electrical charge to their midbrain they will fall asleep; another charge will wake them up. The reason why electricity causes muscle movements and alters an animal's state of consciousness is because such things are caused naturally by electrochemical activity. A simplified way to think of it is that electrical activity regulates biochemical processes, which in turn regulate electrical activity. So, in essence, an external electrical charge mimics the internally occurring electrical activity.

It is now known that virtually everything within an animal's nervous system is controlled by electrochemical activity. By virtually everything I mean everything – sensations, such as pain, hunger or pleasure; emotions, such as sorrow, anger, or fear; sleep and wake cycles; thought processes; muscle movements; bowel movements; tear production; salivation; and more. So now consider this: if those things are activated naturally by electrochemical activity, that means the electrical aspect can also be mimicked electronically. Therefore, using electricity to activate bodily processes is not limited to muscle movements and sleep cycles.

Let's say, therefore, that there is an unfortunate man who some bad actor wants to wake up, make stand on his feet, run to a wall, and then pound on it angrily with a closed fist. After this the bad actor wants the poor man to feel dizzy, confused, and then vomit. Could the bad actor do this remotely? If so, how could it be done? You might have some idea at this point; but I feel the need to explain the science behind it.

Recall that I spoke of modulation, which is when one frequency controls another. Then I spoke of how a sound frequency can be used to modulate an electrostatic frequency which, you may have guessed, does have an electrical charge. Now if the muscle tissue of a dismembered frog leg can be activated by directly applying an electrical charge, to remotely activate the tissue, a modulating ultrasonic frequency could easily deliver an electrostatic charge to the nerve endings. In fact, it would be easier to do it this way than with wires and other bulky equipment. The electrical charge also can be finite enough to perfectly mimic the electrical aspect of the naturally occurring electrochemical activity within the muscle. A frequency in the MHz (million cycles per

16

**184a**

second) range could literally bombard millions of places on a muscle within a second to cause it to accomplish any task desired.

So let's return to the unfortunate man. To wake him up, delivering an electrostatic charge to his midbrain via a modulating ultrasonic frequency will do the trick. To make him stand up, run to the wall, make a fist, and pound on it repeatedly you would simply target the right muscles, in the right order with the proper electrostatic charges. Obviously a cascade of functions must be done to accomplish this, which is very easily done electronically (i.e., a multitude of calculations per second). To make him angry an electrostatic charge can be delivered to the amygdala. To then make him dizzy simply target the vestibular apparatus within his inner ear. The prefrontal cortex would be targeted next to make him confused. For vomit you need only to target the correct places in the stomach, esophagus, and mouth – being dizzy would also help the matter.

To some people all of this sounds like science fiction. Unfortunately it is not; it is basic electronics and basic physiology.

## Beyond the Science

The alarming part, however, is that devices that can do all of these things exist and are in use as I write this. Think of the enormous potential for abuse! But what's more, the device that my boss obtained at a trade show did everything I have described. That means that the device was commercially available for over a decade, which means that untold thousands of them are in private hands. They have seemingly disappeared from the market, though the initiated can find one since they are still produced for use by law enforcement, correctional institutions, and the military. In 2021 a used version of the device was for sale on a popular website, though it was quickly purchased.

All of the information I have given (i.e., the capabilities of such equipment) is readily known to people familiar with ultrasonic surveillance; and they generally do not want the public at large to know about it. There is a twofold reason for this. The first is that if everyone knew about this technology it would open up a Pandora's box. Imagine the abuse that would be unleashed! (But unfortunately it is already occurring.) The second is with people ignorant of such technology it gives a select few a secret power. They can spy on people and deceive people virtually unnoticed. Moreover, they can abuse people with anonymity and virtual impunity.

17

**185a**

I mentioned above that the device is still produced for military and law enforcement applications. However, the fact that just about every military base, county jail, and prison in the US has one or more of those devices within their inventory is kept confidential. And it has been my personal experience that institutions and companies that want to keep secrets have someone "out of the loop" as their spokesman. So when you make an inquiry, as far as the person knows, the institution does not engage in such activities. (But when someone in the know starts blabbing, if caught, he will face all kinds of retribution!) When I read ignorant lawsuits by prisoners claiming electronic harassment, or the ignorant rantings of someone claiming to be initiated into the "super soldier program," it is apparent to me that correctional staff and other individuals and/or agencies use ultrasonic surveillance devices on susceptible people for sport. However, the fact that institutions keep their possession of such equipment confidential would make it extremely difficult for those abused to expose the abuse.

I also suspect, but could very well be wrong, that when the media reports on conversations the president had with counsel in confidence, or mentions "whispers of discontent" within an office, it is likely because some media person was using an ultrasonic surveillance device on the government. But imagine the potential for abuse if that media person does not particularly like a lawmaker. What if he wants to help the lawmaker be to the public what he thinks the lawmaker is in reality? Is this not a serious concern? Is it also not concerning that in this way confidential information might be released to the public that results in retaliatory strikes on US personnel?

## Some Thoughts on Human Psychology

Have you ever read a book, watched a TV series, or played a video game and become invested in a character? Have you ever become upset when the character you were invested in did not act in the way you had hoped? I think we can all relate to this. It is human psychology; it makes us human.

And have you ever played an online video game? Have you ever noticed that some people are not very nice in them? Do something to the wrong person's video game character and you might meet their wrath – not only in video game land, but in the real world via social media and other ways. One reason for this is because you did not play the way they wanted. They were invested in

the game and therefore had a psychological stake in the outcome. They ultimately had hoped for a different outcome or experience.

Now let's apply human psychology to ultrasonic surveillance. It would not take a giant leap of the imagination to bridge these two. If some, for lack of a better word, "troll" with one of those devices happened upon a susceptible person, they could very easily become invested in that person and not very nice to them. In essence, they would treat the poor soul like a video game avatar rather than a real person whose life is going to be adversely affected by the nonsense they are afflicting the victim with.

And let's delve a little deeper into the human psyche. People who spy on others, the voyeuristic, have a predatory mindset. They see themselves as higher on the food chain, so to speak, and their victims as prey – as little more than animals to be exploited. This gives them a sense of power and control having this secret knowledge, this secret view that the victim does not know about.

Just about everyone has seen how a cat treats a mouse. The cat often will not quickly kill the creature, but will toy with it, and pretty much torture the animal. We do not condemn the cat for being a cat. But we would rightly condemn a person for torturing an animal for amusement. It is right to condemn such a person because man is a moral actor and is morally accountable. And if we hold man morally accountable for abusing an animal, should we not all the more hold him accountable for abusing people, whether the abuse is by overt means or by covert means (i.e., ultrasonic harassment)?

### For the Victims

If you claim to be "Targeted," realize that deception and misinformation are your victimizer's best weapons. They, in essence, use sleight-of-hand to get you to believe what is false: it is microwave radiation, there is a sensor in the wall, I have a computer chip implanted in my head, the CIA is to blame, etc. And when you research and find inaccurate information that confirms the victimizers' deception, and you then put stock in it, it frankly makes you look like a mental case. Their goal is accomplished. They have a completely plausible cover for their wrongdoing.

And please do not rail at mental health professionals. They likely are not "in on it". When I read victims' accounts something that is apparent is that mental health professionals are likely just as

19

**187a**

ignorant as you are! So when you talk about whatever symptoms you are afflicted with, they will simply defer to the authority of the DSM V, and diagnose you with whatever mental illness is defined by those symptoms. The ignorance on the part of mental health professionals about this technology is taken advantage of by victimizers. If a credentialled medical person says a man is mentally ill, but he says that he is the victim of electronic harassment, who would people be more likely to believe? So because of this the victimizer's cover is now seemingly backed up by medical science.

To be clear I am *not* saying that mental health professionals should be avoided altogether. I am saying that electronics does not fall within their field of study. Because of this they will likely be oblivious to the fact that mental illness can be mimicked electronically. And the fact that mental illness can be mimicked by electronic harassment obviously does not negate the fact that many such illnesses are not.

Because of the ignorance regarding this topic there are people who capitalize on the victims. They, in essence, further victimize those who are already suffering and downtrodden. Devices such as strong magnets, aluminum foil helmets, and magnetic tape blankets will offer no real help. Nor will a whole host of other silly contraptions available online. If they seemingly help the reason for this is: (1) you are being patronized by whoever is surveilling you; or (2) psychologically you believe it does work. But there is no reason electronically why they would work, and frankly make those who fall for such nonsense look like lunatics.

I have also read accounts of victims who were put to sleep (which the device is capable of doing to people), drugged, kidnapped, and actually implanted with all sorts of things. I suspect the main purpose of the implants is misdirection, in essence, to screw with you. They are similar to a woman and a curtain in a magic act, which shift the focus and cover something that would give away the secret. At best, if one was large enough to house an RFID chip, it could have information that could be retrieved by a scanner, exactly like what was put into the neck of my dog. But electronically they could do little other than ID.

There is another item I must mention that I have only recently discovered. In the past I have read accounts of people who were allegedly burned remotely. I recently discovered, by an experiment performed on me, how this is done. Someone need only to use the device to cause

you to scratch yourself in your sleep. If done correctly you get the equivalent of a rug burn. As I write this I have a burn on my arm from this method that has been there for over a month.

## A Final Plea

I have revealed to you what many have tried to keep confidential. I have made little attempt to "sanitize" my report for public consumption. I did so for the benefit of the victims and as a call to public action.

It is probably inevitable that foreign diplomats and other embassy workers will be surveilled. Not a lot can be done to stop that. But when someone within the US suffers from the so-called *Havana Syndrome*, and when a host of other people are vicitimized by this technology, I feel it is time to act.

I think everyone would agree that no one should be surveilled and harassed within their own home by anyone. We would all likely agree that workers should not be controlled ultrasonically. No one should be forced to live with an electronically simulated mental illness, such as Tourette's, tics, auditory hallucinations, pain, anger, or a host of other abuses. No one should be screwed with so much that out of desperation he takes a shotgun and commits mass murder of his perceived offenders. A pastor should have the right to pray without some "troll" pretending to be the Deity who is giving a revelation. No one should be put to sleep and then kidnapped. And I would think that most would agree that no prisoner should have to file a lawsuit claiming endless electronic harassment. But this short list of offenses by no means exhausts the harm done with those devices.

I have all but named the specific surveillance device. The initiated can find one, however, since they have been around for some time, and are still produced. (A man whose discovery contributed to the development of the device has given a TED talk. He gives an audio demonstration of a soda can opening inside someone's head.)

It is time for victims of these devices to bring a class action lawsuit against the manufacturer(s) of the device for the plague they have unleashed on humanity. Why were they foolish enough to allow such technology to be sold to the public? And I'm sure some law firm can see the moneymaking potential in litigating on behalf of the victims.

Furthermore, I would suggest that the ACLU, and other civil rights organizations, help prisoners who are harassed by this technology. Surveilling prisoners is one thing; but harassing them electronically for sport is unacceptable.

Moreover, lawmakers should be petitioned endlessly to permanently ban all civilian possession of such devices and strictly regulate their use by the military, prisons and law enforcement. (Why does an off duty officer need one in his home?) And I would add that all long range ultrasonic frequency transmissions should be regulated by the FCC, just as they regulate the RF spectrum.

In addition, I believe qualified people should inform mental health professionals how mental illness can be simulated in people electronically, and that the technology is in circulation and has been for some time. Also they should be informed that institutionalized people (i.e., prisoners) are much more likely to be so targeted. Knowing the actual cause of something makes a substantive resolution much more attainable. And I would think that the APA would vociferously oppose the deployment of such technology on unsuspecting individuals and work to end such abuse.

A final note to any electrical engineer who may read this, who may be in a position to help. You know that a scanner can be made that will pick up any RF signal. You could produce a type of scanner that can detect any ultrasonic signal and quickly trace it to its source. (I know that this last part is somewhat difficult, but not impossible.) Perhaps also have a software technician add the ability to place that source on a map in real time. This way someone being harassed can report the offender to law enforcement instantly. As far as I know no such device is available to the public. If such technology was made available more than a few victims would benefit from it.

22

**190a**

I would like to conclude this concise technological summary by making my sentiments about this little known ultrasonic device absolutely clear. The public has a right to know the truth. Victims of this technology have the right to know the truth. And I believe manufacturers should be held accountable for selling such technology to the public. Finally, I believe that anyone who victimizes people with this technology should be exposed and face prosecution.

24

26

27

Made in the USA
Monee, IL
22 September 2024



66253998R00015

Have you heard about these publicly known and published events?

• News outlets reported on a mysterious illness dubbed The Havana Syndrome. It resulted from a sonic attack on embassy workers in Cuba and China.

• A number of years ago a documentary aired on cable TV called The Town that Caught Tourette's. It documented a town in New York State where mainly young women were afflicted with unexplained muscle movements and verbal tics.

• In recent memory a man scratched My ELF Weapon on a shotgun and killed several people with it in a naval shipyard. News outlets reported that ELF likely stood for electromagnetic frequency; and, therefore, the man believed that the Navy was harassing him with ELF. Ranking military officials released a statement to the effect that the US military does not have electromagnetic weapons, which is true but it does not tell the whole story.

So, what do these and other seemingly related events have in common? The answer: a little known technology that has been around since at least the 1970s.

As someone who has an electrical engineering background and has had contact with the very device that can cause these things – a device that can be used to push someone over the edge to commit a horrific act – I wish to expose this hidden reality.

I hope that by explaining how this device works I will help people who claim to be "Targeted," as well as those who tend to be dismissive of such claims. My goal is to arm people with what victimizers do not want their victims to know: THE TRUTH.

J.C.Chase has a life–long fascination with electonics and has a background in electronic engineering.



ISBN 9798332642692

# ATTACHMENT I

Affidavit of Mark Thoma

I, Mark Thoma, swear and affirm the following are true to the best of my memory;

1. I am an attorney in good standing. I have been licensed to practice law in Indiana since 1983. My law office is located at 800 South Calhoun Street, Fort Wayne, Indiana.

2. I was appointed to represent Joseph Corcoran in 1997. John Nimmo was my co-counsel. Corcoran was charged with four counts of murder. The State sought the death penalty. Both Nimmo and I were Criminal Rule 24 qualified.  Steve Brock was part of our team as a mitigation specialist.

3. Prior to John and me entering the case, Corcoran was represented by Robert Bechert. Bechert filed a Notice of Intention to Interpose the Defense of Insanity and Determine Defendant's Competence to Stand Trial.

4. Drs. Fawver, Vodde and Heinemann were appointed to evaluate Corcoran for sanity and competency to stand trial.

5. We filed a motion to withdraw the motion to determine competency and sanity after Drs. Fawver and Vodde had reported their findings to the court. After the State filed its request for the death penalty, we asked Judge Gull to make a ruling regarding Corcoran's competency rather than withdrawing the motion without a ruling.

6. The State offered to drop its request for the death penalty if Corcoran pled guilty. Later, the State offered to drop its request for the death penalty if Corcoran would waive a jury trial and have a bench trial. We had extensive discussions with Corcoran about both offers. His reasons for rejecting each offer defied logic given the strength of the evidence against him.

7. We hired Dr. Eric Engum to evaluate Corcoran before trial. Dr. Engum diagnosed Corcoran with schizotypal personality disorder which he described as right on the borderline of severe mental disease. Dr. Engum believed Corcoran was competent to stand trial.

8. Prior to sentencing, we hired Dr. Phillip Coons, a forensic psychiatrist who had twenty-nine years of experience treating people with mental illness. Dr. Coons evaluated Corcoran and diagnosed Corcoran with paranoid schizophrenia. Dr. Coons unearthed delusions Corcoran tried to hide. It was the discovery of these delusions that led to the diagnosis of schizophrenia.

9. Dr. Coons opined Corcoran was not competent to stand trial because he was unable to assist counsel in his own defense. In his report, Dr. Coons further explained that Corcoran's "refusal to accept either a plea bargain or a bench trial without the death penalty was a product of his mental illness."

10. Dr. Coons testified Corcoran was under the influence of an extreme mental or emotional disturbance when he committed the murders and his capacity to appreciate the criminality of his conduct or to conform that conduct to the requirements of law was substantially impaired as the result of a mental disease or defect. This testimony supports two statutory mitigating circumstances. I.C. 35-50-2-9(c)(2) & (6).

11. We consulted with Dr. Larry Davis, M.D. in March of 1999. He questioned Corcoran's competency to stand trial. Dr. Davis opined that Corcoran's underlying psychosis rendered him incompetent to work with his trial counsel effectively.

12. I believe we eventually obtained the correct diagnosis for Corcoran, paranoid schizophrenia, by hiring Dr. Coons and Dr. Davis. Unfortunately, we did not uncover the accurate diagnosis in time to present it to the jury or to re-raise the issue of Corcoran's competency.

13. Had we had Dr. Coons evaluate Corcoran prior to trial, we would have requested a competency hearing. Dr. Coons' opinion went a long way to helping us understand Corcoran's illogical approach to the plea bargains that would have saved his life.

14. Additionally, had Dr. Coons evaluated Corcoran prior to trial, we would have presented him during the penalty phase of Corcoran's trial and would have had the evidence to support the statutory mitigating circumstances. I.C. 35-50-2-9(c)(2) & (6).

15. The opinions of Dr. Coons and Dr. Davis reflect the difficulties we had consulting with Corcoran in a rational or logical manner.

I affirm under the penalties for perjury that the foregoing representations are true.


Mark Thoma, Attorney at Law

# ATTACHMENT J

Affidavit of John Nimmo

I, John Nimmo, swear and affirm the following are true to the best of my memory;

1. I am an attorney in good standing. I have been licensed to practice law in Indiana since 1982. I worked for many years as a criminal defense attorney and now work in the Allen County Prosecutor's Office.

2. I was appointed to represent Joe Corcoran in his death penalty case in 1997. Mark Thoma was my co-counsel.

3. I have reviewed Mr. Thoma'᾽s signed affidavit regarding our representation of Mr. Corcoran. My memory is consistent with the content of his affidavit.

I affirm under the penalties of perjury that the foregoing representations are true.

*John S. Nimmo*

John Nimmo, Attorney at Law

**203a**

ATTACHMENT K



**State of Indiana**
**Department of Correction**

Division of Medical and Clinical Healthcare Services
Indiana Government Center South
302 W. Washington Street
Indianapolis, IN 46204

| Facility: ISP |
|---|

---

PATIENT:                    JOSEPH E CORCORAN
DATE OF BIRTH:              Patient DOB: 04/18/1975
ID #:                       992454
DATE:                       03/01/2024 1:09 PM
VISIT TYPE:                 Psychotherapy - Individual

---

**Individual Counsel/Psych Prog Note**
**Program Name**
HCR #:  76863

**Individuals Present/Support Resources**
Modality: Individual

Individual present.

Support Resources

| Full Name | Relationship | Home Phone | Work Phone | Effective Date | End Date | Comments |
|---|---|---|---|---|---|---|

MENTAL STATUS EXAM

GENERAL OBSERVATIONS:
Appearance: Unkempt, Disheveled
Build/Stature: Within normal limits
Posture: Within normal limits
Eye Contact: Average
Activity: Within normal limits
Attitude toward examiner: Cooperative
Attitude toward parent/guardian: Not applicable
Separation (for children/adolescent): Not applicable

MENTAL STATUS:
Mood: Anxious

Patient Name: CORCORAN, JOSEPH E                                      Page 1 of 4
ID:  992454    Date of Birth: Patient DOB: 04/18/1975        Encounter Date: 03/01/2024 01:09 PM

**205a**

Affect: Full
Speech: Clear
Thought process: Circumstantial
Perception: Within normal limits
Hallucination: Denied  None evidenced
Thought content: Preoccupations / ruminations
Delusions: Control Thought insertion
Cognition: Within normal limits
Intelligence estimate: Average
Insight: Minimal insight
Judgment: Within normal limits

## ASSESSMENT/DIAGNOSIS

Behavioral Health Diagnoses

| # | Description | Severity | Impression/Differential Dx | Specifiers | Admitting Dx | Present on Admission |
|---|-------------|----------|----------------------------|------------|--------------|----------------------|
| 1 | Schizotypal personality disorder (301.22) | | | | | |

Physical Health Diagnoses

**Reported Diagnosis**

Deferred

Psychosocial Stressors
Severity: Severe

| Problem Type | No/Yes | Description |
|--------------|--------|-------------|
| Primary Support Group | Yes | No support |
| Education | No | |
| Occupation | No | |
| Housing | Yes | Not allowed outside REC- Xrow |
| Finances | No | |

GAF:
Current GAF: 50

Clinical Assessment:  Anxiety is not significant. Cognitive issues are not significant. Substance abuse/dependence is not significant. Depression is not significant. Impulse control is not significant. Psychotic symptoms are not significant. Suicidality is not significant. Mania/manic behavior is not significant. The patient is cooperative and communicative.

## Goals, Objectives, and Interventions Addressed Today

Interventions/Methods Provided:
Patient was seen in confidential office in MSU for HCR 76863. Patient appears euthymic, alert and oriented. Patient reports he recently began talking to an old romantic interest and wanted help with how to "help" her. Patient reports he tends to focus on others rather than himself because that is the "right' thing to do. Patient began sharing about his past and desire to go into electrical engineering. Patient then began sharing information about what he believes to be an ultrasonic machine here at ISP that can control his and others thoughts, sleep, voice, etc. Patient reports it is 'top

Patient Name: CORCORAN, JOSEPH E
ID:  992454    Date of Birth: Patient DOB: 04/18/1975
Page 1 of 4
Encounter Date: 03/01/2024 01:09 PM

**206a**

secret' but it bothers him "endlessly all day." Patient reports the machine does put him to sleep at night. Patient stated "others think i'm delusional but I know its here." Writer inquired if patient ever recognizes his own thoughts as delusional, patient avoided the question. It appears patient's delusions are not causing harm to himself or others at this time. Patient reports functioning well on his unit. Patient denies MH symptoms and the expressed delusions are the only observable concern. Patient denies SI/HI/SIB at this time. Patient will be followed up with per ITP.

RISK ASSESSMENTS
RISK ASSESSMENT HISTORY

| Risk | Current | Past | Documented | Event Date | Approximate Date | Ideation | Plan | Intent | Scale |
|------|---------|------|------------|------------|------------------|----------|------|--------|-------|
| Homicide | Denies | | 12/18/2018 | 12/18/2018 | No | | | | |
| Property | Denies | | 12/18/2018 | 12/18/2018 | No | | | | |
| Suicide | Denies | | 12/18/2018 | 12/18/2018 | No | | | | |
| Homicide | Denies | | 12/13/2018 | 12/13/2018 | No | | | | |
| Property | Denies | | 12/13/2018 | 12/13/2018 | No | | | | |
| Suicide | Denies | | 12/13/2018 | 12/13/2018 | No | | | | |
| Homicide | Denies | | 11/04/2019 | 11/04/2019 | No | | | | |
| Property | Denies | | 11/04/2019 | 11/04/2019 | No | | | | |
| Suicide | Denies | | 11/04/2019 | 11/04/2019 | No | | | | |
| Homicide | Denies | | 09/28/2020 | 09/28/2020 | No | | | | |
| Property | Denies | | 09/28/2020 | 09/28/2020 | No | | | | |
| Suicide | Denies | | 09/28/2020 | 09/28/2020 | No | | | | |
| Homicide | Denies | | 08/25/2023 | 08/25/2023 | No | | | | |
| Property | Denies | | 08/25/2023 | 08/25/2023 | No | | | | |
| Suicide | Denies | | 08/25/2023 | 08/25/2023 | No | | | | |
| Homicide | Denies | | 07/15/2020 | 07/15/2020 | No | | | | |
| Property | Denies | | 07/15/2020 | 07/15/2020 | No | | | | |
| Suicide | Denies | | 07/15/2020 | 07/15/2020 | No | | | | |
| Homicide | Denies | | 04/19/2021 | 04/19/2021 | No | | | | |
| Property | Denies | | 04/19/2021 | 04/19/2021 | No | | | | |
| Suicide | Denies | | 04/19/2021 | 04/19/2021 | No | | | | |
| Homicide | Denies | | 03/07/2019 | 03/07/2019 | No | | | | |
| Property | Denies | | 03/07/2019 | 03/07/2019 | No | | | | |
| Suicide | Denies | | 03/07/2019 | 03/07/2019 | No | | | | |
| Homicide | Denies | | 03/02/2020 | 03/02/2020 | No | | | | |
| Property | Denies | | 03/02/2020 | 03/02/2020 | No | | | | |
| Suicide | Denies | | 03/02/2020 | 03/02/2020 | No | | | | |
| Homicide | Denies | | 02/04/2020 | 02/04/2020 | No | | | | |
| Property | Denies | | 02/04/2020 | 02/04/2020 | No | | | | |
| Suicide | Denies | | 02/04/2020 | 02/04/2020 | No | | | | |

| Attempt | Planned/ Impulsive | Drug/Alcohol Influenced | Medically Treated | Plan Attempt Description |
|---------|--------------------|-----------------------|-------------------|--------------------------|
| | | | | |
| | | | | |
| | | | | |
| | | | | |

Patient Name: CORCORAN, JOSEPH E                                    Page 1 of 4
ID:  992454    Date of Birth: Patient DOB: 04/18/1975    Encounter Date: 03/01/2024 01:09 PM

207a

SIGNATURES

Staff: Signed by Marjorie Sassano, MHP,  on 03/01/2024

*Document generated by: Marjorie Sassano, MHP  03/01/2024 01:27 PM*

Indiana Government Center South
302 W. Washington Street
Indianapolis, IN 46204

Patient Name: CORCORAN, JOSEPH E                                        Page 1 of 4
ID:  992454    Date of Birth: Patient DOB: 04/18/1975          Encounter Date: 03/01/2024 01:09 PM

**208a**

# ATTACHMENT L





FILED

Dec 10 2024, 11:01 am

C L E R K
Indiana Supreme Court
Court of Appeals
and Tax Court

IN THE

# Indiana Supreme Court

Supreme Court Case Nos. 24S-SD-222, 02S00-0508-PD-350

## Joseph E. Corcoran,
*Petitioner,*

–v–

## State of Indiana,
*Respondent.*

---

Decided: December 10, 2024

On Successive Petitions for Post-Conviction Relief
and Motions to Stay in a Capital Case

Direct Appeal from the Allen Superior Court,
Case No. 02D04-9707-CF-465

---

**Opinion by Justice Molter**

Justices Massa and Slaughter concur.
Justice Goff dissents with separate opinion in which Chief Justice Rush joins.

**Molter, Justice.**

A quarter century ago, an Allen County jury convicted Joseph Corcoran of a quadruple murder, and the judge sentenced him to death as the jury recommended. Since then, courts at every level of the state and federal judiciary have been litigating whether the state and federal constitutions prohibit Indiana from executing him. That litigation has included multiple decisions from courts of last resort—five opinions from our Court and two opinions from the United States Supreme Court. After both judiciaries resolved all the issues before them, we set an execution date of December 18, 2024.

At this point, Corcoran doesn't want to petition the courts to challenge his execution. He recently wrote to us: "I am guilty of the crime I was convicted of, and accept the findings of all the appellate courts." Affidavit at 2. He says "[t]he long drawn out appeal history has addressed all the issues [he] wished to appeal, such as the issue of competency." *Id.* And, therefore, he does "not wish to proceed with more and/or endless litigation." *Id.* He confirms that he understands he "will then be put to death for the heinous crime [he] committed," and that his execution "serves as both a punishment and a deterrent." *Id.*

Contrary to Corcoran's wishes, the State Public Defender filed two motions for permission to file two separate successive petitions for post-conviction relief and two accompanying motions to stay the execution while those petitions are litigated. Those submissions argue that Corcoran's mental illness precludes his execution. But we can only disregard Corcoran's decision to waive post-conviction remedies if he isn't competent to make that decision, and our Court previously concluded that he is. The State Public Defender again questions Corcoran's competency to waive post-conviction remedies, but she relies on the same evidence we considered the last time, and the minimal new evidence she identifies is offered only to confirm that Corcoran's condition is unchanged. Since Corcoran does not authorize the successive petitions on his behalf, we cannot authorize them either.

Even setting aside the fact that Corcoran has not authorized the requests for successive petitions, we still must deny the motions because

there is no reasonable possibility that Corcoran is entitled to relief. The State Public Defender has standing only to challenge Corcoran's competency to waive post-conviction remedies, and the remaining claims in the first petition are procedurally defaulted anyway. The second petition argues that Corcoran is not competent to be executed because he does not have a rational understanding of why the State will execute him. But we previously concluded he does; ample evidence, including his recent affidavit, further illustrates that; and the State Public Defender has not made the threshold substantial showing that anything has changed.

We therefore agree with the State that we must deny all four of the State Public Defender's motions.

# Facts and Procedural History

## I.   Prior State Court Proceedings

### A.   Corcoran's Direct Appeal

Just over twenty-five years ago, an Allen County jury convicted Joseph Corcoran of four murders. He had been "under stress because his sister's upcoming marriage would necessitate his moving out of her house," and "his brother said Corcoran could not move in with him." *Corcoran v. State*, 774 N.E.2d 495, 497 (Ind. 2002). When he "awoke one afternoon to hear his brother and others downstairs talking about him," "he loaded his rifle and went downstairs to intimidate them, but as Corcoran said later, 'It just didn't happen that way.'" *Id.* Instead, "Corcoran killed his brother, his sister's fiancé, and two other men in the ensuing incident." *Id.*

That same jury also recommended that Corcoran be sentenced to death for the four murders, and the trial judge imposed that sentence. When imposing the sentence, "the trial judge thoughtfully considered the nine mitigating circumstances asserted by the defendant," agreeing with many, including that "the defendant was under the influence of a mental or emotional disturbance at the time the murders were committed." *Corcoran*

*v. State*, 739 N.E.2d 649, 656 (Ind. 2000). But the judge gave each of the mitigating factors "medium or low weight," and she believed the aggravating circumstances—multiple murders—outweighed the mitigating circumstances. *Id.*

Corcoran didn't appeal his conviction, but he appealed his sentence, raising eight claims: four independent arguments that Indiana's death penalty statute violated the state and federal constitutions; an argument that the prosecutor committed misconduct in the penalty phase closing argument; an argument that the death penalty statute was ambiguous and had to be construed against the State; an argument that the judge improperly considered a non-statutory aggravator when sentencing; and an argument that the death sentence in this case is manifestly unreasonable. *Id.* at 651.

Our Court considered those arguments and unanimously rejected all but one; we agreed with Corcoran that the judge may have considered non-statutory factors when imposing a death sentence because she noted his future dangerousness to the community, the innocence of the victims, and the heinousness of the crime. *Id.* at 657. We remanded for resentencing based on the evidence already presented. *Id.* Chief Justice Shepard concurred with a separate opinion explaining that he agreed with the remand "largely because meticulous attention to capital cases at an early stage saves a good deal of effort later on." *Id.* at 658 (Shepard, C.J., concurring). He read the trial judge's sentencing statement as simply elaborating on the statutory factor for committing multiple murders, and he would have been willing to affirm on that basis. *Id.* But he nevertheless agreed it was "worth clarifying now that only statutory aggravating circumstances are being considered." *Id.*

On remand, the trial court reimposed the death sentence after again assigning "medium weight" to "the mitigating circumstance that [Corcoran] was under the influence of a mental or emotional disturbance at the time the murders were committed." *State v. Corcoran*, No. 02D04-9707-CF-465, 2001 WL 36099910 (Allen Superior Ct. Sept. 30, 2001). It based that conclusion on the opinions of court-appointed experts "that the Defendant suffered from a personality disorder, either paranoid

personality disorder, or schizotypal personality disorder." *Id.* Corcoran again appealed, and our Court affirmed in a 4-1 decision. *Corcoran*, 774 N.E.2d at 499. The majority rejected Corcoran's arguments that the trial judge again considered non-statutory aggravators, that the judge failed to consider all proffered mitigators, and that the sentence was manifestly unreasonable. *Id.* at 499, 500, 502.

As for the reasonableness of the sentence, Corcoran "argue[d] vehemently that his mental health should be of utmost significance in determining his sentence." *Id.* at 501. Our Court acknowledged that "[s]even qualified doctors analyzed Corcoran, and while they offered varying opinions," it seemed "the consensus was that Corcoran suffered from schizotypal or paranoid personality disorder." *Id.* (citations omitted). But after carefully reviewing the evidence, our Court was "satisfied that the trial court's decision that a quadruple killing was weightier than the proffered mitigation of Corcoran's mental health led the trial court to an appropriate sentence." *Id.* at 502.

Justice Rucker dissented because, like the attorneys arguing before us now, he did not "believe a sentence of death is appropriate for a person suffering a severe mental illness." *Id.* (Rucker, J., dissenting). As the attorneys now argue again, he thought the Eighth Amendment's ban on "cruel and unusual" punishment forecloses executing mentally ill prisoners like Corcoran for the same reasons the United States Supreme Court has said the Eighth Amendment prohibits executing the intellectually disabled. Even if the federal constitution didn't prohibit Corcoran's execution, he concluded—like the attorneys here argue—that Indiana's Constitution did. *Id.* at 503 ("Because Indiana's constitution affords even greater protection than its federal counterpart, I would hold that a seriously mentally ill person is not among those most deserving to be put to death. To do so in my view violates the Cruel and Unusual Punishment provision of the Indiana Constitution."). Corcoran requested rehearing, but we denied that request.

### B.  State Court Proceedings to Determine Corcoran's Competency to Waive Post-Conviction Remedies

Our rules permitted Corcoran to again challenge his sentence through procedures for post-conviction remedies, but he elected not to. *Corcoran v. State*, 820 N.E.2d 655, 656 (Ind. 2005), *aff'd on reh'g*, 827 N.E.2d 542 (Ind. 2005). However, the State Public Defender believed Corcoran was incompetent to make that decision given his mental illness, so she requested competency proceedings. *Id.* at 657. The trial court held a hearing, and the State Public Defender offered "the testimony of three mental health experts, each of whom concluded that Corcoran suffers from paranoid schizophrenia." *Id.* at 660 (footnote omitted).

They all said that symptomatic of Corcoran's condition was that he had "recurrent delusions that Department of Correction prison guards are torturing him through the use of an ultrasound machine, causing him substantial pain and uncontrollable twitching." *Id.* Based on their diagnosis, "all three experts concluded Corcoran was unable to make a rational decision concerning the legal proceedings confronting him." *Id.* They thought "Corcoran's decision to forgo post-conviction review of his sentence, thereby hastening his execution, was premised on his desire to be relieved of the pain that he believes he experiences as a result of his delusions." *Id.* In essence, they reasoned that "Corcoran's decision to forgo post-conviction review cannot be rational if based upon his delusions, which are irrational." *Id.*

As in the affidavit Corcoran recently submitted to our Court, in those earlier proceedings he "spoke directly to his reasons for not pursuing post-conviction review and the contention that his delusions were prompting his actions." *Id.* Just as he says now, he said then:

> See, I want to waive my appeals because I am guilty of murder. I think that I should be executed for what I have done and not because I am supposedly tortured with ultrasound or whatever. I am guilty of murder. I should be executed. That is all there is to it. That is what I believe. I believe the death penalty is a just punishment for four counts of murder, and I

believe that I should be executed since I am guilty of four
counts of murder.

*Id.* Dr. George Parker, after evaluating Corcoran for the competency
hearing, explained:

> He has a very clear awareness of the status of his case. He is
> aware he has been sentenced to death. He is aware that he is in
> the appeals process. He has a good memory of the events that
> have taken place from the time of the offense to the trial, to the
> sentencing phase, and then through the more extensive appeals
> phase. He is aware of the attorneys' positions and how, how
> the attorneys have changed over the course of the trial and then
> [the] appeals process. So, he has a good understanding of what
> is at issue.

*Id.* at 661.

That was consistent with Dr. Robert Kaplan's testimony, after
evaluating Corcoran, "that Corcoran was aware that by not continuing
with post-conviction review that he would be executed." *Id.* Both the
State's attorney and the presiding judge questioned Corcoran further and
confirmed his understanding of the legal proceedings and his legal
position. *Id.* That included the judge questioning "Corcoran with respect
to the entire history of his case," and Corcoran's answers reflecting that
"he was aware that he had been convicted of four capital crimes"; that "he
understood the purpose of his initial direct appeal to the Indiana Supreme
Court to review his death sentence and that his appeal had been
unsuccessful"; and that the post-conviction proceedings were his "last
attempt to review [the] case." *Id.* He confirmed that he had court-
appointed counsel whose judgment he trusted with one exception; he
disagreed with them challenging his competency to waive post-conviction
review. *Id.* at 662.

After an extensive review of the record, our Court concluded that
"[b]oth the State's and post-conviction judge's questioning of Corcoran
reaffirm the testimony of Dr. Parker that Corcoran was able to appreciate

the gravity of his legal position and the consequences of his choice to waive further post-conviction review." *Id.* And other portions of the record were "also sufficient evidence to support the post-conviction court's determination that Corcoran made his choice knowingly, voluntarily, and intelligently." *Id.* We explained:

> Corcoran's explicit denial that his delusions prompted him to waive his right to post-conviction review and his reasoning that his death sentence is commensurate with the crime he committed (the conclusion to which both the original trial court jury and judge came), makes it impossible for this Court to conclude that the evidence is without conflict and leads only to a conclusion contrary to the result of the post-conviction court.

*Id.* at 661 (brackets and quotations omitted).

The State Public Defender also raised two additional claims: (1) "the Constitution and the Indiana death penalty statute required this Court's review of issues regarding Corcoran's convictions even though he affirmatively waived such review"; and (2) "it would be unconstitutional to execute a severely mentally ill person, such as Corcoran." *Id.* at 662 (quotations omitted). We rejected those claims because Corcoran did not authorize the State Public Defender to make them, "and without his authority, neither the trial court in this proceeding nor this Court has jurisdiction to review claims for post-conviction relief." *Id.* at 663. We noted our acknowledgment and appreciation "that the State Public Defender raises these claims in the sincere belief that Corcoran is incompetent and did not knowingly, voluntarily, and intelligently waive his right to post-conviction review," but "that belief alone is not sufficient to overcome the rule's requirement" that Corcoran authorize the claim. *Id.* We also noted that the claims were likely to fail anyway because "both contentions appear to constitute free-standing claims of error that would not be available for post-conviction review." *Id.*

Justice Rucker again dissented. Like the State Public Defender argues here, Justice Rucker disagreed with the weight the majority placed on Corcoran's explanations of his understanding of his rights and the

proceedings and instead gave greater weight to the testimony of the three mental health experts who concluded Corcoran was not competent. *Id.* at 666 (Rucker, J., dissenting). Justice Rucker acknowledged "that the existence of delusions and a diagnosis of paranoid schizophrenia do not necessarily preclude rational decision-making and competence." *Id.* at 669. But he believed there was more credence to the experts' conclusion "that Corcoran's decision to welcome and hasten his own death is based on his delusional perception of reality and has no basis in rational thought whatsoever." *Id.*

We affirmed our judgment on rehearing with a published opinion. *Corcoran v. State*, 827 N.E.2d 542, 546 (Ind. 2005).

## C.   Corcoran's Untimely Petition for Post-Conviction Relief

While the appeal of Corcoran's competency proceedings was pending, he changed his mind and decided to pursue post-conviction relief. He then filed a petition for post-conviction relief reflecting his authorization, but that was after the deadline, so the post-conviction court dismissed his petition, and we affirmed. *Corcoran v. State*, 845 N.E.2d 1019, 1020 (Ind. 2006). Only Justice Rucker dissented, this time without a separate opinion. Our Court's majority opinion emphasized that by that point, we had "afforded Corcoran considerable review of his sentence[] and the post-conviction court's competency determination." *Id.* (citations omitted). And "[t]he public interest in achieving finality at [that] stage weigh[ed] heavily against further review." *Id.* at 1023.

# II.  Federal Court Proceedings

## A.   District Court Habeas Proceedings

Following those first six years of post-conviction litigation, review of Corcoran's conviction and sentence moved to the federal courts when he filed a habeas corpus petition under 28 U.S.C. § 2254 in the Northern

District of Indiana. The court began by noting the "unusual and more convoluted than normal" procedural history. *Corcoran v. Buss*, 483 F. Supp. 2d 709, 712 (N.D. Ind. 2007), *rev'd*, 551 F.3d 703 (7th Cir. 2008), *cert. granted, judgment vacated sub nom. Corcoran v. Levenhagen*, 558 U.S. 1, 130 S. Ct. 8, 175 L. Ed. 2d 1 (2009), *and opinion reinstated sub nom. Corcoran v. Wilson*, 651 F.3d 611 (7th Cir. 2011), *and aff'd as modified sub nom. Corcoran v. Levenhagen*, 593 F.3d 547 (7th Cir. 2010), *as amended on denial of reh'g and reh'g en banc* (Apr. 14, 2010), *and aff'd in part, rev'd in part sub nom. Corcoran v. Wilson*, 651 F.3d 611 (7th Cir. 2011). As the citation for that statement foreshadows, the procedural history only got more convoluted from there.

Turning to the claims, the district court felt "compelled to note at this point that this habeas corpus petition is seriously untimely," but it did not dismiss because the respondent had not requested dismissal on that basis. *Id.* at 716, 718. It then granted the petition in part. It agreed with Corcoran that the State's pretrial offer (which he rejected) to waive the death penalty in exchange for Corcoran agreeing to a bench trial violated his Sixth Amendment right to a jury trial, and the court ordered the case remanded for resentencing without the option of reimposing the death penalty. *Id.* at 725–26.

Given this holding, the court declined to address the remaining claims that the trial judge made errors in the sentencing, that Indiana's death penalty statute was unconstitutional, that there was prosecutorial misconduct during the penalty phase, and that Corcoran was incompetent to be executed. *Id.* The court rejected the argument that Corcoran was not competent to stand trial or waive his direct appeal because those claims were procedurally defaulted. *Id.* at 728–29.

Corcoran's counsel also challenged our Court's conclusion that he was competent to waive post-conviction proceedings, and after reviewing the record, the district court concluded our determination was "neither an unreasonable application of United State[s'] Supreme Court law nor an unreasonable determination of the facts." *Id.* at 733. The district court noted that "[t]he state courts acknowledged that the petitioner suffers from a mental illness and fully confronted this question," but "[i]n the end they determined that his mental illness did not substantially affect his

capacity to appreciate his position as a death row inmate and that he understood how and why he was there." *Id.* And "[n]either did his mental illness impact his understanding of his legal position *vis-à-vis* his appeals." *Id.* The court explained that while "philosophically one can question whether it can ever be a rational choice to abandon appeals which are the only means to avoid the death penalty, legally even [United States Supreme Court precedent] leaves no doubt that it is possible to do so." *Id.* So, "[f]rom a legal perspective, the state court's determination that the petitioner made a rational choice [w]as not unreasonable." *Id.* It concluded that on this issue, "[t]he opinion of the Supreme Court of Indiana, as presented above, is thorough, thoughtful, and reasonable," so "no relief can be granted on this ground." *Id.* at 733–34.

## B.    First Seventh Circuit Appeal

The respondent appealed, and the Seventh Circuit reversed the district court's decision granting partial habeas relief and affirmed the district court's decision regarding competency. *Corcoran v. Buss*, 551 F.3d 703, 704 (7th Cir. 2008), *cert. granted, judgment vacated sub nom. Corcoran v. Levenhagen*, 558 U.S. 1, 130 S. Ct. 8, 175 L. Ed. 2d 1 (2009), *and opinion reinstated sub nom. Corcoran v. Wilson*, 651 F.3d 611 (7th Cir. 2011). As for our Court's conclusion that the State's offer not to pursue the death penalty in exchange for Corcoran waiving a jury trial did not violate his constitutional rights, the federal appellate court concluded our decision "was neither incorrect nor unreasonable to warrant the district court's grant of [Corcoran's] habeas petition." *Id.* at 712.

Corcoran cross-appealed the district court's holding that he was competent to waive post-conviction proceedings. But the Seventh Circuit affirmed, observing that our Court "gave careful consideration of all the evidence presented at the post-conviction hearing." *Id.* at 713. The court recounted our acknowledgment "that the experts testified that Corcoran suffered from paranoid schizophrenia and his resulting delusions caused him to waive further review of his sentence, but [we] also found that Corcoran had a clear awareness of the status of his case and what was at risk if he waived further review." *Id.* And we considered "Corcoran's own

conduct and testimony at the hearing, in which he stated that his decision to waive further proceedings was based on his remorse for his crime, and not on any 'delusions' he was said to have been experiencing." *Id.* In the end, while "experts believed otherwise, the Indiana Supreme Court was entitled to accept Corcoran's contention that his request to waive further proceedings was based on his belief that death is a just punishment for his crimes." *Id.*

The court also noted our repeated conclusions that a defendant's acceptance of the death penalty is not necessarily irrational. *Id.* at 714 (citing *Smith v. State,* 686 N.E.2d 1264, 1273 (Ind. 1997) (considering a defendant's preference for death over life imprisonment, where there was an indication of his desire not to spend the rest of his life in prison, and concluding that to do so is not "per se irrational"). And it noted it had reached that conclusion in the past too. *Id.* (citing *Wilson v. Lane*, 870 F.2d 1250, 1254 (7th Cir. 1989) (affirming a district court's finding of a death row inmate's competency to waive further appeals even though the inmate was ruled mentally incompetent after considering the inmate's unwavering testimony that he was aware of his position and of the federal review options available to him, and that he based his decision not on the conditions of his confinement, but on his belief that death was a better option than life in prison)).

The court further found "no support for Corcoran's contention that a petitioner who has been diagnosed with a mental illness is not competent to waive post-trial proceedings." *Id.* As it explained, the question "is whether a mental illness substantially affects the capacity to appreciate his options and make a rational choice among them." *Id.* The Seventh Circuit's "review of the transcripts and the evidence before the Indiana Supreme Court reveals that it (as well as the two other courts that considered Corcoran's competency) thoroughly and conscientiously examined Corcoran's claims of incompetency, and its findings that he had a 'rational understanding of and [could] appreciate his legal position' are factually supported by the record." *Id.* The court remanded with instructions to deny habeas relief, leaving Indiana at liberty to reinstate the death sentence. *Id.*

Judge Williams dissented in part, disagreeing with the majority on the competence issue. She saw the issue like Justice Rucker did. She explained that "[n]o one contests that Corcoran suffers from a mental illness," and that "is clear from his delusion that prison guards torture him daily with an ultrasound machine, his conversations with individuals who are not there, and his delusion that he suffers from an involuntary speech disorder." *Id.* at 714–15 (Williams, J., concurring in part and dissenting in part). Like Justice Rucker, Judge Williams placed great weight on the fact that "[t]he three experts who testified in the competency hearing unanimously concluded that Corcoran suffers from paranoid schizophrenia that renders waiver of further appeal of his death sentence impossible because the illness prevents him from making rational decisions." *Id.* at 715. Judge Williams didn't believe the record supported some of our Court's factual statements, and she faulted the Court for failing "to consider Corcoran's testimony in light of his delusions." *Id.* at 716.

## C.   First United States Supreme Court Review

The United States Supreme Court then granted certiorari and vacated the Seventh Circuit's decision in a *per curiam* opinion. *Corcoran v. Levenhagen*, 558 U.S. 1, 3 (2009). It did not quarrel with the analysis of the Seventh Circuit panel majority for the issues the panel considered, but Corcoran had raised other issues too. So the Supreme Court remanded for the Seventh Circuit either to consider the four other grounds for habeas relief that Corcoran raised or to explain why consideration of those issues was unnecessary. *Id.* at 2.

## D.   Seventh Circuit Remand

On remand, the Seventh Circuit concluded that "all of Corcoran's remaining habeas challenges are waived, and that three of them are frivolous, but that one of the challenges nevertheless entitles him to a new sentencing hearing." *Corcoran v. Levenhagen*, 593 F.3d 547, 549 (7th Cir.), *as amended on denial of reh'g and reh'g en banc* (Apr. 14, 2010), *cert. granted, judgment vacated sub nom. Wilson v. Corcoran*, 562 U.S. 1, 131 S. Ct. 13, 178 L.

Ed. 2d 276 (2010). That one issue was that the Seventh Circuit agreed with Corcoran that the trial judge again relied on a non-statutory aggravator when reimposing the death sentence because she said that her statements about Corcoran's future dangerousness, the victims' innocence, and the heinousness of the murders were part of the explanation for the weight she gave to the statutory factor for multiple murders. *Id.* at 551. And, the Seventh Circuit explained, "factor weighting is part of factor 'balancing', the very process in which the trial court disclaimed reliance on non-statutory aggravators." *Id.*

### E.    Second U.S. Supreme Court Review

The case then returned to the United States Supreme Court, and it again issued a *per curiam* opinion reversing the Seventh Circuit. *Wilson v. Corcoran*, 562 U.S. 1, 2 (2010). It explained that "[f]ederal courts may not issue writs of habeas corpus to state prisoners whose confinement does not violate federal law." *Id.* The panel's discussion of the sentencing factors addressed a matter of state law, and "the panel's opinion contained no hint that it thought the violation of Indiana law it had unearthed also entailed the infringement of any federal right." *Id.* at 5.

### F.    Second Seventh Circuit Remand

On remand to the Seventh Circuit, the federal appellate court concluded that "[i]n hindsight [it] should have returned the case to the district court after the first remand from the Supreme Court," which it went ahead and did on the second remand. *Corcoran v. Wilson*, 651 F.3d 611, 613 (7th Cir. 2011). It noted, "however, that neither of the Supreme Court's decisions casts doubt on [the Seventh Circuit's] resolution of the issues raised in the initial appeal, in which [the court] found no basis for habeas relief on the claimed Sixth Amendment violation or on the issue of Corcoran's competency to waive post-conviction remedies." *Id.* The court therefore reinstated and incorporated by reference its earlier opinion in *Corcoran v. Buss*, 551 F.3d 703, "to the extent that it (1) reversed the district court's judgment granting habeas relief on the basis of the claimed Sixth Amendment violation; and (2) affirmed the district court's conclusion that

the Indiana courts did not mishandle the issue of Corcoran's competence to waive post-conviction remedies." *Corcoran*, 651 F.3d at 613. The court also reinstated Judge Williams' dissent on the competency issue. *Id.* at 613–614. And it remanded to the district court to permit it to address Corcoran's remaining grounds for habeas relief. *Id.* at 614.

## G.   District Court Remand

On remand, the district court considered the remaining habeas claims. While the habeas petition initially argued eight grounds for relief, only two remained contested. *Corcoran v. Buss*, No. 3:05-CV-389, 2013 WL 140378, at *1 (N.D. Ind. Jan. 10, 2013), *aff'd sub nom. Corcoran v. Neal*, 783 F.3d 676 (7th Cir. 2015). Corcoran's counsel claimed "that in imposing the death penalty the trial court improperly considered non-statutory aggravating circumstances and failed to consider mitigating evidence, all in violation of the petitioner's constitutional rights as secured by the Eighth and Fourteenth Amendments." *Id.* They also claimed "that Indiana's Death Penalty Statute is facially unconstitutional because it does not distinguish between circumstances that warrant a sentence of death and circumstances that warrant a sentence of life imprisonment without parole." *Id.* The district court rejected both claims, explaining that "[b]oth claims were adjudicated on the merits by the Indiana Supreme Court, which ruled in favor of the State," and counsel had not demonstrated error as required by 28 U.S.C. § 2254(d). *Id.*

## H.   Second Seventh Circuit Appeal

Corcoran again appealed to the Seventh Circuit, which affirmed. *Corcoran v. Neal*, 783 F.3d 676, 677 (7th Cir. 2015). The court explained that its earlier opinion disagreed with our Court's assessment that the trial judge did not in fact rely on nonstatutory aggravating factors, but that vacated decision "did not adequately grapple with the deference owed to state-court factual findings under the Antiterrorism and Effective Death Penalty Act." *Id.* After "[g]iving the matter a fresh look," the court concluded our "factual determination was not unreasonable." *Id.* The court further concluded that our Court "reasonably determined that the

trial judge considered all proffered evidence in mitigation," and "[t]he sentencer's obligation to consider mitigating evidence in a capital case does not require that the evidence be credited or given any particular weight in the final sentencing decision." *Id.* at 677–78.

## III. State's Motion to Set Execution Date

At that point, there was no remaining litigation and no stay of execution.

On June 26, 2024, the State filed a Verified Motion to Set Execution Date. It explained that "Corcoran has completed state and federal review of his convictions and sentence." Mot. at 1, ¶ 2. And "[n]ow that the federal courts have denied Corcoran's federal habeas petition, no further grounds for review of the validity of his convictions or sentence are available." *Id.* at 3, ¶ 3. Because "[t]his Court has the exclusive jurisdiction to stay the execution of a death sentence as well as the duty to order a new execution date when the stay is lifted," the State requested that we set the date for Corcoran's execution. *Id.* at 3–4, ¶ 5.

The State Public Defender filed a Response to Motion to Set Execution Date, which began by quoting the dissents from Justice Rucker and Judge Williams, and then arguing that the Court should deny the motion because "executing the unquestionably seriously mentally ill Appellant would violate the Eighth Amendment to the United States Constitution and Article I, § 16 of the Indiana Constitution." Resp. at 1. The evidence on which the State Public Defender relied came from the previous direct appeal record and the previous competency proceedings record. *See id.* at 2 n.1, 18.

We granted the State's motion, explaining our limited role given the procedural posture. We acknowledged that "a petitioner can raise claims involving previously undiscovered evidence through a written petition under Section 35-50-2-9(k), raise constitutional claims through a successive petition for post-conviction relief under Post-Conviction Rule 1(12), or raise challenges to an execution protocol through a civil lawsuit." Order at 2. But Corcoran had not pursued any such claims, and the evidence the

State Public Defender cited in the response brief was not new. *Id.* We therefore granted the State's motion on September 11, 2024, and set an execution date of December 18, leaving over three months for the State to undertake preparations for an execution and for Corcoran to pursue any remaining remedies he believed warranted.

## IV. State Public Defender's Current Motions for Permission to File Successive Petitions

For most of that time, neither Corcoran nor anyone on his behalf pursued any claims. But on November 15, 2024, the State Public Defender filed four submissions in our Court: two motions (with proposed petitions) seeking permission to file two successive post-conviction relief petitions, and two motions to stay the execution (one motion for each petition) while those petitions are litigated.

The first proposed Successive Petition for Post-Conviction Relief argues: (1) that Corcoran's death sentence violates the ban on "cruel and unusual" punishments in the Eighth Amendment to the U.S. Constitution because he is severely mentally ill, and executing the severely mentally ill is cruel and unusual; (2) Corcoran's death sentence violates the ban on "cruel and unusual punishments" in Article One, Section 16 of the Indiana Constitution for the same reason; and (3) Corcoran's death sentence violates the Equal Protection Clause in the Fourteenth Amendment to the U.S. Constitution because the State is treating the severely mentally ill different than the intellectually disabled and juveniles, whom the State will not execute. The second proposed Successive Petition for Post-Conviction Relief argues that "Corcoran is not currently competent to be executed under *Panetti v. Quarterman*, 551 U.S. 930 (2007), and *Ford v. Wainwright*, 477 U.S. 399 (1986)," because the State Public Defender does not believe Corcoran can "rationally understand his execution or the reason for it." [Second] Successive Pet. for Post-Conviction Relief at 1–2, 15.

We have jurisdiction because of the death sentence, Ind. Appellate Rule 4(A)(1)(a), and we expedited briefing on the motions. That briefing closed

on December 3, 2024, fifteen days before the execution date. Each member of the Court reviewed the submissions as they were filed, and the Court discussed the submissions at a conference after the briefing concluded. To afford counsel the benefit of the remaining time before the execution date to pursue any relief they believe appropriate in the federal courts, we immediately issued an order reflecting the Court's decision denying the motions on December 5, with this opinion explaining the reasoning a few days later.

## Discussion and Decision

"Any person who has been convicted of, or sentenced for, a crime by a court of this state," Ind. Post-Conviction Rule 1(1)(a), "has the right to collaterally attack that conviction or sentence through a petition for post-conviction relief." *Shaw v. State*, 130 N.E.3d 91, 92 (Ind. 2019). "But a second or successive post-conviction petition cannot be filed without prior authorization from this Court (in capital appeals) or the Court of Appeals (in all other appeals), either of which 'will authorize the filing of the petition if the petitioner establishes a reasonable possibility' that the petitioner is entitled to relief." *Id.* (quoting P-C. R. 1(12)). "By permitting successive post-conviction petitions only when the petitioner makes some showing of merit, this appellate screening function reduces the burden on trial courts." *Id.*

"In deciding whether a petitioner has made the required showing, we consider the applicable law, the successive post-conviction papers, materials from the prior appeals and post-conviction proceedings including the record, briefs and court decisions, and any other material we deem relevant." *Wrinkles v. State*, 915 N.E.2d 963, 965 (Ind. 2009). "Post-conviction proceedings are not a 'super-appeal'; rather, the grounds enumerated in the Post-Conviction Rules are limited to issues that were not known at the time of the original trial or that were not available on direct appeal." *Shaw*, 130 N.E.3d at 92–93 (quotations omitted). If we were to authorize the successive post-conviction petitions proposed here, Corcoran would have a right to appointed counsel, and the case would return to the trial court for proceedings consistent with Post-Conviction

Rule 1(12)(c). *See Baird v. State*, 833 N.E.2d 28, 30 (Ind. 2005), *cert. denied*, 546 U.S. 924 (2005).

Corcoran has informed us that he does not wish to assert any further claims in the courts, including that he does not wish to file any successive petitions for post-conviction relief. His affidavit states bluntly: "I, Joseph Edward Corcoran, do not wish to litigate my case further." Affidavit at 1—2, ¶ 3; *id.* ("I am hereby making this statement to the Court through this affidavit: I do not wish to proceed with more and/or endless litigation."). The State Public Defender confirms that remains his wish. [Second] Mot. for Stay of Execution at 6 ("Indeed, currently, Mr. Corcoran wants to be executed . . . .").

Nevertheless, the State Public Defender seeks permission to file two successive post-conviction relief petitions on his behalf anyway. The State argues we should not authorize the filings because Corcoran has not signed them and does not authorize them, and even if he had signed or authorized them, there is not a reasonable possibility that he is entitled to post-conviction relief. We agree with the State that we must deny the State Public Defender's motions for two independently sufficient reasons.

First, Corcoran does not wish to pursue post-conviction relief. Our Court has already concluded he is competent to make that decision, and a key premise of the State Public Defender's submissions is that nothing has changed about Corcoran's condition since then. Second, the submissions do not demonstrate a reasonable possibility that Corcoran is entitled to relief.

# I.   Corcoran's Competency to Waive Post-Conviction Relief

As we held in the previous appeal of the post-conviction court's determination that Corcoran is competent to waive post-conviction remedies, a petitioner seeking those remedies must authorize the petition unless they are incompetent to do so. *Corcoran v. State*, 820 N.E.2d 655, 663 (Ind.), *aff'd on reh'g*, 827 N.E.2d 542 (Ind. 2005) ("Corcoran himself did not authorize this proceeding within the timeframe required by Criminal Rule

24(H) and without his authority, neither the trial court in this proceeding nor this Court has jurisdiction to review claims for post-conviction relief."). The State Public Defender says that, for a couple reasons, it doesn't matter that Corcoran didn't sign the two proposed petitions, but we disagree with each.

First, the State Public Defender argues that "attorneys are agents of their clients," so they can always sign on their client's behalf. Reply at 13. This argument misses the more fundamental point: "It is the primary duty of an agent to obey the instructions given by the principal," and "[t]he essence of an agency relation is the right of the principal to give directions that the agent is under a duty to obey as long as they remain the agent." 2A C.J.S. Agency § 295; *see also* Restatement (Third) of Agency § 8.09(2) (Am. Law Inst. 2006) ("An agent has a duty to comply with all lawful instructions received from the principal and persons designated by the principal concerning the agent's actions on behalf of the principal.").  So even if the attorneys are Corcoran's agents who can sign filings on his behalf, he still has to authorize them to file the successive petitions unless he is incompetent to waive post-conviction relief. *Corcoran*, 820 N.E.2d at 663.

That competency question has been thoroughly litigated in both state and federal courts, which have concluded Corcoran is competent to waive post-conviction remedies after reviewing the same extensive evidentiary record that the State Public Defender relies on now. As the Seventh Circuit described, our Court "gave careful consideration of all the evidence presented at the post-conviction hearing" and then concluded Corcoran "had a clear awareness of the status of his case and what was at risk if he waived further review," and that "his request to waive further proceedings was based on his belief that death is a just punishment for his crimes." *Corcoran v. Buss*, 551 F.3d 703, 712 (7th Cir. 2008), *cert. granted, judgment vacated sub nom. Corcoran v. Levenhagen*, 558 U.S. 1 (2009), *and opinion reinstated sub nom. Corcoran v. Wilson*, 651 F.3d 611 (7th Cir. 2011).

Second, the State Public Defender argues it would be bad policy "to deprive a mentally ill person access to the court to litigate competency simply because they do not sign a petition." Reply at 14. Depriving that

access, the argument goes, would deny the person of "access to the courts to evaluate their mental illness because of their mental illness." *Id.* at 15. But Corcoran's competency to waive post-conviction relief has already been litigated in state and federal courts. And the State Public Defender does not claim Corcoran's condition has changed such that while he was previously competent to waive post-conviction remedies, he is no longer competent. Instead, the State Public Defender confirmed Corcoran's condition is the same as it has been for decades. [Second] Successive Pet. for Post-Conviction Relief at 14 ("*As he has for twenty years*, he experiences auditory hallucinations, psychosis, and the ever-present delusions . . . ."(emphasis added)).

Because our Court has concluded that Corcoran is competent to waive post-conviction remedies and he has again elected to do so, we do not authorize the successive petitions.

## II.  Appellate Screening

The State Public Defender's motions fail for another reason: they do not demonstrate a reasonable possibility that Corcoran is entitled to post-conviction relief through either petition.

### A.  First Proposed Petition

The first proposed petition seeks relief based on arguments that Corcoran's death sentence violates: (1) the ban on "cruel and unusual" punishments in the Eighth Amendment to the U.S. Constitution because he is severely mentally ill, and executing the severely mentally ill is cruel and unusual; (2) the ban on "cruel and unusual punishments" in Article One, Section 16 of the Indiana Constitution for the same reason; and (3) the Equal Protection Clause in the Fourteenth Amendment to the U.S. Constitution because the State is treating the severely mentally ill different than the intellectually disabled and juveniles, whom the State will not execute. There is no reasonable possibility of success on this petition for at least two threshold reasons.

First, the State Public Defender lacks standing to make these arguments. As we said the last time these arguments were made on Corcoran's behalf contrary to his wishes: "We hold that the State Public Defender does not have standing to raise the other claims she presents without Corcoran's consent." *Corcoran v. State*, 820 N.E.2d 655, 664–65 (Ind.), *aff'd on reh'g*, 827 N.E.2d 542 (Ind. 2005). We agreed with the State that the State Public Defender's standing was limited to litigating Corcoran's competency to waive post-conviction relief. *Id.* at 658.

Second, as we also observed in that opinion, these arguments "appear to constitute free-standing claims of error that would not be available for post-conviction review." *Id.* at 663. "Indiana's Post-Conviction Rule 1(8) addresses res judicata and procedural default." *Isom v. State*, 235 N.E.3d 150, 151 (Ind. 2024). That rule says: "All grounds for relief available to a petitioner under this rule must be raised in his original petition." P-C.R. 1(8). "The petitioner may raise new claims in a successive petition only if the unraised claims 'could not have been raised in earlier proceedings.'" *Isom*, 235 N.E.3d at 152 (quoting *Matheney v. State*, 834 N.E.2d 658, 662 (Ind. 2005)).

"Unraised claims that are 'knowingly, voluntarily and intelligently waived . . . may not be the basis for a subsequent petition' absent a sufficient reason [they were] not asserted.'" *Id.* (quoting P-C.R. 1(8)). "Unraised claims that should have been raised previously are waived or 'procedurally defaulted.'" *Id.* (quoting *Matheney*, 834 N.E.2d at 662). "Our res judicata doctrine bars relitigating post-conviction claims that have already been decided." *Id.* (cleaned up). Claims that it would be unconstitutional for the State to execute Corcoran because of his mental illness could have been, and indeed were, raised in the previous proceedings. *Corcoran*, 820 N.E.2d at 657, 662 (rejecting the claim that "it would be unconstitutional to execute a severely mentally ill person, such as Corcoran" (quotations omitted)).

Because the State Public Defender lacks standing to raise these claims, and procedurally defaulted claims have no chance of success anyway, the State Public Defender has not demonstrated a reasonable possibility of success with the first-filed petition.

## B.    Second Proposed Petition

The State Public Defender's second Successive Petition for Post-Conviction Relief argues Corcoran is not competent to be executed. Specifically, she argues that "Corcoran is not currently competent to be executed under *Panetti v. Quarterman*, 551 U.S. 930 (2007), and *Ford v. Wainwright*, 477 U.S. 399 (1986)," because, she says, Corcoran cannot "rationally understand his execution or the reason for it." [Second] Successive Pet. for Post-Conviction Relief at 1–2. Like the first petition, this petition does not demonstrate a reasonable possibility that Corcoran is entitled to relief.

## 1.    Eighth Amendment Limitations

The Eighth Amendment to the U.S. Constitution prohibits "cruel and unusual punishments," U.S. Const. amend. VIII, and that prohibition is applicable to the States through the Fourteenth Amendment, *Jones v. Mississippi*, 593 U.S. 98, 105 (2021). The United States Supreme Court interprets that bar on cruel and unusual punishments as prohibiting the execution of a prisoner who has "lost his sanity" after sentencing, *Ford*, 477 U.S. at 406, which, in this context, means they "are unaware of the punishment they are about to suffer and why they are to suffer it," *id.* at 422 (Powell, J., concurring); *see also Timberlake v. State*, 858 N.E.2d 625, 628–29 (Ind. 2006) (explaining that "persons are incompetent to be executed if they are insane; persons are insane if they are unaware of the punishment they are about to suffer and why they are to suffer it").

"The critical question is whether a prisoner's mental state is so distorted by a mental illness that he lacks a rational understanding of the State's rationale for his execution." *Madison v. Alabama*, 586 U.S. 265, 269 (2019) (cleaned up). In other words, "the issue is whether a prisoner's concept of reality is so impaired that he cannot grasp the execution's meaning and purpose or the link between his crime and its punishment." *Id.* (cleaned up). Prisoners are "presumed to be" competent to be executed. *Timberlake*, 858 N.E.2d at 628. And to litigate the question of competence to be executed, the movant must make a "substantial threshold showing," *Panetti*, 551 U.S. at 949, that their mental illness prevents them from

"'rational[ly] understanding' why the State seeks to impose" the death penalty, *Madison*, 586 U.S. at 267.

A couple key considerations inspire the U.S. Supreme Court's understanding that the Eighth Amendment prohibits executing those who lack a rational understanding of the execution even though their mental illness does not excuse their crime and they were competent to be convicted. One is "a moral intuition that killing one who has no capacity to understand his crime or punishment simply offends humanity." *Id.* at 268 (quotations omitted). And the other is "the lack of retributive value in executing a person who has no comprehension of the meaning of the community's judgment." *Id.*

## 2.    Corcoran's Competency to be Executed

We agree with the State that the State Public Defender has not made the substantial threshold showing that Corcoran's mental illness prevents him from rationally understanding why the State seeks to impose the death penalty. To the contrary, Corcoran has demonstrated that he does have a rational understanding. As he explained in his recent affidavit, he "understand[s] that if this Court rejects [his] counsel's petition the death warrant will be carried out." Affidavit at 2, ¶ 4. He "will then be put to death for the heinous crime [he] committed," and he understands the "execution will end [his] life." *Id.*

His rational understanding includes the State's reason for executing him. He explains: "I understand the execution, in the interest of judgment, serves as both a punishment and a deterrent." *Id.* He also has a sophisticated, rational understanding of the proceedings. He says in his affidavit: "I remind this Court that my competence to waive my appeals has been adjudicated throughout the extensive appeal process." *Id.* at 2, ¶ 5. And while he understands counsel's strategy "to delay any and all executions through endless litigation" with the "hope to set a precedent so all future death penalty cases can be endlessly litigated effectively putting an end to all executions," *id.* at 1, ¶ 2, he does "not wish to litigate [his] case further," because he is "guilty of the crime [he] was convicted of," and he "accept[s] the findings of all the appellate courts," *id.* at 1–2, ¶ 3.

"The long drawn out appeal history has addressed all the issues [he] wished to appeal." *Id.*

That reaffirms what he has been saying for twenty years, and what we've previously considered to be a rational understanding. In the competency proceedings to evaluate whether he could waive post-conviction review, the courts credited his testimony that he understood that he was being executed "for what [he had] done," and he agreed "the death penalty is a just punishment for four counts of murder." *Corcoran*, 820 N.E.2d at 660–61. He said the same thing to the federal courts, explaining that "since [he is] guilty of murder," he "should be executed." Ex. 2 to Resp. in Opp'n to Mots. at 1. And he still thought "the death penalty is a just punishment for someone who is guilty of four counts of murder." *Id.*

The State Public Defender argues that while Corcoran has a *factual* understanding that the State is going to execute him as punishment for his crime, that doesn't necessarily mean he has a *rational* understanding. And the State Public Defender points to *Panetti* to illustrate the distinction.  In *Panetti*, the prisoner understood the state was saying that it wished to execute him for his murders, but "he believe[d] in earnest that the stated reason [was] a 'sham' and the State in truth want[ed] to execute him 'to stop him from preaching.'" 551 U.S. at 955. The U.S. Supreme Court explained that "the principles set forth in *Ford* are put at risk by a rule that deems delusions relevant only with respect to the State's *announced* reason for a punishment or the fact of an imminent execution, as opposed to the *real* interests the State seeks to vindicate." *Id.* at 959 (citation omitted) (emphases added). So if a prisoner is under the delusion that the State's stated reasons for punishment are a sham, then the prisoner is incompetent even though they understand what the State is claiming are the reasons.

But that isn't the case here. The State Public Defender doesn't claim, and there is no substantial threshold showing that, Corcoran has a delusional belief that the State has some reason for punishing him other than the reasons the State claims. No doubt, the State Public Defender points to evidence that some of Corcoran's other beliefs are irrational, but

his understanding of his execution is not. Virtually all the evidence the State Public Defender cites is the evidence we previously considered when determining Corcoran could waive post-conviction remedies. She does identify minimal new evidence—Corcoran's recent writings which reflect continued delusional thinking. But that is offered only to demonstrate that Corcoran's condition remains the same, not that it has changed and he is no longer competent to be executed. [Second] Successive Pet. for Post-Conviction Relief at 14 ("Now in 2024, Mr. Corcoran continues to suffer the debilitating symptoms of his paranoid schizophrenia. As he has for twenty years, he experiences auditory hallucinations, psychosis, and the ever-present delusions . . . ."); *id.* at 15 ("In short, Mr. Corcoran's longstanding and documented mental illness continues to torment him *as it did at the time of the 1997 offense*." (emphasis added)).

Many capital cases involving prisoners with similar mental illnesses illustrate that a prisoner can suffer from delusions that do not render them incompetent for execution. For example, in *Timberlake*, our court rejected the *Ford* claim even though Timberlake suffered from chronic paranoid schizophrenia because he had "the mental capacity to understand that he [was] about to be executed and why." *Timberlake*, 858 N.E.2d at 626. Timberlake suffered under "a paranoid delusional system resulting in his belief that a secret machine, operated by the government, controls, monitors and tortures people through their brains." *Id.* at 629.

Nevertheless, Dr. George F. Parker—who also examined Corcoran, *Corcoran*, 820 N.E.2d at 661—explained after examining Timberlake that while it was "abundantly clear that Mr. Timberlake was severely mentally ill, and suffers from essentially continuous auditory hallucinations," he "remained relatively organized regarding his legal status," and he "demonstrated an awareness that he had been convicted of the murder of a state police officer and had been sentenced to death as a result of his conviction." *Timberlake*, 858 N.E.2d at 629. Thus, "despite abundant evidence of psychotic systems, including constant auditory hallucinations and a complex and organized paranoid delusional system, it was clear . . . that Mr. Timberlake had the mental capacity to understand that he was about to be executed and why he was to be executed." *Id.* at 629–30. Based

on that evidence, we denied the request for further review and set an execution date. *Id.* at 630.

The State Public Defender has provided plenty of evidence that Corcoran suffers from a mental illness. But despite his mental illness, Corcoran has demonstrated he understands why he is being executed, and the State Public Defender has not provided any evidence suggesting that Corcoran's understanding is irrational. When concluding that Corcoran was competent to waive post-conviction remedies, we concluded that he has a non-delusional understanding of these legal proceedings. And part of what we relied on was his "reasoning that his death sentence is commensurate with the crime he committed (the conclusion to which both the original trial court jury and judge came)." *Corcoran*, 820 N.E.2d at 661.

We acknowledge, as the State Public Defender argues, that the inquiries for competency to waive post-conviction remedies and competency to be executed are not identical, and a claim challenging competency for execution is not ripe until the execution is scheduled. But those inquiries do overlap where it is relevant here. Our determination that Corcoran could waive his post-conviction remedies included an analysis of whether his mental illness interfered with his ability to understand why the State was executing him. And now that a challenge to competency for execution is ripe, there is no indication that Corcoran's understanding of why he is to be executed has changed. Every indication is that it remains the same. At bottom, the State Public Defender's arguments are rehashing the debates between the majorities and the dissents in the previous state and federal opinions evaluating Corcoran's competency, and that is not an adequate basis for further delaying the execution.

There is therefore no substantial threshold showing that Corcoran is not competent to be executed.

## III. Motions for Stay

The two pending motions seek a stay of execution so that the successive petitions can be litigated. Because we do not authorize those petitions, we deny both motions for stay.

# Conclusion

For these reasons, we decline to authorize the petitions for successive post-conviction relief, and we deny the requests for a stay of execution. Our rules permit—but do not require—a petition for rehearing. Rehearing should not be sought if counsel intend to again make the arguments we have already addressed. But if they do petition for rehearing, the petition must be filed no later than 12:00 p.m. on Thursday, December 12, 2024. The State's response must be filed no later than 12:00 p.m. on Friday, December 13, 2024. There will be no further responsive briefing, and no extensions of time for filing will be granted.

Massa and Slaughter, JJ., concur.
Goff, J., dissents with separate opinion in which Rush, C.J., joins.

ATTORNEYS FOR PETITIONER
Amy E. Karozos
Public Defender of Indiana

Joanna L. Green
Laura L. Volk
Deputy Public Defenders
Indianapolis, Indiana

Laurence E. Komp
Federal Public Defender Office
Kansas City, Missouri

ATTORNEYS FOR RESPONDENT
Theodore E. Rokita
Attorney General of Indiana

Angela Sanchez
Chief Counsel of Appeals

Tyler Banks
Deputy Attorney General
Indianapolis, Indiana

**238a**

**Goff, J., dissenting.**

There is no penalty more severe—more irrevocable—than death. So, when reviewing cases imposing this penalty, justice demands not haste but precision and care. Guaranteeing this demand constitutionally requires ensuring a prisoner is competent to be executed.

A trio of decisions from the U.S. Supreme Court provides the proper considerations. In *Ford v. Wainwright*, the Court held that the Eighth Amendment prohibits executing prisoners "whose mental illness prevents" them "from comprehending the reasons for the penalty or its implications." 477 U.S. 399, 417 (1986). The Court later clarified that the question is whether the prisoner can "reach a rational understanding of the reason for the execution." *Panetti v. Quarterman*, 551 U.S. 930, 958 (2007). And, most recently, the Court recognized that execution "lacks retributive purpose when a mentally ill prisoner cannot understand the societal judgment underlying [their] sentence." *Madison v. Alabama*, 586 U.S. 265, 279 (2019). To that end, "[a] prisoner's awareness of the State's rationale for an execution is not the same as a rational understanding of it." *Panetti*, 551 U.S. at 959. When an evidentiary threshold showing is made that a prisoner lacks this understanding, a hearing must be held to evaluate competency. *See id.* at 949–50; *Baird v. State*, 833 N.E.2d 28, 29 (Ind. 2005). And this showing can be made through "observations by lay persons, including a prisoner's attorney, and older assessments by experts." *Timberlake v. State*, 858 N.E.2d 625, 627 (Ind. 2006).

The evidence submitted by Corcoran's attorneys reveals a documented history of severe mental illness, an inability to cooperate with counsel, and a desire to be executed to escape prison—all of which raise substantial questions about his current mental capacity. As a result, we should stay Corcoran's execution to allow his attorneys to seek successive post-conviction relief to litigate his current competency. But at a minimum, we should stay Corcoran's execution and order a psychiatric examination.

# I. Evidence submitted by Corcoran's attorneys raises substantial questions about his competency to be executed.

The critical question under the Eighth Amendment is whether Corcoran's "mental state is so distorted by a mental illness that he lacks a rational understanding of the State's rationale for his execution." *Madison*, 586 U.S. at 269 (cleaned up). In other words, we must ask whether Corcoran's "concept of reality is so impaired that he cannot grasp the execution's meaning and purpose or the link between his crime and its punishment." *Id.* (cleaned up).

The evidence before us—consisting of prior expert evaluations and contemporary accounts and reports—raise significant concerns about whether Corcoran has the requisite rational understanding.

## A. Every medical expert to have examined Corcoran has found him to be seriously mentally ill.

At various points throughout Corcoran's capital proceedings, at least five different medical experts have found him incompetent. In 1999, two psychiatrists—Dr. Philip Coons and Dr. Larry Davis—concluded that Corcoran's paranoid schizophrenia prevented "his ability to assist his attorney in his defense," effectively rendering him incompetent to stand trial. Def.'s Pre-Sent. Memo., Supp. R. Vol. 1, pp. 23, 24. And at a 2003 post-conviction competency hearing, three experts—forensic psychiatrist Dr. George Parker, clinical psychologist Dr. Robert Kaplan, and neuropsychologist Dr. Edmund Haskins—testified to Corcoran's incompetency to waive his appeals. Post-Conviction Comp. Tr., pp. 13, 59, 66. According to these experts, Corcoran was not engaging in rational decision-making but electing to avoid post-conviction review because of his delusion that the prison was torturing him with an ultrasound machine. *Id.* at 11–12, 14, 50, 53, 66–67.

To ignore these findings now and proceed with execution without a current competency evaluation amounts to enabling his delusions—a

state-sanctioned escape from suffering rather than a measured act of justice. *See Panetti*, 551 U.S. at 960 (recognizing that "[t]he beginning of doubt about competence . . . . is a psychotic disorder").

## B. Corcoran's mental illness distorts his ability to rationally engage with the legal process.

Corcoran has consistently displayed an inability to cooperate with counsel and act rationally throughout his legal proceedings. His trial counsel recently submitted affidavits confirming that Corcoran's reasons for rejecting the State's plea offer "defied logic" and that they had "difficulties . . . consulting with Corcoran in a rational or logical manner." Affidavit of Mark Thoma, pp. 1, 3; Affidavit of John Nimmo, p. 1. To those points, Dr. Coons explained at trial that Corcoran's "refusal to accept either a plea bargain or a bench trial without the death penalty was a product of his mental illness." Def.'s Pre-Sent. Memo., Supp. R. Vol. 1, p. 24. As explained in Section I.A, evidence shows during post-conviction proceedings that Corcoran continued to lack a rational understanding of his decisions; the same was true during his federal habeas proceedings. Corcoran's Reply Br. at 3–4. And just last week, Corcoran's attorneys observed that he has never been able to "assist counsel with his defense" or "make rational decisions about his case." *Id.* at 4–5.

Corcoran's persistent refusal to cooperate with counsel underscores his impaired ability to assess and act on his own legal options. This is not a tactical choice; it is the result of his mental illness, as documented by expert testimony over decades. Allowing a person to "volunteer" for execution—whether by choosing to withhold mitigating evidence at sentencing, waiving the right to appellate review, or electing not to seek post-conviction relief—threatens to undermine the state's heightened-reliability interests in death-penalty cases, Anthony J. Casey, *Maintaining the Integrity of Death: An Argument for Restricting a Defendant's Right to Volunteer for Execution at Certain Stages in Capital Proceedings*, 30 Am. J. Crim. L. 75, 76–77, 97 (2002), and ultimately "threatens to diminish public confidence in the integrity of the judicial system," *Wright v. State*, 168 N.E.3d 244, 262 (Ind. 2021). Corcoran's constant irrational behaviors raise

constitutional red flags that demand scrutiny. *See* Richard J. Bonnie, *Mentally Ill Prisoners on Death Row: Unsolved Puzzles for Courts and Legislatures*, 54 Cath. U. L. Rev. 1169, 1181 (2005) ("The possibility, however slim, that incompetent individuals may not be able to assist counsel in reconstructing a viable factual or legal claim requires that executions be barred under these circumstances.").

Additionally, considering this Court previously recognized counsel's standing to litigate Corcoran's competency to waive post-conviction relief on his behalf without written consent, *see Corcoran v. State*, 820 N.E.2d 655, 658, 664–65 (Ind. 2005), I see no reason for depriving counsel of standing to litigate the question of Corcoran's current competency on his behalf.

## C. Contemporaneous evidence reinforces Corcoran's attorneys' incompetency claim.

Corcoran's well-documented paranoid schizophrenia and delusions have persisted for decades. In his world, he suffers from a speech disorder that causes him to unintentionally disclose his innermost thoughts to others as he sleeps. Compounding this paranoia, he believes prison guards perpetually torture him with an ultrasound machine. So pervasive are these delusions, Corcoran's attorneys submit, that he simply "cannot rationally understand the true reason for his execution." Reply Br. at 7. In his mind, Corcoran views execution not as punishment but as the only path to escaping the torment from which he suffers.

Contemporaneous evidence bolsters these observations. In March 2024, for example, medical records from the Department of Correction reported an "observable concern" with Corcoran's "expressed delusions," noting his belief that an "ultrasonic machine" perpetually controls his "thoughts, sleep, voice, etc." Memo. in Support of Successive PCR, Att. A, pp. 2, 3. And in a recently published "whistle-blower report," Corcoran, writing under a pen name, perpetuates these delusions, describing the use of "ultrasonic surveillance devices" by "correctional staff and other individuals and/or agencies" and the effect these devices have on him and other prisoners. JC Chase, *A Whistle-blower Report: Electronic Harassment* 18 (July 2024), Memo. in Support of Successive PCR, Att. B.

## II. Because ample evidence raises uncertainty over Corcoran's current competency, a short stay is warranted for the necessary evaluation.

While "delusions come in many shapes and sizes . . . not all will interfere with the understanding that the Eighth Amendment requires." *Madison*, 586 U.S. at 279. And here, Corcoran has made several statements indicating that he understands the true meaning and purpose of his execution. In a 2005 affidavit, he considered the death penalty "a just punishment for someone who is guilty of four counts of murder." State's Opp. Resp., Ex. 2. And in a letter to the district court the following year, he insisted that he "intentionally killed four people knowing that such an act was wrong," adding that he "should be executed" for committing such a crime. *Id.*, Ex. 1. These statements align with sentiments he expressed in a recently filed affidavit in which he attested to understanding the execution "as both a punishment and a deterrent." Affidavit of Joseph Corcoran (Nov. 22, 2024), p. 2.

But these statements, according to Corcoran's counsel, reflect only the dissonance of someone attempting to mask their mental illness. Indeed, much like his severe mental illness, Corcoran's attempts to hide his delusions are well-documented. Dr. Coons testified at trial that a "person with paranoid schizophrenia generally minimizes their symptoms"—behavior he found consistent with Corcoran's attempts to minimize his symptoms. R. Vol. 13, p. 2076; *see also* R. Vol. 11, p. 1658 (Dr. Eric Engum, another trial expert, testifying to Corcoran's "secretive" behavior, which he found "consistent with the paranoia and suspiciousness").

In any event, Corcoran's statements do not negate the evidentiary threshold showing that he is incompetent to be executed. They must be weighed against two-plus decades of evidence apparently establishing that his delusions about the ultrasound machine and sleep and speech disorders were and are very real to him. So even if it seems that Corcoran may understand why the State is seeking execution, the point is that we simply do not know. Even a "prisoner's awareness of the State's rationale for an execution," his acknowledgment that "he will be executed," and his

understanding that "the reason the State has given for the execution is his commission of the crimes in question" does not resolve the inquiry into whether he has a "rational understanding of the reason for the execution." *Panetti*, 551 U.S. at 956–58. A competency evaluation is needed not because Corcoran fails to acknowledge the facts of his case, but because evidence shows that his mental illness distorts his ability to have the requisite rational understanding.

Additionally concerning is that Corcoran's writings reflect a desire to be executed to avoid further imprisonment. In 2006, for example, he expressed a desire to waive his appeals to "die and escape" prison, which he characterized as benefit because he didn't "want to live in prison for the rest of [his] life." State's Opp. Resp., Ex. 1. And the recently filed affidavit reflects a similar desire. *See* Affidavit of Joseph Corcoran (Nov. 22, 2024). The death penalty, however, is not a mechanism for granting reprieve from suffering or a means to expedite escape from incarceration. It is the gravest act the State can undertake, reserved for those who bear the full weight of their moral culpability. And thus, honoring Corcoran's request undermines society's interest "in not allowing the death penalty . . . to be used as a means of state-assisted suicide." *Smith v. State*, 686 N.E.2d 1264, 1275 (Ind. 1997). To accommodate Corcoran's expressed desire and authorize an execution sought to avoid continued incarceration violates the dignity of both the defendant and the judicial process.

At a minimum, to comply with constitutional due process requirements, this Court should appoint a psychiatrist to conduct a psychiatric examination of Corcoran to render an opinion on his current mental state. In *Timberlake v. State*, the petitioner made a competence claim like the one advanced here. *See Timberlake v. State*, No. 49S00-0606-SD235 (Ind. Sept. 18, 2006) (unpublished order for mental examination). While we ultimately found that Timberlake failed to make the requisite showing, we came to that conclusion only after we ordered contemporaneous testing—which Corcoran's attorneys have asked us to do. There is simply no reason to refuse this request. To the contrary, given the "irreversibility" of a death sentence, "we should err on the side of caution in carrying out an execution." *Baird*, 833 N.E.2d at 33 (Boehm, J., dissenting).

Such caution is particularly warranted here. Twenty-five years elapsed between Corcoran being sentenced to death and the State filing a petition asking us to set his execution date. We received that request last June, and now, less than six months later, Corcoran is scheduled to be executed with threshold evidence of incompetency. We should reaffirm our commitment to the Eighth Amendment and the principles it upholds by, at minimum, ordering a psychiatric examination of Corcoran's current mental status. Doing so would ensure that this irrevocable punishment aligns with moral culpability and that we are not conflating such punishment with escape.

## Conclusion

Corcoran has been diagnosed with paranoid schizophrenia by multiple experts. Due to that diagnosis, he has persistently displayed an irrational ability to assess and act on his own legal options. And, by his own words, he wants to be executed to avoid being incarcerated for the rest of his life. The bedrock of our constitutional order rests on the premise that punishment must align with moral culpability. With the evidence before us, executing Corcoran without first assessing his current mental competence defies this foundational principle.

For these reasons, and for the reasons above, I dissent from the denial of Corcoran's motion to stay and motion to file a successive petition for post-conviction relief.

Rush, C.J., joins.

# ATTACHMENT M

## VERIFICATION

Under penalty of perjury, the undersigned declares that she is the spouse of Mr. Joseph E. Corcoran, named in the foregoing petition and knows the contents thereof; that the pleading is true to the best of her knowledge; and that she is acting on behalf of Mr. Corcoran. 28 U.S.C § 2242.

DATED this 8ᵗʰ day of December 2024.

_Tabira Marie Corcoran_
Spouse/Next Friend of Petitioner

247a

ATTACHMENT N

*Angeline Stanislaus, M.D.*
*Board certified forensic psychiatrist*

*Two CityPlace Dr*                                    *angelinestanislaus@gmail.com*
*2nd floor, suite 200*                                              *618 791 1777*
*St. Louis MO 63141*

**PSYCHIATRY REVIEW OF JOSEPH CORCORAN**

12/10/2024

**Background Information:** Joseph Corcoran is 49 years old (DOB: 04/18/1975). In 1997, in the County of Allen, Indiana, he was charged with 4 counts of Murder for killing his brother James Corcoran, and three others, Doug Stillwell, Robert Turner and Timothy Brickner with a firearm on July 26,1997. In 1999, he was found guilty of all 4 counts of Murder following a trial by jury, and he was sentenced to death as recommended by the jury. He is scheduled for execution on December 18, 2024.

At the request of Federal attorney Laurence Komp, I had reviewed Mr. Corcoran's mental health history as documented in his records, and summarized my findings. I did not interview Mr. Corcoran. All the information contained in this report are from review of documents provided by Mr. Komp, and my findings are based on the record review.

**Review of his Psychiatry History:**

In 1992, at age 17, following the death of his parents, he was evaluated by the psychologist Dr. Spink. He was described as loner, who was depressed with suicidal thoughts. His responses on the Rorschach Test showed he distanced from people, had difficulty building rapport with others and was somewhat suspicious. On the Clinical Analysis Questionnaire, he was noted to be extremely reserved and detached, withdrawn, feeling persecuted, melancholic with a disorganized thought process. MMPI showed severe depression with anxiety and agitation, periods of confusion, unsociable and somewhat suspicious. He was diagnosed with Major Depressive Disorder with Anxiety and Agitation.

249a

*Page 1 of 12*

In 1992, he was prescribed Zoloft (antidepressant) briefly, which he took for a few weeks and stopped.

The Pre-Sentencing Memorandum dated August 14, 1999 indicates that Joseph Corcoran's sister Kelly, with who Joseph lived at the time of offenses in 1997, had reported that Joseph was extremely reclusive. He would often lock himself into his upstairs bedroom. He rarely left the room or spoke to others. He had an elaborate door lock to his bedroom and to the attic. He changed the lock code daily, fearing that others in the home would be looking through his things. Without reason he accused Jim (the brother) of this several times.

His sister Kim had also described him as a loner. He had isolated himself since the age of 5 or 6. He was afraid of things. When he was 15, he would hit himself about the face and head with his fists.

In 1998, when Joseph Corcoran was in Allen County Jail, he repeatedly asked for medical assistance for his "sleep disorder". His requests were multiple times a week. He claimed he was talking in his sleep. He believed this started when he lived with his sister and worked with his sister at TB Company. One night he had a dream about a woman he worked with, and he remembered the dream because he woke up in the middle of it. The next day, he overheard his sister telling people about the things that he remembered dreaming about. He believed his sister knew about the happenings in his dream from talking in his sleep. He believed it happened again before he went to court to enter his plea. Before going to sleep the previous night, he thought about what he was going to say. The next day his cell mates kept alluding to things that only he would have known. From this he gathered that he talked in his sleep. He believed that he responded to questions in his sleep, and he talked in his sleep every time he went to sleep. He believed one particular inmate quizzed him every time he went to sleep. He described this as a sleep disorder and requested medical help repeatedly, specifically an overnight sleep study evaluation.

While he was in the jail, he had reported he tried tying his mouth shut to stop him from talking in his sleep, but it would untie or it would slip. He reported the "sleep disorder" had progressed to the point that a lot of times he remembered what he said in his sleep, and it has integrated itself into his day dreams as well. He wanted to control the problem enough that he wouldn't talk at all.

He reported that it runs off at the mouth what he was thinking about or daydreaming about, and he does not hear what he says. He reported it was difficult to explain.

In July 1999, he was evaluated by psychiatrist, Dr. Coons, MD. Mr. Corcoran described the "sleep disorder". He also reported he thought the jail personnel can read his lips from a camera monitoring system in the jail, when he is sleeping. Dr. Coons noted he had a well-crystallized delusional system with a paranoid theme that Mr. Corcoran described as "a sleep disorder". He diagnosed him with Schizophrenia – paranoid type. In addition to the paranoid delusional system, Dr. Coons noted he had other symptoms of Schizophrenia such as emotional aloofness.

In 2000, he was seen by a psychiatrist at his request in the Indiana Department of Corrections. He reported frequent awakenings, anxiety and recurrent thoughts, which he would not elaborate. He wanted to know if he had Tourette's and asked if he could have surgery to severe vocal cords or at least use a muzzle.

In 2001, he wrote letters to his sister stating the guards are causing muscle spasms making sleep difficult. He believed that the guards have been amplifying the sounds of his mouth. His ribs hurt, foot twitches, chest hurts and it hurt to swallow. He asked that he be put to death sooner, and that would be a blessed relief from this place. In the letter, he stated, "I am reminded of a prophecy about a plague that will happen in end times. In those days, people will seek death but will not find it. They will long to die, but death will elude them."

In 2003, he was evaluated by psychiatrist Dr. George Parker to assess his Competency to Waive Appeals. In his testimony, Dr. Parker talked about Mr. Corcoran's continued belief that he speaks involuntarily in his sleep. Corcoran had also reported his belief that the Department of Corrections had created an ultra sound machine to torment him. The machine can make his muscles contract or twitch. The machine can project sounds into his face and he hears noises from right in front of him. This "torture machine" is controlled by the corrections staff. It caused him a lot of physical symptoms. He verbalized this theme for about 3-4 years prior to the evaluation by Dr. Parker. Mr. Corcoran had reported that his waking life was very uncomfortable and very painful at times. Being dead would put an end to that. He had written about this to his sister.

Dr. Parker opined that the daily torment of his symptoms of psychosis led to his irrational thought process of waiving his appeal. He noted that Corcoran minimized his active pathology. He had a

*Joseph Corcoran*                                                      *Page 4 of 12*

desire to appear bad rather than mad. In a brief interview, he could convince someone things are actually ok. He speaks well for himself and knows a lot of things. He appeared as a bright man.

In 2003, he was evaluated by Dr. Kaplan, a psychologist. Dr. Kaplan testified in court that when he met with Mr. Corcoran for the evaluation Corcoran warned him that he might be saying things that he wasn't aware that he was saying. He turned off the light bulb and unscrewed it while he was talking to Dr. Kaplan. He was emotionally very flat. He described in detail about the ultrasound machine that caused him to twitch and move uncontrollably, and caused him pain. Corcoran told Dr. Kaplan that he makes a noise in his throat, doesn't move his mouth and don't say anything, but other people repeat what he is saying, make fun of him and get upset with him. He told Dr. Kaplan that life without parole would be worse for him than dying and life without parole would be the ultimate punishment for him.

Dr. Kaplan summarized the letters he had written. In May 2000, Mr. Corcoran started hearing the words of Bobby Andrist inserted into the radio songs. In June 2000, he wrote that his emotions and words were being broad cast over the radio throughout the prison, and he wanted to hire a surgeon to severe his vocal cords. In December 2000, he heard voices saying he blew his dad's head off and killed Karen. He thought the voices were the sound effects that the guards were projecting into his head through the ultrasound machine.

In June 2001, he wrote about developing "Joseph Corcoran's Disorder" and the people's reaction to it really sucked. He wrote, "I guess no hope is in sight other than my execution date." He also wrote in a letter that the guards were projecting a song in his mind saying the demons in his mind will follow him. He had muscle spasms caused by the ultrasound machine, and mucus sounds in his mouth.

In March 2002, he wrote that he was having 500 muscle spasms a day. He saw death as a relief from the misery of being tortured. In April 2002, he wrote that the guards were doing this because they wanted to have fun and show him their superiority. In August 2002, he wrote that the guards kept him awake for 52 hours straight with the ultrasound machine. In January 2003, he wrote that the guards caused his arms to spasm and caused him to break his radio.

Dr. Kaplan stated that Mr. Corcoran tried to hide the psychosis. When questioned by Dr. Kaplan during the interview, Mr. Corcoran covered it up stating it was a theory.

*Angeline Stanislaus, M.D, Two CityPlace Dr., Suite 200, St. Louis MO 63141*

*Joseph Corcoran*                                                    ***Page 5 of 12***

**Indiana Department of Corrections Records:**

From 2007 he has been seen by the prison psychiatrist at Indiana Department of Corrections. In March 2007, he requested a decrease in the dosage of Geodon. From the records it is not clear about the dosage of Geodon prescribed and for how long. His only complaint was problem sleeping.

On June 18, 2007, it was noted he was manifesting unusual behavior in recent weeks. He was flaying himself with bizarre arm movements. Other inmates have called attention to his unusual behavior. When the doctor talked to him, he did not display any bizarre behavior. He seemed appropriate in demeanor and speech. He stated he was not afraid to die, because of his immersion into theology he has a belief in God and an afterlife. He indicated curiosity about what it would be like to experience. He stated that death would be better than looking forward to a life without parole. He reported not sleeping well. He was having vivid dreams and perhaps nightmares. He stated he talks in his sleep, but he usually has no memory of the content. He has been experiencing a need to move his limbs sometimes violently. He does not know why he does this. This has brought him to the attention of staff and other inmates. The doctor thought this is an indication of a conversion disorder, some repressed mental function may be converting to the motor disorder. He was prescribed Trazodone for sleep.

On June 22, 2007, the doctor noted that his main concern was poor sleep. He had been sleeping 4-5 hours per night. He wakes up early and cannot return to sleep.

On June 29, 2007, he told the doctor he was feeling somewhat down. He stated the medications were not helping too much. He stated he actually does not have schizophrenia and he feels the diagnosis was made based on letters he wrote to his sister and that he has never heard voices.

On June 8, 2008, the doctor made a request for trazodone, which was non-formulary. Corcoran had reported he has been sleep-deprived for several months. He had not been on any psychotropics recently.

On June 19, 2008, he was in behavioral health segregation unit. He was experiencing some bizarre behaviors. He was diagnosed with conversion disorder.

*Angeline Stanislaus, M.D, Two CityPlace Dr., Suite 200, St. Louis MO 63141*

On August 1, 2008, he was seen for individual therapy. He had reported talking in the sleep, but knows of this only from what others tell him. He also had involuntary moves in his body. He wanted to be executed. He was diagnosed with conversion disorder, parasomnia and schizotypal personality disorder.

On August 11, 2008, he had individual therapy to address conversion disorder. He reported having a sleep disorder predating prison. His involuntary movements were evident during the session. He showed a combination of eye blinks, involuntary head movements and leg spasms. He stated he was loner and preferred not to talk to anyone.

On September 26, 2008, he stated he was unaware of vocalizing sounds that are heard by others. This was also considered a symptom of conversion disorder. The doctor noted that there were not medications for this condition. Mr. Corcoran reported he was involved in writing commentaries related to his Bible readings. He became more involved with Biblical texts since incarceration.

On September 28, 2008, he was seen in behavioral health segregation. He stated he was unaware of his verbal outbursts.

On October 27, 2008, he continued to complain of not being able to sleep at night. He was prescribed medication to sleep and sleep improved.

On December 18, 2008, he reported the medication was helping with sleep. He had bizarre moments when he shouted out obscenities. Normally, he does not use obscene words in conversation. He was quietly contemplating execution.

On December 30, 2008, Remeron was increased to 30 mgs.

On January 5, 2009, he was prescribed Haldol and Artane in an effort to control vocalizations. He stated he is likely to be executed that year and was anticipating it. Over the next few appointments, he continued be yelling more frequently at night.

On March 4, 2009, he stated he was unaware of whether meds are helping control his vocal outbursts. His symptomatology was still obscure and attempts to find a cause or solution has been unsuccessful. Trazodone and Remeron were increased.

*Angeline Stanislaus, M.D, Two CityPlace Dr., Suite 200, St. Louis MO 63141*

On May 28, 2009, Haldol was increased to 10mg PM. He was only in contact with his pastor. He stated he was looking forward to the hereafter.

On August 11, 2009, the psychiatrist noted that Haldol was ineffective and it was discontinued.

On August 25, 2009, the psychiatrist started him on Melleril 5 mg bid. Mr. Corcoran reveals that prison staff have a machine that induces the vocalizations.

On January 20, 2010, Mr. Corcoran submitted a request to discontinue his medications.

On February 11, 2010, he stated he did not want to take his medications. He has a new sentencing hearing and he does not want to be spared the death sentence as he did not want to spend the rest of his life in prison. Meds were discontinued.

On February 24, 2010, he wanted to get back on medications as he couldn't sleep. He was started on Navane and Remeron.

On March 2, 2010, he stated he was resting well and was no longer experiencing as many symptoms such as paranoia. His affect was brighter. During his visit, it was noted that he had very few symptoms that were evident during the past several months during segregation rounds.

From April to June 2020, he was not interested in getting out of the cell for appointments. He behind piles of law books and philosophy books and appeared to be diligently studying. Very little social interaction.

In December 2010, he requested to be back on his medications stating he cannot sleep when he is not on those medications.

In March 2011, he stated he was never delusional. He would holler out expletives in the night while fully awake and Navane helped with this. He was asked if he would like a change or less Navane. He did not want any change.

In September 2012, he stated he was having weight gain from the medications and enlarged right breast. In October 2012, Navane was decreased.

In April 2013, he discussed his medications and his spontaneous vocalizations. He agreed to further decrease in Navane.

*Angeline Stanislaus, M.D, Two CityPlace Dr., Suite 200, St. Louis MO 63141*

In July 2013, Navane was discontinued as no benefit was seen with regards to involuntary vocalizations.

In February 2014, he was still on Remeron. He asked questions about psychiatric symptoms. He stated he had a DSM IV and it was stolen. He continued to complain of sleep difficulties. He reported he had not slept for 35 hours and stated it was not unusual for him. He once went without sleep for 6 days. He continued to complain about involuntary vocalizations.

In February 2015, the psychiatrist offered him Navane again. He stated he did not want to get back on it due to enlarged breast.

In April 2015, he reported he was writing a book that was nearing completion titled Involuntary Demonic Possession.  He told the psychiatrist he did not believe the psychiatrist would agree with unless he was a conservative evangelical Christian. He appeared restless.

In July 2015, he was showing involuntary movements. He hit himself in the forehead involuntarily. His lawyer told him he will probably be executed in December. He agreed to be back on Navane. He was sleeping better after adding Navane.

In 2018, he stated he discontinued one of the medications. It is not clear which medication was discontinued.

His most recent records from Indiana DOC indicates he still holds the same beliefs about the ultrasound machine. On August 25, 2023, he was seen by the DOC therapist. He reported feeling depressed from not sleeping much. He felt he was not in control of his own thoughts and words. He gave the therapist a tutorial about electronic engineering and ultrasonic devices. He spoke about his belief that there was an ultrasonic device at the facility and it was currently being used to insert thoughts and words into his mind and the mind of others that are susceptible to it. He spoke about others thinking he was delusional, but determined he was not because he had worked for a Russian nationalist in the past who had a similar device.

On 03/01/2024, he met with another prison therapist. He began sharing about his past and desire to go into electrical engineering. He began sharing information about what he believes to be an ultrasonic machine in the prison that can control his and others thoughts, sleep, voice etc. He stated it was top secret, but it bothers him "endlessly all day". The machine puts him to sleep at night.

*Angeline Stanislaus, M.D, Two CityPlace Dr., Suite 200, St. Louis MO 63141*

He stated, "Others think I am delusional, but I know its here." When inquired if he ever recognizes his own thoughts as delusional, he avoided the question.

**Review of the Book Authored by Mr. Corcoran:**

In July 2024, he published a book titled "Electronic Harrassment: A Whistle-blower Report" under the name J.C. Chase. In the book, he writes about mysterious illness caused by sonic attacks, people being affiliated with unexplained muscle movements and verbal tics and hearing the voice of God.

In the book, he writes about working in a factory owned by a Russian national in the mid-90s. The owner had a metallic silver box with the word ultrasound on it, and it was an ultrasonic surveillance device that he used to monitor the factory floor. It could do much more than just listen to people. He then goes into descriptions of frequency, modulation, transducers and oscillators.

He then describes "the device". He writes, "You likely do not know that some people, whatever they think in their mind, their throat vibrates in the same way as when they or anyone else talk. This vibration is not as pronounced as when they talk audibly....it is undetectable by unaided observation." The ultrasonic device can detect those very faint vibrations in the throat of such individuals and convert them to an audible voice at the receiver. A small percentage of people are susceptible to ultrasonic surveillance and some one with one of those devices can pretty much listen to them think.

He writes that the ultrasound device has a microphone in it and it can manipulate sound. The operator of the device can send a quiet voice into someone's head and make them think they are thinking the thought. Or maybe something extremely bad: a screaming, demonic voice in their head that only they can hear that tells them to kill people.

If someone is listening to a song an operator could sample a portion of it, play it on an endless loop while projecting it into their head and annoy them to death. Others will assume this to be auditory hallucinations.

He writes, "The device that my boss obtained at a trade show did everything I have described." Every military base, county jail and prison in the US has one of these devices, but it is kept

confidential. Correctional staff use ultrasonic surveillance on susceptible people for sport. It is extremely difficult for those abused to expose the abuse.

He writes that mental health professionals are ignorant. They will diagnose with mental illness if such accounts are disclosed to them. Electronics does not fall under their field of study. They will likely be oblivious to the fact that mental illness can be mimicked electronically.

In his final plea, he writes "No one should be forced to live with an electronically stimulated mental illness such as Tourette's tics, auditory hallucinations, pain, anger and a host of other abuses. No one should be screwed with so much that out of desperation he takes a shotgun and commits mass murder of his perceived offenders….No one should be put to sleep and then kidnapped…no prisoner should have to file a lawsuit claiming endless electronic harassment."

Mr. Corcoran's psychiatric records indicate that he has not been treated with antipsychotics with therapeutic dosages for any length of time. In 1999, he was prescribed Risperidone 1mg (lowest dose) for a month. Similarly, he was on Thorazine 100mg (lowest dose) for a month. He is currently prescribed Zoloft 100mg, an antidepressant, which he has been taking.

**Review of the Affidavit filed by Mr. Corcoran on 11/22/2024:**

In this affidavit, Mr. Corcoran notes he has been sentenced to death and the death warrant would be carried out on December 18, 2024 before sunrise. He does not want to litigate his case further. He says he is guilty of the crime he was convicted. He urged the Court to not accept his counsel's motion and petition to litigate further. He understood that the execution will end his life and his heart will stop and all brain activity will cease.

**Findings Based on the Review of Records:**

Mr. Corcoran suffers from Schizophrenia. Even though he did not verbalize his delusions until 1999/2000, he had exhibited behaviors indicative of severe paranoia such as accusing his siblings of stealing from him, changing the code on his number lock multiple times a day, not engaging in conversations with others etc.

*Angeline Stanislaus, M.D, Two CityPlace Dr., Suite 200, St. Louis MO 63141*

In his book he wrote in 2024, he writes about the factory owner he worked for in the mid-90s, who had an ultrasound device that was capable of stealing, inserting and broadcasting thoughts. He talks about this device manipulating sound to a demonic voice that could tell others to kill.

Mr. Corcoran has verbalized these beliefs in various letters to his sister and to a Mr. Dooley. He had requested that his vocal cords be severed as he believed the vibrations of his throat were heard by others. He wrote about his thoughts being broadcast in the prison radio stations. He described pain from muscle spasms all over his body caused by the ultrasound machine in the prison. He struggles with not being able to sleep. He described these experiences as torture and wanting relief by being put to death.

His DOC therapy records from 2023 and 2024 indicates that he is still very delusional and has no insight into his illness. His book published in 2024 clearly describes his delusional system which consists of being controlled by the DOC ultrasound machine, the voices and the torture from muscle spasms. Therefore, he currently remains seriously mentally ill due to his untreated psychotic symptoms. Due to his severe paranoid beliefs and his belief that mental health professionals will diagnose him with psychiatric illness due to their ignorance of the electronic surveillance system that exists, he will not cooperate with an evaluation from a psychiatrist or other mental health professional. He minimizes and covers up his symptoms.

In the affidavit he filed in 2006 to the court, he denies all mental health symptoms and eloquently describes them as "stories" he made up. His writings are organized and well written. His ability to write and speak eloquently has served him well to cover up his mental health symptoms and psychosis. Dr. Parker noted in his testimony that in brief interviews he could easily cover up the symptoms and present as logical. However, when we look at the full picture longitudinally, we see the signs and symptoms of schizophrenia, which has influenced his illogical decision making.

With regards to his November 2024 affidavit, he makes it sound like his decision to forgo any further litigation is logical. He states that in execution his heart will stop, and all brain activity will cease. This again ties into his delusion of the ultrasonic machine inserting and broadcasting his thoughts from his brain.

Mr. Corcoran has not received consistent treatment for schizophrenia. Over the years he has been prescribed antipsychotics such as risperidone 1mg (lowest dose) for one month, Thorazine 100mg

(lowest dose) for one month and Haldol 10mg hs for a couple of months. He was prescribed Navane (dose not noted) for a couple of years (2011 to 2013) at a lowered dose until it was discontinued due to breast enlargement (side effect). He had reported improved symptoms and did not complain about involuntary vocalizations during this period. Once Navane was discontinued, he began to have involuntary movements and complained about not sleeping.

At the present time, he is only prescribed Zoloft 100mg, which is an antidepressant. This does not treat his symptoms from schizophrenia. He needs treatment with antipsychotic medications in therapeutic dosages for a significant period of time to see the response. Schizophrenia responds to antipsychotic medication treatment.

I would recommend an in-person psychiatric evaluation to further access his thought processes/ beliefs and symptom presentation.

Submitted respectfully,

Angeline Stanislaus, M.D.

Board certified in general and forensic psychiatry

*Angeline Stanislaus, M.D, Two CityPlace Dr., Suite 200, St. Louis MO 63141*

**260a**