UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

TAHINA CORCORAN,

        Petitioner,

              v.                           CAUSE NO. 3:24-CV-970-JD

RON NEAL,

        Respondent.

OPINION AND ORDER

Tahina Corcoran, by counsel and as a next friend on behalf of Joseph E.
Corcoran, filed a habeas petition challenging the timing of his execution in connection
with his conviction on four counts of murder in *State v. Corcoran*, Case No. 02D04-9707-
CF-465 (Allen Sup. Ct. filed July 31, 1997). Pursuant to Section 2254 Habeas Corpus Rule
4, the court must dismiss the petition "[i]f it plainly appears from the petition and any
attached exhibits that the petitioner is not entitled to relief in the district court."[1]

The petition asserts a single claim that Corcoran is not competent to be executed,
citing *Ford v. Wainwright*, 477 U.S. 399 (1986), *Panetti v. Quarterman*, 551 U.S. 930 (2007),
and *Madison v. Alabama*, 586 U.S. 265 (2019). Before proceeding to the merits, the court
will briefly consider the procedural soundness of this claim. Under Indiana law,
individuals may raise *Ford/Panetti* claims by seeking authorization to pursue a

---

[1] On December 12, 2024, the Warden filed a response to the habeas petition without prompting
from this court. ECF 17. Except for this footnote, the court prepared this opinion without reviewing the
Warden's response. The court has now reviewed it but did not make any changes to this opinion based
on that review.

successive post-conviction petition. *Baird v. State*, 833 N.E.2d 28, 29 (Ind. 2005) (A [*Wainwright* claim] is among those that our post-conviction rule on successive post-conviction petitions was designed to address."). The record indicates that Corcoran has pursued this avenue, so the court is satisfied that the claim is exhausted. ECF 1-1 at 167-68. *Panetti* instructs that *Ford/Panetti* claims are not ripe until the execution date is set, which typically occurs after the adjudication of an initial federal habeas petition. *Id.* at 943-48. *Panetti* further interprets the prohibition against unauthorized successive petitions as not applying to claims that were not ripe at the time of the initial habeas proceedings. *Id.* On September 11, 2024, the Indiana Supreme Court set the date of execution for December 18, 2024. *Corcoran v. State*, 240 N.E.3d 701 (Ind. Sept. 11, 2024). The court is thus satisfied that it is not allowing Corcoran to proceed on an unauthorized successive petition or on an untimely claim.

Additionally, the court considers the related questions of whether Corcoran is currently competent to litigate this case and whether a next friend is appropriate. These questions are distinct from the question of whether he is currently competent to be executed. *See Whitmore v. Arkansas*, 495 U.S. 149, 166 (1990) (requiring "meaningful evidence that [the petitioner] was suffering from a mental disease, disorder, or defect that substantially affected his capacity to make an intelligent decision" to demonstrate that a habeas petitioner is incompetent). Perhaps more critically, the court is not required to defer to the State courts under the Anti-Terrorism and Effective Death Penalty Act of 1996 (AEDPA) to allow this case to proceed with a next friend. *See* 28 U.S.C. 2254(d). As a result, the court finds that Tahina Corcoran has adequately shown

that she is a proper next friend for purposes of the preliminary stages of this habeas case. Left remaining are the issue of procedural default and the merits of the claim, which the court will address below.

PROCEDURAL HISTORY

The complete procedural history of Corcoran's legal proceedings is lengthy and was articulated by the Indiana Supreme Court one week ago in admirable detail. *Corcoran v. State*, 2024 WL 5052384, 2-8 (Ind. Dec. 10, 2024). Indeed, this court has played a substantial role in this procedural history by resolving Corcoran's initial habeas proceedings. *Corcoran v. Buss*, 2013 WL 140378 (N.D. Ind. Jan. 10, 2013). As a result, this court will detail only the procedural history that is particularly relevant to resolving this habeas petition.

In 1999, a jury convicted Corcoran on four counts of murder, and the Allen Superior Court sentenced him to death after affording "medium or low weight" to the mitigating factor of being under the influence of mental or emotional disturbances during the crime. *Corcoran v. State*, 739 N.E.2d 649, 651, 656 (Ind. 2000). Corcoran appealed the sentence, and the Indiana Supreme Court remanded because the Allen Superior Court might have considered improper aggravating factors. *Id.* at 657-58. The Allen Superior Court resentenced Corcoran to death but this time afforded "medium weight" to the mitigating factor of being under the influence of mental or emotional disturbances during the crime based on the expert opinions that he suffered paranoid personality disorder or schizotypal personality disorder. *Corcoran v. State*, 774 N.E.2d

495, 498-99 (Ind. 2002). The Indiana Supreme Court affirmed this sentence on appeal, despite Corcoran's emphasis on the significance of his mental health. *Id.* at 501-02.

The Indiana Supreme Court ordered Corcoran to file any petition for post-conviction relief by September 9, 2003. *Corcoran v. State*, 820 N.E.2d 655, 657 (Ind. 2005). Corcoran declined, but counsel requested competency proceedings on the basis that he was incompetent to waive post-conviction proceedings. *Id.* The Allen Superior Court held a hearing, and three mental health experts presented by Corcoran's counsel, including Dr. Parker and Dr. Kaplan, opined that Corcoran suffered from paranoid schizophrenia. *Id.* at 660. According to the experts, Corcoran had recurring delusions that correctional officials tortured him through the use of an ultrasound machine. *Id.* They opined that he could not make a rational decision regarding legal proceedings and that his decision to waive post-conviction proceedings was "premised on his desire to be relieved of the pain that he believes he experiences as a result of his delusions." *Id.* They further opined that his decision to waive post-conviction review could not be rational if it was based on his irrational delusions. *Id.* However, Dr. Parker also opined that Corcoran was aware of the status of his case, his death sentence, the relevant events, and the positions of counsel. *Id.* at 661. Further, Dr. Kaplan opined that Corcoran was aware that waiving post-conviction review would result in his execution. *Id.*

> At this hearing, Corcoran testified:
>
> See, I want to waive my appeals because I am guilty of murder. I think that I should be executed for what I have done and not because I am supposedly tortured with ultrasound or whatever. I am guilty of murder.

> I should be executed. That is all there is to it. That is what I believe. I believe the death penalty is a just punishment for four counts of murder, and I believe that I should be executed since I am guilty of four counts of murder.

*Id.* at 660-61. The State attorney and the judge each questioned and confirmed his understanding of the legal proceedings and his position, including that post-conviction proceedings could be his last attempt to challenge his sentence. *Id.* at 661-62. The Allen Superior Court found Corcoran sufficiently competent to waive post-conviction review. *Id.* at 658.

On the appeal of the competency determination, the Indiana Supreme Court found substantial evidence to support that Corcoran was "able to appreciate the gravity of his legal position and the consequences of his choice to waive further post-conviction review" and to support the "determination that Corcoran made his choice knowingly, voluntarily, and intelligently." *Id.* at 662. The Indiana Supreme Court found Corcoran's express denial that his delusions motivated him to waive post-conviction review and his reasoning that his death sentence was appropriate for his crimes to be particularly persuasive in declining to find that the Allen Superior Court's determination was clearly contradicted by the evidence. *Id.* at 661. During the pendency of this appeal, Corcoran decided to pursue a petition for post-conviction relief, which the State courts denied as untimely. *Corcoran v. State*, 845 N.E.2d 1019 (Ind. 2006); *Corcoran v. State*, 827 N.E.2d 542 (Ind. 2005).

In 2005, Corcoran initiated federal habeas proceedings in this court. *Corcoran v. Buss*, 483 F. Supp. 2d 709, 716 (N.D. Ind. 2007). This court granted habeas relief on

grounds not relevant here but rejected the argument that the State courts erred by finding Corcoran competent to waive post-conviction review. *Id.* at 729-34. This court noted that the Indiana Supreme Court applied the standard set forth in *Dusky v. United States*, 362 U.S. 402 (1960) in which the U.S. Supreme Court held that a defendant is competent to stand trial if "he has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding—and has a rational as well as factual understanding of the proceedings against him." *Id.* at 729-30.  It also noted reliance on the standard in *Rees v. Peyton*, 384 U.S. 312 (1966), in which the U.S. Supreme Court held that a capital defendant may withdraw a petition for certiorari only after it is determined whether "he has capacity to appreciate his position and make a rational choice with respect to continuing or abandoning further litigation or on the other hand whether he is suffering from a mental disease, disorder, or defect which may substantially affect his capacity in the premises." *Id.* at 730. This court recounted the evidence presented at the competency hearing and the Indiana Supreme Court's reasoning for affirming the competency finding. *Id.* at 729-33. This court found that Corcoran's arguments merely amounted to a request to reweigh the evidence. *Id.* at 733. It concluded that the Indiana Supreme Court fully confronted the competency issue and that its opinion was "thorough, thoughtful, and reasonable." *Id.* at 733-34.

On appeal, the Seventh Circuit affirmed the ruling on the competency argument, reiterating that the Indiana Supreme Court carefully considered the evidence from the competency hearing. *Corcoran v. Buss*, 551 F.3d 703, 713-14. (7th Cir. 2008). It added that preferring death to life imprisonment is not per se irrational. *Id.* Though the federal

habeas case was appealed and remanded on multiple occasions thereafter, the Seventh

Circuit's ruling on this argument remained intact. *Corcoran v. Wilson*, 651 F.3d 611, 613

(7th Cir. 2011); *Corcoran v. Buss*, 2013 WL 140378, at *6 (N.D. Ind. Jan. 10, 2013). The

initial habeas case concluded only when the U.S. Supreme Court denied certiorari in

March 2016. *Corcoran v. Neal*, 577 U.S. 1237 (2016).

Corcoran's legal proceedings laid dormant for more than eight years when the

State of Indiana filed a motion to set an execution date with the Indiana Supreme Court

on June 26, 2024. *Corcoran v. State*, 240 N.E.3d 701 (Ind. 2024). Corcoran opposed an

execution date on the basis that he was not competent to be executed, but, on September

11, 2024, the Indiana Supreme Court set an execution date for December 18, 2024,

suggesting that Corcoran's competency argument was more appropriately raised in a

successive petition for post-conviction relief. *Id.*

On November 15, 2024, Corcoran's counsel[2] filed a successive petition for post-

conviction relief, asserting that Corcoran was not competent to be executed. ECF 1-1 at

3-7. In the accompanying memorandum,[3] counsel briefly addressed Corcoran's mental

health before trial and at trial, and they recounted the evidence presented at the post-

conviction competency hearing in 2003. With respect to Corcoran's mental condition at

the present date, counsel offered the following:

---

[2] Given the disagreements between Corcoran and his counsel on whether to pursue a successive petition, the court finds it necessary to distinguish between them at various points in this order.

[3] In 24S-SD-222, Corcoran's counsel filed two successive petitions for post-conviction relief each asserting one claim with accompanying memoranda. Though they appear to have filed the wrong memorandum in this habeas case (ECF 1-1 at 8-23), the relevant memorandum, quoted in the block text below, is available on the State court docket.

Now in 2024, Mr. Corcoran continues to suffer the debilitating symptoms of his paranoid schizophrenia. As he has for twenty years, he experiences auditory hallucinations, psychosis, and the ever-present delusions regarding the ultrasound machine he believes the prison guards are torturing him with and his sleep disorder. For instance, records from the Department of Correction will establish that he has received psychotropic medications to treat the symptoms of schizophrenia for two decades; specifically, Geodon, Haldol, Navane, and Cogentin.

Although the Indiana Department of Corrections has attempted medicating him, his illness has proven to be resistant to treatment, and nothing during his incarceration has cured him of his paranoid schizophrenia. As recently as March 1, 2024, treating correctional personnel noted:

> Patient then began sharing information about what he believes to be an ultrasonic machine here at ISP that can control his and others thoughts, sleep, voice, etc. Patient reports it is 'top secret' but it bothers him 'endlessly all day.' Patient reports the machine does put him to sleep at night. Patient stated 'others' think I'm delusional but I know its here.' Writer inquired if patient ever recognizes his own thoughts as delusional, patient avoided the question. ...Patient denies MH symptoms and the expressed delusions are the only observable concern."

In short, Mr. Corcoran's longstanding and documented mental illness continues to torment him as it did at the time of the 1997 offense.

As exhibits, counsel attached the four-page psychotherapy session record from which they quoted and a thirty-page document, titled, "*A Whistle-blower Report: Electronic Harassment*," written by Corcoran in June 2024. ECF 1-1 at 170-99, 206-10. In this book, Corcoran elaborates on a conspiracy theory that government officials use secret technology to surveil and control individuals, including himself. *Id.* at 170-99. It also includes sections in which Corcoran demonstrates his extensive knowledge of electronics, explaining the frequency and modulation of radio waves, piezoelectric effects, transducers, and oscillators. *Id.* In the reply brief to the Indiana Supreme Court,

counsel also attached affidavits from trial counsel attesting that they received opinions from medical experts in 1999 indicating that Corcoran was not competent to stand trial but that they did not receive them in time to request a competency hearing. *Id.* at 200-05.

On November 22, 2024, Corcoran submitted a handwritten affidavit that he prepared without assistance from counsel, which reads as follows:

1. I am the same Joseph Edward Corcoran who was convicted in Allen County in 1999 of four counts of murder and sentenced to death. I am the same Joseph Edward Corcoran who has a very extensive appeal history. Having lost all appeals this Court has issued a death warrant to be carried out December 18, 2024, before sunrise.

2. My assigned counsel has petitioned this Court on my behalf. They seek to further litigate this case. Their goal, which was explained to me by counsel, is to delay any and all executions through endless litigation. They hope to set a precedent so all future death penalty cases can be endlessly litigated effectively putting an end to all executions.

3. I, Joseph Edward Corcoran, do not wish to litigate my case further. I am guilty of the crime I was convicted of, and accept the findings of all the appellate courts. The long drawn out appeal history has addressed all the issues I wished to appeal, such as the issue of competency. Therefore, I am hereby making this statement to the Court through this affidavit: I do not wish to proceed with more and/or endless litigation. Thus, I urge this Court not to accept my counsel's motion and petition to litigate further.

4. I understand that if this Court rejects my counsel's petition, the death warrant will be carried out. I will then be put to death for the heinous crime I committed. I understand that the execution will end my life. I understand medically my heart will stop and all brain activity will cease. I do not know, however, what will happen metaphysically. (But neither does anyone else.) I understand the execution, in the interest of judgment, serves as both a punishment and a deterrent.

5. I, Joseph Edward Corcoran, give this affidavit to the Court of my own free will. I was not coerced into making this statement, nor was I promised anything. I remind this Court that my competence to waive my appeals has been adjudicated throughout the extensive appeal

process. Therefore, of my own free will and completely voluntarily,
without coercion or promise of anything, being adjudicated competent,
withdraw the motion counsel filed on my behalf. I do not wish to
litigate further. However, if this Court refuses to withdraw the motion
outright, I ask this Court to reject it on the basis that I, the appellant,
have no desire nor wish to engage in further appeals or litigation
whatsoever.

*Id.* at 163-66.

On December 10, 2024, the Indiana Supreme Court denied Corcoran authorization to pursue a successive post-conviction petition. *Corcoran v. State*, 2024 WL 5052384 (Ind. Dec. 10, 2024). The Indiana Supreme Court noted that successive petitions required authorization from an appellate court before they could be litigated in the lower courts and that such authorization would be granted "if the petitioner establishes a reasonable possibility that the petitioner is entitled to relief." *Id.* at 9. The Indiana Supreme Court first considered whether the petition was properly before it given that Corcoran refused to sign it. *Id.* at 10-11. Under Indiana law, the petitioner must authorize a post-conviction petition unless they are incompetent to do so. *Id.* at 10. The Indiana Supreme Court noted that Corcoran's counsel substantially relied on the evidence considered at the 2004 competency hearing and argued that Corcoran remained as incompetent now as he was then. *Id.* The Indiana Supreme Court observed that it had already found Corcoran competent to waive post-conviction review on this evidence and that the Seventh Circuit had described its analysis as careful. *Id.* Because Corcoran competently declined to authorize a successive petition, so too did the Indiana Supreme Court. *Id.* at 11.

The Indiana Supreme Court also considered the merits of the claim that Corcoran was not competent to be executed and found that counsel had not made a substantial threshold showing that his mental illness prevented him from rationally understanding the reason for his impending execution. *Id.* at 12-15. The Indiana Supreme Court cited Corcoran's recent affidavit and found it consistent with Corcoran's statements and the other evidence presented at the 2004 competency hearing. *Id.* at 12-13. The Indiana Supreme Court noted that counsel had submitted new evidence only for the purpose of showing that Corcoran remained as incompetent as he was in 2004. *Id.* at 13. The Indiana Supreme Court distinguished Corcoran's understanding of his execution from the *Panetti* petitioner's understanding by observing that Panetti believed that the Texas's stated reason was a sham. *Id.* It found that, while some evidence suggested that Corcoran was irrational and delusional in certain respects, no evidence suggested that Corcoran was delusional with respect to his execution. *Id.*

As an analogous case, the Indiana Supreme Court relied on *Timberlake v. State*, 858 N.E.2d 625 (Ind. 2006), in which Timberlake similarly sought to demonstrate his incompetency for execution based on his schizophrenic delusions that the government controlled, monitored, and tortured people through a secret machine. *Corcoran,* 2024 WL 5052384 at 14. The Indiana Supreme Court noted that Dr. Parker, the same expert who testified in Corcoran's competency hearing in 2004, testified that, though Timberlake was delusional and severely mentally ill, he had the mental capacity to understand his imminent execution and the reasons for it. *Id.* Based on this testimony, the Indiana Supreme Court denied Timberlake leave to pursue a successive petition. *Id.*

The Indiana Supreme Court found that counsel had similarly established Corcoran's severe mental illness but fell short of demonstrating that his understanding of his execution was irrational. *Id.*

The Indiana Supreme Court further acknowledged that the standards for waiving post-conviction review and for competency to be executed are not identical but noted that their 2005 decision affirming the post-conviction competency determination included a finding that Corcoran's mental ability did not interfere with his ability to understand the reasons for his execution. *Id.* The Indiana Supreme Court found no evidence suggesting that Corcoran's understanding had changed and found no substantial threshold showing of incompetency to be executed. *Id.*

## PROCEDURAL DEFAULT

The court considers whether the Indiana Supreme Court's rejection of the successive petition for lack of authorization by Corcoran constitutes procedural default. "[A] procedural default [bars] consideration of a federal claim on either direct or habeas review [when] the last state court rendering a judgment in the case clearly and expressly states that its judgment rests on a state procedural bar." *Harris v. Reed*, 489 U.S. 255, 263 (1989). "Accordingly, [the court] will not entertain questions of federal law in a habeas petition when the state procedural ground relied upon in the state court is independent of the federal question and adequate to support the judgment." *Lee v. Foster*, 750 F.3d 687, 693 (7th Cir. 2014). "An independent state ground will be found when the court actually relied on the procedural bar as an independent basis for its

disposition of the case." *Id.* "A state law ground is adequate when it is a firmly established and regularly followed state practice at the time it is applied." *Id.*

Here, the Indiana Supreme Court expressly denied authorization to pursue a successive petition because Corcoran, who it found competent, did not authorize it. The verification requirement on which the Indiana Supreme Court relied is set forth in Section 3 of the Indiana Rules of Post-Conviction Remedies. As acknowledged by the Indiana Supreme Court and Corcoran here, the standard for competency to waive post-conviction review is a separate, though potentially overlapping, question than the standard for competency to be executed.

The court is also aware of a single instance in which the Indiana Supreme Court allowed a petitioner to proceed without complying with the verification requirement: *Isom v. State*, 170 N.E.3d 623, 632 (Ind. 2021). Though the Indiana Supreme Court issued only a summary order in January 2017, Isom's petition is distinguishable from Corcocan's successive petition; Isom initially signed but did not verify his petition due to mere inadvertence, his subsequent refusal to verify was a consequence of his desire for new counsel, and he consistently disavowed any intent to waive post-conviction review. *Isom v. State*, 45S00-1508-PD-508 (Ind. filed Aug. 31, 2015).[4] Isom credibly argued that his initial offering substantially complied with the verification requirement, but the same cannot be said for Corcoran. The failure to verify the post-conviction

_____

[4] For these details, the court relies on Isom's appellate brief filed on September 27, 2016.

petition thus appears to be an adequate and independent State ground for procedural bar.

Further, the Indiana Supreme Court's consideration of the merits of the competency to be executed claim does not undermine the lack of verification as a basis for procedural default. *See Harris*, 489 U.S. at 264 n.10 ("[A] state court need not fear reaching the merits of a federal claim in an alternative holding. By its very definition, the adequate and independent state ground doctrine requires the federal court to honor a state holding that is a sufficient basis for the state court's judgment, even when the state court also relies on federal law."). Moreover, "a federal habeas court is not the proper body to adjudicate whether a state court correctly interpreted its own procedural rules, even if they are the basis for a procedural default."[5] *Johnson v. Foster*, 786 F.3d 501, 508 (7th Cir. 2015). That said, this court and the Seventh Circuit carefully reviewed the Indiana Supreme Court's analysis in the prior habeas case and found it to be more than adequate. The Indiana Supreme Court's most recent analysis incorporated its earlier analysis and reasonably found that the new evidence offered by Corcoran's counsel was merely consistent with its earlier understanding of Corcoran's mental condition. Therefore, the court cannot grant habeas relief because the claim that

---

[5] *Johnson* further noted exceptions to this rule in instances of "obvious subterfuge to evade consideration of a federal issue" or a record where it was "clear that the claim had been properly raised." 786 F.3d at 508 n.7. But, here, the Indiana Supreme Court considered the underlying federal claim, and while Corcoran's counsel reasonably argued that they had properly raised the *Ford/Panetti* claim, his competency to waive the opportunity to seek authorization for a successive petition was reasonably disputed by the State.

Corcoran is incompetent to be executed is procedurally defaulted. Nevertheless, for the sake of completeness, the court will consider the merits of the claim.

STANDARD OF REVIEW

"Federal habeas review . . . exists as a guard against extreme malfunctions in the state criminal justice systems, not a substitute for ordinary error correction through appeal." *Woods v. Donald*, 575 U.S. 312, 316 (2015).

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—
>
> > (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> >
> > (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

> [This] standard is intentionally difficult to meet. We have explained that clearly established Federal law for purposes of §2254(d)(1) includes only the holdings, as opposed to the dicta, of this Court's decisions. And an unreasonable application of those holdings must be objectively unreasonable, not merely wrong; even clear error will not suffice. To satisfy this high bar, a habeas petitioner is required to show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.

*Woods,* 575 U.S. at 316. To warrant relief, a state court's decision must be more than incorrect or erroneous; it must be objectively unreasonable. *Wiggins v. Smith*, 539 U.S. 510, 520 (2003). "A state court's determination that a claim lacks merit precludes federal

15

habeas relief so long as fairminded jurists could disagree on the correctness of the state court's decision." *Harrington v. Richter*, 562 U.S. 86, 101 (2011).

However, "[w]hen a state court's adjudication of a claim is dependent on an antecedent unreasonable application of federal law, the requirement set forth in § 2254(d)(1) is satisfied." *Panetti v. Quarterman*, 551 U.S. 930, 953 (2007). "A federal court must then resolve the claim without the deference AEDPA otherwise requires." *Id.*

<u>PRECEDENTIAL SUPREME COURT CASES</u>

As detailed above, to obtain habeas relief, Corcoran must demonstrate that the State court decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). Consequently, the court will detail the *Ford/Panetti* line of opinions issued by the Supreme Court.

<u>*Ford v. Wainwright*, 477 U.S. 399 (1986)</u>

In 1974, Ford was sentenced to death. In 1982, Ford began to experience delusions while in prison. *Id.* at 401. Ford sought the assistance of a psychiatrist, who evaluated Ford for fourteen months and concluded in 1983 that Ford suffered from a mental condition resembling paranoid schizophrenia that substantially affected his "present ability to assist in the defense of his life." *Id.* at 402-03. Another physician examined Ford, who made statements such as, "I know there is some sort of death penalty, but I'm free to go whenever I want because it would be illegal and the executioner would be executed," and, ""I can't be executed because of the landmark case. I won. *Ford v. State* will prevent executions all over." *Id.* at 403. The physician

16

concluded that Ford did not understand that he was being executed or the connection between his offense of murder and the death penalty. *Id.*

Ford initiated the Florida procedure for competency determinations for condemned inmates. *Id.* Pursuant to that procedure, the Governor appointed three psychiatrists, who jointly interviewed Ford for thirty minutes and concluded that Ford understood the death penalty and the reasons for imposing it on him. *Id.* at 403-04. In April 1984, the Governor, without explanation, signed a death warrant for Ford. *Id.* at 404. Though Ford also submitted written materials, the Governor did not indicate that he had considered them. *Id.* Ford unsuccessfully sought an evidentiary hearing in State court before filing a federal habeas petition. *Id.*

On habeas appeal, the Supreme Court examined the common law and invoked the evolving standards of decency to hold, "The Eighth Amendment prohibits the State from inflicting the penalty of death upon a prisoner who is insane." *Id.* at 406-10. It then considered the adequacy of the Florida procedure used to safeguard this constitutional right. *Id.* at 413-16. The Supreme Court found the procedure to be deficient because: (1) it "preclude[d] the prisoner or his counsel from presenting material relevant to his sanity or bar[red] consideration of that material by the factfinder;" (2) it failed "to afford the prisoner's representative any opportunity to clarify or challenge the state experts' opinions or methods;" and (3) Florida placed "the decision wholly within the executive branch." *Id.*

In closing, the Supreme Court disavowed any suggestion that the Constitution required a "full trial on the issue of sanity" but left it to the States to develop

appropriate procedures. *Id.* at 416-18. It further observed that "[i]t may be that some high threshold showing on behalf of the prisoner will be found a necessary means to control the number of nonmeritorious or repetitive claims of insanity." *Id.* In his concurrence,[6] Justice Powell echoed these sentiments as follows:

> Second, petitioner does not make his claim of insanity against a neutral background. On the contrary, in order to have been convicted and sentenced, petitioner must have been judged competent to stand trial, or his competency must have been sufficiently clear as not to raise a serious question for the trial court. The State therefore may properly presume that petitioner remains sane at the time sentence is to be carried out, and may require a substantial threshold showing of insanity merely to trigger the hearing process.
>
> Finally, the sanity issue in this type of case does not resemble the basic issues at trial or sentencing. Unlike issues of historical fact, the question of petitioner's sanity calls for a basically subjective judgment. And unlike the determination of whether the death penalty is appropriate in a particular case, the competency determination depends substantially on expert analysis in a discipline fraught with "subtleties and nuances." This combination of factors means that ordinary adversarial procedures—complete with live testimony, cross-examination, and oral argument by counsel—are not necessarily the best means of arriving at sound, consistent judgments as to a defendant's sanity.
>
> We need not determine the precise limits that due process imposes in this area. In general, however, my view is that a constitutionally acceptable procedure may be far less formal than a trial. The State should provide an impartial officer or board that can receive evidence and argument from the prisoner's counsel, including expert psychiatric evidence that may differ from the State's own psychiatric examination. Beyond these basic requirements, the States should have substantial leeway to determine what process best balances the various interests at stake. As long as basic fairness is observed, I would find due process satisfied, and would apply the presumption of correctness of § 2254(d) on federal habeas corpus.

*Id.* at 425-27.

---

[6] In *Panetti*, the Supreme Court characterized Justice Powell's concurrence as the controlling opinion in *Ford*. 551 U.S. 930, 949 (2007).

*Panetti v. Quarterman*, 551 U.S. 930 (2007)

In 1995, Panetti was sentenced to death. *Id.* at 936. Before trial, he was assessed with "fragmented personality, delusions, and hallucinations," but the trial court found him competent to stand trial and to waive counsel. *Id.* Two months after sentencing, he was found incompetent to waive appointment of State habeas counsel, which suggested that his mental condition had deteriorated. *Id.* at 937. In October 2003, a county court set his execution for February 2004. *Id.* Counsel moved to initiate a competency determination proceeding, but the county court denied the motion without a hearing, and the Texas appellate court dismissed the appeal for lack of jurisdiction. *Id.* at 938.

Panetti then filed a federal habeas petition, and the district court stayed execution to allow the Texas courts to consider evidence of Panetti's mental state. *Id.* The county court selected two mental health experts without input from Panetti, and these experts concluded that he understood that he would be executed and had the ability to understand the reasons for it. The county court granted Panetti one week to file a response and then issued a short order finding that Panetti had failed to demonstrate his incompetency. *Id.* at 939-41. The federal district court denied habeas relief on the basis that "the Fifth Circuit test for competency to be executed requires the petitioner know no more than the fact of his impending execution and the factual predicate for the execution." *Id.* at 941-42.

The Supreme Court disagreed, concluding that the failure to provide Panetti with the procedures set forth in *Ford* was an unreasonable application of clearly established Supreme Court law and declined to apply AEDPA deference to the Texas

court decision. *Id.* at 948. In so concluding, the Supreme Court noted, "It is uncontested that petitioner made a substantial showing of incompetency."[7] *Id.* It then reasoned that the Texas court deprived Panetti of any means "to submit expert psychiatric evidence in response to the evidence that had been solicited by the state court." *Id.*

The Supreme Court also found that the Fifth Circuit's standard for competency was too restrictive on the basis that it treated a delusional belief system as irrelevant "if the prisoner knows the State has identified his crimes as the reason for his execution." *Id.* at 958. The Supreme Court implied that a proper standard should require an understanding of "the real interests the State seeks to vindicate" rather than merely "the State's announced reason" or "the fact of an imminent execution." *Id.* at 959. Put another way, "[a] prisoner's awareness of the State's rationale for an execution is not the same as a rational understanding of it." *Id.* The Supreme Court explained, "The critical question is whether a prisoner's mental state is so distorted by a mental illness that he lacks a rational understanding of the State's rationale for his execution. Or similarly put, the issue is whether a prisoner's concept of reality is so impaired that he cannot grasp the execution's meaning and purpose or the link between his crime and its punishment." *Madison v. Alabama*, 586 U.S. 265, 269 (2019) (articulating the *Panetti* competency standard).

---

[7] Later in the opinion, the Supreme Court found that Panetti had satisfied the substantial threshold showing, relying on two experts the day before the execution date and evidence of mental dysfunction considered in prior litigation. *Panetti v. Quarterman*, 551 U.S. 930, 950 (2007).

<u>*Madison v. Alabama*</u>, 586 U.S. 265 (2019)

After Madison killed a police officer in 1985, he was convicted of murder and sentenced to death. *Id.* at 269. In 2015 and 2016, Madison suffered major strokes and developed vascular dementia. *Id.* Madison then asked the county court for a stay of execution because he no longer understood the facts of his case or the nature of his conviction or sentence. *Id.* at 269-70. The county court heard from dueling experts, and Madison's expert opined that he understood execution as an abstract concept but did not comprehend the reason behind Alabama's effort to execute him. *Id.* at 270. He further opined that vascular dementia caused significant cognitive decline and that Madison had no independent recollection of the murder. *Id.* By contrast, Alabama's expert opined that Madison appeared to understand his legal situation and found no evidence of psychosis, paranoia, or delusion. *Id.* at 270-71. At a hearing, Alabama emphasized that Madison did not experience psychotic episodes or delusions, which the county court found persuasive in concluding that Madison had not demonstrated that he did not have a rational understanding of his execution or the reasons for it. *Id.* at 271. The county court also credited the testimony of the Alabama expert. *Id.* at 271-72. Madison then filed a federal habeas petition, which the Supreme Court applied AEDPA deference to the Alabama court decision and affirmed the denial of habeas relief on the basis that "neither *Panetti* nor *Ford* clearly established that a prisoner is incompetent to be executed because of a simple failure to remember his crime." *Id.* at 272.

In 2018, Alabama set an execution date, and Madison initiated another challenge in State court, contending that he had suffered further cognitive decline and that the

Alabama expert had since been suspended from practicing psychology. *Id.* at 273. The Alabama court declared him mentally competent, finding no substantial threshold showing of insanity. *Id.* at 273-74. Madison then appealed directly to the Supreme Court, allowing for de novo consideration of his claims rather than consideration subject to AEDPA deference. *Id.* at 274.

The Supreme Court considered: (1) "whether *Panetti* prohibits executing Madison merely because he cannot remember committing his crime;" and (1) "whether *Panetti* permits executing Madison merely because he suffers from dementia, rather than psychotic delusions." *Id.* at 274-75. It answered no to both questions, reasoning that "[w]hat matters is whether a person has the rational understanding *Panetti* requires— not whether he has any particular memory or any particular mental illness." *Id.* The Supreme Court held that "[i]n evaluating competency to be executed, a judge must therefore look beyond any given diagnosis to a downstream consequence." *Id.* at 279. It explained that "a delusional disorder can be of such severity—can so impair the prisoner's concept of reality—that someone in its thrall will be unable to come to grips with the punishment's meaning. But delusions come in many shapes and sizes, and not all will interfere with the understanding that the Eighth Amendment requires." *Id.*

The Supreme Court found the brief State court order to be ambiguous as to its reasoning and that the circumstances suggested that the State court had applied the incorrect standard for assessing competency. *Id.* at 280-83. The Supreme Court vacated the judgment of the State court and remanded for further proceedings, advising that the

sole competency question before the State court was "whether he can reach a rational understanding of why the State wants to execute him." *Id.* at 283.

DISCUSSION

Corcoran argues that he is entitled to habeas relief because he is incompetent to be executed. Corcoran contends that the AEDPA deference should not apply in this case because the Indiana courts required him to present his claim in a successive petition for post-conviction relief and because he must obtain authorization from the Indiana Supreme Court to further pursue it. He argues that this procedure allowed the Indiana Supreme Court to improperly conflate the standard for waiving post-conviction review with the standard for competency to be executed.

The court is not persuaded by this argument. The Indiana Supreme Court acknowledged that these standards were distinct and explained why it found its competency determination in 2005 relevant to its threshold determination this month. This explanation and its assessment of the new evidence were not unreasonable. Further, there is no reason to suspect that an assertion of incompetency would not have been similarly challenged if the Indiana courts had allowed him to file a successive petition without authorization from an appellate court. Additionally, no U.S. Supreme Court opinion clearly establishes that the threshold determination must be held in a particular manner or in a particular type of proceeding. This court also sees no inconsistency with the relevant U.S. Supreme Court opinions; to the contrary, the authorization requirement to pursue successive petitions is effectively a vehicle for threshold determinations where the petitioner must demonstrate that his claim has

some merit before he is allowed to proceed. At base, the court perceives no difference of constitutional magnitude between making this threshold determination before the Indiana Supreme Court or the Allen Superior Court. Nor does the court perceive such a difference between the State requirement that a petitioner show a reasonable possibility that the petitioner is entitled to relief or the constitutional requirement that petitioner make a substantial threshold showing of insanity. Moreover, the Indiana Supreme Court framed its ultimate conclusion using the constitutional standard rather than the State standard for successive petitions.

It also strikes the court that the standards used to adjudicate Corcoran's competency to waive post-conviction are more demanding than the standard for competency to be executed. Recall that the Indiana Supreme Court articulated the competency to waive post-conviction review standard as follows: "an individual is competent for purposes of trial if he has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding—and has a rational as well as factual understanding of the proceedings against him." *Corcoran v. State*, 820 N.E.2d 655, 658-59 (Ind. 2005). It seems likely that, as a general matter, greater competency is required to understand ongoing criminal proceedings on serious charges than it is to understand the reasons for punishment. And even if the trial competency standard does not subsume the competency to be executed standard in every instance, it does so here. As the Indiana Supreme Court noted, it specifically found that Corcoran understood the

reasons for his execution in finding that Corcoran was competent to waive post-conviction review.[8]

Corcoran also argues that the Indiana Supreme Court unreasonably determined that counsel had not made a substantial threshold showing of insanity and made improper credibility determinations at the threshold stage. A more accurate characterization is that the Indiana Supreme Court acknowledged its prior credibility determinations in connection with its prior competency determination and found the new evidence consistent with those determinations. The U.S. Supreme Court has not delineated how a threshold determination should be made, but, to Corcoran's point, it logically follows that a threshold determination is something other than a hearing where credibility determinations are ordinarily made. But the Indiana Supreme Court here did not blatantly violate this principle by, for example, resolving a full-scale battle of the experts or a straightforward "he said she said" dispute based entirely on evidence that had been submitted for judicial review for the first time. Consequently, the court cannot find that the Indiana Supreme Court unreasonably applied clearly established federal law by making credibility determinations.

The court also cannot find that the Indiana Supreme Court unreasonably determined that counsel had not made a substantial threshold showing of insanity on

---

[8] Corcoran argues that the State court concocted barriers based on State-specific standards to "circularly deny" him an opportunity to present his competency claim to the lower courts. However, given the history of Corcoran's legal proceedings, the court does not find that the State court engaged in circular reasoning by requiring him to provide more compelling evidence to demonstrate his incompetency to waive post-conviction review and to be executed, such as a recent expert report that spoke directly to the Corcoran's competency or recent medical records showing mental deterioration.

behalf of Corcoran. As mentioned above, the U.S. Supreme Court has not instructed the lower courts on precisely how this standard should be applied by providing a list of elements or factors for consideration or by otherwise expounding on it. Instead, the U.S. Supreme Court has provided three examples of showings that satisfy this threshold determination: (1) in *Ford v. Wainwright*, the Supreme Court found that Florida should have provided Ford with a hearing because he had evidence that his mental condition had deteriorated in recent years and a recent evaluation in which an expert concluded that Ford did not understand his execution of the reasons for it; (2) in *Panetti v. Quarterman*, the Supreme Court found that Texas should have provided Panetti with a hearing because the fact that he had made a threshold showing was undisputed, but it further found Panetti had made the threshold showing based on the earlier finding that he was incompetent to waive appointment of State habeas counsel and recently obtained expert opinions; and (3) in *Madison v. Alabama*, the Supreme Court remanded the case for "renewed consideration of Madison's competency" because the Alabama threshold determination did not consider that a lack of rational understanding could be caused by dementia rather than delusions. In reaching this ruling, the Supreme Court considered evidence that Madison had recently suffered major strokes and been recently inflicted with vascular dementia and a recent expert report that Madison did not understand the reasons for his execution.

Unlike the petitioners in these cases, Corcoran has never been adjudicated incompetent; to the contrary, he was found competent in 2004 based on evidence that is substantially similar to the evidence presented to the Indiana Supreme Court this year.

Counsel did not provide evidence that Corcoran's mental condition has deteriorated since 2004, nor has he presented a recent expert assessment as to whether Corcoran understands his execution or the reasons for it; instead, Corcoran, on his own accord, submitted an affidavit attesting that he did have such an understanding. Further, there is no indication that the Indiana Supreme Court misconstrued "insanity" as defined by *Panetti* and clarified by *Madison*; instead, it squarely addressed the argument that Corcoran was only aware of the stated reasons for execution but did not rationally understand it.

Counsel also faults the Indiana Supreme Court for relying on Corcoran's affidavit due to his delusional behavior, but they cite no U.S. Supreme Court case suggesting that an individual's own statements should not be considered for purposes of competency. Counsel essentially argues that Corcoran knows precisely what to say in order to persuade courts that he is rational but that he does not truly believe it due to his delusional beliefs. However, assuming that Corcoran is merely imitating rationality, counsel concedes that it is an especially good imitation, so it is difficult to characterize the Indiana Supreme Court as unreasonable for relying on it. This is particularly true when no statement made by Corcoran this decade and no expert finding directly undermines Corcoran's rationality toward his execution.[9] Moreover, even this

---

[9] As mentioned above, it is not clear that the Indiana Supreme Court credited his affidavit for purposes of resolving the competency to be executed claim rather than merely assessing the newly submitted evidence. But, to the extent the Indiana Supreme Court did make a credibility determination, Corcoran's counsel has not provided clear and convincing evidence suggesting that this determination was incorrect, nor have they described what evidence they might present at an evidentiary hearing. The court considers the other relevant evidence submitted by counsel below.

purported imitation would have some probative value because persuasively imitating rationality for the purpose of influencing others itself requires a certain degree of rationality.

The court also cannot find that the State court acted unreasonably by considering the 2004 competency hearing as part of the threshold determination of insanity. In *Panetti*, the U.S. Supreme Court specifically noted that a State court had previously found Panetti incompetent, signaling that prior competency hearings are relevant to the question of whether an individual is competent to be executed. That seems even more true here, where substantial litigation occurred regarding that prior competency determination and when the new evidence and counsel's arguments indicate that Corcoran's mental condition has remained the same. It was not unreasonable to find that the evidence from the prior competency hearing was insubstantial given that it had already been considered and found insufficient.

Similarly, it was not unreasonable to conclude that the newly submitted evidence was insubstantial in terms of its volume and its significance. As new evidence, counsel submitted a four-page psychotherapy session record and a thirty-page document, titled, "A Whistle-blower Report: Electronic Harassment," written by Corcoran in June 2024, as well as two affidavits from trial counsel. The affidavits concern Corcoran's mental state at and shortly after trial and so predate the 2004 competency hearing. The psychotherapy record and Corcoran's writing were offered for the express purpose of establishing that Corcoran's mental condition remained as impaired as it was in 2004. The court further observes that, as far as conspiracy theories go, Corcoran's writing is

remarkably cogent and a reasonable effort at presenting an irrational theory in a rational way. His explanation of difficult-to-grasp electricity-related concepts further reinforces that he is not delusional or irrational in every respect.

The court also considers the psychiatric report completed by Angeline Stanislaus, M.D., on December 10, 2024. ECF 1-1 at 250-62. Because it was not submitted to the State courts, it is unclear whether this psychiatric report is properly before this court. *See Shinn v. Ramirez*, 596 U.S. 366, 382-84 (2022); 28 U.S.C. § 2254(e)(2). Setting that aside, the most relevant portion of the report reads as follows:

> [Corcoran's] DOC therapy records from 2023 and 2024 indicates that he is still very delusional and has no insight into his illness. His book published in 2024 clearly describes his delusional system which consists of being controlled by the DOC ultrasound machine, the voices and the torture from muscle spasms. Therefore, he currently remains seriously mentally ill due to his untreated psychotic symptoms. Due to his severe paranoid beliefs and his belief that mental health professionals will diagnose him with psychiatric illness due to their ignorance of the electronic surveillance system that exists, he will not cooperate with an evaluation from a psychiatrist of other mental health professional. He minimizes and covers up his symptoms.

> In the affidavit he filed in 2006 to the court, he denies all mental health symptoms and eloquently describes them as "stories" he made up. His writings are organized and well written. His ability to write and speak eloquently has served him well to cover up his mental health symptoms and psychosis. Dr. Parker noted in his testimony that in brief interviews he could easily cover up the symptoms and present as logical. However, when we look at the full picture longitudinally, we see the signs and symptoms of schizophrenia, which has influenced his illogical decision making.

> With regards to his November 2024 affidavit, he makes it sound like his decision to forgo any further litigation is logical. He states that in execution his heart will stop, and all brain activity will cease. This again ties into his delusion of the ultrasonic machine inserting and broadcasting his thoughts from his brain.

ECF 1-1 at 261. Notably, the expert report offers no conclusions that directly address the credibility of Corcoran's recent affidavit or whether he currently has a rational understanding of his execution. Dr. Stanislaus posits that one of Corcoran's attestations "ties" into his delusions, but this accurate statement about what will happen to his body when he dies does not materially undermine that Corcoran understands the reasons for his execution.

In sum, the court finds that the sole habeas claim that Corcoran is incompetent to be executed is procedurally defaulted and without merit. Therefore, the court will deny the habeas petition pursuant to Rule 4 of the Section 2254 Rules Governing Habeas Cases. Corcoran also filed a motion to stay execution, which the court will deny as moot in light of this Rule 4 dismissal.

<u>CERTIFICATE OF APPEALABILITY</u>

Pursuant to Section 2254 Habeas Corpus Rule 11, the court must grant or deny a certificate of appealability. To obtain a certificate of appealability under 28 U.S.C. § 2253(c), the petitioner must make a substantial showing of the denial of a constitutional right by establishing "that a reasonable jurist could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). Because this case involves the death penalty, the court will grant a motion for a certificate of appealability on the issue of whether the State court unreasonably determined that Corcoran or his counsel had failed to

demonstrate a substantial threshold showing of insanity as required by *Panetti v. Quarterman*, 551 U.S. 930 (2007). The court will also grant a motion for leave to appeal in forma pauperis.

For these reasons, the court DENIES the motion to stay execution (ECF 3); DENIES the habeas corpus petition (ECF 1); GRANTS a certificate of appealability pursuant to Section 2254 Habeas Corpus Rule 11; GRANTS leave to appeal in forma pauperis; and DIRECTS the clerk to enter judgment in favor of the Respondent and against the Petitioner.

SO ORDERED on December 13, 2024

s/ Jon E. DeGuilio
JUDGE
UNITED STATES DISTRICT COURT